IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| RICHARD ALEXANDER MURDAUGH, JR., | ) ) ) | |
| Plaintiff, | ) | Civil Action No.: 9:24-cv-04914-RMG |
| | ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| BLACKFIN, INC., WARNER BROS. DISCOVERY, INC., WARNER MEDIA ENTERTAINMENT PAGES, INC., CAMPFIRE STUDIOS, INC., THE CINEMART LLC, NETFLIX, INC., GANNETT CO., INC. and MICHAEL M. DEWITT, JR., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO REMAND AND IN OPPOSITION TO MOTION TO SEVER

Defendants Netflix, Inc. and The Cinemart LLC (collectively "the Netflix Defendants") removed this action from the Hampton County Court of Common Pleas pursuant to 28 U.S.C. §§ 1332, 1441 and 1446. The Netflix Defendants claim that Defendant Michael M. DeWitt, Jr., a Hampton County resident, was joined as a defendant for the sole purpose of destroying diversity and avoiding federal jurisdiction. However, the Netflix Defendants have not met their burden of demonstrating either (1) outright fraud in Plaintiff Richard Alexander Murdaugh Jr.'s Complaint or (2) that there is no possibility Mr. Murdaugh will be able to establish a claim against DeWitt. Since the Netflix Defendants have failed to establish either of these requirements, the Court should grant Mr. Murdaugh's Motion to Remand.

In the alternative, Defendants Warner Bros. Discovery, Inc., Warner Media Entertainment Pages, Inc., Blackfin, Inc., and Campfire Studios, Inc. ("the Warner Defendants") have moved the Court to sever the defamation causes of action against them from the defamation causes of action

against the Netflix Defendants, Defendant Gannett Co., Inc., and DeWitt and to retain jurisdiction over the claims against them if the Court finds that DeWitt has not been fraudulently joined. (ECF No. 14). The basis of the Warner Defendants' Motion is that the claims against them have been fraudulently misjoined with the claims against the remaining Defendants, and particularly, DeWitt, to destroy diversity and divest the Court of subject matter jurisdiction. Much like the previous argument for fraudulent joinder, the Warner Defendants cannot meet their heavy burden of demonstrating outright fraud or that it would be impossible for Mr. Murdaugh to permissively join all Defendants in this action in a single lawsuit under South Carolina Rule of Civil Procedure 20. Since the Netflix Defendants and the Warner Defendants cannot point to any South Carolina law that would definitively bar the causes of action against DeWitt or preclude all Defendants from being joined in a single action, and their arguments are in fact meritless and unsupported by any recognized principle of South Carolina law, Mr. Murdaugh requests that the Court grant his motion, remand the action to the Hampton County Court of Common Pleas, and award him for costs and attorney's fees incurred by Defendants' frivolous removal.

## **FACTUAL BACKGROUND AND PLAINTIFF'S ALLEGATIONS**

During the late-night hours of July 8, 2015, Stephen Smith, a Hampton County resident, was walking along a rural road in Hampton County, South Carolina. He is believed to have been struck by a part of a vehicle, or something attached to a moving vehicle, and killed. News sources report that the statewide grand jury is now investigating his death. Media sources have also reported on individuals unconnected to Mr. Murdaugh as allegedly being involved in Mr. Smith's death. There is no evidence that Mr. Murdaugh had any involvement in Mr. Smith's tragic passing. Further, no law enforcement agency or media source has produced any such evidence (ECF No. 1-1 ¶ 18)

2

On February 22, 2023, Defendant Netflix, Inc. began streaming a series entitled "Murdaugh Murders: A Southern Scandal" ("the Netflix Series") which depicts a young man with red hair carrying a baseball bat. Mr. Murdaugh has red hair, and it is readily ascertainable from the content of the series that the creators were depicting him as Mr. Smith's killer. The Netflix Series publishes statements such as "everyone keeps coming up to me and saying it was the Murdaugh boys" and "listening to these statements it is pretty clear; Stephen's death is intertwined with the Murdaughs." The series contains false statements that Mr. Murdaugh was engaged in a romantic relationship with Mr. Smith and that it was Mr. Murdaugh who killed him. (ECF No. 1-1 ¶ 25).

These statements are defamatory and falsely accuse Mr. Murdaugh of committing murder. The statements were published to hundreds of thousands, if not millions, of viewers who watched the show, and the defamatory statements continue to be republished by Defendant Netflix, Inc. (ECF No. 1-1 ¶ 26). Defendant The Cinemart LLC created and produced the Netflix Series, and in doing so, published the above-described statements concerning Mr. Murdaugh and profited from the Series' distribution. (ECF No. 1-1 ¶ 27).

DeWitt, editor of *The Hampton County Guardian*, a local weekly newspaper covering Hampton County, appeared in the Netflix Series in which he made the certain statements, set forth in detail below, concerning his knowledge and familiarity with the controversy surrounding Mr. Smith's death and the Murdaugh family. (ECF No. 1-1 ¶ 28). When put in context with the remainder of the documentary it is clear that DeWitt is falsely insinuating that Mr. Murdaugh, and his family, were involved in Mr. Smith's death. In publishing his statements, DeWitt purposefully ignored information demonstrating that Mr. Murdaugh was not connected to Mr. Smith or his death. This is information that was readily available to and within DeWitt's knowledge, and as a result his statements are unfair, biased, and calculated to incite interest and drama. (ECF No. 1-1

¶ 29). The pervasive and continuous publication of DeWitt's statements have defamed Mr. Murdaugh, immeasurably and irreparably damaged his reputation, and caused him immense and ongoing mental anguish.

On or about June 17, 2022, several months prior to the Netflix Series' release, Defendant Warner Bros. Discovery, Inc. began streaming and broadcasting a series, "Murdaugh Murders: Deadly Dynasty", throughout the entire country through its platform Discovery+ and the Investigation Discovery television channel, which falsely suggests and implies that Mr. Murdaugh murdered Stephen Smith. During a ten-minute segment of the Deadly Dynasty Series, Mr. Murdaugh is alluded to a number of times as Stephen Smith's killer. Defendant Blackfin, Inc. created and produced the series. (ECF No. 1-1 ¶¶ 19, 21).

On or about November 3, 2022, Warner Bros. Discovery, Inc. and Warner Media Entertainment Pages, Inc. began distributing and streaming a three-part series to the public on the Murdaugh family entitled: "Low Country: The Murdaugh Dynasty" through Warner Bros. Discovery, Inc.'s platform HBO Max (now entitled Max) throughout the entire country. The series publishes false statements suggesting that Mr. Murdaugh, along with others, murdered Stephen Smith by striking him with a baseball bat. A sequence in the show accuses Mr. Murdaugh of killing Stephen Smith because of his sexual identity and further implies that Mr. Murdaugh killed Stephen Smith in relation to a romantic relationship between him and Smith. Defendant Campfire Studios Inc. created and produced the Murdaugh Dynasty Series. (ECF No. 1-1 ¶¶ 22, 24). The two series created, produced, and distributed by the Warner Defendants published and republished false and defamatory statements and rumors concerning Mr. Murdaugh that have damaged his reputation and caused him severe emotional distress. (ECF No. 1-1 ¶¶ 23, 26, 30).

4

Similar to the production of the Netflix Series, Mr. Murdaugh has alleged that the Warner Defendants' publications were unprivileged, that the Warner Defendants purposefully ignored information demonstrating the falsity of the publications that was readily available to and within the Defendants' knowledge, including information indicating that individuals unrelated to Mr. Murdaugh were responsible for Mr. Smith's death, and that the publications were unfair and biased in that the Defendants deliberately chose to omit information from all three series contradicting the defamatory publications contained within them. (ECF No. 1-1 ¶ 29). The defamatory publications contained within all three series that are the subject of this action arise from the same series of events and rumors which occurred within Hampton County and all allege essentially the same thing: that Mr. Murdaugh killed Mr. Smith. (Ex. 4, CBS News Report).

