## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

### BEAUFORT DIVISION

|  |  |
|---|---|
| RICHARD ALEXANDER MURDAUGH, JR., | Case No. 9:24-cv-04914-RMG |
| Plaintiff, | |
| vs. | |
| BLACKFIN, INC., WARNER BROS. DISCOVERY, INC., WARNER MEDIA ENTERTAINMENT PAGES, INC., CAMPFIRE STUDIOS INC., THE CINEMART LLC, NETFLIX, INC., GANNETT CO., INC. AND MICHAEL M. DEWITT, JR., | **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT BLACKFIN, INC., JOINED BY WARNER BROS. DISCOVERY, INC. AND WARNER MEDIA ENTERTAINMENT PAGES, INC.** |
| Defendants. | |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

    A.   The Blackfin Documentary Chronicles The Criminal Investigations, Scandals, And Speculation Surrounding The Murdaugh Family Dynasty. ..................................... 3

    B.   Publicly Released Law Enforcement Records Document The Investigation Into Stephen Smith's Death, Including A Possible Murdaugh Connection. ................................ 5

    C.   The Blackfin Documentary Discussed The Law Enforcement Investigation Into Smith's Death, Which Serves As The Basis Of Plaintiff's Lawsuit. ..................................... 9

LEGAL STANDARD .................................................................................................... 12

ARGUMENT ............................................................................................................ 13

I.   THE COMPLAINT WARRANTS DISMISSAL AS IT DOES NOT SUFFICIENTLY IDENTIFY ANY DEFAMATORY STATEMENTS ................................................. 13

II.   THE FIRST AMENDMENT BARS PLAINTIFF'S CLAIM BECAUSE THE BLACKFIN DOCUMENTARY CANNOT REASONABLY BE INTERPRETED AS ASSERTING AS FACT THAT PLAINTIFF MURDERED SMITH ................................. 15

III.   THE ONLY FACTUAL ASSERTIONS ABOUT PLAINTIFF IN THE BLACKFIN DOCUMENTARY ARE TRUE ........................................................................ 18

IV.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER SOUTH CAROLINA LAW BECAUSE THE BLACKFIN DOCUMENTARY DOES NOT STATE OR IMPLY THAT PLAINTIFF WAS THE MURDERER OF SMITH. ............................................. 19

    A.   The Complaint Fails To Sufficiently Plead Defamation *Per Se*. ................................ 19

    B.   The Complaint Fails To Sufficiently Plead Defamation By Implication. .................. 20

V.   THE RELEVANT PORTION OF THE BLACKFIN DOCUMENTARY IS NOT ACTIONABLE AS A MATTER OF LAW BECAUSE IT IS PROTECTED BY THE FAIR REPORT PRIVILEGE .......................................................................... 24

    A.   The Fair Report Privilege Applies To The Entirety Of The Relevant Portion Of The Blackfin Documentary. ............................................................................. 24

    B.   If South Carolina Law Applies, The Fair Report Privilege Still Necessitates Dismissal Because The Complaint Does Not And Cannot Plead Facts Demonstrating Actual Malice. 28

VI.   PLAINTIFF FAILS TO SUFFICIENTLY PLEAD FAULT ....................................... 30

CONCLUSION .......................................................................................................... 32

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agbapuruonwu v. NBC Subsidiary (WRC-TV)*,
    821 F. App'x 234 (4th Cir. 2020) ..................................................................... *passim*

*Aitch v. Maybin*,
    2008 WL 2943348 (D.S.C. July 29, 2008), *aff'd*, 325 F. App'x 281 (4th Cir.
    2009) ..................................................................................................................25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................12

*Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*,
    262 F. App'x 556 (4th Cir. 2008) .......................................................................18

*Bayne v. Smith*,
    2024 WL 4277041 (D.S.C. Aug. 20, 2024), *report and recommendation
    adopted*, 2024 WL 4116689 (D.S.C. Sept. 9, 2024)...........................................14

*Beary v. W. Publg. Co.*,
    763 F.2d 66 (2d Cir. 1985)...................................................................................27

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................12

*Biospherics, Inc. v. Forbes, Inc.*,
    151 F.3d 180 (4th Cir. 1998) ..................................................................15, 16, 17

*Blanton v. City of Charleston*,
    2014 WL 4809838 (D.S.C. Sept. 26, 2014)....................................................15, 17

*Boone v. Sunbelt Newspapers, Inc.*,
    347 S.C. 571, 556 S.E.2d 732 (S.C. Ct. App. 2001)............................................31

*Boykin v. Prisma Health*,
    2023 WL 5488448 (D.S.C. Aug. 8, 2023), *report and recommendation
    adopted*, 2023 WL 5487118 (D.S.C. Aug. 24, 2023)............................................23

*Brewster v. Laurens Cnty. Advertiser*,
    2012 WL 4767052 (S.C.Com.Pl. Apr. 06, 2012) ..........................................25, 26

*Butler v. Pennington*,
    2019 WL 1614834 (D.S.C. Apr. 16, 2019)...........................................................18

*CACI Premier Tech., Inc. v. Rhodes,*
    536 F.3d 280 (4th Cir. 2008) ........................................................15, 17

*Carson v. Emergency MD, LLC,*
    2020 WL 5077655 (D.S.C. Aug. 25, 2020) ....................................14, 19

*Champion v. U.S. Postal Serv.,*
    2023 WL 3742294 (D.S.C. May 10, 2023), *report and recommendation
    adopted*, 2023 WL 3737916 (D.S.C. May 31, 2023)..............................18

*Chapin v. Knight-Ridder, Inc.,*
    993 F.2d 1087 (4th Cir. 1993) ....................................... *passim*

*Cobin v. Hearst-Argyle Television, Inc.,*
    561 F. Supp. 2d 546 (D.S.C. 2008).................................... *passim*

*Conway v. S.C. Vocational Rehab. Dep't,*
    2018 WL 2301849 (D.S.C. Jan. 31, 2018), *report and recommendation
    adopted,* 2018 WL 2301848 (D.S.C. Feb. 26, 2018)..............................24

*Cummings v. City of N.Y.,*
    2020 WL 882335 (S.D.N.Y. Feb. 24, 2020), *aff'd*, 2022 WL 2166585 (2d Cir.
    June 16, 2022)......................................................25

*DeBarr v. Maximus Inc.,*
    2022 WL 842907 (D.S.C. Mar. 22, 2022) ............................18

*Dickerson v. Albemarle Corp.,*
    2016 WL 245188 (D.S.C. Jan. 21, 2016) .........................12, 14

*Dombek v. Adler,*
    2019 WL 459019 (D.S.C. Feb. 05, 2019) (Gergel, J.).........................14

*Erickson v. Jones St. Publishers, LLC,*
    368 S.C. 444, 629 S.E.2d 653 (2006) ............................... *passim*

*Faltas v. State Newspaper,*
    928 F. Supp. 637 (D.S.C. 1996), *aff'd*, 155 F.3d 557 (4th Cir. 1998)....................23

*Floyd v. Knight,*
    2023 WL 4409037 (D.S.C. Apr. 27, 2023), *report and recommendation
    adopted*, 2023 WL 4013520 (D.S.C. June 15, 2023)..............................31

*Freeze Right Refrig. & A.C. Servs. v. City of N.Y.,*
    475 N.Y.S.2d 383 (1st Dep't 1984) ..............................26

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974)................................................25

iii

*Glob. Relief Found. v. N.Y. Times Co.*,
  390 F.3d 973 (7th Cir. 2004) ..............................................18

*Harvey v. Cable News Network, Inc.*,
  48 F.4th 257 (4th Cir. 2022) .............................18, 27, 29, 30

*Hatfill v. N.Y. Times Co.*,
  416 F.3d 320 (4th Cir. 2005) ..............................................20

*Horne v. WTVR, LLC*,
  893 F.3d 201 (4th Cir. 2018) ..............................................30

*Hughs v. Royal Energy Res., Inc.*,
  2020 WL 6689132 (D.S.C. Nov. 12, 2020)....................14, 19, 20, 22

*Jeanty v. City of Utica*,
  2017 WL 6408878 (N.D.N.Y. Aug. 18, 2017) ...........................27

*Kelley-Moser Consulting, LLC v. Daniels*,
  2012 WL 554643 (D.S.C. Feb. 21, 2012) .................................31

*Kinsey v. N.Y. Times Co.*,
  991 F.3d 171 (2d Cir. 2021)...............................................28

*Kozel v. Kozel*,
  299 F. Supp. 3d 737 (D.S.C. 2018).......................................28

*Kun v. WCSC-TV-5*,
  2002 WL 34217983 (S.C.Com.Pl. May 28, 2002) ...................18, 26

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
  674 F.3d 369 (4th Cir. 2012) ...........................................28, 29

*McGlothlin v. Hennelly*,
  2021 WL 2935372 (4th Cir. July 13, 2021)...............................31

*McLaughlin v. Darlington Cnty.*,
  2021 WL 4691379 (D.S.C. Sept. 17, 2021), *report and recommendation
  adopted*, 2021 WL 4691055 (D.S.C. Oct. 7, 2021) .......................3, 24

*McNeil v. S.C. Dep't of Corr.*,
  404 S.C. 186, 743 S.E.2d 843 (S.C. Ct. App. 2013).....................19

*Mungo v. BP Oil, Inc.*,
  2012 WL 13005317 (D.S.C. Dec. 21, 2012) ...............................13

*Ortiz v. Jackson*,
  2023 WL 5208007 (D.S.C. Aug. 14, 2023)................................14

*Padgett v. Sun News*,
    278 S.C. 26, 292 S.E.2d 30 (1982) ........................................................................25

