# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

### BEAUFORT DIVISION

|  |  |
|---|---|
| RICHARD ALEXANDER MURDAUGH, JR.,<br>        Plaintiff,<br><br>vs.<br><br>BLACKFIN, INC., WARNER BROS. DISCOVERY, INC., WARNER MEDIA ENTERTAINMENT PAGES, INC., CAMPFIRE STUDIOS INC.,<br><br>        Defendants. | Case No. 9:24-cv-04914-RMG<br><br><br><br>**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT BLACKFIN, INC., JOINED BY WARNER BROS. DISCOVERY, INC. AND WARNER MEDIA ENTERTAINMENT PAGES, INC.** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 3

    A.    The Blackfin Documentary Chronicled The Criminal Investigations, Scandals, And Speculation Surrounding The Murdaugh Family Dynasty. ...................................................... 3

    B.    Publicly Released Law Enforcement Records Documented The Investigation Into Smith's Death, Including Audio Excerpts Of Their Interviews. ............................................... 4

    C.    Plaintiff Files This Lawsuit Claiming The Blackfin Documentary Implies He Is "The Murderer Of Stephen Smith." ............................................................................................. 10

LEGAL STANDARD ............................................................................................................ 10

ARGUMENT ........................................................................................................................ 11

    I.    THE AMENDED COMPLAINT, AND THE LEGAL THEORY ON WHICH IT IS BASED, FAILS TO COMPLY WITH RULE 8. ...................................................................... 14

    II.    THE FIRST AMENDMENT BARS PLAINTIFF'S CLAIM BECAUSE THE BLACKFIN DOCUMENTARY DID NOT ASSERT AS FACT THAT HE MURDERED SMITH. ................................................................................................................................. 16

    III.    PLAINTIFF FAILS TO MAKE THE "ESPECIALLY RIGOROUS SHOWING" REQUIRED TO STATE A CLAIM FOR DEFAMATION BY IMPLICATION. ................. 23

    A.    The Language Of The Blackfin Documentary Cannot "Be Reasonably Read To Impart" That Plaintiff Is "The Murderer Of Stephen Smith." ............................................. 24

    B.    Plaintiff Cannot Meet His Rigorous Burden To Show The Moving Defendants Intended Or Endorsed That Alleged Implication. ................................................................. 27

    IV.    ANY FACTUAL IMPLICATION CONVEYED BY THE BLACKFIN DOCUMENTARY IS TRUE. ..................................................................................................... 28

    V.    PLAINTIFF FAILS TO SUFFICIENTLY PLEAD COMMON LAW MALICE ......... 29

    VI.    PLAINTIFF'S CLAIM CANNOT SURVIVE BECAUSE IT IS PREDICATED ON PRIVILEGED STATEMENTS. ........................................................................................... 33

CONCLUSION ..................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AdvanFort Co. v. Mar. Exec.*, *LLC*,
  2015 WL 4603090 (E.D. Va. July 28, 2015) ..........................................................30

*Agbapuruonwu v. NBC Subsidiary (WRC-TV)*,
  821 F. App'x 234 (4th Cir. 2020) ............................................23, 24, 28, 32, 35

*AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*,
  903 F.2d 1000 (4th Cir. 1990) ...........................................................................28

*Aitch v. Maybin*,
  2008 WL 2943348 (D.S.C. July 29, 2008), *aff'd*, 325 F. App'x 281 (4th Cir.
  2009) .................................................................................................................33

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................10, 14

*Ballengee v. CBS Broad., Inc.*,
  968 F.3d 344 (4th Cir. 2020) ...........................................................................28

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................10, 14, 27

*Biospherics Inc. v. Forbes, Inc.*,
  151 F.3d 180 (4th Cir. 1998) .................................................16, 17, 18, 19, 22

*Biro v. Conde Nast*,
  883 F. Supp. 2d 441 (S.D.N.Y. 2012)..............................................................16

*Blankenship v. NBCUniversal, LLC*,
  60 F.4th 744 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 5 (2023)......................31

*Blanton v. City of Charleston*,
  2014 WL 4809838 (D.S.C. Sept. 26, 2014).....................................................17

*Block v. Matesic*,
  2023 WL 8527670 (S.D. Fla. Dec. 8, 2023)...............................15, 16, 26, 27

*Bongino v. Daily Beast Co.*,
  477 F. Supp. 3d 1310 (S.D. Fla. 2020) ............................................................16

*Boone v. Sunbelt Newspapers, Inc.*,
  347 S.C. 571, 556 S.E.2d 732 (Ct. App. 2001).................................................29

*Boykin v. Prisma Health*,
    2023 WL 5488448, at *6 (D.S.C. Aug. 8, 2023), *report and recommendation adopted*, 2023 WL 5487118 (D.S.C. Aug. 24, 2023) ................................................24

*Brewster v. Laurens Cnty. Advertiser*,
    2012 WL 4767052 (S.C.C.P. Apr. 6, 2012) ...............................................................34

*CACI Premier Tech., Inc. v. Rhodes*,
    536 F.3d 280 (4th Cir. 2008) .................................................................16, 18, 21

*Cantrell v. Forest City Publ'g Co.*,
    419 U.S. 245 (1974) ...................................................................................31

*RE Carroll Mgmt. Co. v. Dun & Bradstreet, Inc.*,
    2025 WL 415743 (4th Cir. Feb. 6, 2025) ...........................................................14, 18

*Carroll v. TheStreet.com, Inc.*,
    2012 WL 13134547 (S.D. Fla. May 25, 2012) ............................................................16

*Carson v. Emergency MD, LLC*,
    2020 WL 5077655 (D.S.C. Aug. 25, 2020) ..............................................................15

*Chapin v. Knight-Ridder, Inc.*,
    993 F.2d 1087 (4th Cir. 1993) ...........................22, 23, 24, 25, 26, 27, 28, 29, 34

*Charleston Carriage Works, LLC v. Charleston Animal Soc.*,
    2022 WL 20838964 (S.C.C.P. May 12, 2022) ..........................................................29, 30

*Cobin v. Hearst-Argyle Television, Inc.*,
    561 F. Supp. 2d 546 (D.S.C. 2008) .............................................3, 4, 26, 33, 34

*Coker v. Norwitch Com. Grp., Inc.*,
    2023 WL 3791106 (D.S.C. June 2, 2023) ..................................................................28

*Conway v. S.C. Vocational Rehab. Dep't*,
    2018 WL 2301849, at *5 (D.S.C. Jan. 31, 2018), *report and recommendation adopted,* 2018 WL 2301848 (D.S.C. Feb. 26, 2018) ...........................................24

*Cook v. United States*,
    2015 WL 1854443 (D.S.C. Apr. 21, 2015) ...............................................................14

*Cummings v. City of N.Y.*,
    2020 WL 882335 (S.D.N.Y. Feb. 24, 2020), *aff'd*, 2022 WL 2166585 (2d Cir. June 16, 2022) .......................................................................................34

*Deripaska v. Associated Press*,
    282 F. Supp. 3d 133 (D.D.C. 2017) ......................................................................16

*Dickerson v. Albemarle Corp.*,
2016 WL 245188 (D.S.C. Jan. 21, 2016) ..........................................................................11, 15

*Dobkin v. Johns Hopkins Univ.*,
1999 WL 22901 (4th Cir. Jan. 21, 1999) ....................................................................................28

*Dongguk Univ. v. Yale Univ.*,
734 F.3d 113 (2d Cir. 2013) ......................................................................................................31

*Erickson v. Jones St. Publishers, LLC*,
368 S.C. 444, 629 S.E.2d 653 (2006) ...............................................................................11, 29

*Faltas v. State Newspaper*,
928 F. Supp. 637 (D.S.C. 1996), *aff'd*, 155 F.3d 557 (4th Cir. 1998) ..............................24, 31

*Floyd v. Knight*,
2023 WL 4409037, at *13 (D.S.C. Apr. 27, 2023), *report and
recommendation adopted*, 2023 WL 4013520 (D.S.C. June 15, 2023) ..................................32

*Freeze Right Refrig. & A.C. Servs. v. City of N.Y.*,
475 N.Y.S.2d 383 (App. Div. 1984) .........................................................................................34

*Gilmore v. Jones*,
C.A. 2021 WL 68684 (W.D. Va. Jan. 8, 2021) .......................................................................32

*Glob. Relief Found. v. N.Y. Times Co.*,
390 F.3d 973 (7th Cir. 2004) ....................................................................................................29

*Harvey v. Cable News Network, Inc.*,
48 F.4th 257 (4th Cir. 2022) ...............................................................................29, 31, 32, 34

*Henry v. Fox News Network LLC*,
629 F. Supp. 3d 136 (S.D.N.Y. 2022) .......................................................................................16

*Herdt v. Horry Cnty. Council*,
No. 4:17-cv-00392-RBH, 2018 WL 827140 (D.S.C. Feb. 12, 2018) .....................................30

*Hogan v. Winder*,
762 F.3d 1096 (10th Cir. 2014) ................................................................................................16

*Holbrook v. Harman Auto., Inc.*,
58 F.3d 222 (6th Cir. 1995) ......................................................................................................32

*Horne v. WTVR, LLC*,
893 F.3d 201 (4th Cir. 2018) ....................................................................................................32

*Hughs v. Royal Energy Res.*,
2020 WL 6689132 (D.S.C. Nov. 12, 2020) ......................................................................15, 23

*Jeanty v. City of Utica*,
   2017 WL 6408878 (N.D.N.Y. Aug. 18, 2017) ....................................................34

*Kesner v. Dow Jones & Co.*,
   515 F. Supp. 3d 149 (S.D.N.Y. 2021).............................................................16

*Kinsey v. N.Y. Times Co.*,
   991 F.3d 171 (2d Cir. 2021) ("New York has strong policy interests in
   regulating the conduct of its citizens and its media").............................................34

*Kozel v. Kozel*,
   299 F. Supp. 3d 737 (D.S.C. 2018)...............................................................34

*Kun v. WCSC-TV-5*,
   2002 WL 34217983 (S.C.C.P. May 28, 2002)...............................................28, 34

*Levin v. McPhee*,
   119 F.3d 189 (2d Cir. 1997).....................................................................22

*Lugo v. Boeing Co.*,
   2020 WL 495336 (D.S.C. Jan. 30, 2020) .........................................................27

*Masson v. New Yorker Mag., Inc.*,
   501 U.S. 496 (1991)............................................................................28

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing Inc.*,
   674 F.3d 369 (4th Cir. 2022) ...................................................................32

*McGlothlin v. Hennelly*,
   2021 WL 2935372 (4th Cir. July 13, 2021).......................................................32

*McLaughlin v. Darlington Cnty.*,
   2021 WL 4691379, at *2 (D.S.C. Sept. 17, 2021), *report and recommendation
   adopted*, 2021 WL 4691055 (D.S.C. Oct. 7, 2021) .............................................3, 33

