## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

## BEAUFORT DIVISION

| | |
|---|---|
| RICHARD ALEXANDER MURDAUGH, JR.,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>BLACKFIN, INC., WARNER BROS. DISCOVERY, INC., WARNER MEDIA ENTERTAINMENT PAGES, INC., AND CAMPFIRE STUDIOS INC.,<br>Defendants. | Case No. 9:24-cv-04914-RMG<br><br><br><br>**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT CAMPFIRE STUDIOS, INC., JOINED BY WARNER BROS. DISCOVERY, INC. AND WARNER MEDIA ENTERTAINMENT PAGES, INC.** |

i

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 3

    A.    The Campfire Documentary Reported On The Murdaugh Family's Fall From Holding Positions Of Legal Authority To Facing Criminal Charges. .............................................. 3

    B.    After The Murdaugh Double Murder, Law Enforcement Re-Opened The Investigation Into The 2015 Death Of Stephen Smith, On Which The Campfire Documentary Reported. 4

    C.    Plaintiff Filed This Lawsuit Claiming The Campfire Documentary Implies That He Is "The Murderer Of Stephen Smith." ....................................................................................... 10

LEGAL STANDARD ............................................................................................................. 10

ARGUMENT ......................................................................................................................... 11

    I.    THE AMENDED COMPLAINT AND THE LEGAL THEORY ON WHICH IT IS BASED FAIL TO COMPLY WITH RULE 8. .......................................................................... 14

    II.    THE FIRST AMENDMENT BARS PLAINTIFF'S CLAIM BECAUSE THE CAMPFIRE DOCUMENTARY DID NOT ASSERT AS A FACT THAT HE  KILLED SMITH WITH A BASEBALL BAT IN CONNECTION WITH A RELTIONSHIP BETWEEN THE TWO ......................................................................................................... 16

    III.    PLAINTIFF HAS FAILED TO MAKE THE "ESPECIALLY RIGOROUS SHOWING" REQUIRED TO STATE A CLAIM FOR DEFAMATION BY IMPLICATION. 23

    A.    The Language Of The Campfire Documentary Cannot "Be Reasonably Read to Impart" That Plaintiff Murdered Smith "By Striking Him With A Baseball Bat" And "In Connection With A Romantic Relationship" With Smith. .................................................... 24

    B.    Plaintiff Must But Cannot Make The Rigorous Showing That The Moving Defendants Intended Or Endorsed The Alleged Implication. ................................................................. 27

    IV.    ANY FACTUAL IMPLICATION CONVEYED BY THE CAMPFIRE DOCUMENTARY IS TRUE. ................................................................................................ 28

    V.    PLAINTIFF FAILS TO SUFFICIENTLY PLEAD COMMON LAW MALICE ......... 29

    VI.    THE CAMPFIRE DOCUMENTARY IS NOT ACTIONABLE AS A MATTER OF LAW BECAUSE IT IS PROTECTED BY THE FAIR REPORT PRIVILEGE. .................... 33

CONCLUSION ...................................................................................................................... 35

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*AdvanFort Co. v. Mar. Exec.*, *LLC*,
2015 WL 4603090 (E.D. Va. July 28, 2015) ........................................................................31

*Agbapuruonwu v. NBC Subsidiary (WRC-TV)*,
821 F. App'x 234 (4th Cir. 2020) ................................................................. *passim*

*AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*,
903 F.2d 1000 (4th Cir. 1990) ...............................................................................19, 29

*Aitch v. Maybin*,
2008 WL 2943348 (D.S.C. July 29, 2008), *aff'd*, 325 F. App'x 281 (4th Cir.
2009) ...........................................................................................................................33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................10

*Ballengee v. CBS Broad., Inc.*,
968 F.3d 344 (4th Cir. 2020) ....................................................................................29

*Biospherics, Inc. v. Forbes, Inc.*,
151 F.3d 180 (4th Cir. 1998) ....................................................................... *passim*

*Biro v. Conde Nast*,
883 F. Supp. 2d 441 (S.D.N.Y. 2012) .......................................................................15

*Blankenship v. NBCUniversal, LLC*,
60 F.4th 744 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 5 (2023) ...............................31

*Blanton v. City of Charleston*,
2014 WL 4809838 (D.S.C. Sept. 26, 2014) ..............................................................16

*Block v. Matesic*,
2023 WL 8527670 (S.D. Fla. Dec. 8, 2023) ..............................................15, 26, 27

*Bongino v. Daily Beast Co.*,
477 F. Supp. 3d 1310 (S.D. Fla. 2020) .....................................................................15

*Boone v. Sunbelt Newspapers, Inc.*,
347 S.C. 571, 556 S.E.2d 732 (Ct. App. 2001) ........................................................30

*Boykin v. Prisma Health*,
2023 WL 5488448, at *6 (D.S.C. Aug. 8, 2023), *report and recommendation
adopted*, 2023 WL 5487118 (D.S.C. Aug. 24, 2023) ...............................................24

*Brewster v. Laurens Cnty. Advertiser*,
  2012 WL 4767052 (S.C.C.P. Apr. 6, 2012) ................................................................34

*CACI Premier Tech., Inc. v. Rhodes*,
  536 F.3d 280 (4th Cir. 2008) ...........................................................16, 17, 18, 19

*RE Carroll Mgmt. Co. v. Dun & Bradstreet, Inc.*,
  2025 WL 415743 (4th Cir. Feb. 6, 2025) ...............................................................26

*Carroll v. TheStreet.com, Inc.*,
  2012 WL 13134547 (S.D. Fla. May 25, 2012) .......................................................15

*Carson v. Emergency MD, LLC*,
  2020 WL 5077655 (D.S.C. Aug. 25, 2020) ............................................................14

*Chapin v. Knight-Ridder, Inc.*,
  993 F.2d 1087 (4th Cir. 1993) ..................................................................... *passim*

*Charleston Carriage Works, LLC v. Charleston Animal Soc.*,
  2022 WL 20838964 (S.C.C.P. May 12, 2022) .......................................................30

*Cobin v. Hearst-Argyle Television, Inc.*,
  561 F. Supp. 2d 546 (D.S.C. 2008) .......................................................3, 4, 27, 33

*Coker v. Norwitch Com. Grp., Inc.*,
  2023 WL 3791106 (D.S.C. June 2, 2023) ..............................................................28

*Conway v. S.C. Vocational Rehab. Dep't*,
  2018 WL 2301849, at *5 (D.S.C. Jan. 31, 2018), *report and recommendation
  adopted*, 2018 WL 2301848 (D.S.C. Feb. 26, 2018) ............................................24

*Cook v. United States*,
  2015 WL 1854443 (D.S.C. Apr. 21, 2015) ............................................................14

*Deripaska v. Associated Press*,
  282 F. Supp. 3d 133 (D.D.C. 2017) ......................................................................16

*Dickerson v. Albemarle Corp.*,
  2016 WL 245188 (D.S.C. Jan. 21, 2016) .........................................................11, 14

*Dobkin v. Johns Hopkins Univ.*,
  1999 WL 22901 (4th Cir. Jan. 21, 1999) ..............................................................29

*Dongguk Univ. v. Yale Univ.*,
  734 F.3d 113 (2d Cir. 2013) ..................................................................................31

*Erickson v. Jones St. Publishers, LLC*,
  368 S.C. 444, 629 S.E.2d 653 (2006) ...............................................................11, 30

*Faltas v. State Newspaper*,
928 F. Supp. 637 (D.S.C. 1996), *aff'd*, 155 F.3d 557 (4th Cir. 1998) ..............................24, 31

*Floyd v. Knight*,
2023 WL 4409037, at *13 (D.S.C. Apr. 27, 2023), *report and recommendation adopted*, 2023 WL 4013520 (D.S.C. June 15, 2023).................................33

*Gardner v. Newsome Chevrolet-Buick, Inc.*,
304 S.C. 328, 404 S.E.2d 200 (1991) ...................................................................................10

*Gilmore v. Jones*,
C.A. 2021 WL 68684 (W.D. Va. Jan. 8, 2021) ......................................................................32

*Glob. Relief Found. v. N.Y. Times Co.*,
390 F.3d 973 (7th Cir. 2004) .................................................................................................29

*Harvey v. Cable News Network, Inc.*,
48 F.4th 257 (4th Cir. 2022) .................................................................................29, 32, 33, 34

*Healthsmart Pac., Inc. v. Kabateck*,
7 Cal. App. 5th 416 (2016) ...................................................................................................33

*Henry v. Fox News Network LLC*,
629 F. Supp. 3d 136 (S.D.N.Y. 2022).....................................................................................15

*Herdt v. Horry Cnty. Council*,
No. 4:17-cv-00392-RBH, 2018 WL 827140 (D.S.C. Feb. 12, 2018).....................................30

*Hogan v. Winder*,
762 F.3d 1096 (10th Cir. 2014) ...............................................................................................15

*Holbrook v. Harman Auto., Inc.*,
58 F.3d 222 (6th Cir. 1995) ...................................................................................................32

*Horne v. WTVR, LLC*,
893 F.3d 201 (4th Cir. 2018) .................................................................................................33

*Hughs v. Royal Energy Res.*,
2020 WL 6689132 (D.S.C. Nov. 12, 2020)..............................................................14, 19, 23

*Kesner v. Dow Jones & Co.*,
515 F. Supp. 3d 149 (S.D.N.Y. 2021)......................................................................................16

*Kozel v. Kozel*,
299 F. Supp. 3d 737 (D.S.C. 2018).........................................................................................34

*Kun v. WCSC-TV-5*,
2002 WL 34217983 (S.C.C.P. May 28, 2002).................................................................29, 34

*Levin v. McPhee*,
   119 F.3d 189 (2d Cir. 1997)................................................................................19

*Lugo v. Boeing Co.*,
   2020 WL 495336 (D.S.C. Jan. 30, 2020) ...........................................................28

*Masson v. New Yorker Mag., Inc.*,
   501 U.S. 496 (1991)............................................................................................28

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing Inc.*,
   674 F.3d 369 (4th Cir. 2022) ..............................................................................32

*McClatchy Newspapers, Inc. v. Superior Ct.*,
   189 Cal. App. 3d 961 (1987) ..............................................................................34

*McGlothlin v. Hennelly*,
   2021 WL 2935372 (4th Cir. July 13, 2021).........................................................32

*McLaughlin v. Darlington Cnty.*,
   2021 WL 4691379, at *2 (D.S.C. Sept. 17, 2021), *report and recommendation
   adopted*, 2021 WL 4691055 (D.S.C. Oct. 7, 2021) ..........................................3, 33

*McNeil v. S.C. Dep't of Corr.*,
   404 S.C. 186, 743 S.E.2d 843 (Ct. App. 2013)...................................................14

*Mejia v. Telemundo Mid-Atlantic LLC*,
   440 F. Supp. 3d 495 (D. Md. 2020)....................................................................32

*Mungo v. BP Oil, Inc.*,
   2012 WL 13005317 (D.S.C. Dec. 21, 2012) .......................................................11

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964)............................................................................................31