## REMOVAL STANDARD

"Federal courts must construe removal statutes strictly, guard against expansion of removal jurisdiction by judicial interpretation, and resolve all doubts about the propriety of removal in favor of retained state court jurisdiction." *Branch v. Coca-Cola Bottling Co. Consol.*, 83 F. Supp. 2d 631, 632 (D.S.C. 2000) (internal quotation marks omitted). "If federal jurisdiction is doubtful, a remand is necessary." *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994). "The burden of establishing federal jurisdiction is placed upon the party seeking removal."[1] *Id.*

## ARGUMENT

---

[1] The Netflix Defendants rely on dicta from the nonbinding decisions of other federal jurisdictions in an attempt to convince the Court that removal is favored in defamation cases implicating the First Amendment, assuming it is implicated at all by Mr. Murdaugh's claims. (ECF No. 1 ¶ 41). Unsurprisingly, there is no case law from this District or the Fourth Circuit supporting this proposition. The Fourth Circuit has clearly placed the burden on defendants to prove fraudulent joinder regardless of the context, and in doing so has specifically instructed that all doubts, facts, and legal uncertainties must be resolved in the plaintiff's favor. *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999).

Defendants cannot meet their burden of establishing federal jurisdiction because South Carolina and federal law do not preclude Mr. Murdaugh from pursuing DeWitt as a Defendant in this defamation action based on the contents of his publications within the Netflix Series, nor do they preclude him from joining all Defendants in a single action since it arises from the same series of events and involves common questions of law and fact. Defendants have asserted that removal is proper, and that there is federal subject matter jurisdiction, because DeWitt has been fraudulently joined and because Mr. Murdaugh cannot state a claim or allege sufficient facts to satisfy the elements of the defamation claim, or in the alternative, because the claims against the Warner Defendants have been fraudulently misjoined with the claims against the remaining Defendants to destroy diversity.

## I.      **Dewitt is a properly joined Defendant.**

DeWitt was named as a defendant in this action on the basis of the following statements he published concerning Mr. Murdaugh within the Netflix Series "Murdaugh Murders: A Southern Scandal" in connection to the widely reported 2015 death of Stephen Smith, a Hampton County resident and classmate of Mr. Murdaugh when they were students at Wade Hampton High School:

> Within one month of his body being found we were hearing all these rumors about a possible Murdaugh connection. And I've learned as a reporter, that if you hear the same rumors from different groups of people wherever you go, it's either a very good rumor or there's some truth to it. So we did a story in the Thanksgiving 2015 paper, and Sandy Smith [Stephen Smith's mother] basically appealed to the community. My son was killed if you know something, please come tell us, we just want answers we want closure. So we could not put the Murdaugh name in a story unless we wanted to face lawsuits. We said a prominent well-known family was rumored to be involved. Everybody knew who we were talking about. We published the story and we waited. People would come up to me in the Piggly Wiggly, pat me on the back, we're so thankful you ran that story, so proud of you to have the courage to do it. I mean, we did everything but put the Murdaugh name in the story, but the story did no good.

***

6

> I began to have a bad taste in my mouth about the members of the Murdaugh family as many people in the community did.

(Ex. 1, DeWitt Excerpt; Ex. 2, DeWitt Tr.). To the contrary of the Netflix Defendants' representations in their Notice of Removal (ECF No. 1), Mr. Murdaugh's Complaint does not misquote DeWitt, and his defamation cause of action against DeWitt is entirely based *on what DeWitt actually said in the Series*. Any inadvertent omissions of any specific words or phrases in the paraphrased allegations of the Complaint actually strengthen Mr. Murdaugh's claims against DeWitt once his statement is considered in its entirety.

The Netflix Series is rife with references to Mr. Murdaugh as the individual responsible for Mr. Smith's death. In the six minutes of the episode preceding the lengthiest DeWitt quote that is the subject of this Motion, the documentary refers to or displays Mr. Murdaugh's name over ten times, depicts a dramatic reenactment of the moments before Mr. Smith's death featuring a young male with red hair resembling Mr. Murdaugh holding a baseball bat, features high school photographs of Mr. Murdaugh juxtaposed with images of Mr. Smith from their high school year book, and republishes rumors and statements of individuals alleging that Mr. Murdaugh was in a romantic relationship with Mr. Smith, that he killed him with assistance from others, and that the crime was covered up. (Ex. 3, Netflix excerpt).

DeWitt's statements concerning Mr. Murdaugh are not only defamatory on their face, they defame Mr. Murdaugh by implication, and were sufficiently clear within the context they were made to inform the recipient that the statements were of and concerning Mr. Murdaugh. These are not statements of opinion or editorial commentary, and they do not report facts of official proceedings or public record; they are statements which could be reasonably understood by any recipient with knowledge of the extrinsic facts and circumstances surrounding Mr. Smith's death and the Murdaugh family controversy to imply that Mr. Murdaugh was involved in Mr. Smith's

death and serve the sole purpose of amplifying rumor. Mr. Murdaugh is not asserting a novel or unconventional theory of liability against DeWitt, and his claims are supported by longstanding, fundamental principles of South Carolina defamation law.

Despite the Netflix Defendants' protestations, Mr. Murdaugh's claim against DeWitt is not a "blatant attempt to manufacture a cause of action where none exists." (ECF No. 1 ¶ 3). As the courts of this District have noted, "it is not inherently bad faith to use strategy to defeat federal jurisdiction." *Brazell v. Gen. Motors, LLC*, No. 6:14-CV-4588-TMC, 2015 WL 1486932, at \*4 (D.S.C. Mar. 30, 2015). "It is well settled federal law in the removal area that the plaintiff is the master of his complaint." *Id.* Instead, it is the Netflix Defendants who have manufactured the legally unsupported removal of this action in a transparent attempt to unfairly prevent Mr. Murdaugh from having his case tried in the venue of his choice. Because there is more than a possibility that Mr. Murdaugh will prevail on his defamation claim against DeWitt, removal is inappropriate, and a remand must be granted.

To prove fraudulent joinder, the Defendants must show either "that there is *no possibility* that the plaintiff would be able to establish a cause of action against the in-state defendant in state court; or that there has been outright fraud in the plaintiff's pleading of jurisdictional facts." *Marshall v. Manville Sales Corp.*, 6 F.3d 229, 232 (4th Cir. 1993) (internal quotation marks omitted). "The burden on the defendant claiming fraudulent joinder is heavy: the defendant must show that the plaintiff cannot establish a claim against the nondiverse defendant even after resolving all issues of fact and law in the plaintiff's favor." *Id.* at 232-33. "This standard is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999). "[A]ll legal uncertainties are to be resolved in the plaintiff's favor in determining whether fraudulent joinder

exists." *Id.* at 425. There need be only a slight possibility of a right to relief to defeat a claim of fraudulent joinder. *Id.* at 426 (citing *Marshall*, 6 F.3d at 233).

The Netflix Defendants do not allege any bad faith in pleading, so the proper inquiry is whether Mr. Murdaugh has any possibility of recovery against DeWitt, the non-diverse defendant. Or as the *Hartley* court poetically framed the inquiry, the question for the Court is this: does Mr. Murdaugh have a "glimmer of hope" in prevailing on his claim against DeWitt?[2] If the answer is "Yes", then the Court lacks diversity jurisdiction over this action. Federal case law cautions that in answering this question, the Court is not to delve into the merits of Mr. Murdaugh's allegations, and instead should only question whether there is a legal bar precluding DeWitt from being a proper party to this action. *See Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 113 (3d Cir. 1990) (where there are colorable claims asserted against non-diverse defendants, a federal court may not find on a motion to remand that the non-diverse parties were fraudulently joined based on its view of the merits of those claims); *Walker v. Philip Morris USA, Inc.*, 443 Fed. App'x 946, 956 (6th Cir. 2011) (stating that a motion to remand is not intended to provide the defendant with an opportunity to test the sufficiency of factual support for a plaintiff's claim as would be done on a motion for summary judgment); *Wells' Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 157 F. Supp.

---

[2] In their Notice of Removal, the Netflix Defendants repeatedly frame their arguments for the propriety of removal within the context of Federal Rule of Civil Procedure 12(b)(6), claiming that removal is proper because Mr. Murdaugh "does not allege facts supporting the elements of defamation", because no cause of action has been stated against DeWitt, and because his Complaint "fails to articulate specific allegations" against DeWitt. (ECF No. 1 ¶¶ 11, 38-40). Decades old Fourth Circuit precedent has made it clear that this is not the correct standard under which a court should analyze the propriety of removal on the basis of fraudulent joinder. *See Hartley*, 187 F.3d at 424. Since the standard for a fraudulent joinder analysis is not as "penetrating" as the standard for a 12(b)(6) or summary judgment analysis, a claim may be remanded even if it would not survive a 12(b)(6) motion to dismiss. *Slaske v. I-Flow Corp.*, Civil Action No. 09-3963, 2010 WL 2516574, at *3 (D.N.J. June 11, 2010). Regardless, even under the Rule 12(b)(6) standard for dismissal, Mr. Murdaugh has adequately pled sufficient facts supporting each element of the South Carolina defamation claim to satisfy the plausibility standard set forth in both *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009). (ECF No. 1-1 ¶¶ 26, 28-30).