*Reuber v. Food Chem. News, Inc.*,
    925 F.2d 703 (4th Cir. 1991) ......................................................................... *passim*

*Robins v. Nat'l Enquirer, Inc.*,
    1995 WL 776708 (D.S.C. Apr. 10, 1995)........................................................21, 23

*Rodriguez v. Daily News, L.P.*,
    37 N.Y.S.3d 613 (2d Dep't 2016).........................................................................25

*Rollins Ranches, LLC v. Watson*,
    2021 WL 5355650 (D.S.C. Nov. 17, 2021) ..................................................... *passim*

*Schnare v. Ziessow*,
    104 F. App'x 847 (4th Cir. 2004) ....................................................................15, 17

*Sellers v. S.C. Autism Soc'y, Inc.*,
    861 F. Supp. 2d 692 (D.S.C. 2012)..................................................................12, 15

*Sigler v. Black River Elec. Coop.*,
    2020 WL 9209285 (D.S.C. July 24, 2020), *report and recommendation
    adopted*, 2021 WL 856879 (D.S.C. Mar. 8, 2021) ................................................29

*Snyder v. Phelps*,
    580 F.3d 206 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) .....................................12

*Toussaint v. Palmetto Health*,
    2017 WL 1950955 (D.S.C. May 10, 2017)......................................................20, 23

*USA v. Murdaugh*,
    No. 9:23-cr-00396-RMG (D.S.C.)...........................................................................5

*Va. Citizens Def. League v. Couric*,
    910 F.3d 780 (4th Cir. 2018) ................................................................................15

*Veney v. Wyche*,
    293 F.3d 726 (4th Cir. 2002) ................................................................................13

*Walker v. Tyler*,
    99 F.3d 1132 (4th Cir. 1996) ........................................................................21, 22, 23

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015) ............................................................................14

*White v. Wilkerson*,
    328 S.C. 179, 493 S.E.2d 345 (1997) ...................................................................26

*Wilkow v. Forbes, Inc.*,
    2000 WL 631344 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552 (7th Cir.
    2001) ..................................................................................................................................28

*Wilson v. Ward*,
    1989 WL 380480 (S.C. Ct. App. Sept. 19, 1989) ...................................................24

**Statutes**

N.Y. Civ. Rights Law § 74 ...............................................................................................25, 27

**Other Authorities**

Fed. R. Evid. 201(b).................................................................................................................3

20 S.C. Jur. Libel and Slander § 3 .......................................................................................20

Defendants Blackfin, Inc. ("Blackfin"), joined in full by Warner Bros. Discovery, Inc. ("WBD") and Warner Media Entertainment Pages, Inc. ("Warner Media Entertainment") (collectively, with the corporate entities disclosed in the Amended Answer to Local Rule 26.01 Interrogatories, "Warner Entities") (Blackfin, with Warner Entities, "Moving Defendants") respectfully move the Court to dismiss the Complaint ("Complaint" or "Compl.") filed by Plaintiff Richard Alexander Murdaugh, Jr. ("Buster" or "Plaintiff") as to the documentary "Murdaugh Murders: Deadly Dynasty," which the Complaint alleges Blackfin produced and WBD aired on the streaming service discovery+ and the Investigation Discovery television channel (the "Documentary" or "Blackfin Documentary"). Compl. ¶¶ 19-21.[1]

## PRELIMINARY STATEMENT

The Murdaugh name had been "synonymous with criminal justice, law enforcement," and "the law" for decades, until 2019 when the family began to find itself on the other side of the criminal justice system. That year, Plaintiff's younger brother, Paul, faced a criminal charge of boating under the influence in connection with a boat crash that killed a local teenager. Days before a court hearing in that case, Paul and his and Plaintiff's mother were shot dead execution style in the family's home. Around the same time, investigators began looking into the mysterious death of the Murdaugh family's longtime housekeeper and the embezzlement of money owed to her estate. Plaintiff's father, Alex, eventually was charged in connection with both the financial

---

[1] For the reasons explained in the Amended Answer to Local Rule 26.01 Interrogatories (Dkt. 44) and based on the allegations of the Complaint (none of which the Warner Entities concede), Plaintiff should have identified WarnerMedia Direct, LLC, Discovery Communications, LLC ("Discovery Communications"), and Discovery Digital Ventures, LLC ("DDV") instead of WBD and Warner Media Entertainment. Plaintiff also makes no allegations connecting Warner Media Entertainment to the Blackfin Documentary, meaning that WBD is the only named Warner Entity relevant to this Motion. Notwithstanding that Discovery Communications and DDV are the only relevant Warner Entities related to the Blackfin Documentary, all of the Warner Entities join this Motion, but reserve all rights and waive none by so doing.

crimes and killing his own wife and son. In the wake of the investigation of the Murdaugh double homicide, local law enforcement announced that it was reopening the investigation into the 2015 death of a local teenager, Stephen Smith.

The Blackfin Documentary chronicled these criminal investigations. In one portion of one of its three episodes, the Documentary discussed the law enforcement investigation into Smith's death, primarily by playing audio recordings of law enforcement interviews with individuals who knew Smith and by including commentary from one of the law enforcement investigators about the official investigation. The Murdaugh name, including Plaintiff's, surfaced "constantly" during the original investigation in 2015, and speculation of a Murdaugh connection intensified after state law enforcement re-opened the investigation as a result of the separate investigation into the double murder of Plaintiff's mother and brother. Those facts were, and remain, true and Plaintiff does not and cannot claim otherwise.

Plaintiff nevertheless attempts to construct a defamation lawsuit against Blackfin (and the Warner Entities) by alleging the Documentary levels an accusation it does not level: that Plaintiff is "the murderer of Stephen Smith." Plaintiff's claim is contrary to the face of the Blackfin Documentary and fails as a matter of constitutional and South Carolina law for several independently fatal reasons. The Complaint does not specifically identify a single allegedly defamatory statement in the Blackfin Documentary, which alone necessitates dismissal. *Infra* Argument § I. Leaving aside the failure to plead *any* statement, the First Amendment of the United States Constitution (the "First Amendment") bars Plaintiff's claims because the Blackfin Documentary does not assert as an actual fact that Plaintiff murdered Smith. *Infra* § II. To the extent that the Blackfin Documentary asserts any facts about Plaintiff, they are the demonstrably true facts about his name surfacing repeatedly during the official law enforcement investigation

into Smith's death. *Infra* § III. The Complaint also fails as a matter of South Carolina law because the Documentary does not state or imply the defamatory meaning Plaintiff claims it does (i.e., that Plaintiff was "the murderer of Stephen Smith"). *Infra* § IV. Even if any of those separate arguments were not fatal (which they are), the Documentary's discussion of the Smith death is protected in its entirety by the fair report privilege because it fairly and accurately described information derived from official government materials. *Infra* § V. Finally, the Complaint necessitates dismissal for failure to plead any facts demonstrating common law or constitutional malice, either one of which Plaintiff bears the burden of demonstrating under South Carolina law. *Infra* § VI. The Moving Defendants respectfully move the Court to dismiss Plaintiff's lawsuit with prejudice as to the Blackfin Documentary for failure to state a claim under Rule 12(b)(6).

## FACTUAL BACKGROUND

**A.     The Blackfin Documentary Chronicles The Criminal Investigations, Scandals, And Speculation Surrounding The Murdaugh Family Dynasty.**

The Blackfin Documentary reports on a series of events connected to the Murdaugh family, a "four generation legal dynasty" whose name was "synonymous with criminal justice, law enforcement, [and] the law" in South Carolina until 2019, when it became associated with criminal investigations, fatal tragedies, and scandal. Ex. D at 21.[2] In February 2019, Plaintiff's brother, then 19-year-old Paul, allegedly crashed the family boat in an early morning accident that took the

---

[2] This Motion submits as exhibits a video copy of all three episodes of the Documentary (*see* Exs. A-C) and official transcripts of the same (*see* Exs. D-F). The Court can consider these materials because they are integral to the Complaint. *See McLaughlin v. Darlington Cnty.*, 2021 WL 4691379, at *2 (D.S.C. Sept. 17, 2021), *report and recommendation adopted*, 2021 WL 4691055 (D.S.C. Oct. 7, 2021); *Cobin v. Hearst-Argyle Television, Inc.*, 561 F. Supp. 2d 546, 552-53 (D.S.C. 2008) (news reports "clearly central to the plaintiff's claim"). The Court also can take judicial notice of Murdaugh-related investigations and prosecutions because they are not subject to reasonable dispute. *See* Fed. R. Evid. 201(b) (fact not subject to reasonable dispute if it: "(1) is generally known within the trial court's territorial jurisdiction; or (2) can   accurately   and readily   determined   from   sources   whose   accuracy   cannot   reasonably   be   questioned").

life of a local teenager, Mallory Beach. *See generally id.* Paul's and Plaintiff's father and grandfather—the latter of whom was part of a long line of Murdaugh men who served as solicitor of Hampton County and both of whom were associated with the family's personal injury law firm, known as the "Murdaugh Firm" (*id*. at 20-22)—reportedly went to the hospital the night of the fatal crash in an apparent attempt to try "to get everyone to change their story" to construct a narrative that someone other than Paul was driving the boat (*id*. at 32-33). Paul was indicted for felony boating under the influence two months later. *Id*. at 40. National news programs covered the fatal boat crash and have been covering events relating to the Murdaugh family in real time to audiences across the country ever since. *See, e.g.*, Ex. E at 01:04:43-1:11:37; 1:22:24-1:38:51.