*McNeil v. S.C. Dep't of Corr.*,
   404 S.C. 186, 743 S.E.2d 843 (Ct. App. 2013)...................................................14

*Mejia v. Telemundo Mid-Atlantic LLC*,
   440 F. Supp. 3d 495 (D. Md. 2020).............................................................32

*Moldea v. New York Times Co.*,
   15 F.3d 1137 (D.C. Cir. 1994)..................................................................19

*Mungo v. BP Oil, Inc.*,
   2012 WL 13005317 (D.S.C. Dec. 21, 2012) .......................................................11

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)................................................................................31

*Ortiz v. Jackson*,
    2023 WL 5208007 (D.S.C. Aug. 14, 2023) ...........................................14

*Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*,
    829 F.2d 1280 (4th Cir. 1987) .......................................................19, 26

*Reuber v. Food Chem. News, Inc.*,
    925 F.2d 703 (4th Cir. 1991) .........................................................33, 35

*Robins v. Nat'l Enquirer, Inc.*,
    1995 WL 776708 (D.S.C. Apr. 10, 1995)..............................................23

*Rodriguez v. Daily News, L.P.*,
    37 N.Y.S.3d 613 (App. Div. 2016)..................................................33, 34

*Rollins Ranches, LLC v. Watson*,
    2021 WL 5355650 (D.S.C. Nov. 17, 2021) ...............................11, 16, 23

*Schnare v. Ziessow*,
    104 F. App'x 847 (4th Cir. 2004) ..............................................17, 18, 19

*Sellers v. S.C. Autism Soc'y, Inc.*,
    861 F. Supp. 2d 692 (D.S.C. 2012)................................................11, 15

*Snyder v. Phelps*,
    580 F.3d 206 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) .....................11

*Tannerite Sports LLC v. NBCUniversal News Grp.*,
    864 F.3d 236 (2d Cir. 2017)...................................................................15

*Toussaint v. Palmetto Health*,
    2017 WL 1950955 (D.S.C. May 10, 2017).............................................23

*USA v. Murdaugh*,
    No. 9:23-cr-00396-RMG (D.S.C.).............................................................4

*Veney v. Wyche*,
    293 F.3d 726 (4th Cir. 2002) .................................................................11

*Walker v. Tyler*,
    1996 WL 612600 (4th Cir. Oct. 24, 1996).................................23, 24, 27

*Wang v. Sussman*,
    2025 WL 81355 (S.D.N.Y. Jan. 13, 2025) .....................................27, 28

*Weise v. Colorado Springs*,
  2020 WL 13701854 (D. Colo. Nov. 30, 2020) .......................................................16

*White v. Wilkerson*,
  328 S.C. 179, 493 S.E.2d 345 (1997) ...................................................................34

*Wilkow v. Forbes, Inc.*,
  2000 WL 631344 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552 (7th Cir.
  2001) ......................................................................................................................35

*Wilson v. Ward*,
  1989 WL 380480 (S.C. Ct. App. Sept. 19, 1989) ..................................................24

*Woodward v. Weiss*,
  932 F. Supp. 723 (D.S.C. 1996)............................................................................22

**Statutes**

N.Y. Civ. Rights Law § 74 .............................................................................................33

**Other Authorities**

Fed. R. Civ. P. 8(a) .........................................................................................................30

Fed. R. Civ. P. 8(a)(2)......................................................................................................14

Fed. R. Evid. 201(b)...........................................................................................................4

Defendant Blackfin, Inc. ("Blackfin"), joined in full by Warner Bros. Discovery, Inc. ("WBD") and Warner Media Entertainment Pages, Inc. ("Warner Media Entertainment") (collectively, with the corporate entities disclosed in the Amended Answer to Local Rule 26.01 Interrogatories, "Warner Entities")[1] (Blackfin, with Warner Entities, "Moving Defendants" and, Moving Defendants, with Campfire Studios, Inc., "Defendants") respectfully move the Court to dismiss the Amended Complaint (Dkt. 86) filed by Plaintiff Richard Alexander Murdaugh, Jr. ("Buster" or "Plaintiff") as to the documentary "Murdaugh Murders: Deadly Dynasty," which the Complaint alleges Blackfin produced and WBD aired on the streaming service discovery+ and the Investigation Discovery television channel ("Blackfin Documentary").

## PRELIMINARY STATEMENT

Despite the Court having afforded Plaintiff Buster Murdaugh the opportunity to amend, the Amended Complaint does not fix any of the fatal defects in his attempt to state a claim for defamation against Blackfin and the Warner Entities.  Plaintiff still does not dispute any of the central facts reported in the Blackfin Documentary, including that: his mother and brother were shot and killed execution style just before his brother was scheduled to appear in court on criminal charges relating to a boat accident that killed a local teenager; Plaintiff's father subsequently was charged, arrested, and convicted of murdering his son and wife; during the investigation into that double homicide, law enforcement re-opened a different criminal investigation into the 2015 death

---

[1] All of the Warner Entities join this Motion even though Plaintiff should have identified WarnerMedia Direct, LLC, Discovery Communications, LLC ("Discovery Communications"), and Discovery Digital Ventures, LLC ("DDV") instead of WBD and Warner Media Entertainment for the reasons explained in the Amended Answer to Local Rule 26.01 Interrogatories (Dkt. 44) and based on the allegations of the Amended Complaint (none of which the Warner Entities concede).  Also, Plaintiff makes no allegations connecting Warner Media Entertainment to the Blackfin Documentary, meaning that WBD is the only named Warner Entity relevant to this Motion.  The Warner Entities reserve all rights and waive none relating to the improper party identification.

of another teenager, Stephen Smith; and multiple third-party individuals raised Plaintiff's name with investigators during the course of the investigation into Smith's death, including in publicly released audio excerpts of the law enforcement interviews. Plaintiff also admits that all of the factual statements about him in the Blackfin Documentary are true and that it never reaches any conclusion about whether Smith was murdered or who was responsible, including whether Plaintiff was involved. Plaintiff nevertheless attempts to construct a defamation lawsuit by alleging the Blackfin Documentary *as a whole* implies that Plaintiff is "*the murderer* of Stephen Smith."

Plaintiff's claims fail as a matter of law for multiple independent reasons and require dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule" or "Rules"). The Amended Complaint fails to sufficiently identify the specific allegedly defamatory content in the Blackfin Documentary, which alone necessitates dismissal. *Infra* Argument § I. Leaving aside the failure to adequately plead the defamatory content, Plaintiff's admission that the *only* content in the Blackfin Documentary connecting him to Smith's murder is "***speculation, rumor, and hearsay***" defeats his claim because the First Amendment of the United States Constitution (the "First Amendment") bars all claims that are not based on assertions of fact. *Infra* § II. Nor has, or can, Plaintiff make the required "rigorous showing" that the Blackfin Documentary conveyed the allegedly defamatory meaning he ascribes to it (i.e., that he is "the murderer of Stephen Smith") *and* that the Moving Defendants endorsed that specific inference. *Infra* § III. Plaintiff's admission that anyone listening to audio recordings of law enforcement interviews in which his name arose could draw the same inference that he claims the Blackfin Documentary conveyed is fatal to his claim under the substantial truth doctrine. *Infra* § IV. Plaintiff's Amended Complaint also fails to plead facts demonstrating that each of the Moving Defendants acted with common law malice. *Infra* § V. Even if any one of those separate arguments were not fatal (which each is), the Blackfin

2

Documentary's discussion of the investigation into Smith's death is protected in its entirety by the fair report privilege. *Infra* § VI. The Moving Defendants respectfully move the Court to dismiss Plaintiff's lawsuit as to the Blackfin Documentary with prejudice for failure to state the only claim it attempts to allege.

## FACTUAL BACKGROUND

### A. The Blackfin Documentary Chronicled The Criminal Investigations, Scandals, And Speculation Surrounding The Murdaugh Family Dynasty.

The Blackfin Documentary reported on a series of events connected to the Murdaugh family, a "four generation legal dynasty" whose name was "synonymous with criminal justice, law enforcement, [and] the law" in South Carolina until 2019, when it became associated with criminal investigations, fatal tragedies, and scandal. Ex. D at 21.[2] In 2019, Plaintiff's brother, then 19-year-old Paul Murdaugh, was indicted for felony boating under the influence in connection with a boat crash that took the life of a local teenager, Mallory Beach. *See generally id.* Two years later, and days before Paul was scheduled to appear in court for the first hearing in his criminal case, police found Paul and his mother, Maggie Murdaugh, shot dead execution style at the family's hunting plantation. Ex. E at 2, 8-9. "After the double murders, the focus was narrowing on the Murdaugh dynasty, and there were *so many questions*, and everything in their life was getting examined." *Id.* at 34 (emphasis added). Around the same time, SLED began to investigate the death of Gloria Satterfield, the Murdaugh family's longtime housekeeper who was found dead in

---

[2] The Moving Defendants previously submitted a thumb drive to the Court containing a video copy of all three episodes of the Documentary. *See* Dkt. 48-3 (Exhibits A-C). This Motion cites those materials as Exhibits A-C without re-submitting a thumb drive, but otherwise re-attaches the official transcripts of the same and retains the exhibit numbers (i.e., Exhibits D-F). The Court can consider these materials because they are integral to the Complaint. *See McLaughlin v. Darlington Cnty.*, 2021 WL 4691379, at *2 (D.S.C. Sept. 17, 2021), *report and recommendation adopted*, 2021 WL 4691055 (D.S.C. Oct. 7, 2021); *Cobin v. Hearst-Argyle Television, Inc.*, 561 F. Supp. 2d 546, 552 (D.S.C. 2008) (news reports "clearly central to the plaintiff's claim").

their home with conflicting reports on whether she fell or was pushed down the stairs by Paul. *Id.* at 34, 43. At the same time, the Satterfield family launched its own investigation into why it had not received any of an alleged $4.3 million insurance settlement related to wrongful death claims against the Murdaughs. Ex. F at 4-6.

Law enforcement later arrested and brought criminal charges against Alex Murdaugh, including for stealing $4.3 million from Satterfield's estate. *Id.* at 30. During a bond hearing, a SLED agent made the following representation to the court:

> "… ***we are investigating multiple different allegations, or investigations at this point at this time [sic] to include the Stephen Smith death***, which you're aware of. The actual cause of Miss Satterfield's death, we're looking into that. The financial case that you're here with today and numerous other financial investigations dealing with, with fraud or possible other criminal actions. That's not to say that there won't be additional charges brought forth in the future."