*Ortiz v. Jackson*,
   2023 WL 5208007 (D.S.C. Aug. 14, 2023) .........................................................14

*Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*,
   829 F.2d 1280 (4th Cir. 1987) ........................................................................22, 26

*Rall v. Tribune 365 LLC*,
   31 Cal. App. 5th 479 (2019) ...............................................................................34

*Reuber v. Food Chem. News, Inc.*,
   925 F.2d 703 (4th Cir. 1991) ..........................................................................34, 35

*Robins v. Nat'l Enquirer, Inc.*,
   1995 WL 776708 (D.S.C. Apr. 10, 1995)............................................................24

*Rollins Ranches, LLC v. Watson*,
  2021 WL 5355650 (D.S.C. Nov. 17, 2021) ...........................................................11, 17, 23

*Sarver v. Chartier*,
  813 F.3d 891 (9th Cir. 2016) .........................................................................................34

*Schnare v. Ziessow*,
  104 F. App'x 847 (4th Cir. 2004) .............................................................16, 18, 22

*Sellers v. S.C. Autism Soc'y., Inc.*,
  861 F. Supp. 2d 692 (D.S.C. 2012)...........................................................................11, 14

*Smith v. Santa Rosa Press Democrat*,
  2011 WL 5006463 (N.D. Cal. Oct. 20, 2011)..............................................................34

*Snyder v. Phelps*,
  580 F.3d 206 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) .......................................11

*Stokes v. Oconee Cnty.*,
  441 S.C. 566, 895 S.E.2d 689 (Ct. App. 2023)..........................................................19

*Tannerite Sports LLC v. NBCUniversal News Grp.*,
  864 F.3d 236 (2d Cir. 2017)........................................................................................15, 16

*Toussaint v. Palmetto Health*,
  2017 WL 1950955 (D.S.C. May 10, 2017)...................................................................23

*USA v. Murdaugh*,
  No. 9:23-cr-00396-RMG (D.S.C.) ...............................................................................4

*Walker v. Tyler*,
  1996 WL 612600 (4th Cir. Oct. 24, 1996)..............................................................23, 24, 28

*Wang v. Sussman*,
  2025 WL 81355 (S.D.N.Y. Jan. 13, 2025) ...............................................................27, 28

*Weise v. Colorado Springs*,
  2020 WL 13701854 (D. Colo. Nov. 30, 2020) ............................................................15

*White v. Wilkerson*,
  328 S.C. 179, 493 S.E.2d 345 (1997) ..........................................................................34

*Wilson v. Ward*,
  1989 WL 380480 (S.C. Ct. App. Sept. 19, 1989)........................................................24

*Woodward v. Weiss*,
  932 F. Supp. 723 (D.S.C. 1996)...................................................................................19

**Statutes**

Cal. Civ. Code § 47(d) ........................................................................................................33, 34

**Other Authorities**

Fed. R. Civ. P. 8(a) .....................................................................................................................30

Fed. R. Civ. P. 8(a)(2)..................................................................................................................14

Fed. R. Evid. 201(b)......................................................................................................................4

South Carolina Rule of Civil Procedure 12(b)(6) ........................................................................10

Defendant Campfire Studios, Inc. ("Campfire"), joined in full by Warner Bros. Discovery, Inc. ("WBD") and Warner Media Entertainment Pages, Inc. ("Warner Media Entertainment") (collectively, with the corporate entities disclosed in the Amended Answer to Local Rule 26.01 Interrogatories, "Warner Entities")[1] (Campfire, with the Warner Entities, "Moving Defendants") respectfully move the Court to dismiss the Amended Complaint (Dkt. 86) filed by Plaintiff Richard Alexander Murdaugh, Jr. ("Buster" or "Plaintiff") as to the documentary "Low Country: The Murdaugh Dynasty" that the Amended Complaint alleges Campfire produced and WBD aired on HBO Max (the "Documentary" or "Campfire Documentary").

## PRELIMINARY STATEMENT

It is understandable for Plaintiff to feel aggrieved by the course of tragic events that have radically changed his life. In 2019, Plaintiff's brother, Paul, was charged with boating under the influence in connection with a boat accident that killed a local teenager. Shortly after, Paul was found shot dead execution-style in his home, along with his and Plaintiff's mother. At the same time, investigators began looking into the mysterious death of the Murdaugh family's longtime housekeeper and the embezzlement of money owed to her estate. Plaintiff's father, Alex, eventually was charged in connection with both financial crimes and killing his own wife and son. In the midst of the investigation of the Murdaugh double homicide, local law enforcement announced that it was reopening the investigation into the 2015 death of a local teenager, Stephen Smith. During the original investigation into Smith's death, Plaintiff's name surfaced *more than*

---

[1] As explained in the Amended Answer to Local Rule 26.01 Interrogatories, Campfire is an improper party because the company that produced the Campfire Documentary is HCM, LLC, which is wholly owned by Campfire Film & TV, LLC. *See* Dkt. 44. Neither of the Warner Entities is a correct party either. *Id.* Based on the allegations of the Amended Complaint (none of which the Warner Entities concede), Plaintiff should have identified WarnerMedia Direct, LLC, Discovery Communications, LLC, and Discovery Digital Ventures, LLC instead of WBD and Warner Media Entertainment. Campfire and all of the Warner Entities reserve all rights and waive none by filing this Motion.

*two dozen times*, as reflected in the official investigative records and recorded official law enforcement interviews. All of these facts are true, and Plaintiff does not (because he cannot) challenge any of them.

The Campfire Documentary reported on the events involving Plaintiff's family, including all of the aforementioned truthful facts. Plaintiff does not claim that any specific statement in the Campfire Documentary defamed him, or that it reached any conclusion about him or about the death of Mr. Smith. Rather, Plaintiff claims that the entire Campfire Documentary—including and especially the portions that play audio of law enforcement interviews during which his name surfaced—implied not only that he murdered Smith but also that he did so by "striking him with a baseball bat as a result of a romantic relationship between the two." There are many fatal problems with Plaintiff's legal theory, any one of which would require dismissal and the totality of which overwhelmingly necessitates dismissal with prejudice.

Despite having been afforded the opportunity to amend, Plaintiff's Amended Complaint does not fix any of the fatal defects of his initial attempt at stating a claim for defamation. *First*, the Amended Complaint still fails to adequately identify the allegedly defamatory content in the Campfire Documentary, which alone necessitates dismissal. *Infra* Argument § I. *Second*, Plaintiff's admission that the *only* content in the Campfire Documentary connecting him to Smith's murder is "***speculation, rumor, and hearsay***" defeats his claim because the First Amendment of the United States Constitution (the "First Amendment") bars all claims that are not based on assertions of fact. *Infra* § II. *Third*, to state a claim for defamation by implication, Plaintiff must, but has failed to, make an "especially rigorous showing" that the Campfire Documentary conveyed the alleged defamatory meaning he ascribes to them ***and*** that the Moving Defendants endorsed that meaning. *Infra* § III. *Fourth*, the substantial truth doctrine forecloses liability because

2

Plaintiff cannot demonstrate that the Campfire Documentary would create any different effect on a view as would the pleaded truth, i.e., that his name surfaced dozens of times in the course of the investigation into Smith's death. *Infra* § IV. *Fifth*, the Amended Complaint does not plead any facts demonstrating common law malice, which South Carolina requires in a case involving a matter of public concern like this one. *Infra* § V. *Sixth, and finally*, Plaintiff seeks to impose liability for content whose factual predicate is derived from official law enforcement materials, which is privileged as a matter of law as fair report. *Infra* § VI. For any one of these reasons, the Court should dismiss Plaintiff's lawsuit as to the Campfire Documentary for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule" or "Rules") and do so with prejudice since the defects are incurable, as evident by the fact Plaintiff already tried and failed to cure them.

## FACTUAL BACKGROUND

### A.  The Campfire Documentary Reported On The Murdaugh Family's Fall From Holding Positions Of Legal Authority To Facing Criminal Charges.

As the Campfire Documentary explained, members of the Murdaugh family "held the position of the prosecutor—the solicitor" of Hampton County "through four generations" with their portraits hanging in local courthouses. Ex. D at 8, 29-32.[2] But, as one local lawyer explained in the Documentary, "what took 100 years to build crumbled . . . in one year." *Id*. at 8 (ellipses in original). Throughout three episodes, the Campfire Documentary documented a series of events,

---

[2] The Moving Defendants previously submitted a thumb drive containing a video copy of all episodes of the Documentary. *See* Dkt. 49-3 (Exs. A-C). This Motion cites those materials as Exhibits A-C without re-submitting a thumb drive, but otherwise re-attaches the official transcripts of the same and retains the same exhibit numbers (i.e., Exs. D-F). The Court can consider these materials because they are integral to the Amended Complaint. *See McLaughlin v. Darlington Cnty.*, 2021 WL 4691379, at *2 (D.S.C. Sept. 17, 2021), *report and recommendation adopted*, 2021 WL 4691055 (D.S.C. Oct. 7, 2021); *Cobin v. Hearst-Argyle Television, Inc.*, 561 F. Supp. 2d 546, 552 (D.S.C. 2008) (news reports "clearly central to plaintiff's claim").

3

including criminal investigations, involving various members of the Murdaugh family. *See* Exs. A-F. In 2019, Plaintiff's brother, Paul, was charged with felony boating under the influence as a result of a boat crash that took the life of a local teenage girl. Ex. D at 11, 15-28, 43. Then, on June 7, 2021, detectives found Paul and his (and Plaintiff's) mother shot dead execution-style at the family's hunting lodge. Ex. E at 2, 8-9, 47. Plaintiff's father, Alex, subsequently was criminally charged and convicted of murdering his wife and son. Ex. F at 38; *see State v. Murdaugh*, Appellate Case Nos. 2023-000392 and 2024-000576; *USA v. Murdaugh*, No. 9:23-cr-00396-RMG (D.S.C.).[3] Plaintiff's father also has been convicted of additional crimes, and admitted liability in connection with stealing $4.3 million in insurance proceeds from the estate of the Murdaugh family's longtime housekeeper, Gloria Satterfield, who was found dead in their home, surrounded by speculation on whether she fell or was pushed down the stairs (perhaps by Paul). Ex. F at 9-11, 13-16, 38.

**B.     After The Murdaugh Double Murder, Law Enforcement Re-Opened The Investigation Into The 2015 Death Of Stephen Smith, On Which The Campfire Documentary Reported.**

After the Murdaugh double murder, the South Carolina Law Enforcement Division ("SLED") announced that it was reopening the investigation into the death of a local teenager, Stephen Smith, who was found dead on the side of a road in Hampton County in 2015. Ex. E at 42; Ex. 2 at 4.[4] Official law enforcement records indicated that Smith's body was found with

---

[3] The Court can take judicial notice of Murdaugh-related investigations and prosecutions. *See* Fed. R. Evid. 201(b) (fact not subject to reasonable dispute if it: "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[4] Counsel for the Moving Defendants obtained state investigative materials via a Freedom of Information Act request. Certain of those materials were filed as the "Appendix in Support of Defendants' Motion to Dismiss" at Dkt. 51 as Exhibits 1-11. The "Court may consider the police report as a matter of public record" that is properly subject to judicial notice and to assess fair report privilege. *See Cobin*, 561 F. Supp. 2d at 550-51; *see also* Fed. R. Evid. 201(b).