9

2d 1018, 1040 (N.D. Iowa 2001) (stating that determination of propriety of removal on the basis of fraudulent joinder is not the appropriate procedural footing for resolving fact issues going to the merits of a plaintiff's claims); *DeLaGarza v. Trafigura Trading LLC*, Civil Action No. 2:17-CV-188, 2017 WL 4250404, at \*5 (S.D. Tex. Sep. 26, 2017) (stating that questions implicating fact-intensive determinations that go to the merits of liability should not be resolved on a motion to remand).

Under South Carolina law, "[i]n order to prove defamation, the plaintiff must show (1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 465, 629 S.E.2d 653, 664 (2006) (citations omitted). The Netflix Defendants' Notice of Removal solely focuses on the first two elements of the defamation claim and attempts to set forth that it is impossible for Mr. Murdaugh to show that DeWitt made unprivileged, false and defamatory statements concerning Mr. Mudaugh.

## A.   It is possible for Mr. Murdaugh to demonstrate that DeWitt made false and defamatory statements.

To be clear, Mr. Murdaugh's Complaint, insofar as its allegations against DeWitt are concerned, is not a "shotgun pleading."[3] The Complaint clearly sets forth allegations concerning the precise statements Mr. Murdaugh alleges were false and defamatory; the manner in which they were published and to whom they were published; the Defendants' omissions and juxtapositions of relevant facts which (1) create the implication that Mr. Murdaugh murdered Smith and (2)

---

[3] The prototypical "shotgun complaint", as it has been described by other courts, consists of a pleading that is "so disorganized and ambiguous that it is almost impossible to discern precisely what it is" the plaintiff is claiming, or when it is "virtually impossible" to know which allegations of fact are intended to support which claim for relief. *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996); *Cramer v. Florida*, 117 F.3d 1258, 1261 (11th Cir. 1997).

evince the recklessness of Defendants' conduct, as well as their awareness of the truth of the matters asserted; and the extent of harm caused to Mr. Murdaugh by Defendants' publications. (ECF No. 1-1 ¶¶ 18-30). The Complaint clearly only advances a single cause of action for defamation as to all Defendants. It is bewildering that the Netflix Defendants are having difficulty understanding which allegations of fact specifically apply to DeWitt and themselves, or how the allegations apply to Mr. Murdaugh's defamation claim. Mr. Murdaugh doubts the Court will have similar difficulties.

The Netflix Defendants contend that DeWitt's comments are not actionable assertions of fact, that the statements constitute protected opinions, and that the statements are true. (ECF No. 1-1 ¶¶ 51-56). "In addition to being defamatory, the statement must be false." *Boone v. Sunbelt Newspapers, Inc.*, 347 S.C. 571, 580, 556 S.E.2d 732, 737 (Ct. App. 2001) (citation omitted). "[T]he intent and meaning of an alleged defamatory statement must be gathered not only from the words singled out as [defamatory], but from the context; all the parts of the publication must be considered in order to ascertain the true meaning, and words are not to be given a meaning other than that which the context would show them to have." *Jones v. Garner*, 250 S.C. 479, 485, 158 S.E.2d 909, 912 (1968) (citation omitted).

Specifically, DeWitt's statements concerning Mr. Murdaugh asserted that (1) DeWitt had heard rumors about a possible "Murdaugh connection" with Mr. Smith's death, (2) DeWitt had learned as a reporter that if you hear the same rumors from different groups of people wherever you go that there may be some truth to it, (3) as a reporter, DeWitt he published that a prominent well-known family was rumored to be involved with Mr. Smith's death, (4) everyone knew DeWitt was talking about the Murdaughs, and (5) Dewitt did everything he could to inform his readers that there was a "Murdaugh connection" except put the family name in the story. DeWitt also later

11

stated in the Netflix Series that he began to "have a bad taste" in his mouth about the members of the Murdaugh family. Assuming arguendo that each of these statements is couched in terms that could make them facially true, the statements as a whole, when taken within the context of all the extrinsic circumstances, as well as when construed in juxtaposition with each other and DeWitt's omission of certain material facts, can still support a valid claim for defamation by innuendo or implication.

### 1. Mr. Murdaugh has a possibility of recovery against DeWitt under a theory of defamation by innuendo/implication.

Since it is reasonable under the circumstances for DeWitt's statements to be interpreted by the hundreds of thousands of subscribers who have viewed the Netflix Series to possess multiple meanings, including a defamatory implication, it would be inappropriate for the Court to find that it is impossible for Mr. Murdaugh to show that DeWitt's statements are defamatory and false. South Carolina clearly recognizes that a statement, while not defamatory on its face, may be defamatory by innuendo or implication.[4] A defamatory inference may even be derived from a factually true, seemingly innocent statement. *Jones v. Garner*, 250 S.C. 479, 484, 158 S.E.2d 909, 912 (1968) (stating that if words are susceptible to two *meanings*, one defamatory and the other innocent, the issue of whether they were defamatory must be left to the jury); *McBride v. Merrell Dow and Pharms. Inc.*, 717 F.2d 1460 (D.D.C. 1983) (stating that a facially true statement could have a defamatory meaning); Restatement (Second) of Torts § 563 cmt. d (Am. L. Inst. 1977) ("[W]ords which alone are innocent may in their context clearly be capable of a defamatory meaning and may be so understood.").[5]

---

[4] While South Carolina recognizes that a statement may be defamatory by innuendo, the modern trend is to recognize the principle as defamation by implication. *Fountain v. First Reliance Bank*, 398 S.C. 434, 441, 730 S.E.2d 305, 309 (2012); *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827-29 (Iowa 2007).

[5] Mr. Murdaugh's citation to the law of other jurisdictions and secondary sources is not a valid basis for finding that he could not prevail against DeWitt under South Carolina law. *See Hartley*, 187 F.3d at 425

Statements which are technically true on their face, but which by innuendo or implication

covey an untrue and defamatory meaning, may constitute defamation. 50 Am. Jur. 2d *Libel and*

*Slander* § 161; *see Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1108 n.13 (Fla. 2008) ("'[I]n a

defamation by implication claim, the "matter charged as defamatory" is not the literally true

statement, but the false impression given by the juxtaposition or omission of facts. Accordingly,

truth remains an available defense to defendants who can prove the *defamatory implication* is

true.").

> To render the defamatory statement actionable, it is not necessary that the false charge
> be made in a direct, open and positive manner. A mere insinuation is as actionable as
> a positive assertion if it is false and malicious and the meaning is plain. Statements
> therefore may be either defamatory on their face, or defamatory by way of innuendo.
> Innuendo is extrinsic evidence used to prove a statement's defamatory nature. It
> includes the aid of inducements, colloquialisms, and explanatory circumstances.

*Fountain*, 398 S.C. at 441-42, 730 S.E.2d at 309. Therefore, under a defamation by implication

theory, what matters is whether the *implications* of a defendant's statements are true. *See Verity v.*

*USA Today*, 164 Idaho 832, 844, 436 P.3d 653, 655 (Idaho 2019) ("Thus, the statements in the

article, though true, were alleged to be defamatory by the way the facts were written and by what

was understood by the reader . . . . This is a textbook example of defamation by implication.").

Here, it matters little if rumors concerning Mr. Murdaugh, his family, and Mr. Smith abounded in

Hampton County, whether DeWitt has actually found in his experience as a reporter that pervasive

rumors are often true, or whether DeWitt had in fact reported that a prominent local family was

rumored to be involved in Mr. Smith's death; what matters is whether the defamatory implication

that Mr. Murdaugh was connected to the death of Mr. Smith can reasonably be inferred from

DeWitt's statements, and if so, if the implication is false. The Netflix Defendants' assertion of

---

(finding that even if a novel issue unaddressed by state law exists, legal uncertainties must be resolved in
the plaintiff's favor, and "the very fact that courts may differ in their resolutions" of the issue shows there
is a possibility of recovery).

truth as a bar to Mr. Murdaugh's recovery in this case is unnuanced and fails to appreciate the

distinction between the facial validity of a statement and its potential defamatory implications

within the context of other statements and extrinsic facts.