Two years after the crash—and days before Paul was scheduled to appear in court for the first hearing in his case—police found Paul and his mother, Maggie, shot dead execution style at the family's hunting plantation. Ex. E at 2, 8-9. "After the double murders, the focus was narrowing on the Murdaugh dynasty, and there were so many questions, and everything in their life was getting examined." *Id*. at 34. The South Carolina State Law Enforcement Division ("SLED") began to investigate the death of Gloria Satterfield, the Murdaugh family's longtime housekeeper who was found dead in their home with conflicting reports on whether she fell or was pushed down the stairs by Paul. *Id*. at 34, 43. At the same time, the Satterfield family launched its own investigation into why it had not received any of an alleged $4.3 million insurance settlement related to wrongful death claims against the Murdaughs. Ex. F at 4-6. The Murdaugh Firm conducted its own investigation, and discovered that Plaintiff's father, Alex, had embezzled money from it and some of its clients. *Id*. at 10-13.

Then, on September 4, 2021, Alex called law enforcement to report that he had been shot in the head. *Id*. at 14-20. He subsequently issued a statement, announcing he was "resigning from

my law firm and entering rehab after a long battle that has been exacerbated by these murders" of his wife and son. *Id*. at 24.  While in rehab for an alleged opioid addiction, Alex admitted to having hired a man to shoot him in the head as part of a scheme to secure his $10 million life insurance policy for his son, the Plaintiff.  *Id*.  Law enforcement arrested and charged Alex with insurance fraud in connection with the shooting, as well as with criminal charges for stealing $4.3 million from Satterfield's estate. *Id*. at 25, 27.  During a bond hearing relating to the latter, a SLED agent told the Court:

> "… we are investigating multiple different allegations, or investigations at this point at this time [*sic*] to include the Stephen Smith death, which you're aware of. The actual cause of Miss Satterfield's death, we're looking into that.  The financial case that you're here with today and numerous other financial investigations dealing with, with fraud or possible other criminal actions.  That's not to say that there won't be additional charges brought forth in the future."

*Id*. at 32.  SLED subsequently charged Alex with murdering his wife and son, and additional criminal acts.  *See State v. Murdaugh*, Appellate Case Nos. 2023-000392 and 2024-000576; *USA v. Murdaugh*, No. 9:23-cr-00396-RMG (D.S.C.).

**B.     Publicly Released Law Enforcement Records Document The Investigation Into Stephen Smith's Death, Including A Possible Murdaugh Connection.**

In 2015, a local teenager, Stephen Smith, was found dead on the side of a road in Hampton County.  Ex. 2 at 4.[3]  Official law enforcement records from the time of Smith's death state that his body was found on the side of a road in Hampton County with "some sort of blunt force trauma to the head" and "no evidence to suggest the victim was struck by a vehicle." *Id*.  Corporal Michael Duncan  of  the  South  Carolina's  Multi-Disciplinary  Accident  Investigation  Team  recorded

---

[3] Counsel for the Moving Defendants obtained state investigative materials via a Freedom of Information Act request.  Certain of those materials are marked as joint Exhibits 1-11 and filed jointly as their own docket entry (the "Appendix in Support of Defendants' Motion to Dismiss") for ease of reference amongst the Defendants' briefs.  The "Court may consider the police report as a matter of public record" that is properly subject to judicial notice and to assess fair report privilege. *See Cobin*, 561 F. Supp. 2d at 550-51.

contemporaneous audio notes, which the Blackfin Documentary played, reflecting his theory of Smith's death: "There is no body trauma other than to the head area.  Does not appear to be, in my opinion, struck by a vehicle." Ex. E at 16, 18.

Between August and September 2015, law enforcement conducted recorded interviews with witnesses, which included the following excerpts:[4]

| Date (Cite) | Statement |
|---|---|
| 07/17/2015<br><br>(Ex. 3B at 9) | **Sandy Smith (victim's mother):** "*The rumors going around Hampton that everybody keeps coming up to me and it was Murdaugh boys.*"<br><br>**Cpl. Duncan:** "The Murdaugh boys?"<br><br>**Sandy Smith:** "*Yes, whoever they are.*" |
| 07/17/2015<br><br>(Ex. 4B at 21) | **Stephanie Smith (victim's sister):** "*And I went into the store and a bunch of people kept coming up to me and they're like did you know the Murdaugh boys are behind it, you know, saying Buster Murdaugh, the one we went to school with did it and some of his friends, and I'm just sitting here like why, you know. It makes no sense.  He's never said anything bad about Stephen.  He's never been around Stephen too, you know.*" |
| 08/07/2015*<br><br>(Ex.  5B  at  3; Ex. E at 32) | **Cpl. Duncan:** "Kind of tell me what you told her about that."<br><br>**A.C.:** "*I told her that another friend of mine had texted me asking me if Buster and Stephen and (sic) were together, and I told him no.  I said not that I knew of, and then I asked him why.  He said because he had heard that.  And then I asked him who he heard it from, and he said he didn't know.  He just heard it.*" |
| 08/11/2015*<br><br>(Ex.  6B  at  4; Ex. E at 32-33) | **Cpl. Duncan:** "So the only rumor you heard is possibly Buster having some type of relationship with Stephen?"<br><br>**B.S.:** "*Yes, sir.  Okay.*"<br><br>**Cpl. Duncan:** "All right.  And how long ago was that?  Do you recall when that was when you heard?"<br><br>**B.S.:** "*I cannot—a few weeks ago, maybe.*"<br><br>**Cpl. Duncan:** "Was it after or before his death?"<br><br>**B.S.:** "*After.*" |

---

[4] The Blackfin Documentary played the excerpts marked with a [*].  All witnesses whose names appear in the law enforcement materials but whose names do not appear in the Documentary are referenced herein by their initials only.

| | |
|---|---|
| | **Cpl. Duncan:** "Okay. So it was after Stephen had died?"<br><br>**B.S.:** "*Yes, sir.*" |
| 09/01/2015*<br><br>(Ex. 7B at 7-8;<br>Ex. E at 25) | **Tpr. Proctor:** "Just go ahead and tell me, you know, what you heard."<br><br>**T.D.:** "*Yes, sir. Not a problem. First heard, just like everybody else in our little small town, that he was—first we heard he was shot, then we heard it was a hit and run. But recently, probably a week ago, week and a half ago, I'd say something like that, I heard that these two, maybe three young men were in a vehicle. They were riding down 601, saw the car on the side of the road, I guess saw the boy walking. They turned back around. I guess they were attempting to, I don't want to say, you know, mess around with him or something like that, stuck something out of the window and it, you know, hit him in, I don't know if it hit him in the head or the back or where it hit him, and then that's pretty much all I heard. I did hear names and—or heard a name, and that name was—he goes by Buster Murdaugh.*" |
| 09/01/2015*<br><br>(Ex. 7B at 14;<br>Ex. E at 25) | **Tpr. Proctor:** "Yeah. Okay. And it could be a whole gamut of people that, you know, the other two people that could have been in the car with him?"<br><br>**T.D.:** "*Really, yes, sir. I have no idea. The only name that was given to me was the Murdaugh name. And of course, everybody's kind of shy to say that out, you know what I mean, because of the, I don't want to say power, but of the name, you know, it brings a certain standard when you say Murdaugh in Hampton County.*" |
| 09/01/2015*<br><br>(Ex. 7B at 15;<br>Ex. E at 29) | **T.D.:** "*It wouldn't surprise me just because I feel like they wouldn't want anything happen to their reputation or name or anything like that. And it is kind of out of character to a certain extent because, I mean, I've known his—I've known the Murdaugh family, like I said, pretty much my whole life.*" |
| 09/01/2015*<br><br>(Ex. 7B at 24-25;<br>Ex. E at 30) | **T.D.:** "*And when I originally heard this, I was thinking of the younger Murdaugh boy, Buster's little brother Paul because Paul's more of the I want to say troublemaker, but he's a little more my last name is Murdaugh. I can do whatever, you know what I mean?*"<br><br>**Tpr. Proctor:** "It went to his head a lot more."<br><br>**T.D.:** "*Right. Yeah. He was more that type of kid. And he's—I don't know how old he is now. I just remember him when he was younger. So when I first heard it was Buster kind of—it kind of caught me off guard because he's never been that type of person. But then again, like I say, once with alcohol and drugs, I'm sure things can go way out of way out of control when you mix all that together.*" |

| | |
|---|---|
| 09/02/2015*<br><br>(Ex. 8B at 3;<br>Ex. E at 27-28) | **Tpr. Proctor:** "Can you tell me what you heard about the Stephen Smith incident?"<br><br>**T.S.:** "*I just heard a classmate that didn't know (inaudible).*"<br><br>**Tpr. Proctor:** "You heard what, I'm sorry?"<br><br>**T.S.:** "*One of the classmates did it.*"<br><br>**Tpr. Proctor:** "Okay. And who was that?"<br><br>**T.S.:** "*Buster Murdaugh.*" |
| 09/02/2015<br><br>(Ex. 8B at 5) | **T.S.:** "*Some people were talking about how he died, and then everyone was like well, you heard who did it. And I was like no, I didn't. And he was like well, Buster did it. It was a guy that told me that.*"<br><br>**Tpr. Proctor:** "And did he say where he heard that from or how he was backing that up?"<br><br>**T.S.:** "*No, sir.*"<br><br>**Tpr. Proctor:** "So he just said, 'oh, I heard Buster did it?'"<br><br>**T.S.:** "*Yes, sir.*"<br><br>**Tpr. Proctor:** "Did he say how he did it or what happened?"<br><br>**T.S.:** "*No, he didn't. Yes, he did. He said they beat him up and threw him out the truck.*"<br><br>**Tpr. Proctor:** "Beat him up and threw him out of the truck?"<br><br>**T.S.:** "*Yes, sir.*" |
| 09/02/2015<br><br>(Ex. 8B at 8) | **Tpr. Proctor:** "Okay. So he's the one that said Buster had something to do with it, but he didn't tell you how he knew that?"<br><br>**T.S.:** "*Yes, sir.*"<br><br>**Tpr. Proctor:** "Because I want to get in touch with him and, you know, talk to him and find out like where he heard this from, and basically I'm having to track it down. You are the one, two, three, four, five, six, seven, eight, you're the ninth person that I've talked to in reference to this rumor, okay." |
| 09/02/2015<br><br>(Ex. 9B at 3-4) | **Tpr. Proctor:** "And the information that was first given to me was that Buster Murdaugh and maybe one or two other people were out that night, and they had saw Stephen's car or whatever, so they went down the road and they actually saw him walking, and they were going to kind of like play around with him, and they held something or swung something out of the car and accidentally hit him. Does any of that sound familiar to you?"<br><br>**D.S.:** "*I do remember someone saying something about Buster, but they didn't really go into details because they didn't really know.*" |