*Id.* at 25, 27, 32. SLED subsequently charged Alex with various criminal acts, including murdering his wife and son (for which he was convicted). *See State v. Murdaugh*, Appellate Case Nos. 2023-000392 and 2024-000576; *USA v. Murdaugh*, No. 9:23-cr-00396-RMG (D.S.C.).[3]

**B.     Publicly Released Law Enforcement Records Documented The Investigation Into Smith's Death, Including Audio Excerpts Of Their Interviews.**

A local teenager, Stephen Smith, was found dead on the side of a road in Hampton County in 2015. Ex. 2 at 4.[4] Official law enforcement records indicated Smith's body was found with "some sort of blunt force trauma to the head" and "no evidence to suggest the victim was struck

---

[3] The Court can take judicial notice of the investigations and prosecutions since they are not subject to reasonable dispute. *See* Fed. R. Evid. 201(b) (not subject to reasonable dispute if: "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[4] Counsel for the Moving Defendants obtained state investigative materials via a Freedom of Information Act request. Certain of those materials were filed as the "Appendix in Support of Defendants' Motion to Dismiss" at Dkt. 51 as Exhibits 1-11. The "Court may consider the police report as a matter of public record" that is properly subject to judicial notice and to assess fair report privilege. *See Cobin*, 561 F. Supp. 2d at 550-51; *see also* Fed. R. Evid. 201(b).

by a vehicle." *Id*. SLED crime scene notes explained that a "hole in the skull was located above the victim's right eye" and that it was "unclear" if the "hole was caused by a projectile." *Id*. at 58. Investigative case notes by South Carolina's Multi-Disciplinary Accident Investigation Team ("M.A.I.T.") stated that a former officer who investigated the incident, Corporal Michael Duncan, believed it "appeared to be a homicide[.]" *Id*. at 9. M.A.I.T. case notes of investigator Trooper Todd Proctor illustrated his view that there was "no evidence" (other than Smith having been found in the road) to support the pathologist's theory that Smith was "possibly struck by a motor vehicle mirror" and recalled a subsequent conversation between the two: "I asked her if someone with a baseball bat could do that and she stated 'no.' When I probed further saying what about someone in a moving car, with a bat she stated 'well I guess it's possible.'" *Id.* at 25.

Roughly ten minutes into the second episode, the Blackfin Documentary explained that two weeks after the double murder of Plaintiff's mother and brother, SLED announced it had "reopened a 2015 case where a young teen, 19 year old [*sic*] Stephen Smith, was found dead on the side of the road." Ex. E at 12. The ensuing twenty minutes explained the circumstances surrounding Smith's death, relying on official investigative materials, including audio recordings of the police interviews and Cpl. Duncan's contemporaneous audio notes, as well as an interview with Cpl. Duncan. *Id*. at 12-34. The Blackfin Documentary played Cpl. Duncan's audio notes about his impressions from the scene of the incident: "There is no body trauma other than to the head area. ***Does not appear to be, in my opinion, struck by a vehicle***." *Id*. at 16-18 (emphasis added). In an interview, Cpl. Duncan reiterated that, in his opinion, Smith "was murdered by someone, or a group, through some type of blunt force trauma" and "somebody in Hampton County knows exactly who did it." *Id*. at 21-24. Cpl. Duncan explained he "would hear all these rumors, but they were all the same type of stories," including from individuals who went to high

school with Smith saying they had "heard one thing or another about Stephen's death." *Id*. at 25, 28.

As reflected in the official law enforcement records, Plaintiff's name surfaced during those investigatory conversations. Ex. 2 at 19 (tip that someone asked "if Stephen and Buster Murdaugh ever had any type of relationship"); *id*. at 28 ("stated that the reason that he was passing this information on was because Randy Murdaugh told him to call"); *id*. at 29 (detailing questioning about Buster Murdaugh). Cpl. Duncan's case notes from December 7, 2015 state he "received an email in reference to an anonymous tip" that one man "'along with another black male and a white male (Murdaugh) are the ones involved in death.' This tip is referring to Stephen Smith." *Id*. at 24. During recorded interviews with law enforcement, including with Cpl. Duncan, multiple third-party individuals independently raised Plaintiff's name. *See* Ex. 3B at 9 ("rumors going around Hampton that everybody keeps coming up to me and it was Murdaugh boys"); Ex. 4B at 21 ("people kept coming up to me and they're like did you know the Murdaugh boys are behind it, you know, saying Buster Murdaugh . . ."); Ex. 9B at 4 ("*I do remember someone saying something about Buster, but they didn't really go into details because they didn't really know.*"); Ex. 7B at 14 ("only name that was given to me was the Murdaugh name"); Ex. 8B at 8 ("he's the one that said Buster had something to do with it, but he didn't tell you how he knew that?"); Ex. 10B at 4 ("story that Taylor told me was that I guess the information that his understanding of it was is that Buster and either one or two other people were driving around, saw Stephen's car . . .were possibly gonna, you know, kinda messed with them or something, stuck something out of the vehicle and it hit them. Is that the story that you got?"); see *also* Ex. 7B at 7-8, 24-25, Ex. 8B at 3, 5; Ex. 9B at 3-4; Ex. 10B at 3; Ex. E at 26-27, 30-36.

Part of the second episode of the Blackfin Documentary—specifically pages 25 through 35 of the transcript attached at Exhibit E ("Relevant Portion")[5]—aired the following excerpts of audio recordings of the law enforcement interviews, pasted below in italics and as played in the Documentary with the immediate surrounding context, including on-camera commentary notated with underlining and substantive on-screen graphics in bold underlining:[6]

| **On-Screen Graphic:** | **"Actual Police Interview Audio September 2, 2015"** |
|---|---|
| **Tpr. Proctor**: | *"Just go ahead and–and tell me, you know, what you heard."* |
| **T.D.:** | *"Yessir, not a problem. I heard that these two, maybe three young men were in a vehicle, saw the car on the side of the road, I guess, saw the boy walking. They turned back around. I guess they were attempting to--, I don't wanna say, you know, mess around with him or something like that, and stuck something out the window, and it, you know, hit him...I did hear names and I'm--, or heard a name, and that name was--, he goes by Buster Murdaugh. The only name that was given to me was the Murdaugh name. And, of course, everybody's kinda shy to say, to say that out, you know what I mean? Because of, of the--, yeah, I won't say power, but of the, the name, you know, it brings a certain standard when you say Murdaugh in Hampton County."[7]* |
| **T.S.:** | *"Someone was talking about how he died. And then it was like, 'Well, you guys did it' And I was like, 'Nope. Didn't.' And he was like, 'Well, Buster did it.'"* |
| **Tpr. Proctor:** | *"And who was that?"* |
| **T.S.:** | *"Buster Murdaugh."[8]* |

---

[5] Plaintiff confirms his claim is based on a "10-minute segment" of the Blackfin Documentary in which he alleges he "is alluded to a number of times as the murderer for Stephen Smith" and subsequently characterizes what appears to be the same segment. ¶¶ 12, 32. Based on the content of the Blackfin Documentary and the Amended Complaint's description, the Moving Defendants understand Plaintiff to be referring and basing liability on the Relevant Portion identified and excerpted here.

[6] All witnesses whose names appear in the law enforcement materials but whose names do not appear in the Documentary are referenced herein by their initials only.

[7] Ex. E at 25; Ex. 7B at 7-8, 14.

[8] Ex. E at 27-28; Ex. 8B at 3, 5.

| | |
|---|---|
| **B.S.:** | "*We just heard that Buster did it.  So, after that, I mean, everybody knows who Buster is and, like, his family and all that.  So it was kinda, like, shocking.*"[9] |
| **Cpl. Duncan:** | "You would hear all these rumors, but they were all the same type of stories." |
| **D.S.:** | "*We heard it was Buster, I was like – They were saying 'If it's him, it's--.  Nothing was going to be done about it because of who he was.* "[10] |
| **Cpl. Duncan:** | "It's constantly there.  It's not like it was brought up one time.  When the Murdaugh family's name come about, it was like, okay, we gotta treat this one a little bit different at this point, because it is a well-known powerful family in this area.  It was at that point in time we had to say, hey, do we have stuff that we're gonna have to connect the dots with?" |
| **On-Screen Graphic:** | **"Actual Police Interview Audio September 2, 2015"** |
| **T.D.:** | "*It wouldn't surprise me just because of --, I feel like they wouldn't want anything to happen to their reputation or name or anything like that.  And I've known the Murdaugh family, like [I] said, pretty much my whole life.*"[11] |
| **Anne Emerson**: | "There was another Murdaugh mentioned, and that was Buster's little brother, Paul." |
| **On-Screen Graphic:** | **"Actual Police Interview Audio September 2, 2015"** |
| **T.D.:** | "*And when I originally heard this, I was thinking of the younger Murdaugh boy, Buster's little brother Paul.  Because Paul's more the--, I don't wanna say troublemaker, but, I mean, with the right amount of alcohol or drugs.*"[12] |
| **Kimberly Brant (Hampton Native):** | "Rumors were everywhere.  The scenario that was presented to me was, they were out joyriding, they see the boy walking down the side of the road, Paul leans out the window, pegs him with a baseball bat.  That did not surprise me one bit.  I could see it happening.  I could see Paul doing that." |
| **On-Screen Graphic:** | **"Additional, unsubstantiated rumors surface during law enforcement's interviews with Stephen's friends."** |

---

[9] Ex. E at 28; Ex. 10B at 3.
[10] Ex. E at 28; Ex. 9B at 4.
[11] Ex. E at 29; Ex. 7B at 15.
[12] Ex. E at 30; Ex. 7B at 24-25.

| | |
|---|---|
| **Gregg Roman (Investigative Journalist)**: | "There may have been a closer relationship between Buster and Stephen than their parents had known about. Him and Buster were in high school together." |
| **Cpl. Duncan:** | "You would hear all these rumors that Buster and Stephen may have had a relationship together." |
| **On-Screen Graphic:** | **"Actual Police Interview Audio September 2, 2015"** |
| **T.D.:** | *"He heard it from her. She heard it from Buster's best friend."*[13] |
| **Cpl. Duncan:** | *"Kindly tell me what you told her about that."* |
| **A.C.:** | *"Another friend of mine had texted me asking me if Buster and Stephen were together. Well, then, I asked him why. He said because he had heard that."*[14] |
| **Cpl. Duncan:** | *"So the only rumor you heard is possibly Buster having a-- some type of relationship with Stephen?"* |
| **B.S.:** | *"Yes, sir."*[15] |
| **Cpl. Duncan:** | "Is it a true story? You have to take any of that information with a grain of salt. The investigation was not really leading anywhere. You would never get a individual that you could talk to that was there at the time. We are in Hampton County. My opinion is, as far as the Murdaughs, and—them knowing everybody in that county, I believe that they do run that county to an extent. That is my belief...The investigation went cold. After probably fall towards winter, there was very limited information coming in, you know, and at some point in time, you're-- where do you go? We have followed every lead that we could." |
| **Sandra Smith (victim's mother)**: | "I don't see any reason why they would--any reason they would have to, you know, harm Stephen. But then, later on, it just kept coming up, Murdaughs, Murdaughs, Murdaughs. And then everything was just, like, swept under the rug. So then, that just got me thinking, well maybe they did have something to do with it."[16] |

---

[13] Ex. E at 32; Ex. 7B at 28.

[14] Ex. E at 32; Ex. 5B at 3.

[15] Ex. E at 32-33; Ex. 6B at 4.