4

"some sort of blunt force trauma to the head" and "no evidence to suggest the victim was struck by a vehicle." *Id*. SLED Crime Scene notes explained a "hole in the skull was located above the victim's right eye" and that it was "unclear" if the "hole was caused by a projectile." *Id*. at 58. Investigative case notes by South Carolina's Multi-Disciplinary Accident Investigation Team ("M.A.I.T.") stated that a former officer who investigated the incident, Corporal Michael Duncan, believed it "appeared to be a homicide[.]" *Id*. at 9. M.A.I.T. case notes of investigator Trooper Todd Proctor illustrated his view that there was "no evidence" (other than Smith having been found in the road) to support the pathologist's theory that Smith was "struck by a vehicle" and recalled a subsequent conversation between the two: "I asked her if someone with a baseball bat could do that and she stated 'no.' When I probed further saying what about someone in a moving car, with a bat she stated 'well I guess it's possible.'" *Id*. at 25.

Part of the second episode of the Campfire Documentary—specifically pages 10 through 47 of the transcript attached at Exhibit E ("Relevant Portion")—chronicled the investigation into Smith's death. Ex. E at 11-47. It played law enforcement radio traffic from 2015 reporting there was a "young white male lying in the roadway with severe head trauma." *Id*. at 14. Lt. Moore recounted to viewers that he reported to the scene after hearing reports of a "hit-and-run" and— after seeing the injuries to Smith's body and the lack of any car parts, glass, or fragments—left the scene believing "this is not a wreck. This is murder." *Id*. at 14. The Campfire Documentary played Cpl. Duncan's contemporaneous audio notes which expressed the same view: "As far as evidence here, there's only evidence of where the body was found. There's no parts to a car or truck or any other vehicle. I also took pictures of the body at the mortuary. There is some scrapes and scratches on his left and right arm, on his knuckles, some across his face. But his injuries pertain to his head area. ***Does not appear to be, in my opinion, struck by a vehicle***." *Id*. at 19

(emphasis added). Cpl. Duncan stated: "As we started the investigation, we were pretty much starting with nothing except for a body and a car. So we started where we thought we needed to, you know, with friends, last person who talked with Stephen." *Id*. at 25.

As reflected in the official law enforcement records, Plaintiff's name surfaced during those investigatory conversations. Ex. 2 at 19 (tip that someone asked "if Stephen and Buster Murdaugh ever had any type of relationship"); *id*. at 28 ("stated that the reason that he was passing this information on was because Randy Murdaugh told him to call"); *id*. at 29 (detailing questioning about Buster Murdaugh). Cpl. Duncan's case notes from December 7, 2015, stated that he "received an email in reference to an anonymous tip" that one man "'along with another black male and a white male (Murdaugh) are the ones involved in death.' This tip is referring to Stephen Smith." *Id*. at 24. During recorded interviews with law enforcement, including Cpl. Duncan, Tpr. Proctor, and Lt. Thomas Moore of the South Carolina Highway Patrol, multiple third-party individuals independently raised Plaintiff's name. *See* Ex. 4B at 21 ("people kept coming up to me and they're like did you know the Murdaugh boys are behind it, you know, saying Buster Murdaugh . . ."); Ex. 5B at 3 ("another friend of mine had texted me asking if Buster and Stephen. . . were together, and I told him no. I said not that I knew of" and "[h]e said because he had heard that"); Ex. 6B at 4 (discussing "rumor" of "Buster having some type of relationship with Stephen"); Ex. 7B at 14 ("only name that was given to me was the Murdaugh name"); Ex. 8B at 8 ("he's the one that said Buster had something to do with it, but he didn't tell you how he knew that?"); Ex. 10B at 3 ("we just heard that Buster did it"); *id.* at 4 ("story that Taylor told me was that I guess the information that his understanding of it was is that Buster and either one or two other people were driving around, saw Stephen's car . . .were possibly gonna, you know, kinda messed with them or something, stuck something out of the vehicle and it hit them. Is that the story that you

6

got?"); *see also* Ex. 3B at 9; Ex. 7B at 7-8, 24-25, Ex. 8B at 3; Ex. 9B at 3-4; Ex. E at 26-27, 30-36.

The Relevant Portion of the Campfire Documentary played the following excerpts of audio recordings of the law enforcement interviews, pasted below with the immediate surrounding context, including on-camera commentary by law enforcement officers notated with underlining:

---

**On-Screen Graphic: HIGHWAY PATROL INTERVIEW**

**Sandy Smith (victim's mother):** "*The rumors that's going around Hampton that everybody keeps coming up to me and saying it was Murdaugh boys.*"

**Cpl. Duncan:** "The Murdaugh boys?"

**Sandy Smith:** "*Yes*"

(Ex. 3B at 9; Ex. E at 26)

---

**On-Screen Graphic: HIGHWAY PATROL INTERVIEW**

**Tpr. Proctor:** "Can you tell me what you heard about the Stephen Smith incident?"

**T.S.:** "*I just heard that one of my classmates did it*"

**Tpr. Proctor:** "And who was that?"

**T.S.:** "*Buster Murdaugh.*"

<u>**Cpl. Duncan:** "I don't want to drag somebody's name through the mud unless it's necessary. In this case, the Murdaughs' name was brought up at least a dozen times, possibly more. So when you have that name constantly brought up, you know, you have to take it serious."</u>

**On-Screen Graphic: HIGHWAY PATROL INTERVIEW**

**Tpr. Proctor:** "What I'm seeing is that a lot of people seem a little hesitant to speak about Buster [or] the Murdaughs in general. Do you kind of see that?"

**D.S.:** "*Yes, Sir. Because when someone told me that it was Buster, and I was like they were saying, if it's him nothing was going to be done because of who he was.*"

**Tpr. Proctor:** "Let's go ahead and tell me, you know, what you heard."

**T.D.:** "*I heard that these two, maybe three young men were in a vehicle. They were riding down 601, saw the car on the side of the road, I guess saw the boy walking. They turned back around. I guess they were attempting to, I don't want to say, you know, mess around with him or something like that and stuck something out of the window and it, you know, hit him in, I don't know if it hit him in the head or the back or where it hit him. And then that's pretty much all I heard. I did hear names or heard a name, and that name was—he goes by Buster Murdaugh.*"

(Ex. 8B at 3; Ex. 7B at 7-8; Ex. E at 30-32)

---

**T.D.:** "*When I originally heard this, I was thinking of the younger Murdaugh boy, Buster's little brother, Paul because Paul's more the—I want to say troublemaker, but he's a little more, 'My last name is Murdaugh.  I can do whatever' you know what I mean?*"

**Lt. Moore:** "Yeah, yeah."

**T.D.:** "*So when I first heard it was Buster it kind of caught me off guard because he's never been that type of person.*"

(Ex. 7B at 24-25; Ex. E at 33-34)

**On-Screen Graphic: HIGHWAY PATROL INTERVIEW**

**Tpr. Proctor:** "Now, who passed this information on to you that Buster was involved in this?"

**T.S.:** "(bleep)."

**Tpr. Proctor:** "And did he say where he heard that from or how he was backing that up?"

**T.S.:** "*No, sir.*"

**Tpr. Proctor:** "So he just said, 'oh, I heard Buster did it?'"

**T.S.:** "*Yes, sir.*"

**Tpr. Proctor:** "Did he say how he did it or what happened?"

**T.S.:** "*No, he didn't.  Yes, he did.  He said—he said they beat him up and threw him out the truck.*"

**Tpr. Proctor:** "Beat him up and threw him out of the truck?"

**T.S.:** "*Yes, sir.*"

**Cpl. Duncan:** <u>"One of the rumors that we heard was that Buster and a couple of other guys had been out, seen Stephen, and they got in some type of argument and that a 2x4 or a bat was used to strike Stephen in the head area and that's what caused his death."</u>

**Producer:** <u>"Did anybody look at the autopsy and try to figure out if it was consistent with a bat?"</u>

**Cpl. Duncan:** <u>"Yes, and we actually looked at it, and it is consistent with some type of blunt force object."</u>

**On-Screen Graphic:** <u>"Buster Murdaugh's name was mentioned over two dozen times in law enforcement interviews.  He has not been charged with any crime and has not been interviewed by law enforcement in connection with these events."</u>

(Ex. 8B at 5; Ex. E at 35-37)

Shortly thereafter, the Campfire Documentary played the following explanation from Lt. Moore:

>"***There's different stories and different versions out there. I've heard Paul. I've heard Buster. Those names have been brought up numerous times consistently by people. But there's nothing we can point to and say, 'Mm-hmm, that's what happened.'***"

*Id*. at 38 (emphasis added).

The Campfire Documentary also included theories of family members and friends of Smith, including in the following sequence:

---

**George Smith (friend of Smith family):** "*I still remember seeing Joel in the casket. And you could just tell he wasn't at peace, 'cause he wanted to know what happened to his child. The day he died, he told me, 'Them Murdaughs killed my son.' He would tell anybody. Or you could've asked Joel, 'Joel, what happened to your son?' 'The Murdaughs killed my son because he was gay.' 'How do you know?' 'I know my son. I know he was seeing Buster.' 'How can you prove it?' 'I can't, but I just know them Murdaugh boys killed my boy.'*"

**Producer:** "Have you ever heard that Stephen had any kind of sexual relationship with Buster Murdaugh?"

**Passion Mixon (Lowcountry resident):** "*There was rumors of that. I don't know if it was true. If Buster was gay, he would have never came out about it. I don't think his family would've approved of it either, so—because they are a big name.*"

**George Smith:** "*Joel knew 100% in his heart it was Buster.*"

**Producer:** "Why didn't Joel go and talk to the police?"

**George Smith:** "*There's no need to do that. The police have got ties with them Murdaughs all the way from their great-granddad to their granddad to their daddy. They all got pull through the law. When they found Paul and his mama dead, they had everybody from Colleton County, Hampton County there investigating it. Stephen dies, they just put him in a body bag. He was hit by a car. Who cares? It's that name. They got pull.*"

**Ashly Carroll (Smith's cousin):** "*Being the underdogs in town, I guess, in their head, we're nothing, so who's gonna notice nothing being gone?*"

(Ex. E at 39-40).

---

Towards the end of the second episode, the Campfire Documentary explained that, six years after Smith's death, SLED announced it was reopening its investigation into Smith's death as a result of the double Murdaugh murders. *Id*. at 41. Cpl. Duncan reacted: "I found it real curious when they brought up Stephen Smith. What did they find? Did they find something on a

phone?  Did they find something on the property that relayed Stephen Smith's death to the Murdaugh family?"  *Id*.  The second episode concluded with on-screen text explaining that: "Currently no charges have been filed related to the death of Stephen Smith."  *Id*. at 46.