Defamatory statements must be construed within the context of extrinsic facts surrounding

the publication. For example, the statement that "'A' had a baby" does not have a defamatory meaning

obvious from the face of the statement, but it could be defamatory by way of innuendo where the

extrinsic fact is that A is unmarried. *Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 509,

506 S.E.2d 497, 501 (1998). Thus, South Carolina courts have found that the statements such as "there

was simply no family support to encourage her to continue her education" and "I don't believe I ever

called Don Capps a paranoid bastard. I called him a paranoid sonofabitch" are capable of defamatory

meanings in light of the extrinsic facts. *See id.*; *Capps v. Watts*, 271 S.C. 276, 246 S.E.2d 606 (1978).

It is for a court to decide whether a communication is reasonably capable of conveying a defamatory

meaning. *Holtzscheiter*, 332 S.C. at 530, 506 S.E.2d at 512 (Toal, J. concurring). However, if

reasonable minds might differ as to whether the statement is capable of a defamatory construction,

then the issue must be submitted to the jury. *Id.* at 531, 506 S.E.2d at 513.

After considering the extrinsic circumstances, if the words used are themselves capable of

conveying a defamatory meaning within the context in which they are spoken, a court should not

find otherwise simply because the words themselves can be construed as facially true or non-

defamatory:

> The District argues that because the statements in Stevens' email could be read as
> non-defamatory, the trial court should have declared them so and granted JNOV to
> the District. The District is in essence trying to resurrect the ancient doctrine of
> *mitior sensus* ("gentler sense"), which held that if words may be construed as either
> defamatory or not, the court must give them the non-defamatory meaning as a
> matter of law. *Wardlaw v. Peck*, 282 S.C. 199, 203, 318 S.E.2d 270, 273 (Ct. App.
> 1984) (discussing doctrine). English courts cast the doctrine off by the early 18th
> century, and we inherited that common law by the reception statute. *Id.* We have

since directly rejected the doctrine, most famously in Judge O'Neall's decision in *Davis v. Johnston*, 18 S.C.L. 579, 579-80 (1832), and most recently in Judge Bell's comprehensive opinion in *Wardlaw*, both of which we reaffirm today. *See generally* Eldredge, The Law of Defamation § 24 at 161 (criticizing the doctrine as "peculiar" and one that would allow defamers to destroy another's reputation and escape liability by phrasing the defamatory statement in such a way that it can also be interpreted as an innocent comment).

*Cruce v. Berkeley Cnty. Sch. Dist.*, 442 S.C. 1, 16, 896 S.E.2d 765, 773 (2024).

Even if the defamatory meaning is not intended, if the defamatory implication is a reasonable construction of the statement's language, given the extrinsic circumstances and context, then the statement can be defamatory. Restatement (Second) of Torts § 563 cmt. c. "The meaning of a communication is that which the recipient correctly, or *mistakenly but reasonably*, understands that it was intended to express." Restatement (Second) of Torts § 563 (emphasis added). Therefore, a statement may have a defamatory and false *meaning* even if the words of the communication itself are facially true.

> The usual test applied to determine the meaning of a defamatory utterance is whether it was reasonably understood by the recipient of the communication to have been intended in the defamatory sense . . . . When one uses language, *one is held to the construction placed on it by those who hear or read, if that construction is a reasonable one*.

F. Harper, et al., *The Law of Torts* § 5.4 (1986) (emphasis added).

"In determining the meaning of a communication, account is to be taken of *all the circumstances* under which it is made so far as they were known to the recipient." *Id.* at § 563 cmt. e (emphasis added); *Parrish v. Allison*, 376 S.C. 308, 321, 656 S.E.2d 382, 389 (Ct. App. 2007) ("[T]he trial court may consider not only the statement on its face, but also evidence of any extrinsic facts and circumstances."). "[T]he decisive question is what the person or persons to whom the communication was published reasonably understood as the meaning intended to be expressed." Restatement (Second) of Torts § 563 cmt. e. Unless the question of what the recipient

15

understood is free from reasonable doubt, *it is for the jury* to determine the meaning and construction of the alleged defamatory language." *Id.* (citing Restatement (Second) of Torts § 614(2) (Am. L. Inst. 1977)) (emphasis added).

DeWitt's statements are problematic in several respects. First, DeWitt juxtaposes the fact that as a reporter he has learned that if you hear the same rumor from different groups of people wherever you go that there may be some truth to it with subsequent statements asserting rumors of a connection between Mr. Murdaugh's family and the death of Stephen Smith. While DeWitt may have couched his statements as reporting rumors, this does not absolve him from liability. "Except as to those who only deliver or transmit defamation published by a third person, one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it." Restatement (Second) of Torts § 578 (Am. Law Inst. 1977). "Thus a newspaper is subject to liability if it republishes a defamatory statement . . . . [O]ne who repeats a slanderous statement originally published by a third person is subject to liability to the person defamed as though he had himself originated the statement. This is true although the speaker accompanies the slander with a statement that it is a rumor only . . . ." *Id.* at § 578 cmt. b, c.

Second, the extrinsic facts and circumstances that would have been known to the recipient at the time DeWitt made his statements could have led a reasonable person to believe that DeWitt was implying that Mr. Murdaugh was involved in Mr. Smith's death. There was rampant, widespread speculation that Mr. Smith's death may not have been an accident at the time of DeWitt's publications. (Ex. 4, CBS News Report; Ex. 3 Netflix excerpt). Lastly, DeWitt's statements do not inform the listener of certain facts known to DeWitt that would exonerate Mr. Murdaugh, such as the fact that there was no evidence linking Mr. Murdaugh to the death of Mr. Smith, as well as a tip from 2015 indicating that two other individuals were involved, and not Mr.

16

Murdaugh. (*Id.*). Given these omissions of fact and juxtapositions within DeWitt's statements, a person to whom DeWitt's communications were published could reasonably understand the meaning intended to be expressed was that Mr. Murdaugh was involved in the death of Mr. Smith.

### 2. DeWitt's statements are not protected opinions, and even if they were opinions, they could reasonably be interpreted by the listener as implying something provably false.

The Netflix Defendants also believe that DeWitt's statements are not assertions of fact and are pure opinions that should be protected by the First Amendment. (ECF No. 1-1 ¶ 51). A cursory glance at DeWitt's statements reveals this to be anything but the case. DeWitt, while making sure to state that the basis for his statements is rumor, never frames anything he says as simply his opinion. In fact, DeWitt admits that he did everything he could to inform his readers that there was a rumor connecting Mr. Murdaugh's family to Mr. Smith's death, and that everyone knew who was being referenced in the story. He then implies that his hope was that the story would result in something being done by law enforcement, presumably with regards to a member or members of the Murdaugh family. As explained above, the republication of anonymous rumors is as actionable as if the speaker published the rumor himself. As to DeWitt's statement that the Murdaugh name had began to leave a "bad taste" in his mouth, this may be opinion and nonactionable in itself, but when construed alongside his other statements, it supports that his entire publication could be reasonably interpreted as implying a provably false, defamatory statement of fact, that Mr. Murdaugh, and possibly his family, were involved in the death of Mr. Smith.

Regardless of whether the statements at issue were couched as opinion, opinions may imply an assertion of objective fact. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990). "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion

of fact." *Id.; see also Goodwin,* 347 S.C. at 40-41, 552 S.E.2d at 325 ("In *Milkovich,* the United States Supreme Court rejected the creation of an artificial dichotomy between opinion and fact, holding that the Constitution does not require a wholesale defamation exemption for anything that might be labeled 'opinion.'").

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Id.* Therefore, the question for the Court is not whether DeWitt's statements are opinions (which on their face they have not been asserted by DeWitt as such), but whether the statements made by DeWitt could permit the listener to make a reasonable inference that Mr. Murdaugh engaged in specific conduct that is provably false. There has never been a bright-line rule that a statement is not actionable just because it could be the speaker's "opinion". Since the law allows the factfinder to make a conclusion of falsity from the implication of DeWitt's statements, it is not impossible for Mr. Murdaugh to demonstrate DeWitt's statements are indeed false statements of fact and defamatory, and Mr. Murdaugh's Motion to Remand should be granted.