| | |
|---|---|
| 09/02/2015*<br><br>(Ex. 9B at 4;<br>Ex. E at 28) | **Tpr. Proctor:** "But what I'm seeing is that a lot of people seem a little hesitant to speak about Buster or the Murdaughs in general. Do you kind of see that in general?"<br><br>**D.S.:** "*Yes, Sir.*"<br><br>**Tpr. Proctor:** "Okay."<br><br>**D.S.:** "*When we were speaking about someone told me that it was Buster, I was like I was saying if it's him, nothing was going to be done about it because of who he was.*" |
| 09/02/2015*<br><br>(Ex. 10B at 3;<br>Ex. E at 28) | **B.S.:** "*And we didn't know who did it, but we just heard that Buster did it. So after that, I mean, everybody know who Buster is and like his family and all that. So it was kind of like shocking so, you know, we just kept talking about it and like I guess it spreads it around, like a lot.*" |
| 09/02/2015<br><br>(Ex. 10B at 4) | **Tpr. Proctor:** "Okay. Now, the story that Taylor told me was that I guess the information that his understanding of it was is that Buster and either one or two other people were driving around, saw Stephen's car, you know, looped around or whatever, saw them walking in the road, were possibly gonna, you know, kinda messed with them or something, stuck something out of the vehicle and it hit them. Is that the story that you got?"<br><br>**B.S.:** "*Yes, sir.*" |

Names of members of the Murdaugh family also appear in the police files and related investigative materials. *See* Ex. 2 at 19 (tip that someone asked "if Stephen and Buster Murdaugh ever had any type of relationship"); *id*. at 28 (witness "stated that the reason that he was passing this information on was because Randy Murdaugh told him to call"); *id*. at 29 (detailing questioning about Buster Murdaugh). Cpl. Duncan's case notes from December 7, 2015, state that he "received an email in reference to an anonymous tip" that one man "'along with another black male and a white male (Murdaugh) are the ones involved in death.' This tip is referring to Stephen Smith." *Id*. at 24.

C.    **The Blackfin Documentary Discussed The Law Enforcement Investigation Into Smith's Death, Which Serves As The Basis Of Plaintiff's Lawsuit.**

Roughly ten minutes into the second episode, the Blackfin Documentary explained that two weeks after the double murder of Plaintiff's mother and brother, SLED announced that it had "reopened a 2015 case where a young teen, 19 year old [*sic*] Stephen Smith, was found dead on

the side of the road." Ex. E at 12. The Documentary spent about twenty minutes explaining the circumstances surrounding Smith's death, relying on official investigative materials, including audio recordings of the police interviews and Cpl. Duncan's audio notes, both discussed above, as well as an interview with Cpl. Duncan. *Id*. at 12-34.

Cpl. Duncan described the early days of the investigation, including that in the first week he located and interviewed Smith's boyfriend, audio excerpts of which the Blackfin Documentary played. *Id*. at 16-24. Despite initially wondering if Smith's boyfriend was "someone who was of some interest in this case?[,]" Cpl. Duncan concluded that "this person was not" someone "of interest" but speculated that Smith "was murdered by someone, or a group, through some type of blunt force trauma" and "somebody in Hampton County knows exactly who did it." *Id*. at 21-24. Cpl. Duncan explained that he "would hear all these rumors, but they were all the same type of stories," including from individuals who went to high school with Smith saying they had "heard one thing or another about Stephen's death." *Id*. at 25, 28. In the midst of playing police audio recording excerpts discussed above mentioning members of the Murdaugh family (*id*. at 25-28), the Documentary included a statement from Cpl. Duncan explaining:

> "It's constantly there. It's not like it was brought up one time. When the Murdaugh family's name come about, it was like, okay, we gotta treat this one a little bit different at this point, because it is a well-known powerful family in this area. It was at that point in time we had to say, hey, do we have stuff that we're gonna have to connect the dots with?"

*Id*. at 29. But, nevertheless, Cpl. Duncan confirmed the tips led nowhere:

> "The investigation went cold. After probably fall towards winter, there was very limited information coming in, you know, and at some point in time, you're—where do you go? We have followed every lead that we could."

*Id*. at 33. The Blackfin Documentary displayed on-screen text graphics stating: "SLED has not revealed what evidence led them to reopen the Stephen Smith case. They are following multiple leads and have not identified suspects. Buster Murdaugh has not been named a suspect or person

10

of interest in Stephen Smith's death." *Id*. at 34.

The Blackfin Documentary also included excerpts of a local news interview with Smith's mother, during which she talked about hearing the Murdaugh name in connection with her son's death:

> "I don't see any reason why they would—any reason they would have to, you know, harm Stephen. But then, later on, it just kept coming up, Murdaughs, Murdaughs, Murdaughs. And then everything was just, like, swept under the rug. So then, that just got me thinking, well maybe they did have something to do with it."

*Id*. at 33. One Hampton native explained that "[r]umors were everywhere" including as follows: "The scenario that was presented to me was, they were out joyriding, they see the boy walking down the side of the road, Paul leans out the window, pegs him with a baseball bat. That did not surprise me one bit. I could see it happening. I could see Paul doing that." *Id*. at 31. Another local resident explained that after a while, there "was nothing. It was a cold case, it dried up. It just dried up until Paul and Maggie were killed." *Id*. at 34.

On June 14, 2024, Plaintiff filed this lawsuit in state court in Hampton County against eight defendants arising from three separate documentaries that chronicled the events described above. Plaintiff in his Complaint does not challenge the truth of any parts of the Documentary except as related to Stephen Smith. The Complaint alleges that the Blackfin Documentary "falsely suggests and subtly accuses the Plaintiff of being the murderer of Stephen Smith" and that, during a "ten-minute segment," the "Plaintiff is alluded to a number of times as the murderer of Stephen Smith." Compl. ¶ 19; Ex. E at 12-34 (referred to hereinafter, individually, as the "relevant portion").[5] Plaintiff's Complaint does not identify any specific statements or assert any cause of action.

---

[5] The Complaint does not provide any specificity about what "10-minute portion" to which it is referring. The entire relevant portion is around 29 minutes (*see* Ex. E at 12 (timecode 1:11:15) through 34 (timecode 1:30:18)), and halfway through is when it first references Plaintiff's uncle (*id*. at 20 (timecode 1:20:03)).

**LEGAL STANDARD**

Rule 12(b)(6) authorizes a motion to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Dismissal is warranted when a complaint fails to plead any "factual content that allows the court to draw the reasonable inference" that defendants are "liable for the misconduct alleged." *Id*. A complaint that amounts to "little more than boilerplate allegations, devoid of sufficient facts to satisfy the pleading standards applicable in federal court" warrants dismissal. *Sellers v. S.C. Autism Soc'y, Inc*., 861 F. Supp. 2d 692, 699 (D.S.C. 2012).

To state a claim for defamation under South Carolina law, Plaintiff must plead facts sufficient to demonstrate: "(1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 465, 629 S.E.2d 653, 664 (2006); *Dickerson v. Albemarle Corp.*, 2016 WL 245188, at *3 (D.S.C. Jan. 21, 2016). When considering whether a plaintiff states a claim for defamation, the "inquiry is not only to assess whether the statements in the complaint 'may constitute a sufficient basis for Plaintiffs' defamation claim,' but also to consider whether such a claim would comport with the First Amendment." *Rollins Ranches, LLC v. Watson*, 2021 WL 5355650, at *4 (D.S.C. Nov. 17, 2021) (citation omitted); *see also Snyder v. Phelps*, 580 F.3d 206, 218 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) ("regardless of the specific tort being employed, the First Amendment applies when a plaintiff seeks damages for reputational, mental, or emotional injury allegedly resulting from the defendant's speech"). The Court need not "accept as true" allegations that contradict materials

properly before the Court because they are referenced in the pleading or properly subject to judicial

notice. *Mungo v. BP Oil, Inc.*, 2012 WL 13005317, at *2 (D.S.C. Dec. 21, 2012) (quoting *Veney*

*v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)); *see also supra* nn. 2 & 3.

## ARGUMENT

Plaintiff's Complaint necessitates dismissal for multiple independent reasons. Plaintiff

fails to specifically identify a single statement, as the Rules require. *Infra* § I. Leaving aside the

lack of requisite specificity, the First Amendment bars Plaintiff's claims as to the Blackfin

Documentary because it does not state as a fact that he is "the murderer of Stephen Smith" (which

is the only alleged defamation). *Infra* § II. To the extent the Blackfin Documentary asserts any

fact about Smith's death, it is the truthful one that Plaintiff's name surfaced repeatedly during law

enforcement's criminal investigation. *Infra* § III. The Complaint also fails to sufficiently plead,

as South Carolina law requires, that the Documentary stated or implied Plaintiff was "the murderer

of Stephen Smith." *Infra* § IV. Further, Plaintiff's claims are barred by the fair report privilege

because the relevant portion of the Blackfin Documentary derives in its entirety from official

government information about the criminal investigation. *Infra* § V. Finally, Plaintiff fails to

plead any facts demonstrating either actual or common law malice, as he must in a defamation

lawsuit about a matter of public concern. *Infra* § VI.