[16] Ex. E at 33. Smith's on-camera video excerpt originally aired during a local news interview.

| Kimberly Brant: | "There was nothing.  It was a cold case, it dried up.  It just dried up until Paul and Maggie were killed." |
|---|---|
| **On-Screen Graphic:** | **"No rumors regarding Stephen and Buster's alleged relationship have been substantiated and all remain speculation."** |
| **On-Screen Graphic:** | **"SLED has not revealed what evidence led them to reopen the Stephen Smith case.  They are following multiple leads and have not identified suspects."** |
| **On-Screen Graphic:** | **"Buster Murdaugh has not been named a suspect or person of interest in Stephen Smith's death."** |

C.    **Plaintiff Files This Lawsuit Claiming The Blackfin Documentary Implies He Is "The Murderer Of Stephen Smith."**

On June 14, 2024, Plaintiff filed a version of this lawsuit in state court in Hampton County against eight defendants arising from three separate documentaries.  After removal and severance, the Moving Defendants moved to dismiss the Original Complaint on October 16, 2024.  Dkt. 48. The Court subsequently denied the motions to dismiss without prejudice as moot pursuant to Plaintiff filing an amended complaint to which the Moving Defendants would have 21 days to respond.  Dkts. 85, 87.  Plaintiff filed the Amended Complaint on April 1, 2025.  Dkt. 86.

## LEGAL STANDARD

Rule 12(b)(6) authorizes a motion to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Dismissal is warranted when a complaint fails to plead any "factual content that allows the court to draw the reasonable inference" that defendants are "liable for the misconduct alleged."  *Id*.  A complaint that amounts to "little more than boilerplate allegations, devoid of

10

sufficient facts to satisfy the pleading standards applicable in federal court" warrants dismissal. *Sellers v. S.C. Autism Soc'y, Inc.*, 861 F. Supp. 2d 692, 699 (D.S.C. 2012).

To state a claim for defamation under South Carolina law, Plaintiff must plead facts sufficient to demonstrate: "(1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 465, 629 S.E.2d 653, 664 (2006); *Dickerson v. Albemarle Corp.*, 2016 WL 245188, at *3 (D.S.C. Jan. 21, 2016). When considering whether a plaintiff states a claim for defamation, the "inquiry is not only to assess whether the statements in the complaint 'may constitute a sufficient basis for Plaintiffs' defamation claim,' but also to consider whether such a claim would comport with the First Amendment." *Rollins Ranches, LLC v. Watson*, 2021 WL 5355650, at *4 (D.S.C. Nov. 17, 2021) (citation omitted); *see also Snyder v. Phelps*, 580 F.3d 206, 218 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) ("regardless of the specific tort being employed, the First Amendment applies when a plaintiff seeks damages for reputational, mental, or emotional injury allegedly resulting from the defendant's speech"). The Court need not "accept as true" allegations that contradict materials properly before the Court because they are referenced in the pleading or properly subject to judicial notice. *Mungo v. BP Oil, Inc.*, 2012 WL 13005317, at *2 (D.S.C. Dec. 21, 2012) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)); *see also supra* nn. 2 & 3.

## ARGUMENT

The Amended Complaint attempts to assert a claim of defamation by alleging the Blackfin Documentary "falsely implies and subtly accuses the Plaintiff of being *the murderer* of Stephen Smith" and killing him with a baseball bat because of a romantic relationship between the two. Amended Compl. at ¶¶ 12 (emphasis added); 13 ("falsely imply"); 23 ("that Plaintiff killed Mr.

11

Smith with a baseball bat as a result of a romantic relationship between the two"); 32 ("implies and subtly asserts"); 33 ("ultimately conveys the defamatory inference that Plaintiff killed Mr. Smith in connection with a romantic relationship").[17]  Plaintiff is "not claiming that ***any*** specific statement made during [the Blackfin Documentary] is actionable or defamatory in itself" or that his legal claim relies on the alleged falsity of any statements or facts contained in the Blackfin Documentary.  Dkt. 72 at 7; *id*. at 2 ("interview excerpts and sound bites it presents in the series are ***facially true***"); *id*. at 10 ("defamation by implication claim is ***not actionable because of any specific*** statement" but rather because of what "can be gleaned from what otherwise could be ***truthful statements*** or opinions within the series") (all emphases added).[18]  Instead, Plaintiff's legal theory is "the ***entire*** series when read as a ***whole*** represents its own individual act or statement of defamation" (*id*. at 8) because it purportedly juxtaposed "certain statements within the show, ***even if they are opinion and/or facially true***, to create a defamatory implication, alongside certain omissions of information that would have tended to show that Plaintiff was not involved in the death of Mr. Smith"  (¶ 34) (emphases added).  The Amended Complaint alleges the Blackfin Documentary as a "whole" creates a defamatory implication by juxtaposing: (1) an unspecified "ten-minute segment" that plays video and audio "excerpts from interviews conducted by law enforcement" in which "Plaintiff is alluded to a number of times as the murderer of Stephen Smith" (¶¶ 12, 32; Ex. E at 12-34) with (2) various "sequences, excerpts, and statements" contained in the hour-plus of preceding content that Plaintiff pleads "were intentionally calculated to prime the

---

[17] Any citations to paragraphs (¶¶) refer to the Amended Complaint.

[18] In moving to amend, Plaintiff confirmed that the Amended Complaint does not attempt to advance any new legal claims or theory and rather seeks only to add "additional, specific factual detail to preexisting claims against preexisting Defendants."  Dkt. 75 at 8.

recipient" for the Relevant Portion by introducing "themes" about Plaintiff's family (¶¶ 20-34;[19] Ex. G ("Priming Portions")).[20]

Plaintiff's Amended Complaint necessitates dismissal for multiple independent reasons. Plaintiff fails to sufficiently identify the allegedly defamatory content, as the Rules require. *Infra* § I. Leaving aside the lack of requisite specificity, the First Amendment bars Plaintiff's claims as to the Blackfin Documentary because it does not state as a fact that he is "the murderer of Stephen Smith" (which is the only alleged defamation). *Infra* § II. The Amended Complaint separately fails because it does not plead any facts sufficient to meet the "rigorous standard" Plaintiff has conceded applies to his claim, specifically that the "plain and natural meaning of the words used" in the Blackfin Documentary can be "reasonably" viewed to impart the false inference he ascribes to it *and* that the Moving Defendants intended or endorsed that implication. *Infra* § III. To the extent the Blackfin Documentary implies any facts about Plaintiff, such facts would not cause a different effect on viewers than the admitted truth that Plaintiff's named surfaced repeatedly in the course of the law enforcement investigation. *Infra* § IV. Even if the Amended Complaint were able to overcome all those hurdles, it still requires dismissal for the lack of any facts demonstrating common law malice. *Infra* § V. Further, Plaintiff's claims are barred by the

---

[19] ¶¶ 23 ("vilifies the Murdaugh family and thematically sets the stage for Defendants to later encourage the audience to take a logical leap and conclude that Plaintiff killed Mr. Smith with a baseball bat as a result of a romantic relationship between the two"); 24 ("reinforce the theme" that the Murdaugh family holds "'incredible power and influence'"); 25 ("demonstrate[s]" that there "were sinister and depraved elements within the family's ranks" including because Paul Murdaugh "would 'kill little baby animals' and 'could kill anyone'"); 28 ("foreshadows Defendants' later implication that Mr. Smith's death was the result of his sexual orientation, as well as a false thread established by the series' narrative tying Mr. Smith romantically to Plaintiff").

[20] The Amended Complaint includes only cherry-picked snippets of statements in the Priming Portions, and in some cases only as "samples" of "juxtaposed, editorialized statements" contained therein. *See* ¶¶ 23-25, 27-31. Exhibit G contains the full context of the Priming Portions as best as the Moving Defendants could discern from the characterizations in the Amended Complaint.

fair report privilege because the Relevant Portion of the Blackfin Documentary derives in its entirety from official government information about the criminal investigation. *Infra* § VI.

## I.     THE AMENDED COMPLAINT, AND THE LEGAL THEORY ON WHICH IT IS BASED, FAILS TO COMPLY WITH RULE 8.

Leaving aside its lack of legal merit (*infra* Argument §§ II-VI), Plaintiff's "whole" publication theory violates the pleading requirements of the Federal Rules. Rule 8 requires a pleading to contain "a short and plain statement of the claim ***showing*** that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). As this Court has explained, the requirement to *show* rather than just *say* means "that ***a plaintiff must do more than make conclusory statements to state a claim and must provide sufficient factual information to put defendants on notice of their wrongdoing***." *Cook v. United States*, 2015 WL 1854443, at \*4 n.2 (D.S.C. Apr. 21, 2015) (emphasis added) (citing *Ashcroft*, 556 U.S. at 677–79 (2009), *Twombly*, 550 U.S. at 555, and Rule 8(a)(2) ("a short and plain statement of the claim *showing* that the pleader is entitled to relief")).

The Amended Complaint alleges but does not plead sufficient factual information to ***show*** the Blackfin Documentary implied Plaintiff was "the murderer of Stephen Smith" because Plaintiff does not "specify a factual statement" from the Blackfin Documentary "that gives rise to this implication." *RE Carroll Mgmt. Co. v. Dun & Bradstreet, Inc.*, 2025 WL 415743, at \*3 (4th Cir. Feb. 6, 2025) (affirming dismissal of claim for defamation by implication); *McNeil v. S.C. Dep't of Corr.*, 404 S.C. 186, 195, 743 S.E.2d 843, 848 (Ct. App. 2013) ("specificity" required); *see Ortiz v. Jackson*, 2023 WL 5208007, at \*3 (D.S.C. Aug. 14, 2023) (dismissing where complaint had not "alleged enough context and specificity 'to put the other party on notice as to which

14

statements it was to defend against'" (cleaned up)); *see* ¶¶ 13, 20-34.[21]  Plaintiff seems to believe

he can avoid pleading any specific defamatory content by claiming the Blackfin Documentary "is

***not actionable because of any specific statement***" but rather based on what "can be gleaned from

what otherwise could be truthful statements or opinions within the series."  Dkt. 72 at 10.  But

defamation-by-implication plaintiffs still must identify the specific "truthful statements" that

convey the alleged defamatory implication "so defendants and courts may address themselves to

the parts of a communication alleged to be false and defamatory instead of those not objected to"

especially where a publication "includes thousands of direct statements and implied messages

whose veracity could be questioned by a defamation plaintiff."  *Tannerite Sports LLC v.*

*NBCUniversal News Grp.*, 864 F.3d 236, 251 (2d Cir. 2017) ("specificity" required); *Block v.*

*Matesic*,  2023 WL 8527670, at *10 (S.D. Fla. Dec. 8, 2023).  The Amended Complaint's

allegations about an unspecified "10-minute segment" and "samples" of snippets of statements in

the Priming Portions throughout the Blackfin Documentary are the type of "scattered, cryptic

references" that "do not amount to proper pleading." *Tannerite Sports*, 864 F.3d at 251; ¶¶ 12-13,

20-34.  Nor does Plaintiff's "effort to weave a tapestry of defamation" sufficiently put the Moving

Defendants "on notice of the ***specific facts***" they "(supposedly) manipulated" in the Blackfin

Documentary.  *Block*, 2023 WL 8527670, at *9-10 (emphasis added) (dismissal of defamation-by-

implication claim where complaint did not "connect the dots" by "specifically" identifying the

---

[21] *See also Carson v. Emergency MD, LLC*, 2020 WL 5077655, at *5 (D.S.C. Aug. 25, 2020) ("Many courts applying South Carolina law have found that a lack of specificity in a plaintiff's allegations regarding a defamation claim warrants dismissal."); *Hughs v. Royal Energy Res.*, 2020 WL 6689132, at *3 (D.S.C. Nov. 12, 2020) ("trial court must initially determine if the communication is reasonably capable of conveying a defamatory meaning"); *Dickerson v. Albemarle Corp.*, WL 245188, at *4 (D.S.C. Jan. 21, 2016) (dismissal based on "broad and unspecific allegation of defamation"); *accord Sellers*, 861 F. Supp. 2d at 699 (dismissing "boilerplate allegations, devoid of sufficient facts to satisfy the pleading standards applicable in federal court").