### C.    Plaintiff Filed This Lawsuit Claiming The Campfire Documentary Implies That He Is "The Murderer Of Stephen Smith."

On June 14, 2024, Plaintiff filed a version of this lawsuit in state court in Hampton County against eight defendants arising from three separate documentaries.  After removal, the Moving Defendants moved to dismiss the Original Complaint on October 16, 2024.  Dkt. 49.  The Court subsequently denied the motions to dismiss without prejudice as moot after granting Plaintiff leave to file an amended complaint to which the Moving Defendants would have twenty-one days to respond.  Dkts. 85, 87.  Plaintiff filed the Amended Complaint on April 1, 2025.  Dkt. 86.

## LEGAL STANDARD

Rule 12(b)(6) authorizes a motion to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord* South Carolina Rule of Civil Procedure 12(b)(6) (grounds for dismissal include "failure to state facts sufficient to constitute a cause of action"); *Gardner v. Newsome Chevrolet-Buick, Inc.*, 304 S.C. 328, 330, 404 S.E.2d 200, 201 (1991) ("our Rules of Procedure are based on the Federal Rules").  Dismissal is warranted when a complaint fails to plead any "factual content that allows the court to draw the reasonable inference" that defendants are "liable for the misconduct alleged."  *Ashcroft*, 556 U.S. at 678.  A complaint that amounts to "little more than boilerplate allegations, devoid of sufficient facts to satisfy the pleading standards applicable

in federal court" warrants dismissal. *Sellers v. S.C. Autism Soc'y., Inc.*, 861 F. Supp. 2d 692, 699 (D.S.C. 2012).

To state a claim for defamation under South Carolina law, Plaintiff must plead facts sufficient to demonstrate: "(1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Erickson v. Jones St. Publishers*, *LLC*, 368 S.C. 444, 465, 629 S.E.2d 653, 664 (2006); *Dickerson v. Albemarle Corp.*, 2016 WL 245188, at *3 (D.S.C. Jan. 21, 2016). When considering whether a plaintiff states a claim for defamation, the "inquiry is not only to assess whether the statements in the complaint 'may constitute a sufficient basis for Plaintiffs' defamation claim,' but also to consider whether such a claim would comport with the First Amendment." *Rollins Ranches, LLC v. Watson*, 2021 WL 5355650, at *4 (D.S.C. Nov. 17, 2021) (citation omitted); *see also Snyder v. Phelps*, 580 F.3d 206, 218 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) ("regardless of the specific tort being employed, the First Amendment applies when a plaintiff seeks damages for reputational, mental, or emotional injury allegedly resulting from the defendant's speech"). The Court need not accept as true allegations that contradict materials properly before the Court because they are referenced in the pleading or properly subject to judicial notice. *Mungo v. BP Oil, Inc.*, 2012 WL 13005317, at *2 (D.S.C. Dec. 21, 2012) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)); *supra* at nn.2 & 3.

## ARGUMENT

Asserting a claim of defamation, the Amended Complaint alleges that the Campfire Documentary published statements that "falsely suggest" Plaintiff "murdered Stephen Smith by striking him with a baseball bat" and "in relation to a romantic relationship between Plaintiff and Smith." Am. Compl. ¶¶ 15, 49; *see also* ¶¶ 16 ("falsely imply that Plaintiff committed murder");

11

37 ("insinuated that Plaintiff killed Mr. Smith"); 38 ("killed Mr. Smith with a baseball bat as a result of a romantic relationship between the two"); 43 ("implication that Mr. Smith's death was the result of his sexual orientation"); 46 ("implies and subtly asserts that Plaintiff was responsible for the death of Mr. Smith").[5] Plaintiff is "not claiming that *any* specific statement made during [the Campfire Documentary] is actionable or defamatory in itself" or that his legal claim relies on the alleged falsity of any statements or facts contained in the Campfire Documentary. Dkt. 73 at 7 (emphasis added); *see also id.* at 2 ("the interview excerpts and sound bites it presents in the series are *facially true*"); *id.* at 9-10 (defamation claim based on what "can be gleaned from what otherwise could be *truthful statements* or opinions within the series") (all emphases added).[6] Instead, Plaintiff predicates his legal claim on a theory that "the *entire* series when read as a *whole* represents its own individual act or statement of defamation" (*id.* at 7-8) because it juxtaposes "certain statements within the show, *even if they are opinion and/or facially true*, to create a defamatory implication, alongside certain omissions of information that would have tended to show that Plaintiff was not involved in the death of Mr. Smith." ¶ 50 (emphasis added). Specifically, the Amended Complaint alleges the Campfire Documentary as a "whole" created a defamatory implication by juxtaposing: (1) an unspecified "segment of the series, in which Defendants' editorialization of a number of excerpts from interviews implies and subtly asserts that Plaintiff was responsible for the death of Mr. Smith" by "striking him with a baseball bat" and "in relation to a romantic relationship between Plaintiff and Smith" (¶¶ 15-16, 46-48), which the Moving Defendants understand to be describing the Relevant Portion summarized above (*supra* at

---

[5] Any citations to paragraphs (¶) refer to the Amended Complaint.

[6] In moving to amend, Plaintiff confirmed that the Amended Complaint does not attempt to advance any new legal claims or theory and rather seeks only to add "additional, specific factual detail to preexisting claims against preexisting Defendants." Dkt. 75 at 8.

7-9), *with* (2) various "sequences, excerpts, and statements" contained in the hour plus of preceding content that introduced "themes" about Plaintiff's family that "were intentionally calculated to prime the recipient for the next segment of the series" (¶¶ 35-51;[7] Ex. G ("Priming Portions")).[8]

Plaintiff's Amended Complaint necessitates dismissal for multiple independent reasons. It is deficient as a matter of law because it fails to sufficiently identify the allegedly defamatory content, as the Rules require. *Infra* § I. Leaving aside the lack of requisite specificity, the First Amendment bars Plaintiff's claims because the Campfire Documentary did not state as a fact that he killed Smith with a baseball bat because of a romantic relationship. *Infra* § II. The Amended Complaint separately fails because it does not plead any facts sufficient to meet the "especially rigorous showing" that the Campfire Documentary conveyed the defamatory inference Plaintiff ascribes to it ***and*** that any of the Moving Defendants endorsed that inference. *Infra* § III. Moreover, the substantial truth doctrine requires dismissal because Plaintiff has conceded that the effect on a viewer from hearing the allegedly defamatory content would be the same as hearing the admitted truth. *Infra* § IV. Even if all of that did not provide independent bases for dismissal, such a result is required because Plaintiff must but fails to plead any facts in the Amended Complaint that demonstrate fault, as South Carolina law requires. *Infra* § V. Finally, liability is

---

[7] *See* ¶ 37 ("introduces numerous themes…which serve to drive the Defendants' narrative" and "'intentionally build to the next episode in the series, in which it is insinuated that Plaintiff killed Mr. Smith"); 38 ("vilifies the Murdaugh family and thematically sets the stage for Defendants to later encourage the audience to take a logical leap and conclude that Plaintiff killed Mr. Smith with a baseball bat as a result of a romantic relationship between the two"); 39 ("reinforce the theme"); 40 ("demonstrate that people in the Hampton community were afraid of the Murdaugh family"); 43 ("foreshadows Defendants' later implication that Mr. Smith's death was the result of his sexual orientation, as well as a false thread established by the series' narrative tying Mr. Smith romantically to Plaintiff"); 45 ("bolster the inference that Plaintiff killed Mr. Smith").

[8] The Amended Complaint includes only cherry-picked snippets of statements in the Priming Portions, and in some cases only as "samples" of "juxtaposed, editorialized statements" contained therein. *See* ¶¶ 35-51. Exhibit G contains the full context of the Priming Portions as best as the Moving Defendants could discern from the characterizations in the Amended Complaint.

barred as a matter of law based on the fair report privilege because Plaintiff admits his liability relies upon information extracted from law enforcement records. *Infra* § VI.

## I.     THE AMENDED COMPLAINT AND THE LEGAL THEORY ON WHICH IT IS BASED FAIL TO COMPLY WITH RULE 8.

Leaving aside its lack of legal merit (*infra* at 11-14), Plaintiff's "whole" publication theory violates the pleading requirements of the Rules. Rule 8 requires that a pleading contain "a short and plain statement of the claim ***showing*** that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). As this Court has explained, the requirement to *show* rather than just *say* means "that ***a plaintiff must do more than make conclusory statements to state a claim and must provide sufficient factual information to put defendants on notice of their wrongdoing***." *Cook v. United States*, 2015 WL 1854443, at *4 n.2 (D.S.C. Apr. 21, 2015) (emphasis added) (citing *Ashcroft*, 556 U.S. at 677–79, *Twombly*, 550 U.S. at 555, and Rule 8(a)(2) ("a short and plain statement of the claim *showing* that the pleader is entitled to relief")) *McNeil v. S.C. Dep't of Corr.*, 404 S.C. 186, 195, 743 S.E.2d 843, 848 (Ct. App. 2013) ("specificity" required); *see Ortiz v. Jackson*, 2023 WL 5208007, at *3 (D.S.C. Aug. 14, 2023) (dismissing where complaint had not "alleged enough context and specificity 'to put the other party on notice as to which statements it was to defend against'" (cleaned up)); *see* ¶¶ 15, 35-51.[9]

Plaintiff seems to believe that he need not identify any specific statements because the Campfire Documentary "is ***not actionable because of any specific statement***" but rather based on

---

[9] *See also Carson v. Emergency MD, LLC*, 2020 WL 5077655, at *5 (D.S.C. Aug. 25, 2020) ("Many courts applying South Carolina law have found that a lack of specificity in a plaintiff's allegations regarding a defamation claim warrants dismissal."); *Hughs v. Royal Energy Res.*, 2020 WL 6689132, at *3 (D.S.C. Nov. 12, 2020) ("trial court must initially determine if the communication is reasonably capable of conveying a defamatory meaning"); *Dickerson v. Albemarle Corp.*, 2016 WL 245188, at *4 (D.S.C. Jan. 21, 2016) (dismissal based on "broad and unspecific allegation of defamation"); *accord Sellers*, 861 F. Supp. 2d at 699 (dismissing "boilerplate allegations, devoid of sufficient facts to satisfy the pleading standards applicable in federal court").

what "can be gleaned from what otherwise could be truthful statements or opinions within the

series." Dkt. 73 at 9. But defamation-by-implication plaintiffs still must identify the specific

"truthful statements" that convey the alleged defamatory implication "so defendants and courts

may address themselves to the parts of a communication alleged to be false and defamatory instead

of those not objected to" especially where a publication "includes thousands of direct statements

and implied messages whose veracity could be questioned by a defamation plaintiff." *Tannerite*

*Sports LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 251 (2d Cir. 2017) ("specificity" required);

*Block v. Matesic*, 2023 WL 8527670, at *9 (S.D. Fla. Dec. 8, 2023) ("defamation by implication

is, by definition, the manipulation of *true facts* to create a defamatory effect") (emphasis in

original).[10] The Amended Complaint makes general references to "statements" and a "segment"

or "sequence" in the Campfire Documentary that Plaintiff alleges carried defamatory meaning, but

nowhere does it allege a single truthful statement of fact that he claims the Moving Defendants