**B.      It is possible for Mr. Murdaugh to show that DeWitt's statements were "of and concerning" Mr. Murdaugh.**

The Netflix Defendants mistakenly believe that just because DeWitt's statements do not specifically single out Mr. Murdaugh that they are insufficient to serve as the basis of a defamation claim, apparently because they believe it would be impossible for the recipient to reasonably understand that they could refer to the individual members of the Murdaugh family, including Mr. Murdaugh. This argument reflects a deep misunderstanding of defamation law. It is true that the general rule is that an individual member of a group may not maintain an action for defamation of

the group. *Hospital Care Corp. v. Commercial Cas. Ins. Co.*, 194 S.C. 370, 377, 9 S.E.2d 796, 800

(1940).However, individual members of a small group may maintain a defamation action for false

statements made about the group as a whole. *Holtzscheiter*, 332 S.C. at 514, 506 S.E.2d at 504.

Another court has stated that "[i]t is not necessary that the world should understand the

[defamation]; it is sufficient if those who know the plaintiff can make out that she is the person

meant." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). "To support an action for a

[defamation], the plaintiff's name need not be mentioned in the writing; it is sufficient that there

is a description of, or reference to, him, by which he may be known." *Nash v. Sharper*, 229 S.C.

451, 456, 93 S.E.2d 457, 459 (1956).

The rationale behind this exception to the general rule is that in a small group, a defamatory

statement about the group may be reasonably understood to refer to the individual members. *Evans

v. Chalmers*, 703 F.3d 636, 659-60 (4th Cir. 2012). The question of whether a statement is "of

and concerning" an individual member of a group is a jury issue. *Holtzscheiter*, 332 S.C. at 514,

506 S.E.2d at 504. South Carolina has not explicitly adopted a test to determine whether a group

is small enough such that its individual members may commence their own defamation actions for

statements made about the group as a whole. Other jurisdictions have relied on two tests to assist

in this determination: the Restatement test, and the "intensity of suspicion" test. However, the

Court need not specifically rely on either test to determine if it is impossible for Mr. Murdaugh to

prevail on a showing that DeWitt's statements are "of and concerning" Mr. Murdaugh, as both

embrace run-of-the-mill, common-sense principles to determine whether an individual member of

a group could be identified as the subject of a defamatory statement about the group. Regardless,

under either test, it is not impossible for Mr. Murdaugh to demonstrate the statements are "of and

concerning" Mr. Murdaugh himself.

**1.    Under the Restatement approach, a publisher of defamatory statements about a group may be liable to individual members if the circumstances of the publication could lead to their identification.**

Under the Restatement (Second) of Torts section 564A, the focus of the analysis is on the size of the group:

> One who publishes defamatory matter concerning a group or class of persons is subject to liability to an individual member of it if, but only if,
>
> > (a)  the group or class is so small that the matter can reasonably be understood to refer to the member, or
>
> > (b)  the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.

Restatement (Second) of Torts § 564A (Am. L. Inst. 1965). Therefore, while defamatory comments about a large group will generally not be "of and concerning" its individual members, there may be circumstances surrounding the publication, the group, and the individuals which would enhance the personal application of the comments to the individual members, even if it is a large group. *Id.* cmt. a.

While a comment to section 564A provides that there is a presumption that only the individual members of a group of twenty-five or less may generally recover for defamation under the Restatement approach, the number twenty-five is not set in stone, and members of larger groups may recover depending on the circumstances. *Id.* cmt. d. Additionally, the guideline of twenty-five persons appears to be completely arbitrary, as section 564A otherwise analyzes the characteristics of the group, the plaintiff(s), the defendant, and the individual himself to determine if the individual has been defamed. *Id.* cmt. a, d. In South Carolina, there has never been a pronounced limit on size for group defamation actions. Other courts have found an arbitrary limit on size to be "inequitable and illogical":

I cannot assent to the idea, that the number of persons who may be libeled, affords the rule to determine whether or not an action will lie. Such a rule would be unjust and arbitrary. The libeler who calumniates a number of persons, by name, is liable to an action by each; and, in such a case, he would hardly be allowed to say, even in extenuation of his offence, much less in bar to the action, that, because he had exposed himself to so many actions, he ought not, therefore, to be punished at all. If such a rule should be adopted, the calumniator, who assails and reviles a great number of individuals in the same malicious publication, will escape; while the less guilty and less hardy slanderer, who as traduced the character of a single man only, shall be punished.

*Brady v. Ottaway Newspapers, Inc.*, 84 A.D.2d 226, 234-35, 445 N.Y.S.2d 786, 792 (N.Y. App. Div. 1981) (quoting *Sumner v. Buel*, 12 Johns. 475, 482 (N.Y. 1815)).

Further, under section 564A an action may be maintained by individuals in a group of greater than twenty-five persons in size when there exists extrinsic evidence by which the defamatory words may be shown to have referred specifically to the individual. *Pratt v. Nelson*, 164 P.3d 366, 382 (Utah 2007); Restatement (Second) of Torts § 564A cmt. d ("Even when the group or class defamed is a large one, there may be circumstances that are known to the readers or hearers and which give the words such a personal application to the individual that he may be defamed as effectively as if he alone were named.").

South Carolina cases supporting that a defamatory statement is not "of and concerning" the individual members of a group all refer to groups much larger in size than Mr. Murdaugh's immediate family. *See Hospital Care Corp. v. Commercial Cas. Ins. Co.*, 194 S.C. 370, 9 S.E.2d 796 (1940) (defamatory statements were made about "small insurance companies"); *Burns v. Gardner*, 328 S.C. 608, 493 S.E.2d 356 (Ct. App. 1997) (defamatory statements were about "blind people"). The facts in this case easily distinguish Mr. Murdaugh's defamation claims from those of the plaintiffs in *Hospital Care Corp.* and *Burns*.

Mr. Murdaugh's immediate family consisted of himself, his father, his deceased mother, and his deceased brother. (Ex. 4, CBS News Report). The only other Murdaugh family members

routinely identified in the news media have been his two uncles and his deceased paternal grandparents. Mr. Murdaugh has been publicly identified within the media as a member of the Murdaugh family throughout much of the controversy surrounding his father's trial and Mr. Smith's death. DeWitt's defamatory statements referred specifically to the Murdaugh family. Some family members have held prominent positions within the Hampton County community and in some instances have represented Hampton County citizens in a very public manner.

The Netflix Defendants argue that because DeWitt's statements did not single out any individual members of the family or Mr. Murdaugh himself that they cannot be ascribed to Mr. Murdaugh. However, this is not the end of the analysis, as the Court (and one day, the factfinder) must consider whether Mr. Murdaugh's family was small enough such that any defamatory statements about it would be ascertainable to the individual members (even those such as Mr. Murdaugh who are private figures), whether individual members of Mr. Murdaugh's family in general were readily identifiable as members of the Hampton County community, and whether other evidence demonstrates that Mr. Murdaugh is readily and easily ascertainable by the Netflix Series' viewers as a member of the Murdaugh family. This clearly presents an analysis under which it would not be impossible for Mr. Murdaugh to demonstrate that DeWitt's statements could reasonably be heard to refer individually to Mr. Murdaugh himself.

### 2. Under the intensity of suspicion approach, the prominence of the Murdaugh family within the community and other factors must be considered, establishing that the defamatory statements were "of and concerning" Mr. Murdaugh.