## I.     THE COMPLAINT WARRANTS DISMISSAL AS IT DOES NOT SUFFICIENTLY IDENTIFY ANY DEFAMATORY STATEMENTS.

The Complaint does not specify a cause of action, but Plaintiff has confirmed in a separate

filing that he attempts only to assert a single claim for defamation. *See, e.g.*, Compl. ¶ 4 ("the

cause of action"); Dkt. 41-1 at 11 ("Complaint clearly only advances a single cause of action for

defamation as to all Defendants").[6]  A "single cause of action for defamation as to all Defendants" based on three different documentaries and different legal theories is directly contrary to the legal requirement that each "act of defamation is a separate tort" that a "plaintiff must specifically allege."  Dkt 41-1 at 11; *Hughs v. Royal Energy Res., Inc.*, 2020 WL 6689132, at *3 (D.S.C. Nov. 12, 2020).  Despite the requirement of specificity, the Complaint fails to identify *any* statements from the Blackfin Documentary.  It relies entirely on a two-sentence characterization of the alleged defamatory content indicating that Plaintiff is seeking liability in connection with the entirety of a "10-minute segment." *Id.* ¶ 19.  Such allegations are "too nebulous a claim to survive a motion to dismiss" and necessitate dismissal here.  *Dickerson*, 2016 WL 245188, at *4 (dismissing defamation complaint for failure to allege "sufficient factual matter" because it was not "even clear whether Plaintiff's allegation is that coworkers used the specific term, 'sexual advance,' in their alleged defamatory comments about Plaintiff or whether their false reporting was something else that Plaintiff, herself, now characterizes as a 'sexual advance'" (citations omitted)); *see also Bayne v. Smith*, 2024 WL 4277041, at *3 (D.S.C. Aug. 20, 2024), *report and recommendation adopted*, 2024 WL 4116689 (D.S.C. Sept. 9, 2024) (dismissing defamation claims where Plaintiff failed to identify the alleged defamatory statements in their complaint); *Ortiz v. Jackson*, 2023 WL 5208007, at *3 (D.S.C. Aug. 14, 2023) (dismissing where complaint had not "alleged enough context and specificity 'to put the other party on notice as to which statements it was to defend against'" (cleaned up)); *Carson v. Emergency MD, LLC*, 2020 WL 5077655, at *5 (D.S.C. Aug. 25, 2020) (dismissing defamation claims where Plaintiff fails to identify with specificity what defamatory statements were made about her); *Dombek v. Adler*, 2019 WL 459019, at *2 (D.S.C.

---

[6] The Complaint's failure to identify any cause of action constitutes improper "shotgun pleading." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).  Moving Defendants waive no rights if Plaintiff argues the Complaint asserts any other causes of action.

Feb. 05, 2019) (Gergel, J.) (dismissing defamation counterclaim where counterclaim identified the email in which the alleged defamatory statement took place, but did not specify the statement at issue); *accord Sellers*, 861 F. Supp. 2d at 699 (dismissing "boilerplate allegations, devoid of sufficient facts to satisfy the pleading standards applicable in federal court").

## II.     THE FIRST AMENDMENT BARS PLAINTIFF'S CLAIM BECAUSE THE BLACKFIN DOCUMENTARY CANNOT REASONABLY BE INTERPRETED AS ASSERTING AS FACT THAT PLAINTIFF MURDERED SMITH.

Plaintiff's lawsuit does not "comport with the First Amendment" because the Blackfin Documentary "cannot reasonably be interpreted" as conveying as fact that Plaintiff was "the murderer of Stephen Smith."  Compl. ¶ 19; *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 293 (4th Cir. 2008) (affirming dismissal where defamatory content "cannot reasonably be interpreted as stating actual facts" about plaintiff); *see also Schnare v. Ziessow*, 104 F. App'x 847, 851 (4th Cir. 2004) (whether statements are actionable "depends on whether a reasonable reader would construe them as seriously asserting that" the plaintiff "committed the crime of perjury"); *Blanton v. City of Charleston*, 2014 WL 4809838, at *5 (D.S.C. Sept. 26, 2014) (dismissing where "the Court concludes as a matter of law that none of the three statements at issue can reasonably be interpreted as stating a fact about the plaintiff").[7]  Where, as here, "a speaker plainly expresses 'a subjective view, an interpretation, a theory, conjecture or surmise,'" rather than a claim "to be in possession of objectively verifiable [false] facts, the statement is not actionable.'"  *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998) (alteration in original); *Cf. Va. Citizens Def. League v. Couric*, 910 F.3d 780, 786 (4th Cir. 2018) (rejecting argument that "divorces the twelve-second clip from the film as a whole").  Dismissal is warranted here because the language, "context

---

[7] Whether the Documentary reasonably can be interpreted as conveying actual facts is a question of law for the Court and is capable of resolution based on the Blackfin Documentary.  *CACI*, 536 F.3d at 294; *Biospherics*, 151 F.3d at 186; *see also Rollins Ranches*, 2021 WL 5355650, at *4 (must consider First Amendment when determining whether lawsuit states a defamation claim).

and tenor" of the Blackfin Documentary suggests "subjective and speculative supposition" about Plaintiff, rather than the assertion that Plaintiff was *in fact* responsible for Smith's death. *Biospherics*, 151 F.3d at 183-84, 186 (dismissing where statement constituted "a subjective view, not a factual statement").

The Documentary as a whole conveyed theories and speculation about the sudden fall of the Murdaugh family from a "four generation legal dynasty" that was "synonymous with criminal justice, law enforcement," and "the law" to one associated with criminal law enforcement investigations. *Supra* 3. As an individual in the Documentary explained: "After the double murders, the focus was narrowing on the Murdaugh dynasty, and there were so many questions, and everything in their life was getting examined." Ex. E at 34; *see also* Ex. F at 32 (SLED agent telling court that it was "investigating multiple different allegations, or investigations at this point at this time to include the Stephen Smith death," and "numerous other financial investigations dealing with, with fraud or possible other criminal actions"). Over the course of three episodes, the Blackfin Documentary delved into those questions and investigations. *Supra* 3-9.

It was in this context that the Blackfin Documentary discussed the Smith death. The context, tenor, and language of the Blackfin Documentary reflected that law enforcement received and investigated multiple tips and developed theories about Smith's death, including the possible involvement of Smith's boyfriend or members of the Murdaugh family (including but not limited to Plaintiff), but that there was no ultimate conclusion. Nor did the Documentary itself reach any conclusion about who was responsible for Smith's death. *Supra* 10-11. Cpl. Duncan explained to viewers that, even after law enforcement received tips about Plaintiff's potential involvement, the "investigation went cold" and "towards winter" of 2015, "there was very limited information coming in, you know, and at some point in time, you're—where do you go? We have followed

every lead that we could." Ex. E at 33. The relevant portion of the Blackfin Documentary concluded with graphics disclosing to the viewers that SLED was in the process of "following multiple leads and have not identified suspects" and that "Buster Murdaugh has not been named a suspect or person of interest in Stephen Smith's death." *Id*. at 34. And, as the Documentary explained, there "was another Murdaugh mentioned, and that was Buster's little brother, Paul" with one theory being that "they were out joyriding, they see the boy walking down the side of the road, Paul leans out the window, pegs him with a baseball bat." *Id*. at 30-31. The Blackfin Documentary "plainly" expressed law enforcement *theories* (not verifiable facts) about Smith's death, including the possible involvement of members of the Murdaugh family, which are not actionable as a matter of law. *Biospherics*, 151 F.3d at 186 ("any reasonable person reading" the article "would recognize, based on the tenor, language, and context of the article, that the challenged statements constitute a subjective view, not a factual statement"); *CACI*, 536 F.3d at 303 ("list of potential targets for investigation without assigning blame to any" one did not convey "the 'actual fact' that [plaintiff] committed murder"). It would be contradictory to the tenor, language, and context of the Documentary to conclude that any reasonable viewer could construe it as "seriously asserting" that Plaintiff, in fact, was the murderer of Smith. *Schnare*, 104 F. App'x at 851. The Documentary's "subjective and speculative supposition" cannot be "reasonably interpreted to declare or imply untrue facts" and, therefore, cannot state a claim for defamation. *Biospherics*, 151 F.3d at 184; *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1098 (4th Cir. 1993); *Blanton*, 2014 WL 4809838, at *5.