"literally true facts" juxtaposed or omitted to create the defamatory implication). The Amended Complaint's failure to identify any specific factual statements in the Blackfin Documentary that conveyed the defamatory meaning Plaintiff ascribes to it is fatal to his claim. *Id.*; *Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 175 (S.D.N.Y. 2021) (dismissing "theory of holistic defamation" where plaintiff did "not identify any part of the article" as defamatory); *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 149 (D.D.C. 2017) (dismissing claim that a reader could "infer defamatory meaning from the article as a whole" for failure to identify "any single statement as false that is both capable of verification and capable of defamatory meaning").[22]

## II. THE FIRST AMENDMENT BARS PLAINTIFF'S CLAIM BECAUSE THE BLACKFIN DOCUMENTARY DID NOT ASSERT AS FACT THAT HE MURDERED SMITH.

Plaintiff's lawsuit does not "comport with the First Amendment" because the Blackfin Documentary "cannot reasonably be interpreted" as conveying as fact that Plaintiff was "the murderer of Stephen Smith." *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 293 (4th Cir. 2008).[23] Plaintiff concedes the Blackfin Documentary did not reach any explicit conclusion about

---

[22] *See also Hogan v. Winder*, 762 F.3d 1096, 1106-10 (10th Cir. 2014) (analyzing "two categories of allegedly defamatory statements" in affirming dismissal of defamation- by-implication claims); *Henry v. Fox News Network LLC*, 629 F. Supp. 3d 136, 149-50 (S.D.N.Y. 2022) (dismissing defamation-by-implication claim with respect to statement that plaintiff engaged in "willful sexual misconduct"); *Weise v. Colorado Springs*, 2020 WL 13701854, at *5 (D. Colo. Nov. 30, 2020) (declining to recognize defamation-by-implication solely for the "gist" of a publication as a whole); *Bongino v. Daily Beast Co.,* 477 F. Supp. 3d 1310, 1319-20 (S.D. Fla. 2020) (dismissing defamation-by-implication claims with respect references to "quick temper" and "brash style"); *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 482 (S.D.N.Y. 2012) ("There can be no claim for an overall defamatory impact from the reporting of true statements beyond the specific defamatory implications that may arise from those specific statements."); *Carroll v. TheStreet.com, Inc.*, 2012 WL 13134547, at *5 (S.D. Fla. May 25, 2012) (dismissing defamation-by-implication claim relying on "only general, conclusory allegations as to the defamatory nature").

[23] Whether the Documentary reasonably can be interpreted as conveying actual facts is a question of law for the Court to resolve. *CACI*, 536 F.3d at 294; *Biospherics Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998); *see also Rollins Ranches*, 2021 WL 5355650, at *4 (must consider First Amendment when determining whether lawsuit states a defamation claim).

whether Smith was murdered or who was responsible, but Plaintiff nevertheless claims it implied he murdered Smith in the Relevant Portion, which played nine video and audio excerpts of law enforcement interviews in which five separate third-party individuals reported to police what they had heard about Plaintiff. ¶¶ 12-13, 32; Ex. E at 25-33; *supra* at 7-10.  Leaving aside that reporting on what those third parties told law enforcement is privileged as a matter of law (*see infra* Argument § VI), Plaintiff's Amended Complaint pleads that "the **only** sources of information tying Plaintiff to Mr. Smith were based on **unfounded speculation, rumor, and hearsay**."  ¶ 19 (emphasis added).  It would be inconsistent with the allegations of the Amended Complaint for this Court to determine that any of the third-party statements to law enforcement (i.e. the "only sources of information tying Plaintiff to Mr. Smith") constituted facts about Plaintiff rather than "subjective and speculative supposition." *Biospherics, Inc.* 151 F.3d at 183-84, 186 (dismissing where statement constituted "a subjective view, not a factual statement").  Where, as here, "a speaker plainly expresses 'a subjective view, an interpretation, a theory, conjecture or surmise, rather than a claim to be in possession of objectively verifiable [false] facts, the statement is not actionable.'" *Id.* at 186 (alteration in original) (to be actionable, statement must "reasonably be interpreted as stating actual facts"); *see also Schnare v. Ziessow*, 104 F. App'x 847, 851 (4th Cir. 2004) (whether statements are actionable "depends on whether a reasonable reader would construe them as seriously asserting that" the plaintiff "committed the crime of perjury"); *Blanton v. City of Charleston*, 2014 WL 4809838, at *5 (D.S.C. Sept. 26, 2014) (dismissing where "the Court concludes as a matter of law that none of the three statements at issue can reasonably be interpreted as stating a fact about the plaintiff").

Even without Plaintiff's admission, "any reasonable person" listening to the audio excerpts of the law enforcement interviews that the Blackfin Documentary played "would recognize, based

on the tenor, language, and context" that they did not convey any "actual facts" about Plaintiff. *Biospherics*, 151 F.3d at 186; *CACI*, 536 F.3d at 293; *see* Ex. E at 25-33; *supra* at 7-10.  For example, one of the individuals told law enforcement he "heard that these two, maybe three young men were in a vehicle" and were trying to "you know, mess around with [Smith] or something like that, and stuck something out of the window and it, you know, hit him." *See* Ex. E at 25; *supra* at 7.  Other statements to law enforcement were similarly speculative, including such as "We just heard that Buster did it" or "*if* it was Buster." *See* Ex. E at 28 (emphasis added); *supra* at 8.  Plus, the Blackfin Documentary expressly provided disclaimers emphasizing the unproven, speculative nature of the information, including that no "rumors regarding Stephen and Buster's alleged relationship have been substantiated and all remain speculation" and that Plaintiff "has not been named a suspect or person of interest." Ex. E at 34.  No reasonable person would understand the statements in the Relevant Portion as "seriously asserting" *any* "fact" about Plaintiff or Smith's death, let alone that Plaintiff, in fact, killed Smith and did so with a baseball bat because of a romantic relationship. *See* ¶¶ 23, 28, 33; *Schnare*, 104 F. App'x at 851; *Biospherics*, 151 F.3d at 186; *see RE Carroll Mgmt. Co.*, 2025 WL 415743, at *3  (affirming dismissal of publication because "an ordinary person" would view the inclusion of information, including a "disclaimer," as signifying an alternative conclusion).

The Amended Complaint's reliance on the Priming Portions does not change, and in fact strengthens, the conclusion that the Blackfin Documentary conveys protected speculation rather than actionable fact.  Plaintiff defeats his own claim by confirming that the Priming Portions are relevant to his legal theory only insofar as they disclose factual information from which he claims a viewer *could* conclude that Plaintiff murdered Smith when considered in combination with the Relevant Portion.  ¶¶ 23 ("encourage the audience to *take a logical leap* and conclude that Plaintiff

killed Mr. Smith with a baseball bat as a result of a romantic relationship between the two"); 29 ("***could reasonably lead*** to the inference"); 32 ("calculated to prime the recipient"); *accord* Dkt. 72 at 11 ("could lead an objective viewer to reasonably infer from its contents that Mr. Murdaugh is responsible for Mr. Smith's death"); *id* at 17 ("***could*** reasonably lead a viewer to infer the defamatory meaning"); *id.* at 15 ("the impressions and inferences that ***can be reasonably be drawn by the audience*** from the series' depiction of the subject events") (all emphasis added).  When a publication discloses the factual bases for a conclusion—which is Plaintiff's entire theory of liability (*supra* at 16-18)—a "reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation." *Biospherics*, 151 F.3d at 185 (quoting *Moldea v. New York Times Co.,* 15 F.3d 1137, 1144–45 (D.C. Cir. 1994) (citing cases)).  Even if *arguendo* the Blackfin Documentary implied any conclusion about Smith's death, the First Amendment bars attaching liability to it because Plaintiff admits it disclosed the factual basis to viewers, who were free to draw their own conclusions.  *Id.*; *see also Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1288 (4th Cir. 1987) (emphasizing importance of "fact/opinion distinction"); *accord Schnare*, 104 F. App'x at 852 (affirming dismissal of defamation claims where author disclosed "factual basis for his disagreement, allowing the reader to draw her own conclusion").

Even if Plaintiff's own admissions were not fatal, it would be unreasonable to find that the Priming Portions conveyed Smith was, in fact, murdered or Plaintiff was, in fact, the murderer. None of the statements in the Priming Portions mention *Plaintiff* at all and virtually none reflect

factual assertions.[24]  Ex. G.  Plaintiff cannot explain how conjecture in the Priming Portion about *other* specific members of the Murdaugh family—namely, Plaintiff's father,[25] grandfather,[26] and brother[27]—converts the Relevant Portion's "***speculation, rumor, and hearsay***" about Plaintiff's connection with Smith into verifiable fact.  ¶ 19.  Not only would such a conclusion be unreasonable, it also would be inconsistent with the language, context, and tenor of the Blackfin Documentary, including even the Priming Portions, to find they conveyed *any facts* about Plaintiff or Smith's death.

The Blackfin Documentary explained to viewers that "there were ***so many questions***" after the double murder of Plaintiff's brother and mother and that SLED was "investigating multiple different allegations, or investigations at this point at this time to include the Stephen Smith death" among other possible crimes.  Ex. E at 34; Ex. F at 32.  Within this context, the Relevant Portion of the Blackfin Documentary chronicled law enforcement's ultimately unsuccessful criminal investigation into Smith's death, including by playing for viewers audio and video excerpts of law enforcement materials, such as Cpl. Duncan's audio notes and the official interviews with third-party individuals.  *See* Ex. E at 25-33.  The segment the Amended Complaint appears to describe at paragraphs 29 to 31 includes the portion of the Blackfin Documentary that played Cpl. Duncan's

---

[24] The way the Amended Complaint characterizes the statements in the Priming Portions reflects that they are subjective views and speculation.  *See* ¶¶ 23 ("Who killed them?" "an incredibly powerful family" "somebody in Hampton County knows exactly who did it" "Everyone around this guy seems to die" "tip of the iceberg" "Pandora's Box is open"); 24 ("incredible power and influence" "great protector" "sense of invincibility, immunity and impunity" "probably going to be swept under the rug"); 25 ("could kill anyone"); 27 ("knew this was gonna happen" "dirty business"); 30 ("Why would Randy Murdaugh call Stephen Smith's house, after he's found dead in the road and offer to represent the family?"); 31 ("believed that he was being followed").