"(supposedly) manipulated in his effort to weave a tapestry of defamation." *Block*, 2023 WL

8527670, at *9-10 (emphasis added) (dismissal of defamation-by-implication claim where

complaint did not plead "notice of the specific facts" or "connect the dots" by "specifically"

---

[10] *See also Hogan v. Winder*, 762 F.3d 1096, 1106-10 (10th Cir. 2014) (analyzing "two categories of allegedly defamatory statements" in the articles at issue in affirming dismissal of defamation-by-implication claims); *Henry v. Fox News Network LLC*, 629 F. Supp. 3d 136, 149-50 (S.D.N.Y. 2022) (dismissing defamation-by-implication claim with respect to statement that plaintiff engaged in "willful sexual misconduct"); *Weise v. Colorado Springs*, 2020 WL 13701854, at *5 (D. Colo. Nov. 30, 2020) (declining to recognize defamation-by-implication solely for the "gist" of a publication as a whole as a separate cognizable action); *Bongino v. Daily Beast Co.*, 477 F. Supp. 3d 1310, 1319-20 (S.D. Fla. 2020) (dismissing defamation-by-implication claims with respect to article's references to plaintiff's "quick temper" and "brash style"); *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 482 (S.D.N.Y. 2012) ("There can be no claim for an overall defamatory impact from the reporting of true statements beyond the specific defamatory implications that may arise from those specific statements."); *Carroll v. TheStreet.com, Inc.*, 2012 WL 13134547, at *5 (S.D. Fla. May 25, 2012) (dismissing a defamation-by-implication claim because complaint made "only general, conclusory allegations as to the defamatory nature" of an exhibit).

identifying the "'literally true facts'" juxtaposed or omitted to create the defamatory implication); ¶¶ 15-16, 46-48.  The Amended Complaint's allegations about "samples" of snippets of statements in the Priming Portions throughout the Campfire Documentary do not save his claim because they, like the allegations relating to the Relevant Portion, are "scattered, cryptic references" that "do not amount to proper pleading."  *Tannerite Sports*, 864 F.3d at 251; ¶¶ 38-40, 42-44.  Dismissal is required because Plaintiff does not, and implicitly concedes that he cannot consistent with his legal theory, identify any specific factual statements in the Campfire Documentary that conveyed the defamatory meaning he ascribes to it.  *Id.*; *Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 175 (S.D.N.Y. 2021) (dismissing plaintiff's "theory of holistic defamation" where plaintiff did "not identify any part of the article" as defamatory); *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 149 (D.D.C. 2017) (dismissing because plaintiff failed to identify "any single statement as false that is both capable of verification and capable of defamatory meaning" as part of a claim that a reader could "infer defamatory meaning from the article as a whole").

II.     **THE FIRST AMENDMENT BARS PLAINTIFF'S CLAIM BECAUSE THE CAMPFIRE DOCUMENTARY DID NOT ASSERT AS A FACT THAT HE KILLED SMITH WITH A BASEBALL BAT IN CONNECTION WITH A RELTIONSHIP BETWEEN THE TWO.**

Plaintiff's lawsuit does not "comport with the First Amendment" because the Campfire Documentary "cannot reasonably be interpreted" as having stated as a fact that Plaintiff killed Smith, used a baseball bat to kill Smith, or killed him due to a relationship with Smith.  ¶ 15; *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 293 (4th Cir. 2008) (affirming dismissal where defamatory content "cannot reasonably be interpreted as stating actual facts" about plaintiff); *see also Schnare v. Ziessow*, 104 F. App'x 847, 851 (4th Cir. 2004) (whether statements are actionable "depends on whether a reasonable reader would construe them as seriously asserting that" the plaintiff "committed the crime of perjury"); *Blanton v. City of Charleston*, 2014 WL 4809838, at

16

\*5 (D.S.C. Sept. 26, 2014) (dismissing where "the Court concludes as a matter of law that none of the three statements at issue can reasonably be interpreted as stating a fact about the plaintiff").[11] Plaintiff concedes that the Campfire Documentary did not reach any explicit conclusion about whether or how Smith was murdered or who was responsible, but nevertheless claims the Relevant Portion "implies and subtly asserts that Plaintiff was responsible" for Smith's death. ¶ 46. As described above, the Relevant Portion played video and audio excerpts of law enforcement interviews in which four third-party individuals reported what they heard about Plaintiff and included separate interviews with the investigators about the information they received. ¶¶ 12-13, 32; Ex. E at 25, 27-30, 32-33; *supra* at 7-9. Leaving aside that reporting on what those third-parties told law enforcement is privileged as a matter of law (*see infra* § VI), Plaintiff has alleged that "the **only** sources of information tying Plaintiff to Mr. Smith were based on **unfounded speculation, rumor, and hearsay**." ¶ 19 (emphasis added). It would be inconsistent with that allegation in the Amended Complaint for this Court to determine that any of the third-party statements to law enforcement (i.e., the "only sources of information tying Plaintiff to Mr. Smith") constituted facts about Plaintiff rather than "subjective and speculative supposition." *Biospherics*, 151 F.3d at 183-84, 186 (dismissing where statement constituted "a subjective view, not a factual statement"). Where, as here, "a speaker plainly expresses 'a subjective view, an interpretation, a theory, conjecture or surmise", rather than a claim "to be in possession of objectively verifiable [false] facts, the statement is not actionable.'" *Id*. at 186 (alteration in original) (to be actionable, statement must "reasonably be interpreted as stating actual facts").

---

[11] Whether the Documentary reasonably can be interpreted as conveying actual facts is a question of law for the Court and is capable of resolution based on materials properly before the Court. *CACI*, 536 F.3d at 294; *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998); *see also Rollins Ranches*, 2021 WL 5355650, at \*4 (must consider First Amendment when determining whether lawsuit states a defamation claim).

Even without Plaintiff's admission, "any reasonable person" listening to the Relevant Portion "would recognize, based on the tenor, language, and context" that it did not convey any "actual facts" about Plaintiff. *Id.*; *CACI*, 536 F.3d at 293; *supra* at 7-9. The audio excerpts of the law enforcement interviews indicated that the third-party individuals were conveying "rumors" and speculation about Plaintiff, not facts. *Supra* at 7-9 ("rumors going around" and "just heard" and "someone told me" and "if it's him"). The interwoven interviews with Cpl. Duncan and Lt. Moore and on-screen graphics emphasized that what law enforcement was hearing was only "subjective and speculative supposition." *Biospherics*, 151 F.3d at 183-84. While the Murdaugh name was "constantly brought up" during the investigation—at "least a dozen times"—Lt. Moore cautioned viewers that there were "different stories and different versions" with some pointing to Paul, others to Buster, but that there was "***nothing we can point to and say, 'Mm-hmm, that's what happened.***'" *Supra* at 7-9. That law enforcement could not ultimately "point to" what happened was evident by the on-screen disclaimer that "no charges have been filed related to the death of Stephen Smith." *Id.* at 10. No reasonable person would understand these statements to be "seriously asserting" *any* "fact" about Plaintiff or Smith's death, let alone that Plaintiff, in fact, killed Smith and how or why he did so. *Schnare*, 104 F. App'x at 851; *Biospherics*, 151 F.3d at 186 *see CACI*, 536 F.3d at 293, 303 (finding statements asking for the president of the United States to "investigate and identify" contractor responsible for committing murder, including CACI, did not state "the 'actual fact' that CACI committed murder at Abu Ghraib").

It likewise would be unreasonable to view the statements in the Relevant Portion that refer to a baseball bat or an alleged relationship between Plaintiff and Smith as asserting any facts about either. Directly after playing an audio clip of an interview in which a third-party told law enforcement he heard "they beat him up and threw him out of the truck," Cpl. Duncan summarized

18

one "of the **rumors**" investigators heard that "a 2x4 or a bat was used to strike Stephen in the head area and that's what caused his death." Ex. E at 36-37.[12] In his response to a question about whether such a theory would be consistent with the autopsy, Cpl. Duncan did not affirmatively state that a bat was used, but rather that the autopsy "is consistent with **some type of blunt force object**." *Id.* (emphasis added).

Consistent with the Campfire Documentary as a whole, law enforcement had various theories about how Smith died (including that a baseball bat may have been used), but there was "nothing" they could "point to" to say definitively what happened. The Relevant Portion of the Campfire Documentary as a whole "plainly" expressed what law enforcement heard and what investigative theories they pursued, which is precisely the type of "theory, conjecture, or surmise, rather than a claim to be in possession of objectively verifiable false facts," that is not actionable under defamation law. *Biospherics*, 151 F.3d at 186 (cleaned up); *CACI*, 536 F.3d at 303. The Campfire Documentary's reporting on various theories in connection with a law enforcement "inquiry itself, however embarrassing or unpleasant to its subject, is not accusation" and the "language used cannot be tortured to 'make that certain which is in fact uncertain.'" *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993); *see Biospherics*, 151 F.3d at 184; *Woodward v. Weiss*, 932 F. Supp. 723, 727 (D.S.C. 1996); *see also Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) (affirming dismissal of defamation claim complaining of book reporting

---

[12] Cpl. Duncan did not state that Buster, in particular, was the one who allegedly used the bat or struck Smith, relying instead on passive voice. He, therefore, "did not communicate any false message" of and concerning Plaintiff as an individual, which is another required element of defamation. *Stokes v. Oconee Cnty.*, 441 S.C. 566, 580, 895 S.E.2d 689, 697 (Ct. App. 2023); *see also AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*, 903 F.2d 1000, 1005 (4th Cir. 1990) (publication must "'reasonably give rise to the conclusion that there is a particular reference' to the individual" (citation omitted)); *Hughs*, 2020 WL 6689132, at *3 (failure to state a claim for defamation where alleged statement had "only a nebulous connection" to defendant).

comments by individuals who had "their own personal theories" regarding a mysterious death implicating plaintiff but had no "first-hand knowledge of what happened" because "a reasonable reader would understand that any allegations of murder, especially any implicating Levin, are nothing more than conjecture and rumor").

The "sequence" in the Campfire Documentary with the commentary of Mr. Smith and Ms. Mixon did not convey any facts about Plaintiff either.  George Smith's recollection of his conversation with Stephen Smith's father on his deathbed cannot reasonably be viewed as conveying that Plaintiff, in fact, murdered Stephen Smith because of Plaintiff's sexual identity or a romantic relationship between the two.  George Smith's statement indicated that Stephen Smith's father, Joel, was expressing his own hunch, intuition, and speculation that the "Murdaughs" and the "Murdaugh boys" were responsible for his son's death and, separately, that his son and Buster were in a relationship—i.e., the statement on its face shows that Joel did not actually know and could not actually prove his hunch that they were in a relationship but felt it to be true "***in his heart***."  *Supra* at 9.  The "tenor, language, and context" of George Smith's statements, in relation to the Documentary as a whole, reflect a grieving father's "subjective view" and a grasping for answers and accountability, not factual statements about Plaintiff.  *See Biospherics*, 151 F.3d at 186.  Same with Ms. Mixon's statement about rumors of a relationship between Plaintiff and Stephen Smith, which on its face indicates that she was merely speculating, not stating a fact about his sexual identity.  In fact, Ms. Mixon's statement cast doubt on any alleged relationship between Plaintiff and Stephen Smith and suggested that it was only "rumors."  *Id.*  It would be unreasonable to find that the commentary of a Smith family friend "is really a statement of fact rather than" her "own interpretation" of speculation she heard.