While the Restatement focuses on group size as the primary thrust of its analysis, with deference given to the group number of twenty-five, the intensity of suspicion test is more comprehensive and takes into account a variety of factors. In *Fawcett Publ'ns, Inc. v. Morris*, 377 P.2d 42 (Okla. 1962), the Supreme Court of Oklahoma found that an individual member of the

22

Oklahoma University football team, a much larger group than the Murdaugh family, could pursue a defamation claim even though the defamatory statements only referred to the football team in general and not any individual player. In *Fawcett*, a *True Magazine* article entitled "The Pill That Can Kill Sports" accused substantially all of the Oklahoma team of using performance enhancing amphetamines during games. *Id.* at 46-47. However, the evidence showed that the substance that had been administered to players was peppermint spray used to alleviate dryness of the mouth, and not amphetamines. *Id.* at 47. The team's fullback brought an action for defamation, even though he was not named personally in the *True Magazine* article. The relevant circumstances included evidence that he was on "the alternate squad", the team had a successful ten-win season, the plaintiff played in all but two of the games, and that there were sixty to seventy members of the team. *Id.*

Noting that historically recovery was never barred in the common law for group defamation cases unless the group was extremely large, the court concluded that there was no reason why size alone should be conclusive as to whether a plaintiff could recover for a group libel. *Id.* at 51. "A more realistic approach would recognize that even a general derogatory reference to a group does affect the reputation of every member, and would adopt as its test the intensity of the suspicion cast upon the plaintiff." *Id.* at 52 (quoting *Liability for Defamation of a Group*, 34 Colum. L. Rev. 1322, 1325 (1934)). Therefore, the court chose instead to focus on the team's prominence within the community, the knowledge that a casual reader who was familiar with the team would possess as to individual team members, and the percentage of team members defamed by the article. *Id.*

The intensity of suspicion test has been more recently described as follows. First, size must be considered, with the degree of suspicion cast upon an individual member shrinking as the size of the group increases. *Brady*, 84 A.D.2d at 237-38, 445 N.Y.S.2d at 794. Second, the higher the

23

degree of organization of the group, the more likely that a recipient of the defamatory publications will understand the group libel to pertain to the individual members of the group. *Id.* Obviously, it is much easier to ascertain who a defamatory comment applies to when it is alleged against a specific family within a small, rural community, as opposed to blind people, or "small insurance companies". Under this factor, courts may also look to whether the composition of the group was definite and its size fixed during the time in which it was defamed. *Id.* Lastly, courts may evaluate the prominence of the group and its individual members within the community and region of publication. *Id.* at 239, 445 N.Y.S.2d at 794-95.

Here, Mr. Murdaugh's family and its members that were known to the public, was not so large that it would have diluted the defamatory accusations' impact upon Mr. Murdaugh, nor is Mr. Murdaugh's family so large as to be practically indefinite, as was the case in *Hospital Care Corp.* and *Burns*. Mr. Murdaugh's position in his family is highly visible, through no voluntary choice of his own, due to the extensive reporting that has occurred regarding the controversies surrounding this lawsuit and Mr. Murdaugh's father, Alex Murdaugh's misdeeds. The Hampton County community is small, and certain members of the Murdaugh family took special prominence within that community. It is certainly possible that Mr. Murdaugh is individually ascertainable from the defamatory statements published by DeWitt. South Carolina law and black letter defamation law does not preclude Mr. Murdaugh from proving that DeWitt's statements implying that the Murdaugh family was connected to Mr. Smith's death were "of and concerning" Mr. Murdaugh, in light of the relevant circumstances. *See Wilhoit v. WCSC, Inc.*, 293 S.C. 34, 39, 358 S.E.2d 397, 400 (Ct. App. 1987) ("Whether a written defamatory statement refers to a particular plaintiff, normally, is a question of fact for a jury.").

### C.    The fair report privilege does not preclude Mr. Murdaugh's defamation claim against DeWitt.

Under South Carolina law, the fair report privilege protects fair and impartial reports of official acts and reports, as well as other matters of public interest involving public records. *Jones v. Garner*, 250 S.C. 479, 158 S.E.2d 909 (1968). DeWitt's statements do not concern any official acts, reports, or public records, and were in sum merely republications of rumors he had heard in the Hampton County community with added context and embellishment by DeWitt. But even if the Court assumes arguendo that DeWitt's statements would somehow fall within the scope of the privilege, it is a *qualified* privilege. That is, Mr. Murdaugh may overcome the privilege by demonstrating that the privilege was abused. *West v. Morehead*, 396 S.C. 1, 7, 720 S.E.2d 495, 499 (Ct. App. 2011). The issue of whether the privilege was abused will be fact-intensive, case specific, and should only be resolved by a jury. *Id.* at 8, 720 S.E.2d at 499. The Netflix Defendants' assertion of the privilege does not preclude Mr. Murdaugh from overcoming the privilege even if it did apply, which it does not, and does not establish that it would be impossible for Mr. Murdaugh to pursue a defamation claim against DeWitt.

## D.    Mr. Murdaugh should be awarded costs and attorney's fees for Defendants' frivolous removal of this action.

Mr. Murdaugh has no doubt that this is only the first instance of a voyage Defendants are set to embark upon for the purpose of overburdening him, and consequently the judicial system, with any procedural delays Defendants can conjure to frustrate and pressure Mr. Murdaugh into submission. The Court should not allow them to do so when those efforts are frivolous and are objectively lacking in any legitimate legal basis.

"An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). The award of costs and attorney fees is left to the sound discretion of the court. *Martin v. Franklin Capital*

25

*Corp.,* 546 U.S. 132, 136, 126 S. Ct. 704, 163 L.Ed.2d 547 (2005) ("The word 'may' clearly connotes discretion. The automatic awarding of attorney's fees to the prevailing party would pretermit the exercise of that discretion."). There is not a presumption in favor of or against an award of attorney's fees under 1447(c). *Martin,* 546 U.S. at 136, 126 S. Ct. 704. "[T]he standard for awarding fees should turn on the reasonableness of the removal. Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied." *Id.* at 141, 126 S. Ct. 704. *See also In re Lowe,* 102 F.3d 731, 733 (4th Cir. 1996) (holding that awarding of attorneys' fees and costs was appropriate under § 1447(c) where "'a cursory examination . . . would have revealed' a lack of federal jurisdiction.") (citation omitted); *Clipper Air Cargo, Inc. v. Aviation Products Intern., Inc.,* 981 F.Supp. 956, 960 (D.S.C.1997) (holding that awarding of attorneys' fees and costs is appropriate under § 1447(c) where removal is "frivolous").

> The process of removing a case to federal court and then having it remanded back to state court delays resolution of the case, imposes additional costs on both parties, and wastes judicial resources. Assessing costs and fees on demand reduces the attractiveness of removal as a method for delaying litigation and imposing costs on the plaintiff. The appropriate test for awarding fees under § 1447(c) should recognize the desire to deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party, while not undermining Congress' basic decision to afford defendants a right to remove as a general matter, when the statutory criteria are satisfied.

*Martin*, 546 U.S. at 141.

The question before the Court, then, is whether Defendants' grounds for removal were "objectively reasonable." The Netflix Defendants assert that DeWitt was fraudulently joined and is only a nominal or formal party. For the reasons discussed above, it is clear that it is at least possible that DeWitt's statements could be found by a jury to be "of and concerning" Mr.

Murdaugh, that they carry a false implication that would render them actionable, that they are not opinions but imply an objectively provable statement of fact, and that even if they are privileged, the privilege could be overcome by evidence of the manner in which they were published.

The only instances in which South Carolina law has ever held that an individual member of a group could not assert a defamation claim for statements made about the group as a whole involved groups of an indeterminately large size, and black letter law describing the theory of defamation by innuendo/implication clearly contemplates claims predicated upon statements, including opinions, carrying a provably false implication, even if they appear innocent or true on their face. There is no absolute privilege protecting DeWitt's statements. A cursory glance of Mr. Murdaugh's allegations show that DeWitt is a proper defendant to this action, and Defendants have asserted no reasonable or legally recognized grounds for finding otherwise. As such, the Court should find that Defendants have asserted no "objectively reasonable" grounds for removing the case to this Court, and that it is only proper to award him all attorneys' fees and costs resulting from Mr. Murdaugh's opposition to the Notice of Removal, including all attorneys' fees and costs associated with opposing the Warner Defendants' Motion to Sever.

## II.    In the alternative, the Warner Defendants cannot demonstrate that it would be impossible under South Carolina law for Mr. Murdaugh to permissively join all Defendants in a single action for defamation.