17

## III.       THE ONLY FACTUAL ASSERTIONS ABOUT PLAINTIFF IN THE BLACKFIN DOCUMENTARY ARE TRUE.

To the extent any of the statements at issue in the Blackfin Documentary convey factual assertions, they are true and not actionable. *Kun v. WCSC-TV-5*, 2002 WL 34217983 (S.C.Com.Pl. May 28, 2002) ("The truth of the matter is a complete defense to an action based on defamation."). It is literally true, and Plaintiff does not dispute,[8] that law enforcement repeatedly heard speculation that the Murdaugh family, including the Plaintiff, was involved in Smith's death. Plaintiff's claim fails as a matter of law because the Documentary truthfully reported on law enforcement's theories and the tips and speculation that informed them. *See Harvey*, 48 F.4th at 270 (dismissal where plaintiff "failed to establish that these statements are either materially false or defamatory"); *Chapin*, 993 F.2d at 1094 (affirming dismissal in part based on assertions that were "true"); *see also Glob. Relief Found. v. N.Y. Times Co.*, 390 F.3d 973, 986 (7th Cir. 2004) ("reports were either true or substantially true recitations of the government's suspicions"). To the extent Plaintiff attempts to argue that the Documentary's statements are not literally true, he fails to meet his burden to plead falsity, as required in a case involving a matter of public concern. *Erickson*, 368 S.C. at 465; *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 270-71 (4th Cir. 2022) (affirming dismissal for failure to plead falsity in matter of public concern).[9]

---

[8] Plaintiff should not be permitted to argue that any specific factual assertion is literally false, as that would amount to an improper attempt to amend a complaint by pleading. *See Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008) (plaintiff may not amend complaint through an argument in an opposing brief); *Champion v. U.S. Postal Serv.*, 2023 WL 3742294, at *2 (D.S.C. May 10, 2023), *report and recommendation adopted*, 2023 WL 3737916 (D.S.C. May 31, 2023) (rejecting attempt to modify nature of damages in response); *DeBarr v. Maximus Inc.*, 2022 WL 842907, at *4 (D.S.C. Mar. 22, 2022) (refusing to consider argument raised in objections); *see also Chapin*, 993 F.2d at 1098 ("these paragraphs were not labeled as false in the complaint, and plaintiffs may not belatedly rely on them").

[9] There can be no colorable argument that on-going criminal investigations, especially involving a family like the Murdaughs, are not a matter of public concern. *See, e.g., Butler v. Pennington*, 2019 WL 1614834, at *5 (D.S.C. Apr. 16, 2019) (finding that the alleged ethical misconduct of a

IV.     **THE COMPLAINT FAILS TO STATE A CLAIM UNDER SOUTH CAROLINA LAW BECAUSE THE BLACKFIN DOCUMENTARY DOES NOT STATE OR IMPLY THAT PLAINTIFF WAS THE MURDERER OF SMITH.**

South Carolina law recognizes two types of defamatory statements: (1) "defamatory *per se* when the meaning or message is obvious on its face"; and (2) "defamatory *per quod* when the defamatory meaning is not clear unless the hearer knows facts or circumstances not contained in the statement itself, and the plaintiff must introduce extrinsic facts to prove the defamatory meaning." *Erickson*, 368 S.C. at 465; *Hughs*, 2020 WL 6689132, at *3; *accord Chapin*, 993 F.2d at 1092 (comparing "facts literally related" versus "falsity of implications"). While the absence of any cause of action makes it unclear which theory Plaintiff is pursuing, the Complaint fails to sufficiently plead either.[10]

A.      **The Complaint Fails To Sufficiently Plead Defamation *Per Se*.**

The Compliant fails to state a claim for defamation *per se* because the Blackfin Documentary does not "on its face" state that Plaintiff "is the murderer of Stephen Smith." Compl. ¶ 19; *Erickson*, 368 S.C. at 465. Plaintiff does not claim otherwise, and he implicitly concedes that his claim is not for defamation *per se* by referring only to a 10-minute portion that the Complaint alleges "suggests and subtly accuses" and "alludes" to Plaintiff as the murderer. Compl. ¶¶ 19, 23; *Chapin*, 993 F.2d at 1092 (finding complaint alleged "falsity of implications" rather than specific statements on their face). The Court need not consider allegations that a Complaint does not plead, and can therefore find that it fails to allege (or even to attempt to allege) a claim of defamation *per se* without considering the merits. *See, e.g.*, *McNeil v. S.C. Dep't of*

---

local prosecutor's office in a serious criminal matter was an issue of "significant public concern").

[10] The Court need not decide which type of defamation the Complaint attempts to plead because it fails either way. *See Carson*, 2020 WL 5077655, at *5 n.2 (type of defamation irrelevant because complaint failed to "properly plead the elements of defamation required under both interpretations").

*Corr.*, 404 S.C. 186, 195, 743 S.E.2d 843, 848 (S.C. Ct. App. 2013) (affirming dismissal of defamation suit for failure to state a claim where plaintiff "did not set forth with any specificity what the alleged false statements were").  But even based on what is alleged, the lack of any statement that "itself" and "on its face" contains allegedly false and defamatory language is fatal to any defamation *per se* claim.  *Erickson*, 368 S.C. at 465; *Rollins Ranches*, 2021 WL 5355650, at *9 (statement not defamatory *per se* where the "defamatory meaning of Defendant's statement is not obvious and appears to require" facts outside the statement itself); *Toussaint v. Palmetto Health*, 2017 WL 1950955, at *2 (D.S.C. May 10, 2017) (finding complaint based on inference that plaintiff "abandoned his patients" where he made "no contention" that any statements in letter or talking points were themselves "false"); *Hughs*, 2020 WL 6689132, at *3 (finding that defendant failed to state a counterclaim for defamation where alleged statement had "only a nebulous connection" to defendant); *see also* 20 S.C. Jur. Libel and Slander § 3 (explaining that the statement "Jones has borne a child" is not defamatory *per se* because "reference to a fact extrinsic to the statement itself—the fact that Jones is an unmarried woman—gives the statement its defamatory meaning").

### B.     The Complaint Fails To Sufficiently Plead Defamation By Implication.

Given the absence of any specific allegedly false statement, the Moving Defendants understand that Plaintiff's defamation-by-implication theory is not "that the factual assertions from which that inference arises are false"—i.e., he concedes, as he must, that the facts themselves are literally true, *see supra* § III—but that the literally truthful statements convey a defamatory implication.  *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 334 n.7 (4th Cir. 2005).  To sustain dismissal on such a theory, Plaintiff "must make an especially rigorous showing" that the language of the Blackfin Documentary can "not only be reasonably read to impart" that Plaintiff is "the murderer of Stephen Smith," but also that it "affirmatively suggest[s]" that the Moving Defendants intended

or endorsed that inference. *Chapin*, 993 F.2d at 1092-93, 1110 (citation omitted); *Walker v. Tyler*, 99 F.3d 1132, at *2 (4th Cir. 1996) ("For a defamation-by-implication cause of action to survive, the defamatory implication must be present in the plain and natural meaning of the words used."). Plaintiff cannot meet his burden as to either.[11]

It would be unreasonable to find that the Blackfin Documentary expresses "the libelous meanings ascribed to it" by Plaintiff, i.e., that he is "the murderer of Stephen Smith." *Chapin*, 993 F.2d at 1091; *see Robins v. Nat'l Enquirer, Inc.*, 1995 WL 776708, at *3 (D.S.C. Apr. 10, 1995) ("court must review the entire article"). The Blackfin Documentary "does not speak in certainties" and its "words cannot be perverted to 'make that certain which is in fact uncertain.'" *Chapin*, 993 F.2d at 1096. The Documentary is analogous to the article at the center of *Chapin* (the "Greve article"), which questioned the finances of a nonprofit organization that delivered gift packs to troops abroad. *Id*. at 1091. The Fourth Circuit affirmed the district court's dismissal of the case based on the lack of defamatory implication, explaining:

> "***In the Court's view, it is a story constructed around questions, not conclusions. But the mere raising of questions is, without more, insufficient to sustain a defamation suit in these circumstances***. Questions are not necessarily accusations or affronts. Nor do they necessarily insinuate derogatory answers. They may simply be, as they are here, expressions of uncertainty. The Greve article advances alternative answers to the questions it raises, presenting both favorable and unfavorable views, but does not ultimately adopt any particular answer as correct. From this, a reasonable reader would not be likely to conclude that one answer is true and the other false. Language of ambiguity and imprecision permeates the article, significantly coloring its tone."

*Id*. at 1098 (emphasis added). The same rationale applies here. As discussed above, the relevant portion of the Blackfin Documentary chronicled law enforcement's ultimately unsuccessful criminal investigation into Smith's death, including official interviews with individuals who told

---

[11] Whether "a statement is reasonably capable of conveying a defamatory implication" is a matter of "law to be decided on a motion to dismiss." *Agbapuruonwu v. NBC Subsidiary (WRC-TV)*, 821 F. App'x 234, 239 (4th Cir. 2020).

investigators about speculation that Plaintiff was involved. *Supra* 9-11. Those tips pointed to multiple, alternative possibilities, including the involvement of Plaintiff *or* his brother, Paul, or other individuals not yet identified as a result of the case going "cold." Ex. E at 33. Like in *Chapin*, there was no conclusion as to whether there was a "murderer of Stephen Smith" and, if so, who it was or that it was Plaintiff. Plaintiff cannot, as he must, make the "especially rigorous showing" otherwise. *Rollins Ranches*, 2021 WL 5355650, at *9 ("to the extent that Plaintiffs allege the attempted artificial insemination of a dog suffering from a pyometra is an allegation of animal abuse, the court does not find the statement capable of a defamatory meaning where Defendant clarified in the same post that the infection was unknown"); *Hughs*, 2020 WL 6689132, at *4 (dismissal because letter accusing the plaintiff of engaging in corporate misconduct "only provides notice" of the existence of an investigation and "specifically notes that 'there has been no suggestion to this point of any wrongdoing'" by the plaintiff's company or its directors).

Even if Plaintiff could make the "rigorous" showing that the Blackfin Documentary implied that Plaintiff was "the murderer of Stephen Smith" (which Plaintiff cannot), his defamation-by-implication claim still fails because the Complaint pleads no facts that "affirmatively suggest" that any of the Moving Defendants intended or endorsed such inference. *Chapin*, 993 F.2d at 1092-93; *Walker*, 99 F.3d 1132, at *2 (dismissal where defendants did not endorse any factual allegations or intend "an inference to be drawn"); *Agbapuruonwu*, 821 F. App'x at 238 ("the court noted that the Complaint did not allege facts suggesting that NBC intended or endorsed either implication"). To the contrary, the Blackfin Documentary expressly disclosed to readers via on-screen text that while there were leads, law enforcement had not identified any suspects or persons of interest, including Plaintiff. Far from an endorsement, the Documentary included statements from Cpl. Duncan explaining that tips alone are insufficient and

there must be evidence sufficient to "connect the dots." *Supra* 10-11. In the end, the investigation was not "really leading anywhere" and "went cold" despite investigators having "followed every lead that we could." *Id.* These are not the type of statements that "affirmatively suggest" endorsement of the purported inference that Plaintiff was "the murderer of Stephen Smith." *See Chapin*, 993 F.2d at 1092-93.