[25] Ex. G at 1, 4-5.

[26] Ex. G at 4-5.

[27] Ex. G at 3, 5.

contemporaneous audio notes in which he stated that Smith's body did "not ***appear*** to be, ***in my***

***opinion***, struck by a vehicle" but "***[p]ossibly*** something else." *Supra* at 5; Ex. G at 4. Shortly

thereafter (in the Relevant Portion), Cpl. Duncan explained—in the midst of audio excerpts of the

law enforcement interviews, and immediately after one individual repeated rumors about a

relationship between Plaintiff and Smith—why he treated what he was hearing as *speculation*

*rather than fact*: "***Is it a true story?  You have to take any of that information with a grain of***

***salt***. The investigation was not really leading anywhere. You would never get a [*sic*] individual

that you could talk to that was there at the time." Ex. E at 33. He continued: "The investigation

went cold. After probably fall towards winter [of 2015], there was very limited information

coming in, you know, and at some point in time, you're-- where do you go?  We have followed

every lead that we could." *Id.*  The Relevant Portion of the Blackfin Documentary concluded with

graphics disclosing to the viewers that SLED still was in the process of "following multiple leads

and have not identified suspects" and that "Buster Murdaugh has not been named a suspect or

person of interest in Stephen Smith's death." *Id*. at 34. No reasonable viewer would conclude that

such statements, alone or in combination with any other portion of the Blackfin Documentary,

conveyed as a matter of fact that Plaintiff murdered Smith with a baseball bat because of a romantic

relationship between the two—including because Cpl. Duncan *expressly* cautioned that all

information relating to the investigations needed to be taken "with a grain of salt."

Moreover, Plaintiff's theory would require finding that the statements in the Priming

Portions describing his brother Paul as someone who "would 'kill little baby animals' and 'could

kill anyone'" nonetheless confirms that *Plaintiff* was "the murderer."  ¶ 25; Ex. G at 2-3; *see CACI*,

536 F.3d at 303 ("list of potential targets for investigation without assigning blame to any" one did

not convey "the 'actual fact' that [plaintiff] committed murder").[28]  Such a conclusion also would

be inconsistent with the following portion of the Blackfin Documentary that mentions Paul:

> "There was **another Murdaugh mentioned, and that was Buster's little brother, Paul**.
>
> And when I originally heard this**, I was thinking of the younger Murdaugh boy, Buster's little brother, Paul**. Because Paul's more the--, I don't wanna say troublemaker, but, I mean, with the right amount of alcohol or drugs.
>
> Rumors were everywhere.  The **scenario that was presented to me was**, they were out joyriding, they see the boy walking down the side of the road, **Paul leans out the window, pegs him with a baseball bat**.  That did not surprise me one bit.  I could see it happening.  **I could see Paul doing that**."

Ex. E at 30-31 (emphases added).  The Blackfin Documentary's reporting on various theories in

connection with a law enforcement "inquiry itself, however embarrassing or unpleasant to its

subject, is not accusation" and the "language used cannot be tortured to 'make that certain which

is in fact uncertain.'"  *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993); *see*

*Biospherics*, 151 F.3d at 184; *Woodward v. Weiss*, 932 F. Supp. 723, 727 (D.S.C. 1996); *see also*

*Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) (affirming dismissal of defamation claim

complaining of book reporting comments by individuals who had "their own personal theories"

regarding mysterious death implicating plaintiff but had no "first-hand knowledge of what

happened" because "a reasonable reader would understand that any allegations of murder,

especially any implicating Levin, are nothing more than conjecture and rumor").

---

[28] Plaintiff does not address any of the parts of the Blackfin Documentary about his brother, including the deaths of Mallory Beach or Gloria Satterfield, both of which the Blackfin Documentary reported on in the portions preceding the discussion about the Smith investigation. *See* Ex. D.

**III.     PLAINTIFF FAILS TO MAKE THE "ESPECIALLY RIGOROUS SHOWING" REQUIRED TO STATE A CLAIM FOR DEFAMATION BY IMPLICATION.**

Plaintiff admits he must make the "especially rigorous showing" articulated by the Fourth Circuit in *Chapin*: (1) the "plain and natural meaning of the words used" in the Blackfin Documentary "reasonably" can be viewed to impart the false inference he ascribes to them, i.e., Plaintiff was the person who murdered Mr. Smith; and (2) Defendants intended or endorsed that implication. *Chapin*, 993 F.2d at 1092-93; *Walker v. Tyler*, 1996 WL 612600, at *2 (4th Cir. Oct. 24, 1996) ("For a defamation-by-implication cause of action to survive, the defamatory implication must be present in the plain and natural meaning of the words used."); Dkt. 72 at 15 ("the proper analysis for the Court when deciding whether a discrete implication is constitutionally protected is to determine whether there is any evidence demonstrating that Defendant intended or endorsed the defamatory implication").[29]   Consistent with its gatekeeping role, the Court should dismiss the lawsuit with prejudice because Plaintiff cannot meet his burden as to either prong.  *See Rollins Ranches*, 2021 WL 5355650, at *9, *11 (dismissal where statements not capable of the defamatory meaning alleged, including because the publication expressly said the alleged defamatory conclusion was "unknown"); *Hughs*, 2020 WL 6689132, at *4 (dismissal because letter accusing the plaintiff of engaging in corporate misconduct "only provides notice" of the existence of an investigation and "specifically notes that 'there has been no suggestion to this point of any wrongdoing'"); *Toussaint v. Palmetto Health*, 2017 WL 1950955, at *2 (D.S.C. May 10, 2017) (dismissal where it would be "objectively unreasonable" to find that communications to patients that doctor departed his practice implied he "abandoned his patients"); *Robins v. Nat'l Enquirer, Inc.*, 1995 WL 776708, at *3 (D.S.C. Apr. 10, 1995) (dismissal because the "article contains no

---

[29] Whether "a statement is reasonably capable of conveying a defamatory implication" is a matter of "law to be decided on a motion to dismiss."  *Agbapuruonwu v. NBC Subsidiary (WRC-TV)*, 821 F. App'x 234, 239 (4th Cir. 2020).

words which reasonably could be construed" to imply plaintiff was "'partially' responsible for the murder" of two boys); *accord Agbapuruonwu*, 821 F. App'x at 241-42 (affirming dismissal where "no explicit statement" said plaintiff "was involved" in murder and such an inference would not be reasonable); *Walker*, 1996 WL 612600, at *1 (affirming dismissal where statements "cannot reasonably be interpreted to express defamatory meanings"); *Boykin v. Prisma Health*, 2023 WL 5488448, at *6 (D.S.C. Aug. 8, 2023), *report and recommendation adopted*, 2023 WL 5487118 (D.S.C. Aug. 24, 2023) (dismissal based on failure to plead defamation by implication).[30]

### A.    The Language Of The Blackfin Documentary Cannot "Be Reasonably Read To Impart" That Plaintiff Is "The Murderer Of Stephen Smith."

The Blackfin Documentary cannot "be reasonably read to impart" the "libelous meanings ascribed to it" by Plaintiff, i.e., that he is "the murderer of Stephen Smith." *Chapin*, 993 F.2d at 1091.   As discussed above (*supra* at 3-10), the Blackfin Documentary "does not speak in certainties"—there was no conclusion as to whether there was *any* "murderer of Stephen Smith" or, if so, who it was or that it was Plaintiff or that it was the result of a baseball bat because of a romantic relationship between Plaintiff and Smith—and the "plain and natural meaning of the words" it uses does not convey any such conclusion.   *Chapin*, 993 F.2d at 1092, 1096.   The Blackfin Documentary is analogous to the article at the center of *Chapin* (the "Greve article"), which questioned the finances of a nonprofit organization that delivered gift packs to troops

---

[30] *Cf. Faltas v. State Newspaper*, 928 F. Supp. 637, 650 (D.S.C. 1996), *aff'd*, 155 F.3d 557 (4th Cir. 1998) (letter stating "plaintiff *was not* terminated due to the publication of her piece on homosexuality" was "not reasonably susceptible to an inference that the newspaper believed plaintiff *was* terminated for cause" (emphasis in original))*; Conway v. S.C. Vocational Rehab. Dep't*, 2018 WL 2301849, at *5 (D.S.C. Jan. 31, 2018), *report and recommendation adopted,* 2018 WL 2301848 (D.S.C. Feb. 26, 2018) (summary judgment on defamation by implication claim); *Wilson v. Ward*, 1989 WL 380480, at *1 (S.C. Ct. App. Sept. 19, 1989) (truthful statement that plaintiff resigned after murders could not "reasonably be interpreted as an admission of guilt" by the plaintiff or to suggest "that she was involved in the murders").

abroad. *Id*. at 1091. The Fourth Circuit affirmed the district court's dismissal of the case based on the lack of defamatory implication, explaining:

> "***In the Court's view, it is a story constructed around questions, not conclusions. But the mere raising of questions is, without more, insufficient to sustain a defamation suit in these circumstances. Questions are not necessarily accusations or affronts.*** Nor do they necessarily insinuate derogatory answers. ***They may simply be, as they are here, expressions of uncertainty***. The Greve article advances alternative answers to the questions it raises, presenting both favorable and unfavorable views, but does not ultimately adopt any particular answer as correct. From this, a reasonable reader would not be likely to conclude that one answer is true and the other false. Language of ambiguity and imprecision permeates the article, significantly coloring its tone."

*Id*. at 1098 (emphasis added).

Plaintiff fails the first prong of the *Chapin* test because he has failed to identify any truthful statements of facts whose "plain and natural" meaning conveyed the meaning he ascribes to the Blackfin Documentary. *Id*. at 1092. Plaintiff implicitly concedes that the alleged defamatory meaning is not based on the "plain and natural" meaning of any specific statements of fact by constructing an elaborate "whole" publication theory based on either the juxtaposition of "themes" suggested by snippets of statements in the Priming Portion with the Relevant Portion or on "omissions of information that would have tended to show that Plaintiff was not involved in the death of Mr. Smith." Compl. ¶¶ 33-34, 50; *see also id*. ¶¶ 18-19 ("ignored" "information indicating that individuals unrelated to Plaintiff were responsible for Mr. Smith's death"). Moving Defendants are unaware of any court in South Carolina or in this Circuit that has recognized a defamation-by-implication claim based solely on an *entire publication*, or that has applied the juxtaposition or omission standard within the *Chapin* framework under South Carolina law.[31] If

---

[31] Moving Defendants are aware of a few opinions of other district courts within this Circuit considering whether juxtaposition of facts or an omission of a material fact may constitute defamation, but none that has held that juxtaposition or omission of facts constitutes defamation in the absence of specific defamatory statements.

such a legal theory is viable, the Amended Complaint fails to plead any facts demonstrating any alleged juxtaposition or omission of facts that would meet the "rigorous" *Chapin* standard.