The Amended Complaint's reliance on the Priming Portions does not change, and in fact

strengthens, the conclusion that the Campfire Documentary conveyed protected speculation rather than actionable fact. Plaintiff confirms that the Priming Portions are relevant to his legal theory only insofar as they disclose facts from which he claims a viewer *could* conclude that Plaintiff murdered Smith. ¶ 38 ("encourage the audience to ***take a logical leap*** and conclude that Plaintiff killed Mr. Smith with a baseball bat as a result of a romantic relationship between the two"); ¶ 44 ("***could reasonably lead*** to the inference"); *accord* Dkt. 73 at 11 ("***could lead*** an objective viewer to reasonably infer from its contents that Mr. Murdaugh is responsible for Mr. Smith's death"); *id* at 17 ("***could*** reasonably lead a viewer to infer the defamatory meaning"); *id.* at 15 ("the impressions and inferences that ***can be reasonably be drawn by the audience*** from the series' depiction of the subject events") (all emphasis added).[13] When a publication discloses the factual bases for a conclusion—which is Plaintiff's entire theory of liability (*supra* at 16-18)—a "reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation." *Biospherics*, 151 F.3d at 185 (quoting *Moldea v. New York Times Co.*, 15 F.3d 1137, 1144–45 (D.C. Cir. 1994) (citing cases)). Even if *arguendo* the Campfire Documentary implied any conclusion about Smith's death, the First

---

[13] Virtually none of the statements Plaintiff identifies in the Priming Portions are *facts*—they are opinions and "subjective and speculative supposition," as evident by how Plaintiff characterizes them. *Biospherics*, 151 F.3d at 184; ¶ 38 ("If you didn't know the Murdaughs, you wasn't from Hampton. And whether you knew 'em or not, they knew you" "Where the Murdaughs go, death seems to follow" "There is no justice in Hampton County. Yeah, if it comes out of Hampton, it's not going nowhere" "People that could erase it like it never happened" "Enough evil had been done by the family. It's gone too far this time"); ¶ 39 ("Hampton is pretty much historically dominated by one family: the Murdaughs" "like the puppet master" "You didn't want to get on the Murdaughs' bad side. It would be beneficial to stay out of the Murdaughs' radar" "The Murdaughs were like the Mafia. You know you just don't mess with em"); ¶ 40 ("hurt you any way he could" and "crab bait" "could have somebody taken out in a minute"); ¶ 42 ("What you got from a lot of people was, 'It's the Murdaughs. Nothing's going to happen.'"); ¶ 44 ("there were several red flags from the start in this investigation").

Amendment bars attaching liability to it because Plaintiff admits it disclosed the factual basis to viewers, who were free to draw their own conclusions. *Id.*; *see also Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1288 (4th Cir. 1987) (emphasizing importance of "fact/opinion distinction"); *accord Schnare*, 104 F. App'x at 852 (affirming dismissal of defamation claims where author disclosed "factual basis for his disagreement, allowing the reader to draw her own conclusion").

If Plaintiff's own theory did not defeat his claim, it would be unreasonable to find that the Priming Portions conveyed that Plaintiff murdered Smith with a baseball bat as a result of a romantic relationship. The Priming Portions do not include a *single statement* about a baseball bat or a romantic relationship between Plaintiff and Smith. *See* Ex. G. They mention Plaintiff only once, in the context of a family tree, and virtually none of the statements about other members of the Murdaugh family—namely, Plaintiff's father,[14] grandfather,[15] and brother[16]—amount to factual assertions. Ex. G. Further, Plaintiff must—but cannot—explain how conjecture in the Priming Portion about *other* specific members of the Murdaugh family converts the Relevant Portion's "**speculation, rumor, and hearsay**" about Plaintiff's connection with Smith into verifiable fact. ¶ 19. As far as inclusion in the Priming Portion of Cpl. Duncan's contemporaneous audio recordings and subsequent on-camera interview in which he described his reasons for doubting that Smith's death was the result of a hit-and-run, they did not convey any facts for the reason described above. *Supra* at 18-19. Dismissal is required because it would be inconsistent with the language, context, and tenor of the Campfire Documentary to find that either the Relevant or Priming Portions, alone or together, conveyed *any facts* about Plaintiff or Smith's death.

---

[14] Ex. G at 1, 4-5.

[15] Ex. G at 4-5.

[16] Ex. G at 3, 5.

**III.**    **PLAINTIFF HAS FAILED TO MAKE THE "ESPECIALLY RIGOROUS SHOWING" REQUIRED TO STATE A CLAIM FOR DEFAMATION BY IMPLICATION.**

Plaintiff admits that he must make the "especially rigorous showing" articulated by the Fourth Circuit in *Chapin*:  (1) the "plain and natural meaning of the words used" in the Campfire Documentary can be "reasonably" viewed to impart the false inference he ascribes to it, i.e., Plaintiff murdered Mr. Smith with a baseball bat as a result of a romantic relationship that existed between them; and (2) Defendants intended or endorsed that implication.  *Chapin*, 993 F.2d at 1092-93; *Walker v. Tyler*, 1996 WL 612600, at *2 (4th Cir. Oct. 24, 1996) ("For a defamation-by-implication cause of action to survive, the defamatory implication must be present in the plain and natural meaning of the words used."); Dkt. 73 at 14 ("the proper analysis for the Court when deciding whether a discrete implication is constitutionally protected is to determine whether there is any evidence demonstrating that Defendant intended or endorsed . . . the defamatory implication").[17]  Consistent with its gatekeeping role, the Court should dismiss the lawsuit with prejudice because Plaintiff cannot meet his burden as to either prong.  *See Rollins Ranches*, 2021 WL 5355650, at *9, *11 (dismissing defamation lawsuit with prejudice where statements were not capable of the defamatory meaning alleged by plaintiffs, including because the publication expressly said the alleged defamatory conclusion was "unknown"); *Hughs*, 2020 WL 6689132, at *4 (dismissal because letter accusing the plaintiff of engaging in corporate misconduct "only provides notice" of the existence of an investigation and "specifically notes that 'there has been no suggestion to this point of any wrongdoing'" by the plaintiff's company or its directors); *Toussaint v. Palmetto Health*, 2017 WL 1950955, at *2 (D.S.C. May 10, 2017) (dismissing

---

[17] Whether "a statement is reasonably capable of conveying a defamatory implication" is a matter of "law to be decided on a motion to dismiss."  *Agbapuruonwu v. NBC Subsidiary (WRC-TV)*, 821 F. App'x 234, 239 (4th Cir. 2020).

defamation lawsuit with prejudice where it would be "objectively unreasonable" to find that communications to patients that doctor departed his practice implied he "abandoned his patients"); *Robins v. Nat'l Enquirer, Inc.*, 1995 WL 776708, at *3 (D.S.C. Apr. 10, 1995) (dismissing defamation lawsuit with prejudice because the "article contains no words which reasonably could be construed" to imply plaintiff was "'partially' responsible for the murder" of two boys); *accord Agbapuruonwu*, 821 F. App'x at 241-42 (affirming dismissal of defamation lawsuit where "no explicit statement" said plaintiff "was involved" in murder and such an inference would not be reasonable); *Walker*, 1996 WL 612600, at *1 (affirming dismissal where statements "cannot reasonably be interpreted to express defamatory meanings"); *Boykin v. Prisma Health*, 2023 WL 5488448, at *6 (D.S.C. Aug. 8, 2023), *report and recommendation adopted*, 2023 WL 5487118 (D.S.C. Aug. 24, 2023) (dismissal based on failure to plead defamation by implication).[18]

### A. The Language Of The Campfire Documentary Cannot "Be Reasonably Read to Impart" That Plaintiff Murdered Smith "By Striking Him With A Baseball Bat" And "In Connection With A Romantic Relationship" With Smith.

It would be unreasonable to find that the Campfire Documentary expressed "the libelous meanings ascribed to it" by Plaintiff, i.e., that he "murdered Stephen Smith by striking him with a baseball bat" and "in connection with a romantic relationship" with Smith. ¶¶ 15, 49. As discussed above, the Campfire Documentary chronicled law enforcement's ultimately unsuccessful criminal investigation into Smith's death. *Supra* at 3-10. It did not "speak in certainties"—there was no

---

[18] *Cf. Faltas v. State Newspaper*, 928 F. Supp. 637, 650 (D.S.C. 1996), *aff'd*, 155 F.3d 557 (4th Cir. 1998) (letter stating "plaintiff *was not* terminated due to the publication of her piece on homosexuality" was "not reasonably susceptible to an inference that the newspaper believed plaintiff *was* terminated for cause" (emphasis in original)); *Conway v. S.C. Vocational Rehab. Dep't*, 2018 WL 2301849, at *5 (D.S.C. Jan. 31, 2018), *report and recommendation adopted*, 2018 WL 2301848 (D.S.C. Feb. 26, 2018) (summary judgment on defamation by implication claim); *Wilson v. Ward*, 1989 WL 380480, at *1 (S.C. Ct. App. Sept. 19, 1989) (truthful statement that plaintiff resigned after murders could not "reasonably be interpreted as an admission of guilt" by the plaintiff or to suggest "that she was involved in the murders").

conclusion as to whether *anyone* murdered Smith or, if so, if Plaintiff did so at all, or with a baseball bat because of a romantic relationship—and the "plain and natural meaning of the words" it uses did not convey any such conclusion. *Chapin*, 993 F.2d at 1096. The Campfire Documentary is analogous to the article at the center of *Chapin* (the "Greve article"), which questioned the finances of a nonprofit organization that delivered gift packs to troops abroad. *Chapin*, 9932 F.2d at 1091. The Fourth Circuit affirmed the district court's dismissal of the case based on the lack of defamatory implication, explaining:

> "***In the Court's view, it is a story constructed around questions, not conclusions. But the mere raising of questions is, without more, insufficient to sustain a defamation suit in these circumstances. Questions are not necessarily accusations or affronts.*** Nor do they necessarily insinuate derogatory answers. ***They may simply be, as they are here, expressions of uncertainty.*** The Greve article advances alternative answers to the questions it raises, presenting both favorable and unfavorable views, but does not ultimately adopt any particular answer as correct. From this, a reasonable reader would not be likely to conclude that one answer is true and the other false. Language of ambiguity and imprecision permeates the article, significantly coloring its tone."

*Id*. at 1098 (emphasis added).