Taking a different tack, the Warner Defendants have offered a fraudulent misjoinder argument as an additional ground for the Court to retain jurisdiction solely over the claims against them if the Netflix Defendants fail to prove fraudulent joinder. The theory of fraudulent misjoinder "asserts that while all the claims pled may be viable, the claims of a non-diverse plaintiff (or against a non-diverse defendant) are so unrelated to the remaining causes of action that they cannot be joined in a single suit under Fed. R. Civ. P. 20 or a similar state rule." *In re Lipitor (Atorvastatin*

27

*Calcium) Marketing, Sales Practices and Prods. Liab. Litigation*, MDL No. 2:14-mn-02502-RMG, 2016 WL 7339811, at \*2 (D.S.C. Oct. 24, 2016).[6] Under this Court's analysis, the removing party must show (1) outright fraud or (2) that there is no possibility that plaintiffs would be able to properly join the claims under state procedural rules involving a non-diverse party in state court.[7] *Id.* at \*6. The Warner Defendants do not argue that there has been outright fraud in Mr. Murdaugh's Complaint, therefore the question is whether there is any possibility that all Defendants would be properly joined in one action in a South Carolina state court.

Under South Carolina law,

> All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or

---

[6] Mr. Murdaugh notes that it is not a foregone conclusion that the doctrine of fraudulent misjoinder has any validity under Fourt Circuit precedent. While this Court has adopted the fraudulent misjoinder doctrine, other courts of this District have declined to do so, noting a lack of Fourth Circuit guidance. *See, e.g. Palmetto Health All. v. S.C. Elec. & Gas Co.*, No. 3:11-CV-2060-JFA, 2011 WL 5027162, at \*2 (D.S.C. Oct. 21, 2011). Plaintiff maintains, as many jurisdictions do, that fraudulent misjoinder is contrary to Federal Rule of Civil Procedure 82 and constitutes an impermissible judicial expansion of removal jurisdiction. *See Halliburton v. Johnson & Johnson*, 983 F. Supp. 2d 1355, 1359–60 (W.D. Okla. 2013) ("For this court to rule on joinder issues before determining whether it has subject matter jurisdiction puts the cart before the horse; Rule 82 of the Federal Rules of Civil Procedure does not permit the court to fashion subject matter jurisdiction by using the federal rules governing joinder and severance."), *aff'd sub nom. Parson v. Johnson & Johnson*, 749 F.3d 879 (10th Cir. 2014); *Echols v. Omni Med. Grp., Inc.*, 751 F. Supp. 2d 1214, 1217 (N.D. Okla. 2010) (concluding "that severance [of the claims against the nondiverse defendant using Rule 21] . . . would constitute an impermissible use of the federal rules to extend federal diversity jurisdiction under Rule 82"); *Lyons v. Lutheran Hosp. of Ind.*, No. 104CV0728DFHVSS, 2004 WL 2272203, at \*6 (S.D. Ind. Sep. 15, 2004) (finding that "[t]he use of Rule 21 to expand a federal court's jurisdiction . . . does not appear to be an option" given Rule 82). However, for the sake of argument, Mr. Murdaugh contends that under the analysis adopted by this Court in *In re Lipitor* for fraudulent misjoinder that the current facts do not support the retention of federal jurisdiction over any of his defamation claims against Defendant.

[7] The Warner Defendants propose that the Court should consider factors for misjoinder under a Federal Rule of Civil Procedure 21 analysis. (ECF No. 14 pp. 16-21). These factors are irrelevant to the doctrine of fraudulent misjoinder and whether it is impossible for Mr. Murdaugh to have joined Defendants under Rule 20, SCRCP, in South Carolina state court. The factors were not cited by the Court in its analysis in *In re Lipitor*, are not South Carolina procedural law, and should be wholly disregarded by the Court. *See Alvarado v. Sweetgreen, Inc.*, Case No. 23-cv-8948 (LJL), 2024 WL 182761, at \*11 n.5 (S.D.N.Y. Jan. 17, 2024) (stating that invoking Rule 21 to justify fraudulent misjoinder "puts the cart before the horse" and only applies after a federal court has jurisdiction.); *Kips Bay Endoscopy Ctr., PLLC v. Travelers Indem. Co.*, No. 14 Civ. 7153(ER), 2015 WL 4508739, at \*4 (S.D.N.Y. July 24, 2015) (stating that the application of Rule 21 in the removal context "would circumvent the strict constraints of the removal statute and unduly expand diversity jurisdiction", collecting supporting cases).

> arising out of the same transaction, occurrence, or series of transactions or
> occurrences and if any question of law or fact common to all defendants will arise
> in the action.

Rule 20, SCRCP. "While the joinder of claims, parties and remedies is strongly encouraged, courts have wide discretion with respect to permissive joinder of parties." *Fraser Construction Co., LLC v. Action Insulation Co.*, Civil No. 9:16-cv-2488-DCN, 2017 WL 11440831, at *6 (D.S.C. Aug. 8, 2017).

There is very little South Carolina case law interpreting Rule 20, SCRCP. However, one South Carolina court has stated that when viewed alongside Rules 17, 19, and 21, Rule 20 demonstrates "the general purpose . . . to eliminate the old restrictive and inflexible rules of joinder designed for a day when formalism was vogue and to allow joinder of interested parties liberally to the end that an unnecessary multiplicity of actions thus might be avoided." *Farmer v. CAGC Ins. Co.*, 424 S.C. 579, 586, 819 S.E.2d 142, 145 (Ct. App. 2018) (quotation omitted). Another South Carolina court has stated that when claims "involve one or more common questions of law and fact of 'sufficient importance in proportion to the rest of the action to render it desirable that the whole of the matter should be disposed of at the same time'" then permissive joinder of the parties is proper. *McGann v. Mungo*, 287 S.C. 561, 569, 340 S.E.2d 154, 158 (Ct. App. 1986) (quoting 59 Am. Jur. 2d *Parties* § 105 (1971)). Therefore, the question is whether the claims arise out of a closely related series of transactions or occurrences and whether there is a significant question of law or fact that is common to all defendants. *See In re Lipitor*, 2016 WL 7339811, at *6.

The Warner Defendants assert that Mr. Murdaugh's permissive joinder of the Defendants violates Federal Rule of Civil Procedure 20(a) because his defamation claims against the

Defendants do not arise out of the same transaction or occurrence.[8] (ECF No. 14 p. 10). The Warner Defendants take the narrowest view possible in asserting that the bases for the claims are completely distinct because they don't "stem from related purported misconduct", even though they admit that each claim concerns common circumstances surrounding the controversies involving the Murdaugh family and Mr. Smith, and the sequence of events arising from Mr. Smith's death. (ECF No. 14 p. 11). South Carolina authority has never gone so far as to articulate such a narrow requirement for permissive joinder, and the Court must consider, with due regard to the absence of guiding South Carolina precedent, whether it would be impossible for Mr. Murdaugh to permissively join Defendants in this case in a South Carolina court, given the wide latitude afforded courts with respect to permissive joinder. Instead, the most relevant guidance offered by any South Carolina authority interpreting Rule 20 has only stated that permissive joinder is proper when there are common questions of law and fact of sufficient importance in proportion to the remainder of the action to justify joinder.

Federal case law has provided some guidance in interpreting Rule 20's requirement for claims to arise from the same series of transactions or occurrences. "'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *DIRECTV, Inc. v. Barrett*, 220 F.R.D. 630, 631 (D. Kan. 2004) (quoting *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974). The logical relationship test is flexible and should be construed in favor of joinder, and it does not require any allegations of concerted action between joined

---

[8] Mr. Murdaugh notes that the proper standard is whether he could join the Defendants under Rule 20, SCRCP, and not the federal rule. While the federal and South Carolina rules are substantially similar, there is a notable absence of South Carolina precedent interpreting Rule 20, making it exceedingly difficult for anyone, including the Defendants or the Court, to predict with any certainty how a South Carolina court would apply the current facts to Rule 20's directives.

defendants. *Martinez v. Dep't of Justice*, 324 F.R.D. 33, 36-37 (D.D.C. 2018). Instead, it permits "all *reasonably related* claims for relief by or against different parties to be tried in a single proceeding." 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1653 (3d ed. 2001) (emphasis added). "[L]anguage in a number of decisions suggests that the courts are inclined to find that claims arise out of the same transaction or occurrence when the likelihood of overlapping proof and duplication in testimony indicates that separate trials would result in delay, inconvenience, and added expense to the parties and to the court." *Id.*

In *In re Lipitor*, this Court analyzed whether plaintiffs who were separately prescribed, purchased, and ingested Lipitor could join their actions in a single lawsuit against the pharmaceutical manufacturer. *Id.* at *1. The defendant argued that the plaintiffs could not be joined because the same transaction or series of transactions requirement could not be met. *Id.* at *6. Analyzing Illinois law, which has essentially the same requirements for permissive joinder as South Carolina, the Court noted that even if claims do not arise out of the exact same transaction, when all claims arise from some common series of transactions and there exist numerous common questions of law and fact, joinder is proper. *Id.* Therefore, even if the exact same series of occurrences did not lead to each plaintiff's injuries, because the claims involved *some* overlap between the series of occurrences leading to them, there was at least a possibility that the plaintiffs were properly joined under Illinois law. *Id.* at *7.