***

Consistent with its gatekeeping role, the Court should dismiss the lawsuit with prejudice because Plaintiff has not made any "rigorous showing" that the Documentary reasonably expresses that he was "the murderer of Stephen Smith" or that any of the Moving Defendants endorsed such implication. *See Rollins Ranches*, 2021 WL 5355650, at *11 (dismissing defamation lawsuit with prejudice where statements were not capable of the defamatory meaning alleged by plaintiffs); *Toussaint*, 2017 WL 1950955, at *2 (dismissing defamation lawsuit with prejudice where it would be "objectively unreasonable" to find that communications to patients that doctor departed his practice implied he "abandoned his patients"); *Robins*, 1995 WL 776708, at *3 (dismissing defamation lawsuit with prejudice because the "article contains no words which reasonably could be construed" to imply plaintiff was "'partially' responsible for the murder" of two boys); *accord Agbapuruonwu*, 821 F. App'x at 242 (affirming dismissal of defamation lawsuit where "no explicit statement" said plaintiff "was involved" in murder and such an inference would not be reasonable); *Walker*, 99 F.3d 1132 at *1 (affirming dismissal where statements "cannot reasonably be interpreted to express defamatory meanings"); *Boykin v. Prisma Health*, 2023 WL 5488448, at *6 (D.S.C. Aug. 8, 2023), *report and recommendation adopted*, 2023 WL 5487118 (D.S.C. Aug. 24, 2023) (dismissal based on failure to plead defamation by implication).[12]

---

[12] *Cf. Faltas v. State Newspaper*, 928 F. Supp. 637, 650 (D.S.C. 1996), *aff'd*, 155 F.3d 557 (4th

V.      **THE RELEVANT PORTION OF THE BLACKFIN DOCUMENTARY IS NOT ACTIONABLE AS A MATTER OF LAW BECAUSE IT IS PROTECTED BY THE FAIR REPORT PRIVILEGE.**

Plaintiff cannot state a claim for defamation because the Blackfin Documentary is protected by the fair report privilege, under either the law of South Carolina or New York, where Blackfin, who "created and produced" the Documentary, is incorporated and has its principal place of business.  *See* Compl. ¶¶ 1, 21; Dkt. 44.[13]  The Court can apply the same analysis under both sets of law to determine the fair report privilege attaches to the Blackfin Documentary because the challenged material is derived from official governmental investigative records and actions.  *See infra* §V(A).  The inquiry is over and dismissal required at that point if the Court applies New York law; but the same outcome results under South Carolina law because Plaintiff has not and cannot sufficiently plead actual malice.  *See infra* §V(B).[14]

A.      **The Fair Report Privilege Applies To The Entirety Of The Relevant Portion Of The Blackfin Documentary.**

The fair report privilege (under either South Carolina or New York law) bars liability relating to the publication of a fair and true report of information derived from government reports

---

Cir. 1998) (letter stating "plaintiff *was not* terminated due to the publication of her piece on homosexuality" was "not reasonably susceptible to an inference that the newspaper believed plaintiff *was* terminated for cause" (emphasis in original))*; Conway v. S.C. Vocational Rehab. Dep't*, 2018 WL 2301849, at *5 (D.S.C. Jan. 31, 2018), *report and recommendation adopted,* 2018 WL 2301848 (D.S.C. Feb. 26, 2018) (summary judgment on defamation by implication claim); *Wilson v. Ward*, 1989 WL 380480, at *1 (S.C. Ct. App. Sept. 19, 1989) (truthful statement that plaintiff resigned after murders could not "reasonably be interpreted as an admission of guilt" by the plaintiff or to suggest "that she was involved in the murders").

[13] "Generally, whether a publication gives rise to a qualified privilege is a question of law for the courts." *McLaughlin*, 2021 WL 4691379, at *3 (citation omitted).

[14] The Moving Defendants do not concede, and affirmatively reject, that any part of the Blackfin Documentary is defamatory as a matter of law for the reasons discussed herein.  Regardless, they are not actionable under the fair report privilege.  The Moving Defendants also reserve the right to argue that South Carolina law does not apply to the substantive claims in this lawsuit even though this motion only asserts the point for the purposes of fair report.

or sources.  *See Cobin*, 561 F. Supp. 2d at 550 (privilege "shields news organizations from defamation claims when publishing information originally based upon government reports or actions") (citing *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 712 (4th Cir. 1991)); *accord Padgett v. Sun News*, 278 S.C. 26, 31, 292 S.E.2d 30, 33 (1982)[15]; *Aitch v. Maybin*, 2008 WL 2943348, at *2 (D.S.C. July 29, 2008), *aff'd,* 325 F. App'x 281 (4th Cir. 2009); *see also* N.Y. Civ. Rights Law § 74 (privilege protects "publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published"); *Rodriguez v. Daily News, L.P.*, 37 N.Y.S.3d 613, 615 (2d Dep't 2016).  The only statements in the relevant portion of the Blackfin Documentary arguably about Plaintiff are protected as fair report because they are comprised of the actual law enforcement interviews with witnesses telling investigators about speculation that Plaintiff was involved in Smith's death.  *Reuber*, 925 F.2d at 713 (privilege attaches when the "factual predicate for the privilege" is "a report on a government action or document"); *Rodriguez*, 37 N.Y.S.3d at 615 (police investigation of an attempted rape constituted an official proceeding under New York law and collecting cases); *Aitch*, 2008 WL 2943348, at *2 ("Under longstanding South Carolina case law, contents of governmental records—such as judicial proceedings, case reports, published cases, investigative reports, or arrest records—do not give rise to liability for slander or libel."); *Cummings v. City of N.Y.*, 2020 WL 882335, at *16 (S.D.N.Y. Feb. 24, 2020), *aff'd*, 2022 WL 2166585 (2d Cir. June 16, 2022) ("reports on allegations that lead to a government investigation are fully protected" including "allegations from parents and students that triggered the

---

[15] In *Padgett*, "the South Carolina Supreme Court recognized that there is a constitutional basis for the common law privilege, in that holding a publisher liable for an accurate report of information obtained from a governmental record or proceeding would constitute liability without fault in violation of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)."  *See Brewster v. Laurens Cnty. Advertiser*, 2012 WL 4767052, at *1 (S.C.Com.Pl. Apr. 6, 2012).

investigation" (citation omitted)); *Brewster*, 2012 WL 4767052, at *2 (privilege protects content that "accurately report the substance of government proceedings, acts, reports, or documents" including police reports); *Kun*, 2002 WL 34217983 (no liability where broadcast "accurately reported the events as recorded" by police, including in police reports); *Freeze Right Refrig. & A.C. Servs. v. City of N.Y.*, 475 N.Y.S.2d 383, 388 (1st Dep't 1984) ("even the announcement of an investigation by a public agency, made before the formal investigation has begun, is protected as a report of an official proceeding within the contemplation of the statute, as is a report of an ongoing investigation").

No statements other than the audio recordings of the law enforcement interviews mention Plaintiff in connection with Smith's murder, but to the extent Plaintiff attempts to attach liability to any other statements of the Blackfin Documentary, the rest of the relevant portion also is protected.[16]   The fair report privilege applies where, as here, the "factual predicate" for the Documentary's discussion about Smith's death is derived from law enforcement sources, including Cpl. Duncan.   *Reuber*, 925 F.2d at 713-14 (applying fair report privilege to a letter from the National Cancer Institute that was "invoking the prestige of a government agency" and the "factual predicate" of which was a "governmental" decision to investigate and discipline plaintiff); *Chapin*, 993 F.2d at 1097 (same as to "'unofficial' public statements of" a congressman in a newspaper interview because such remarks will be more "newsworthy and of concern than will the countless 'official' documents generated by quasi-public agencies"); *Cobin*, 561 F. Supp. 2d at 554-56 ("The privilege does not require that the published report be verbatim with the official report but it must only be substantially correct" even if it uses "'shorthand' to summarize the contents"); *White v.*

---

[16] Because Plaintiff does not identify any specific statements, he is barred from introducing specific statements in defense to the fair report privilege.  *Supra* n.8.

*Wilkerson*, 328 S.C. 179, 186, 493 S.E.2d 345, 349 (1997) (affirming fair report protects local news station for statements made on air about lawsuit); *Jeanty v. City of Utica*, 2017 WL 6408878, at *17-20 (N.D.N.Y. Aug. 18, 2017) (dismissing claims against a reporter who published a fair and accurate report of statements made directly to her by a district attorney); *see also Harvey*, 48 F.4th at 274 (affirming application of fair report to statements that a lawyer told a CNN reporter what "his client would say in response to the subpoena and summarized" official documents).

Plaintiff does not, because he cannot, allege the Blackfin Documentary inaccurately reports on any of the underlying investigative materials. Moreover, all of the underlying rationales for the fair report privilege—public supervision, the public's right to information, and agency, meaning "a reporter acts as an agent for members of an otherwise preoccupied public which could, if it possessed the time, energy, or inclination, inform itself about a government report or action," *Reuber*, 925 F.2d at 713—support its application here. *See also Jeanty*, 2017 WL 6408878, at *17 (noting that the "purpose of the fair reporting privilege is 'in part to implement the public policy in favor of encouraging publication and dissemination of judicial decisions and proceedings as being in the public interest'") (quoting *Beary v. W. Publg. Co.*, 763 F.2d 66, 68 (2d Cir. 1985)). Because the relevant portion of the Blackfin Documentary is based on official government sources, the fair report privilege of either New York or South Carolina applies.