As discussed above, virtually none of the statements Plaintiff identifies in the Priming Portions are *facts* at all, which defeats a claim for defamation by implication. *Chapin*, 993 F.2d at 1094 (for a question to defame by implication "it must be reasonably read as an *assertion* of a false *fact*" (emphasis in original)); *accord Potomac Valve,* 829 F.2d at 1289–1290; *see Block*, 2023 WL 8527670, at *10 (defamation by implication "is, by definition, the manipulation of *true facts* to create a defamatory effect"). The limited statements in the Priming Portions that may convey truthful facts—such as that Mr. Smith's death was "unresolved" and "reopened" or that Plaintiff's brother would "kill little baby animals" (¶¶ 23, 25)—do not, when juxtaposed with the Relevant Potion, convey any implication that *Plaintiff* murdered Smith. *See supra* 14-16. For the reasons discussed above, Plaintiff cannot meet the first prong of *Chapin* based on a "story constructed around questions, not conclusions" about how Smith died and who may be responsible. *Chapin*, 993 F.2d at 1098.

Nor does the Amended Complaint sufficiently plead any facts demonstrating the Blackfin Documentary created the defamatory implication by omitting facts. The only indication about what "information" the Blackfin Documentary purportedly omitted is an allegation that "at least four individuals other than Plaintiff were rumored to be involved in the death of Mr. Smith or were potential suspects, that there was evidence indicating Mr. Smith's death was the result of a hit-and-run and not a homicide." *Id.* ¶ 19. Such an assertion is too vague and conclusory to permit the Court to determine whether their absence created the purported defamatory inference. *See Cobin v. Hearst-Argyle Television, Inc.*, 561 F. Supp. 2d 546, 558 (D.S.C. 2008) (considering plaintiff's claim that certain "information would have made for a more balanced presentation"

before determining that the "absence of such details does not make the story against the plaintiff defamatory"). Plaintiff's attempt to plead a "tapestry of defamation" does not meet *Chapin*'s rigorous requirement of showing that the Blackfin Documentary conveyed the defamatory meaning he ascribes to it. *Block*, 2023 WL 8527670, at *10.

**B.      Plaintiff Cannot Meet His Rigorous Burden To Show The Moving Defendants Intended Or Endorsed That Alleged Implication.**

Even if Plaintiff met *Chapin*'s first prong, his defamation-by-implication claim still requires dismissal for failure to sufficiently plead that the Moving Defendants intended or endorsed the alleged inference that he killed Smith with a baseball bat because of a romantic relationship between Plaintiff and Smith. *Chapin*, 993 F.2d at 1092-93; *Wang v. Sussman*, 2025 WL 81355, at *9 (S.D.N.Y. Jan. 13, 2025) ("The latter requirement is measured by an 'objective' standard that 'asks whether the plain language of the communication itself suggests that an inference was intended or endorsed.'"). Plaintiff attempts to meet this "rigorous" standard with the single allegation that the "Defendants' deliberate editorial choices and narrative themes suggest that they intended, or at least endorsed, the inference that Plaintiff killed Mr. Smith." ¶ 34. A conclusory assertion that parrots the legal standard is insufficient to state any claim for defamation, let alone to meet the "especially rigorous showing" *Chapin* requires. *Lugo v. Boeing Co.*, 2020 WL 495336, at *3 (D.S.C. Jan. 30, 2020) (Gergel, J. ) ("A pleading that merely offers … 'labels and conclusions,' or 'a formulaic recitation of the elements of a cause of action will not do.'" (citing *Twombly*, 550 U.S. at 555) (cleaned up)). The Amended Complaint pleads no facts, including specific "editorial choices" or "narrative themes" *about Plaintiff*, that "affirmatively suggest" that any of the Moving Defendants intended or endorsed the inference that he murdered Smith with a baseball bat because of a relationship with Smith. *Chapin*, 993 F.2d at 1092-93; *Walker*, 1996 WL 612600, at *2 (dismissal where defendants did not endorse any factual allegations or intend "an

inference to be drawn"); *Agbapuruonwu*, 821 F. App'x at 238 ("the court noted that the Complaint did not allege facts suggesting that NBC intended or endorsed either implication").  To the contrary, the Blackfin Documentary's express disclosures to viewers that authorities reached no conclusions about the manner of Smith's death, or whether Plaintiff or anyone else was responsible affirmatively contradicts, rather than suggests, endorsement.  *Supra* at 10; *Chapin*, 993 F.2d at 1092-93; *Wang*, 2025 WL 81355, at *10 (dismissal where statements in publication "undercut" and illustrate the "opposite" of endorsement).

## IV.     ANY FACTUAL IMPLICATION CONVEYED BY THE BLACKFIN DOCUMENTARY IS TRUE.

To the extent the Blackfin Documentary implies facts, they are true and not actionable. *Dobkin v. Johns Hopkins Univ.*, 1999 WL 22901, at *4 (4th Cir. Jan. 21, 1999) (defamation does not lie if "the gist or 'sting' of a statement is substantially true"); *Kun v. WCSC-TV-5*, 2002 WL 34217983 (S.C.C.P. May 28, 2002) ("The truth of the matter is a complete defense to an action based on defamation."); *see also AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990).  The substantial truth doctrine requires dismissal because Plaintiff cannot demonstrate that the Blackfin Documentary would create a "different effect on the mind of" the viewer "from that which the pleaded truth would have produced."  *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991) (internal quotation marks omitted); *Coker v. Norwitch Com. Grp., Inc.*, 2023 WL 3791106, at *6 (D.S.C. June 2, 2023) ("the alleged defamatory statement was more damaging to the plaintiff's reputation in the mind of the average listener, than a truthful statement would have been" (internal quotation marks omitted)); *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 350 (4th Cir. 2020) (statement is "'substantially' true in overall effect" when looking at its "effect on the viewer").  The pleaded truth is that Plaintiff's name repeatedly surfaced during the law enforcement investigation into Smith's death and the playing of "excerpts from interviews

conducted by law enforcement implies and subtly asserts Plaintiff was responsible" for Smith's death. ¶ 32. Plaintiff must, but has failed to, explain how the "effect on the mind of" the viewer from that pleaded truth—i.e. that the audio excerpts may lead a viewer to conclude that Plaintiff was responsible for Smith's murder—is any different from hearing those audio excerpts alongside the other content in the Blackfin Documentary. *See Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 270 (4th Cir. 2022) (dismissal where plaintiff "failed to establish that these statements are either materially false or defamatory"); *Chapin*, 993 F.2d at 1094 (affirming dismissal in part based on assertions that were "true"); *see also Glob. Relief Found. v. N.Y. Times Co.*, 390 F.3d 973, 986 (7th Cir. 2004) ("reports were either true or substantially true recitations of the government's suspicions").

## V.       PLAINTIFF FAILS TO SUFFICIENTLY PLEAD COMMON LAW MALICE.

Accepting as true Plaintiff's allegations that he is a private figure,[32] Plaintiff must plead facts sufficient to demonstrate common law malice, which as applied here requires showing that the Moving Defendants published the Blackfin Documentary as a whole "with such recklessness as to show a conscious indifference towards plaintiff's rights." *Charleston Carriage Works, LLC v. Charleston Animal Soc.*, 2022 WL 20838964, at *12 (S.C.C.P. May 12, 2022); *accord* Dkt. 72 at 28-29 (defining common law malice to mean "reckless disregard for the truth"); *Erickson*, 368 S.C. at 466, 629 S.E.2d at 665; *see also Boone v. Sunbelt Newspapers, Inc.*, 347 S.C. 571, 581,

---

[32] Plaintiff argued that common law malice was the appropriate standard, notwithstanding his alleged private figure status, when opposing the earlier motions to dismiss. Dkt. 72 at 28-29. The Warner Entities do not concede that the common law malice standard applies to the exclusion of constitutional actual malice, or that Plaintiff is a private figure.

556 S.E.2d 732, 737-38 (Ct. App. 2001).[33]   Plaintiff attempts to meet this standard as to *all*

Defendants with the following conclusory allegation:

> "The publications were made with reckless indifference to the truth and with
> knowledge of information that would have cast serious doubts on the intended
> defamatory meaning of the Defendants' publications.   In publishing these
> statements Defendants purposefully ignored information demonstrating their falsity
> that was readily available to and within the Defendants' knowledge, including
> information indicating that individuals unrelated to Plaintiff were responsible for
> Mr. Smith's death.   Accident investigation notes from the South Carolina
> Department of Public Safety's ('DPS') Multi-Disciplinary Accident Investigation
> Team ('MAIT') that were available to and reviewed by Defendants prior to
> publishing and republishing their series demonstrate that at least four individuals
> other than Plaintiff were rumored to be involved in the death of Mr. Smith or were
> potential suspects, that there was evidence indicating Mr. Smith's death was the
> result of a hit-and-run and not a homicide, and that the only sources of information
> tying Plaintiff to Mr. Smith were based on unfounded speculation, rumor, and
> hearsay.   Defendants had no reliable or credible information indicating that Mr.
> Smith's death was the result of his sexual orientation or connected to Plaintiff."

¶ 19; ¶ 51 ("reckless and intentional conduct of the Defendants, in complete disregard of the

truth").

The Court can find the Amended Complaint fails to sufficiently plead common law malice

solely based on its improper group pleading. Fed. R. Civ. P. 8(a); *Herdt v. Horry Cnty. Council*,

No. 4:17-cv-00392-RBH, 2018 WL 827140, at *2 (D.S.C. Feb. 12, 2018) ("Any amended

complaint must also set forth allegations of wrongdoing as to each Defendant sufficient to give

each defendant fair notice of what the claim is and the grounds upon which it rests."). By lumping

together the states of mind of multiple organizations and with respect to all Defendants *en masse*,

the Amended Complaint fails to provide sufficient notice of any facts demonstrating reckless

indifference to the truth or knowledge of falsity of any of the individual defendants. *Cf. AdvanFort*

---

[33] South Carolina law also defines common law malice to include publication "actuated by ill will
in what [they] did, with the design to causelessly and wantonly injure the plaintiff" (*Charleston
Carriage Works*, 2022 WL 20838964, at *12), but Plaintiff has confirmed in the Amended
Complaint and in opposition to the earlier filed motions to dismiss that he is relying only on the
"recklessness" standard (¶¶ 19, 51; Dkt. 72 at 28-29).