Plaintiff fails the first prong of the *Chapin* test because he must, but has failed to, identify any truthful statements of facts at all, let alone whose "plain and natural" meaning conveys the meaning he ascribes to the Campfire Documentary. *Id*. at 1092 ("defamatory implication" must be present in "the plain and natural meaning of the words used"); *supra* at 14-16. Plaintiff implicitly concedes the alleged defamatory meaning is not based on the "plain and natural" meaning of any specific statements of fact by constructing an elaborate "whole" publication theory: that snippets of statements in the Priming Portions introduced "numerous themes" that, when juxtaposed with the Relevant Portion, created the possibility for viewers to infer that Plaintiff murdered Mr. Smith by "striking him" with a baseball bat as the result of a romantic relationship. *See* ¶¶ 37-40, 42-44, 50; *supra* at 14-16. Alternatively, Plaintiff suggests the Campfire

Documentary conveyed the defamatory meaning by "certain omissions of information that would have tended to show that Plaintiff was not involved in the death of Mr. Smith." ¶ 50; *see also id.* ¶¶ 18-19 ("ignored. . .information indicating that individuals unrelated to Plaintiff were responsible for Mr. Smith's death"). Moving Defendants are unaware of any court in South Carolina or in this Circuit that has recognized a defamation-by-implication claim based solely on an *entire publication*, or that has applied the juxtaposition or omission standard within the *Chapin* framework under South Carolina law.[19] If such a legal theory is viable, the Amended Complaint fails to plead any facts demonstrating any alleged juxtaposition or omission of facts that would meet the "rigorous" *Chapin* standard.

As discussed above, Plaintiff has not identified any facts in the Relevant or Priming Portions at all, that defeat a claim for defamation by implication. *Chapin*, 993 F.2d at 1094 (for a question to defame by implication "it must be reasonably read as an *assertion* of a false *fact*") (emphasis in original); *accord Potomac Valve*, 829 F.2d at 1289–90; *see Block*, 2023 WL 8527670, at *10. Even if *arguendo* the Priming Portions conveyed any truthful facts, they did not, when juxtaposed with the Relevant Portion, convey any implication that *Plaintiff* murdered Smith, or that he did so with a baseball bat because of a romantic relationship. *See supra* at 14-16. For the reasons explained above, Plaintiff cannot meet the first prong of *Chapin* based on a "story constructed around questions, not conclusions" about how Smith died and who may be responsible, and which expressly cautions that there are no answers. *Chapin*, 993 F.2d at 1098; *see RE Carroll Mgmt. Co. v. Dun & Bradstreet, Inc.*, 2025 WL 415743, at *3 (4th Cir. Feb. 6, 2025) (affirming

---

[19] Moving Defendants are aware of a few opinions of other district courts within this Circuit considering whether juxtaposition of facts or an omission of a material fact may constitute defamation, but none that has held that juxtaposition or omission of facts constitutes defamation in the absence of specific defamatory statements.

dismissal of publication because "an ordinary person" would view the inclusion of information, including a "disclaimer," as signifying an alternative conclusion).

Nor does the Amended Complaint sufficiently plead any facts demonstrating that the Campfire Documentary created the defamatory implication by omitting facts. The only indication about what "information" was purportedly omitted is a conclusory allegation that "at least four individuals other than Plaintiff were rumored to be involved in the death of Mr. Smith or were potential suspects, [and] that there was evidence indicating Mr. Smith's death was the result of a hit-and-run and not a homicide." ¶ 19. Such an allegation is too vague and conclusory to allow the Court to determine whether the alleged factual omission created the purported defamatory inference. *See Cobin*, 561 F. Supp. 2d at 558 (considering plaintiff's claim that certain "information would have made for a more balanced presentation" and determining that the "absence of such details does not make the story against the plaintiff defamatory"). Plaintiff's attempt to plead a "tapestry of defamation" does not meet *Chapin*'s rigorous requirement that he show that the Campfire Documentary conveyed the defamatory meaning he ascribes to it. *Block*, 2023 WL 8527670, at *10.

**B.      Plaintiff Must But Cannot Make The Rigorous Showing That The Moving Defendants      Intended      Or      Endorsed      The      Alleged      Implication.**

Even if Plaintiff met *Chapin*'s first prong, his defamation-by-implication claim still requires dismissal for failure to show that the Moving Defendants intended or endorsed the alleged inference that he killed Smith with a baseball bat because of a romantic relationship. *Chapin*, 993 F.2d at 1092-93; *Wang v. Sussman*, 2025 WL 81355, at *9 (S.D.N.Y. Jan. 13, 2025) ("The latter requirement is measured by an 'objective' standard that 'asks whether the plain language of the communication itself suggests that an inference was intended or endorsed.'"). Plaintiff attempts to meet this "rigorous" standard with the single allegation that the "Defendants' deliberate editorial

choices and narrative themes suggest that they intended, or at least endorsed, the inference that

Plaintiff killed Mr. Smith." ¶ 50. A conclusory assertion that parrots the legal standard is

insufficient to state any claim for defamation, let alone to meet the "especially rigorous showing"

*Chapin* requires. *Lugo v. Boeing Co.*, 2020 WL 495336, at *3 (D.S.C. Jan. 30, 2020) (Gergel, J.)

("A pleading that merely offers. . .'labels and conclusions,' or 'a formulaic recitation of the

elements of a cause of action will not do.'" (citing *Twombly*, 550 U.S. at 555) (cleaned up)). The

Amended Complaint pleads no facts, including specific "editorial choices" or "narrative themes"

*about Plaintiff*, that "affirmatively suggest" that any of the Moving Defendants intended or

endorsed the inference that he murdered Smith with a baseball bat because of a relationship with

Smith. *Chapin*, 993 F.2d at 1092-93; *Walker*, 1996 WL 612600, at *2 (dismissal where defendants

did not endorse any factual allegations or intend "an inference to be drawn"); *Agbapuruonwu*, 821

F. App'x at 238 ("the court noted that the Complaint did not allege facts suggesting that NBC

intended or endorsed either implication"). To the contrary, the Campfire Documentary's express

disclosures to viewers that there was nothing investigators could "point to" to convert stories into

charges affirmatively contradicts, rather than suggests, any such endorsement. *Supra* at 8-9;

*Chapin*, 993 F.2d at 1092-93; *Wang*, 2025 WL 81355, at *10 (dismissal where statements in

publication "undercut" and illustrate the "opposite" of endorsement).

## IV.     ANY FACTUAL IMPLICATION CONVEYED BY THE CAMPFIRE DOCUMENTARY IS TRUE.

The substantial truth doctrine requires dismissal because Plaintiff cannot demonstrate that

the Campfire Documentary would create a "different effect on the mind of" the viewer "from that

which the pleaded truth would have produced." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496,

517 (1991); *Coker v. Norwitch Com. Grp., Inc.*, 2023 WL 3791106, at *6 (D.S.C. June 2, 2023)

("the alleged defamatory statement was more damaging to the plaintiff's reputation in the mind of

the average listener, than a truthful statement would have been" (internal quotation marks omitted)); *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 350 (4th Cir. 2020) (statement is "'substantially' true in overall effect" when looking at its "effect on the viewer"). The pleaded truth is that law enforcement confirmed that Plaintiff's name repeatedly surfaced during the investigation into Smith's death. Plaintiff must, but cannot, explain how the content in the Campfire Documentary—which included audio excepts of law enforcement interviews mentioning Plaintiff's name—would have any different "effect on the mind of" the viewer from that pleaded truth. *See Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 270 (4th Cir. 2022) (dismissal where plaintiff "failed to establish that these statements are either materially false or defamatory"); *Chapin*, 993 F.2d at 1094 (affirming dismissal in part based on "true" assertions); *see also Glob. Relief Found. v. N.Y. Times Co.*, 390 F.3d 973, 986 (7th Cir. 2004) ("reports were either true or substantially true recitations of the government's suspicions"). The Amended Complaint cannot survive dismissal because the "gist" of the Campfire Documentary is the same as the admitted truth. *Dobkin v. Johns Hopkins Univ.*, 1999 WL 22901, at *4 (4th Cir. Jan. 21, 1999) (defamation does not lie if "the gist or 'sting' of a statement is substantially true"); *Kun v. WCSC-TV-5*, 2002 WL 34217983 (S.C.C.P. May 28, 2002) ("The truth of the matter is a complete defense to an action based on defamation." (citation omitted)); *see also AIDS Counseling & Testing Ctrs.*, 903 F.2d at 1004.

## V.    PLAINTIFF FAILS TO SUFFICIENTLY PLEAD COMMON LAW MALICE.

Accepting as true Plaintiff's allegations that he is a private figure,[20] Plaintiff must plead facts sufficient to demonstrate common law malice, which as applied here requires showing that

---

[20] Plaintiff argued that common law malice was the appropriate standard, notwithstanding his alleged private figure status, when opposing the earlier motions to dismiss. Dkt. 73 at 28-29. The Warner Entities do not concede that the common law malice standard applies to the exclusion of constitutional actual malice, or that Plaintiff is a private figure.

the Moving Defendants published the Campfire Documentary as a whole "with such recklessness as to show a conscious indifference towards plaintiff's rights." *Charleston Carriage Works, LLC v. Charleston Animal Soc.*, 2022 WL 20838964, at *12 (S.C.C.P. May 12, 2022); *accord* Dkt. 73 at 28-29 (defining common law malice to mean "reckless disregard for the truth"); *Erickson*, 368 S.C. at 466, 629 S.E.2d at 665; *see also Boone v. Sunbelt Newspapers, Inc.*, 347 S.C. 571, 581, 556 S.E.2d 732, 737-38 (Ct. App. 2001).[21]   Plaintiff attempts to meet this standard as to *all* Defendants with the following conclusory allegation:

> "The publications were made with reckless indifference to the truth and with knowledge of information that would have cast serious doubts on the intended defamatory meaning of the Defendants' publications.   In publishing these statements Defendants purposefully ignored information demonstrating their falsity that was readily available to and within the Defendants' knowledge, including information indicating that individuals unrelated to Plaintiff were responsible for Mr. Smith's death.   Accident investigation notes from the South Carolina Department of Public Safety's ('DPS') Multi-Disciplinary Accident Investigation Team ('MAIT') that were available to and reviewed by Defendants prior to publishing and republishing their series demonstrate that at least four individuals other than Plaintiff were rumored to be involved in the death of Mr. Smith or were potential suspects, that there was evidence indicating Mr. Smith's death was the result of a hit-and-run and not a homicide, and that the only sources of information tying Plaintiff to Mr. Smith were based on unfounded speculation, rumor, and hearsay.   Defendants had no reliable or credible information indicating that Mr. Smith's death was the result of his sexual orientation or connected to Plaintiff."

¶ 19; ¶ 51 ("reckless and intentional conduct of the Defendants, in complete disregard of the truth").