In *Courthouse News Serv. v. Schaefer*, 2 F.4th 318 (4th Cir. 2021), the Fourth Circuit reviewed a district court's denial of the defendant's motion to dismiss for misjoinder under Federal Rule of Civil Procedure 20. In *Schaefer*, the plaintiff, a news service reporting on civil litigation in state and federal courts throughout the country, brought a declaratory judgment action against two Virginia courts for not providing prompt access to newly filed civil complaints. *Id.* at 322.

31

One defendant court was the Circuit Court of the City of Norfolk, and the other was the Circuit Court of the County of Prince William. *Id.* After the plaintiff began daily coverage of these courts, it began experiencing delays in accessing newly filed civil complaints. *Id.*

The plaintiff's reporters began tracking the delays, which revealed that while each court had statistically different rates of producing newly filed complaints, the rate at which both courts made newly filed complaints available was unreasonably low. *Id.* For example, the City of Norfolk court made only 19% of the complaints available on the day of filing, while the Prince William County court made only 42.4% of the complaints available. *Id.* The two court defendants moved to dismiss the action for misjoinder, asserting that the claims against them did not arise out of the same transactions or occurrences. *Id.* at 325. The Fourth Circuit's analysis of these facts, which are analogous to those before the Court (same cause of action, same plaintiff, separate individual defendants, separate allegedly wrongful acts), was as follows:

> But absolute identity of all events is unnecessary for joinder. Instead, Rule 20 permits joinder of all reasonably related claims for relief by or against different parties. For this reason, two claims arise from the same transaction – and therefore can be joined in the same action – when there is a logical relationship between them. Courthouse News alleged identical claims against similarly situated defendants. The claims arose out of Courthouse News' coverage of Virginia courts, and the complaint alleged that delays in access occurred for similar reasons. The joinder standard is met here, and the district court did not abuse its discretion in holding joinder appropriate.

*Id.* at 324 (citations and punctuation omitted). Thus, it is not necessary that the same wrongful conduct give rise to each defendant's liability, or that the preceding series of transactions be identical, for there to be a possibility of permissive joinder, as under Rule 20 the term "transaction" has a flexible meaning, and courts are to construe its definition in favor of joinder.

Here, the claims against all Defendants arise out of the same series of transactions or occurrences leading to the defamatory acts. The series of occurrences includes the tragic death of

Mr. Smith, the rumors that arose in Hampton County shortly after Mr. Smith's death, the crimes of Alex Murdaugh that renewed interest in the circumstances surrounding Mr. Smith's death, and the investigations which followed and ultimately culminated in all Defendants publishing and republishing statements implicating or asserting that Mr. Murdaugh murdered Mr. Smith or was involved in his death. Even though Mr. Murdaugh has separate claims against each Defendant for their own publications and republications, the factual basis (or more accurately lack thereof) for every publication and republication stems from the same series of events and rumors. To put it simply, all claims pertain to and arise from the same limited subject matter.

Mr. Murdaugh is asserting a right to relief common to all Defendants, for the harm caused to his reputation by the defamatory publication of statements implying he killed someone, not jointly and severally, but in the alternative against each Defendant individually. There is no requirement under Rule 20, SCRCP, for there to be overlapping forms of relief or interest for all Defendants to be joined in the same action. *See, e.g., In re Lipitor*, at *6-7. If anything, South Carolina case law indicates that the focus of the analysis is not on whether there is any overlapping or common right to relief against all parties, but on whether "one or more common questions of law and fact of 'sufficient importance in proportion to the rest of the action render it desirable that the whole of the matter should be disposed of at the same time'". *McGann*, 287 S.C. at 569, 340 S.E.2d at 158.

There are numerous questions of law and fact that are common to the claims against all Defendants in this action. Mr. Murdaugh asserts an identical defamation claim against each Defendant for their publication of statements implying that Mr. Murdaugh murdered Mr. Smith. One of the primary issues of fact that will be the subject of extensive litigation and intense public interest in this case will be the determination of the first element of the defamation claim, whether

the Defendants' statements implicating that Mr. Murdaugh was involved in the death of Mr. Smith implied a true or defamatory meaning. The claims are not "wholly different" or "inextricably related" because all claims will require proof of the truth or falsity of the Defendants' defamatory implications, implications which are virtually identical between each Defendant. *Contra, e.g. Todd v. Cary's Lake Homeowners Assoc.*, 315 F.R.D. 453, 457-58 (D.S.C. 2016). Therefore, the claims against all Defendants hinge on the same series of facts and events giving rise to Defendants' separate publications, as well as the same facts that will demonstrate Mr. Murdaugh's innocence. The inescapable conclusion is that the claims against all Defendants share a logical connection.

Further, questions of privilege, whether Mr. Murdaugh is a private figure, whether common law malice or constitutional malice is the appropriate standard, and other issues necessary to Mr. Murdaugh's defamation claim and establishing the burden of proof for damages in this case will present common questions of law that will apply across the board to all Defendants. *See Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 508-14, 506 S.E.2d 497, 501-04 (1998). These issues, along with the issue of truth, will predominate the litigation of this case and are of such importance to the resolution of Mr. Murdaugh's claims that it only makes sense they should be tried in a single action. Other jurisdictions and courts of this District have found that claims can be permissively joined, even when they present entirely different theories of recovery against different defendants, when the claims arise out of overlapping series of events, there are facts and law common to both defendants, and the legal obligations of the defendants are at least in some part premised on a common factual showing. *See Fraser Const. Co., LLC v. Action Insulation Co.*, Civil No. 9:16-cv-2488-DCN, 2017 WL 11440831, at *7 (D.S.C. Aug. 8, 2017).

These shared underlying occurrences and common questions of law and fact distinguish this case from nearly every case cited by the Warner Defendants in their Motion. For example, in

34

*Sanders v. Domingo*, 3:21-cv-02415, 2022 WL 110243 (D.S.C. Jan. 11, 2022), the court severed bad faith, fraud, and breach of contract claims against an insurance company defendant from the negligence claims against individuals arising out of an automobile accident. *Id.* at *3. The court noted that the contract claims arose from an insurance policy that the plaintiff and the insurer negotiated separately, while the tort claims arose from the personal injury and property damage to the plaintiff's car, and that the nature of the claims were not intertwined and did not raise any questions of law or fact common to all parties. *Id.* Obviously, this case presents a set of factual and legal issues that are in some aspect identical and will be predicated on the same evidence across all claims.

The Warner Defendants have pointed to no South Carolina stating that Rule 20, SCRCP requires that all claims must arise from an identical series of transactions and occurrences for permissive joinder to be appropriate. The Warner Defendants have pointed to no South Carolina law interpreting Rule 20's "series of transactions" language at all. The Warner Defendants have pointed to no South Carolina law stating that liability must be joint or several and cannot be some other alternative theory of liability for permissive joinder to be appropriate. While the Warner Defendants have extensively relied on federal case law to cherry-pick inapposite cases in support of their argument for misjoinder, the Court cannot ignore that there are cases within this District and the Fourth Circuit supporting Mr. Murdaugh's counterarguments. Because there is a dearth of South Carolina case law giving any guidance on how a South Carolina court would apply these facts to Rule 20, there is a substantial similarity in the factual background behind each claim, and a South Carolina court would have wide discretion to determine whether the parties have been properly joined, the Warner Defendants have not and cannot show that it would be impossible for Mr. Murdaugh to properly join these claims in South Carolina state court.

## CONCLUSION

For the aforementioned reasons, Mr. Murdaugh respectfully requests that his Motion be granted, along with an award of costs and attorney's fees.

KENT LAW FIRM, LLC

/s/ Shaun C. Kent
Shaun c. Kent Fed. Bar #9326
Post Office Box 117 Fed. Bar #9326
Manning, SC 29102
(803) 433-5368
shaun@shaunkentlaw.com
*Attorney For Plaintiff*