The Court need not conduct any further analysis to dismiss the Complaint if applying New York law. The only conflict between New York and South Carolina law on the issue of fair report privilege is whether it is *absolute* (New York) or *qualified* (i.e., vitiated in South Carolina by showing of actual malice). *Compare* N.Y. Civ. Rights Law § 74, *with Cobin*, 561 F. Supp. 2d at

550. The Court should apply New York law under the "depecage principle"[17] because that state has the most significant interest in ensuring its own citizen and conduct occurring within its borders, are protected by the full scope of their codified fair report privileges. *See Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 178 (2d Cir. 2021) ("the Times is domiciled in New York and the alleged defamatory statement emanated from New York" and "New York has strong policy interests in regulating the conduct of its citizens and its media"); *Wilkow v. Forbes, Inc.*, 2000 WL 631344, at * 6-7 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552 (7th Cir. 2001) (applying Illinois law to defamation claims and New York law to fair report privilege because New York made its privilege absolute out of a "strong interest in encouraging unfettered expression by protecting certain types of speech within its borders"). The Court should apply New York fair report law and dismiss the Complaint in its entirety.

> **B.     If South Carolina Law Applies, The Fair Report Privilege Still Necessitates Dismissal Because The Complaint Does Not And Cannot Plead Facts Demonstrating Actual Malice.**

The Fourth Circuit has explained that while it is theoretically "possible that a possessor of a qualified privilege could nonetheless be acting with reckless disregard of truth, the existence of a privilege diminishes the likelihood of that occurrence" and "makes it more difficult for a reviewing court to conclude that a news report on government functions was published in reckless disregard of the truth." *Reuber*, 925 F.2d at 712-14. Plaintiff cannot overcome the fair report privilege here "because the Complaint makes no plausible allegation" of actual malice, which "requires 'factual allegations' that 'raise a right to relief above the speculative level.'" *Agbapuruonwu*, 821 F. App'x at 240 (quoting *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing,*

---

[17] *See Kozel v. Kozel*, 299 F. Supp. 3d 737, 751 (D.S.C. 2018) ("because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case, a principle known as 'depecage'").

*Inc.*, 674 F.3d 369, 377 (4th Cir. 2012)).  That means Plaintiff must allege *facts* (not conclusory allegations) that the Moving Defendants "knowingly uttered a falsehood or 'in fact entertained serious doubts as to the truth of'" the publication.  *Harvey*, 48 F.4th at 273-74 (citation omitted).

The sole paragraph of the Complaint relating to actual malice lumps together the states of mind of all eight defendants and is comprised of conclusory recitations of law incapable of plausibly alleging actual malice:

> "The statements were made with reckless indifference to the truth.  In publishing these statements Defendants purposefully ignored information demonstrating their falsity that was readily available to and within the Defendants' knowledge, including information indicating that individuals unrelated to Plaintiff were responsible for Mr. Smith's death.  Defendants' publications and republications of the defamatory statements are unfair and biased in that Defendants deliberately chose to omit from the series information contradicting the above-described defamatory statements."

Compl. ¶ 29; *Agbapuruonwu*, 821 F. App'x at 240 ("A conclusory allegation of knowledge of falsity or reckless disregard thereof—that is, 'a mere recitation of the legal standard'—does not constitute a plausible allegation of actual malice."); *Mayfield*, 674 F.3d at 377 (same).  The pleading fails to provide any factual allegation as to the state of mind of the Moving Defendants *in particular* or in connection with the information conveyed in the relevant portions *in particular*. *See Sigler v. Black River Elec. Coop.*, 2020 WL 9209285, at *5 (D.S.C. July 24, 2020), *report and recommendation adopted*, 2021 WL 856879 (D.S.C. Mar. 8, 2021) (finding that plaintiff "failed to allege actual malice, beyond stating without elaboration that the alleged statements were published to 'unprivileged employees' and that 'Defendant's actions were willful, mean-spirited, and intentional.'"); *Harvey*, 48 F.4th at 273-74 (affirming dismissal where complaint " did not add any new facts regarding the state of mind of the reporters who published the statements, and still does not plausibly allege that" they "knew the information was false, or that it was subjectively false").  The general, conclusory allegation that the defendants *en masse* acted in a way that was

"unfair" and "biased" fails to demonstrate actual malice. *Reuber*, 925 F.2d at 715 ("the Supreme Court consistently has held that 'the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term'" (citation omitted).

Plaintiff's conclusory allegations that all defendants "ignored" purported "information contradicting" statements in the publications does not change the conclusion. The Complaint's reference to unspecified "information" is too vague and conclusory to demonstrate actual malice, including because it provides no detail about what supposed "information" exists and whether that "information" created "*obvious* reasons to doubt the veracity" of the allegedly defamatory content. *See Harvey*, 48 F.4th at 274 (claim that defendant "ignored information that would have demonstrated the falsity" of the statements is a "naked assertion" that does not plausibly allege actual malice); *Horne v. WTVR, LLC*, 893 F.3d 201, 211-12 (4th Cir. 2018) (affirming lack of evidence to support actual malice because "within the context of the story's creation from trusted sources, the email from the anonymous source does not provide '*obvious* reasons to doubt the veracity of the informant or the accuracy of his reports'" (emphasis in original)). The Complaint's failure to sufficiently plead any facts demonstrating actual malice requires dismissal based on the fair report privilege (even if South Carolina law applies). *Reuber*, 925 F.2d at 712; *Agbapuruonwu*, 821 F. App'x at 240.

## VI.     PLAINTIFF FAILS TO SUFFICIENTLY PLEAD FAULT.

The Complaint warrants dismissal for failure to plead any facts demonstrating fault, which Plaintiff must do regardless of whether he is a public or private figure (an inquiry that the parties agree the Court need not, should not, and lacks sufficient information to make at this point, *see* Dkt. 41-1 at 34). If Plaintiff is a public figure, dismissal is required for failure to plead actual malice, as discussed above. *See supra* § V. Even if Plaintiff were a private figure (which the Moving Defendants do not concede), and because this lawsuit involves an issue of public concern,

binding South Carolina dictates that he "must plead and prove common law malice." *Erickson*, 368 S.C. at 466; *McGlothlin v. Hennelly*, 2021 WL 2935372, at *1 (4th Cir. July 13, 2021); *see supra* n.8 (explaining why this case is one of public concern).

Common law malice means the defendant "acted with ill will toward the plaintiff, or acted recklessly or wantonly, i.e., with conscious indifference of the plaintiff's rights." *Erickson*, 368 S.C. at 466; *see also Boone v. Sunbelt Newspapers, Inc.*, 347 S.C. 571, 581,  556 S.E.2d 732, 737-38 (S.C. Ct. App. 2001) (common law malice "refers to feelings of ill-will, spite, or desire to injure"); *McGlothlin*, 2021 WL 2935372, at *2 (no common law malice, notwithstanding that plaintiff "might dispute that he engaged in any impropriety," where there was no evidence that the defendant "harbored serious doubts about the accuracy of his statements"); *Floyd v. Knight*, 2023 WL 4409037, at *13 (D.S.C. Apr. 27, 2023), *report and recommendation adopted*, 2023 WL 4013520 (D.S.C. June 15, 2023) (no common law malice where defendant "reasonably believed" statements to be true); *Kelley-Moser Consulting, LLC v. Daniels*, 2012 WL 554643, at *13 (D.S.C. Feb. 21, 2012) (common law standard "considers the motivation of the alleged wrongdoer" and whether defendant demonstrated "ill will" with "the design to causelessly and wantonly injure"). The Complaint fails to plead a single factual allegation relating to any of the Moving Defendants' states of mind, including any allegation indicating that any of the Moving Defendants acted out of "ill-will, spite, or desire to injure" Plaintiff or "harbored serious doubts" about the accuracy of the Blackfin Documentary.  *See Boone*, 347 S.C. at 581, 737-38; *Kelley-Moser Consulting*, 2012 WL 554643, at *13.  The Complaint cannot survive given its failure to sufficiently plead any facts demonstrating either actual or common law malice.  Nor will Plaintiff be able to meet that burden because it would be contrary to the law to find that the Moving Defendants acted with any form of malice by accurately describing official law enforcement reports and sources.

## CONCLUSION

For the reasons discussed herein, the Moving Defendants respectfully request the Court dismiss Plaintiff's claim of defamation as to the Blackfin Documentary with prejudice.

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH, LLP

s/ MERRITT G. ABNEY
David E. Dukes, Esq. (Federal Bar No. 00635)
E-Mail: david.dukes@nelsonmullins.com
1320 Main Street / 17th Floor
Post Office Box 11070 (29211-1070)
Columbia, SC 29201
(803) 799-2000

Merritt G. Abney, Esq. (Federal Bar No. 09413)
E-Mail: merritt.abney@nelsonmullins.com
151 Meeting Street / Sixth Floor
Post Office Box 1806 (29402-1806)
Charleston, SC 29401-2239
(843) 853-5200

WILLKIE FARR & GALLAGHER LLP

Meryl C. Governski, *pro hac vice*
Kristin Bender, *pro hac vice*
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006-1238
(202) 303-1000
mgovernski@willkie.com
kbender@willkie.com

*Attorneys for Defendants Blackfin, Inc., Warner Bros.*
*Discovery, Inc., Warner Media Entertainment Pages, Inc. and*
*Campfire Studios, Inc.*

Charleston, South Carolina
October 16, 2024

32