*Co. v. Mar. Exec.*, *LLC*, 2015 WL 4603090, at *7 (E.D. Va. July 28, 2015) ("it is well established that actual malice must be proved with respect to *each* defendant") (citing *Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245, 252-54 (1974)); *see also Faltas*, 928 F. Supp. at 646 (must show "that each defendant acted" with "knowledge of the falsity of the statement or reckless disregard for its truth").[34]

Even if paragraphs 19 and 51 do not amount to improper group pleading, they do not satisfy Plaintiff's burden because they are devoid of any facts that could impute reckless indifference or subjective doubt of truth to any individual at the organizations responsible for publishing the Blackfin Documentary. The requisite state of mind in a defamation lawsuit must be "be brought home to the persons in the … organization having responsibility for the publication …." *New York Times Co. v. Sullivan*, 376 U.S. 254, 287 (1964); *Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 761 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 5 (2023) (same). The Amended Complaint does not identify a single individual at any of the Moving Defendants' organization responsible for the publication of the Blackfin Documentary, let alone who acted with common law malice. *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) ("When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice."); *see also Harvey*, 48 F.4th at 273-74 (affirming dismissal where complaint "did not add any new facts regarding the state of mind of the reporters who published the statements, and still does not plausibly allege that" they "knew the information was false, or

---

[34] Given the similarities between how South Carolina courts have defined the recklessness standards of common law malice and constitutional actual malice, there is no substantive rationale for why Plaintiff should be able to plead the former as to the Defendants with group pleading without any specific allegations as to any individual defendant.

that it was subjectively false"); *Holbrook v. Harman Auto., Inc.*, 58 F.3d 222, 225 (6th Cir. 1995) ("where, as here, the defendant is an institution rather than an individual, the question is whether the individual responsible for the statement's publication acted with the requisite culpable state of mind"); *Gilmore v. Jones*, C.A. 2021 WL 68684, at * 4 (W.D. Va. Jan. 8, 2021) ("where one or more defendants are institutional actors rather than individuals, the state of mind inquiry focuses on the subjective state of mind of the individuals responsible for the publication at issue"); *Mejia v. Telemundo Mid-Atlantic LLC*, 440 F. Supp. 3d 495, 502 (D. Md. 2020) (dismissing amended complaint that "contains no factual allegations referring to the state of mind of the individual in charge of" the publications).

Finally, Plaintiff's sole allegation as to fault fails to demonstrate it on the merits. The Amended Complaint's "conclusory allegation of knowledge of falsity or reckless disregard thereof" is "a mere recitation of the legal standard" that is insufficient to sustain dismissal. *Agbapuruonwu*, 821 F. App'x at 240; *see Mayfield v. Nat'l Ass'n for Stock Car Auto Racing Inc.*, 674 F.3d 369, 377 (4th Cir. 2022). The allegations that the Defendants relied on alleged "speculation, rumor, or hearsay" or "purposefully ignored information" about other individuals "rumored to be involved" in Smith's death are too vague for the Court to draw any inferences about the alleged information (*supra* at 27) and do not include any facts demonstrating that the Moving Defendants "doubted—or had reason to doubt—the veracity of the offending statements." *McGlothlin v. Hennelly*, 2021 WL 2935372, at *2 (4th Cir. July 13, 2021).[35]  Further, because

---

[35] *Cf. Harvey*, 48 F.4th at 274; *Horne v. WTVR, LLC*, 893 F.3d 201, 211-12 (4th Cir. 2018) (affirming lack of evidence to support fault because "within the context of the story's creation from trusted sources, the email from the anonymous source does not provide '*obvious* reasons to doubt the veracity of the informant or the accuracy of his reports'" (emphasis in original)); *Floyd v. Knight*, 2023 WL 4409037, at *13 (D.S.C. Apr. 27, 2023), *report and recommendation adopted*, 2023 WL 4013520 (D.S.C. June 15, 2023) (no common law malice where defendant "reasonably believed" statements to be true).

Plaintiff admits that a listener of the law enforcement interviews could conclude Plaintiff was involved in Smith's death, it would be inconsistent with the allegations of the Amended Complaint (and the Blackfin Documentary) to find that any of the Moving Defendants conveyed any such inference with common law malice.  *See supra* at 16-22.

## VI.    PLAINTIFF'S CLAIM CANNOT SURVIVE BECAUSE IT IS PREDICATED ON PRIVILEGED STATEMENTS.

Plaintiff cannot state a claim for defamation because the Blackfin Documentary is protected by the fair report privilege.[36]  The fair report privilege bars liability relating to the publication of a fair and true report of information derived from government reports or sources. *See Cobin*, 561 F. Supp. 2d at 550 ("shields news organizations from defamation claims when publishing information originally based upon government reports or actions") (citing *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 712 (4th Cir. 1991)); *Aitch v. Maybin*, 2008 WL 2943348, at *2 (D.S.C. July 29, 2008), *aff'd,* 325 F. App'x 281 (4th Cir. 2009) ("Under longstanding South Carolina case law, contents of governmental records—such as judicial proceedings, case reports, published cases, investigative reports, or arrest records—do not give rise to liability for slander or libel.").[37]  Plaintiff cannot avoid the fair report privilege by claiming the entirety of the Blackfin Documentary conveys a defamatory implication because he *admits* the video and audio "excerpts from interviews conducted by law enforcement" in which "Plaintiff is alluded to a number of times as the murderer of Stephen Smith" is the "factual predicate" for his claim.  ¶¶ 12, 32; Ex. E at 12-34; *Reuber*, 925 F.2d at 713 (privilege attaches when the "factual predicate for the privilege" is "a

---

[36] "Generally, whether a publication gives rise to a qualified privilege is a question of law for the courts."  *McLaughlin*, 2021 WL 4691379, at *3 (citation omitted).

[37] *Accord* N.Y. Civ. Rights Law § 74 (privilege protects "publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding"); *Rodriguez v. Daily News, L.P.*, 37 N.Y.S.3d 613, 615 (App. Div. 2016).

report on a government action or document"); *see Chapin*, 993 F.2d at 1097 (privilege applies to "'unofficial' public statements of" a congressman in a newspaper interview); *White v. Wilkerson*, 328 S.C. 179, 186, 493 S.E.2d 345, 248  (1997) (affirming privilege applies to statements made on air about lawsuit); *Cobin*, 561 F. Supp. 2d at 554-56 ("The privilege does not require that the published report be verbatim with the official report but it must only be substantially correct" even if it uses "'shorthand' to summarize the contents"); *Harvey*, 48 F.4th at 274 (affirming privilege to statements about what a lawyer's "client would say in response to the subpoena and summarized" official documents); *Brewster v. Laurens Cnty. Advertiser*, 2012 WL 4767052, at *2 (S.C.C.P. Apr. 6, 2012) (privilege applies to police reports); *Kun*, 2002 WL 34217983 (privilege applies to "accurately reported the events as recorded" by police, including in police reports).[38]

The Court need not conduct any further analysis to dismiss the Complaint if it applies the law of New York—where Blackfin is incorporated and has its principal place of business (¶ 1; Dkt. 44)—because New York recognizes an absolute privilege.  The Court should apply New York law under the "depecage principle"[39] because that state has the most significant interest in ensuring its own citizens and conduct occurring within its borders are protected by the full scope of their codified fair report privileges.  *See Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 178 (2d Cir. 2021)

---

[38] *Accord Rodriguez*, 37 N.Y.S.3d at 615 (police investigation of an attempted rape constituted an official proceeding under New York law); *Cummings v. City of N.Y.*, 2020 WL 882335, at *16 (S.D.N.Y. Feb. 24, 2020), *aff'd*, 2022 WL 2166585 (2d Cir. June 16, 2022) ("reports on allegations that lead to a government investigation are fully protected" including "allegations from parents and students that triggered the investigation"); *Jeanty v. City of Utica*, 2017 WL 6408878, at *17 (N.D.N.Y. Aug. 18, 2017) ("purpose of the fair reporting privilege is 'in part to implement the public policy in favor of encouraging publication and dissemination of judicial decisions and proceedings as being in the public interest'"). *Freeze Right Refrig. & A.C. Servs. v. City of N.Y.*, 475 N.Y.S.2d 383, 388 (App. Div. 1984) ("[e]ven the announcement of an investigation by a public agency, made before the formal investigation has begun, is protected as a report of an official proceeding within the contemplation of the statute, as is a report of an ongoing investigation").
[39] *See Kozel v. Kozel*, 299 F. Supp. 3d 737, 751 (D.S.C. 2018) (as "choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case").

("New York has strong policy interests in regulating the conduct of its citizens and its media"); *Wilkow v. Forbes, Inc.*, 2000 WL 631344, at * 6-7 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552 (7th Cir. 2001) (applying Illinois law to defamation claims and New York law to fair report privilege because of "strong interest in encouraging unfettered expression by protecting certain types of speech within its borders").[40]

If South Carolina law applies, the fair report privilege still necessitates dismissal because the Amended Complaint does not and cannot plead facts demonstrating fault. The Fourth Circuit has explained that while it is theoretically "possible that a possessor of a qualified privilege could nonetheless be acting with reckless disregard of truth, the existence of a privilege diminishes the likelihood of that occurrence" and "makes it more difficult for a reviewing court to conclude that a news report on government functions was published in reckless disregard of the truth." *Reuber*, 925 F.2d at 712-14. Plaintiff cannot overcome the fair report privilege here "because the Complaint makes no plausible allegation" of common law malice for the reasons described above. *Agbapuruonwu*, 821 F. App'x at 240; *supra* §5.

## CONCLUSION

For the reasons discussed herein, the Moving Defendants respectfully request the Court dismiss Plaintiff's claim of defamation as to the Blackfin Documentary with prejudice.

**SIGNATURES ON FOLLOWING PAGE**

---

[40] The Moving Defendants reserve the right to argue that South Carolina law does not apply to any of the substantive claims even though this motion only asserts the point for the purposes of fair report.

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH, LLP

s/ MERRITT G. ABNEY
David E. Dukes, Esq. (Federal Bar No. 00635)
E-Mail: david.dukes@nelsonmullins.com
1320 Main Street / 17th Floor
Post Office Box 11070 (29211-1070)
Columbia, SC 29201
(803) 799-2000

Merritt G. Abney, Esq. (Federal Bar No. 09413)
E-Mail: merritt.abney@nelsonmullins.com
151 Meeting Street / Sixth Floor
Post Office Box 1806 (29402-1806)
Charleston, SC 29401-2239
(843) 853-5200

WILLKIE FARR & GALLAGHER LLP

Meryl C. Governski, *pro hac vice*
Kristin Bender, *pro hac vice*
1875 K Street N.W.
Washington, DC 20006-1238
(202) 303-1000
mgovernski@willkie.com
kbender@willkie.com

*Attorneys for Defendants Blackfin, Inc., Warner Bros.
Discovery, Inc., Warner Media Entertainment Pages, Inc. and
Campfire Studios, Inc.*

Charleston, South Carolina,
April 22, 2025