The Court can find the Amended Complaint fails to sufficiently plead common law malice solely based on its improper group pleading. Fed. R. Civ. P. 8(a); *Herdt v. Horry Cnty. Council*, No. 4:17-cv-00392-RBH, 2018 WL 827140, at *2 (D.S.C. Feb. 12, 2018) ("Any amended

---

[21] South Carolina law also defines common law malice to include publication "actuated by ill will in what [they] did, with the design to causelessly and wantonly injure the plaintiff" (*Charleston Carriage Works*, 2022 WL 20838964, at *12), but Plaintiff has confirmed in the Amended Complaint and in opposition to the earlier filed motions to dismiss that he is relying only on the "recklessness" standard (¶¶ 19, 51; Dkt. 73 at 28-29).

complaint must also set forth allegations of wrongdoing as to each Defendant sufficient to give each defendant fair notice of what the claim is and the grounds upon which it rests."). By lumping together the states of mind of multiple organizations and with respect to all Defendants *en masse*, the Amended Complaint fails to provide sufficient notice of any facts demonstrating reckless indifference to the truth or knowledge of falsity of any of the individual defendants. *Cf AdvanFort Co. v. Mar. Exec.*, *LLC*, 2015 WL 4603090, at *7 (E.D. Va. July 28, 2015) ("it is well established that actual malice must be proved with respect to *each* defendant") (citing *Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245, 252-54 (1974)); *see also Faltas*, 928 F. Supp. at 646 (must show "that each defendant acted" with "knowledge of the falsity of the statement or reckless disregard for its truth").[22]

Even if paragraphs 19 and 51 do not amount to improper group pleading, they do not carry Plaintiff's burden because they are devoid of any facts that could impute fault to any individual at Campfire. The requisite state of mind in a defamation lawsuit must be "'be brought home to the persons in the . . . organization having responsibility for the publication.'" *See New York Times Co. v. Sullivan*, 376 U.S. 254, 287 (1964); *Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 761 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 5 (2023) (same). The Amended Complaint does not identify a single individual at any of the Moving Defendants' organization responsible for the publication of the Campfire Documentary, let alone who acted with common law malice. *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) ("When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify

---

[22] Given the similarities between how South Carolina courts have defined the recklessness standards of common law malice and constitutional actual malice, there is no substantive rationale for why Plaintiff should be able to plead the former as to the Defendants with group pleading without any specific allegations as to any individual defendant.

the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice."); *see also Harvey*, 48 F.4th at 273-74 (affirming dismissal where complaint " did not add any new facts regarding the state of mind of the reporters who published the statements, and still does not plausibly allege that" they "knew the information was false, or that it was subjectively false"); *Holbrook v. Harman Auto., Inc.*, 58 F.3d 222, 225 (6th Cir. 1995) ("where, as here, the defendant is an institution rather than an individual, the question is whether the individual responsible for the statement's publication acted with the requisite culpable state of mind"); *Gilmore v. Jones*, C.A. 2021 WL 68684, at * 4 (W.D. Va. Jan. 8, 2021) ("where one or more defendants are institutional actors rather than individuals, the state of mind inquiry focuses on the subjective state of mind of the individuals responsible for the publication at issue"); *Mejia v. Telemundo Mid-Atlantic LLC*, 440 F. Supp. 3d 495, 502 (D. Md. 2020) (dismissing amended complaint that "contains no factual allegations referring to the state of mind of the individual in charge of" the publications).

Plaintiff's allegations as to fault also fail to demonstrate it on the merits as well. The Amended Complaint's "conclusory allegation of knowledge of falsity or reckless disregard thereof" is "a mere recitation of the legal standard" that is insufficient to sustain dismissal. *Agbapuruonwu*, 821 F. App'x at 240; *see Mayfield v. Nat'l Ass'n for Stock Car Auto Racing Inc.*, 674 F.3d 369, 377-78 (4th Cir. 2022); ¶¶ 19, 51. The allegations that the Defendants relied on alleged "speculation, rumor, or hearsay" or "purposefully ignored information" about other individuals "rumored to be involved" in Smith's death are too vague to permit the Court to draw any inferences about the alleged information (*supra* at 20-22) and, even if they were not, they do not plead facts demonstrating that the Moving Defendants in fact "doubted—or had reason to doubt—the veracity of the offending statements." *McGlothlin v. Hennelly*, 2021 WL 2935372, at

*2 (4th Cir. July 13, 2021).[23]  Further, because Plaintiff admits that a viewer of the Campfire Documentary could conclude Plaintiff was involved in Smith's death solely based on the law enforcement materials, it would be inconsistent with the allegations of the Amended Complaint to find that any of the Moving Defendants acted in reckless disregard of the truth.  *See supra* at 28-29.

## VI.  THE CAMPFIRE DOCUMENTARY IS NOT ACTIONABLE AS A MATTER OF LAW BECAUSE IT IS PROTECTED BY THE FAIR REPORT PRIVILEGE.

Plaintiff cannot state a claim for defamation because the Campfire Documentary is protected by the fair report privilege, which bars liability relating to the publication of a fair and true report of information derived from government reports or sources.[24]  *See Cobin*, 561 F. Supp. 2d at 550 ("shields news organizations from defamation claims when publishing information originally based upon government reports or actions") (citing *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 712 (4th Cir. 1991)); *Aitch v. Maybin*, 2008 WL 2943348, at *2 (D.S.C. July 29, 2008), *aff'd*, 325 F. App'x 281 (4th Cir. 2009) ("Under longstanding South Carolina case law, contents of governmental records—such as judicial proceedings, case reports, published cases, investigative reports, or arrest records—do not give rise to liability for slander or libel.").[25]  Because Plaintiff's theory of liability requires relying on the *entirety* of the Relevant Portion—which includes squarely protected official investigative materials, such as the audio recordings of

---

[23] *Cf. Harvey*, 48 F.4th at 274; *Horne v. WTVR, LLC*, 893 F.3d 201, 211-12 (4th Cir. 2018) ("within the context of the story's creation from trusted sources, the email from the anonymous source does not provide '*obvious* reasons to doubt the veracity of the informant or the accuracy of his reports'" (emphasis in original)); *Floyd v. Knight*, 2023 WL 4409037, at *13 (D.S.C. Apr. 27, 2023), *report and recommendation adopted*, 2023 WL 4013520 (D.S.C. June 15, 2023) (no common law malice where defendant "reasonably believed" statements to be true).

[24] "Generally, whether a publication gives rise to a qualified privilege is a question of law for the courts." *McLaughlin*, 2021 WL 4691379, at *3 (citation omitted).

[25] *Accord* Cal. Civ. Code § 47(d); *Healthsmart Pac., Inc. v. Kabateck*, 7 Cal. App. 5th 416, 431 (2016).

interviews with law enforcement—his claim necessarily relies on attaching liability to privileged materials. ¶¶ 12, 32; Ex. E at 12-34; *Reuber*, 925 F.2d at 713 (privilege attaches when "factual predicate for the privilege" is "a report on a government action or document"); *see Chapin*, 993 F.2d at 1097 (privilege to "'unofficial' public statements of" a congressman in a newspaper interview); *White v. Wilkerson*, 328 S.C. 179, 186, 493 S.E.2d 345, 248 (1997) (privilege to statements made on air about lawsuit); *Harvey*, 48 F.4th at 274 (privilege to statements about what a lawyer's "client would say in response to the subpoena and summarized" official documents); *Brewster v. Laurens Cnty. Advertiser*, 2012 WL 4767052, at *2 (S.C.C.P. Apr. 6, 2012) (privilege to police reports); *Kun*, 2002 WL 34217983 (privilege to "accurately reported the events as recorded" by police, including in police reports).[26]  The Court need not conduct any further analysis to dismiss the Amended Complaint if it applies the law of California—where Campfire is incorporated and has its principal place of business (¶¶ 8, 17)—because California recognizes an absolute privilege. Cal. Civ. Code § 47(d).[27]  The Court should apply California law under the "depecage principle" because that state has the most significant interest in ensuring its own citizens and conduct occurring within its borders are protected by the full scope of their codified fair report privileges. *See Sarver v. Chartier*, 813 F.3d 891, 897, 899 (9th Cir. 2016).[28]

---

[26] *Smith v. Santa Rosa Press Democrat*, 2011 WL 5006463, at *7 (N.D. Cal. Oct. 20, 2011) (allegedly defamatory statements absolutely shielded by the fair and accurate report privilege); *Rall v. Tribune 365 LLC*, 31 Cal. App. 5th 479, 500 (2019) ("we cannot find the Times articles to be anything other than a fair and true report of an LAPD investigation that was central to the substance of the articles, and accordingly absolutely privileged"); *see also McClatchy Newspapers, Inc. v. Superior Ct.*, 189 Cal. App. 3d 961, 977 (1987) ("A verbatim use of the allegedly defamatory material reported in its proper context not only presents the gist and sting of the statement, but it epitomizes the meaning of 'fair and true report.'").

[27] The Moving Defendants reserve the right to argue that South Carolina law does not apply to the substantive claims in this lawsuit even though this motion only asserts the point for the purposes of the fair report privilege.

[28] *See Kozel v. Kozel*, 299 F. Supp. 3d 737, 751 (D.S.C. 2018) (as "choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case").

If South Carolina law applies, the fair report privilege still necessitates dismissal because the Amended Complaint does not and cannot plead facts demonstrating fault. *Supra* at 32-33. The Fourth Circuit has explained that while it is theoretically "possible that a possessor of a qualified privilege could nonetheless be acting with reckless disregard of truth, the existence of a privilege diminishes the likelihood of that occurrence" and "makes it more difficult for a reviewing court to conclude that a news report on government functions was published in reckless disregard of the truth." *Reuber*, 925 F.2d at 712-14. Plaintiff cannot overcome the fair report privilege here "because the Complaint makes no plausible allegation" of common law malice for the reasons described above. *Agbapuruonwu*, 821 F. App'x at 240; *supra* at 29-33.

## CONCLUSION

For the reasons discussed herein, the Moving Defendants respectfully request the Court dismiss Plaintiff's claim of defamation as to the Campfire Documentary with prejudice.

**SIGNATURES ON FOLLOWING PAGE**

35

Respectfully submitted,

s/ MERRITT G. ABNEY

NELSON MULLINS RILEY & SCARBOROUGH, LLP
 David E. Dukes, Esq. (Federal Bar No. 00635)
 E-Mail: david.dukes@nelsonmullins.com
 1320 Main Street / 17th Floor
 Post Office Box 11070 (29211-1070)
 Columbia, SC 29201
 (803) 799-2000

 Merritt G. Abney, Esq. (Federal Bar No. 09413)
 E-Mail: merritt.abney@nelsonmullins.com
 151 Meeting Street / Sixth Floor
 Post Office Box 1806 (29402-1806)
 Charleston, SC 29401-2239
 (843) 853-5200

WILLKIE FARR & GALLAGHER LLP
 Meryl C. Governski, *pro hac vice*
 Kristin Bender, *pro hac vice*
 1875 K Street N.W.
 Washington, DC 20006-1238
 (202) 303-1000
 mgovernski@willkie.com
 kbender@willkie.com

*Attorneys for Defendants Blackfin, Inc., Warner Bros. Discovery, Inc., Warner Media Entertainment Pages, Inc. and Campfire Studios, Inc.*

Charleston, South Carolina
April 22, 2025

36