IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| RICHARD ALEXANDER MURDAUGH, JR., <br><br> Plaintiff, <br><br> v. <br><br> BLACKFIN, INC., WARNER BROS. DISCOVERY, INC., WARNER MEDIA ENTERTAINMENT PAGES, INC., AND CAMPFIRE STUDIOS, INC., <br><br> Defendants. | Civil Action No.: 9:24-cv-04914-RMG <br><br> JURY TRIAL DEMANDED |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS WARNER BROS. DISCOVERY, INC. AND WARNER MEDIA ENTERTAINMENT PAGES, INC.'S MOTION TO DISMISS**

Defendants Warner Bros. Discovery, Inc. and Warner Media Entertainment Pages, Inc. ("Warner Defendants") have moved the Court to dismiss Plaintiff's Amended Complaint pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6). The Warner Defendants contend that the Amended Complaint relies solely on "group pleading" for its allegations concerning common law malice and endorsement of a defamatory implication instead of providing factual allegations pertaining to each individual Warner Defendant. Defendants argue that Plaintiff must "set forth allegations of wrongdoing as to each Defendant sufficient to give each defendant fair notice of what the claim is and the grounds upon which it rests." (ECF No. 90-1, p. 6). However, there is no general rule under federal law prohibiting "group pleading." While Plaintiff does make collective allegations against the Warner Defendants and the individual companies they retained to assist with developing, creating, and producing each work that is the subject of Plaintiff's defamation claims (namely, Blackfin, Inc. and Campfire Studios, Inc.), these joint allegations are sufficient to

provide fair notice of Plaintiff's claims to the Warner Defendants, which is all that is required by Rule 8(a)(2). For these and the following reasons, the Warner Defendants' Motion to Dismiss should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 14, 2024, Plaintiff Richard "Buster" Alexander Murdaugh, Jr. filed this defamation action in the Hampton County Court of Common Pleas. On April 1, 2025, after removal, he filed an Amended Complaint. The relevant allegations of the Amended Complaint are as follows:

> 11. On July 8, 2015, Stephen Smith, whose care had given out of gas, was walking along a rural road in Hampton County, South Carolina. It was late at night. As he was walking along the road he was allegedly struck by a part of a vehicle and killed. News sources now report his death is being considered by a statewide grand jury, and the media has reported on individuals unrelated to Plaintiff allegedly being involved in his death. The Plaintiff, even though he has been falsely accused of harming Stephen Smith as described below, has not been notified by any law enforcement entities of any allegations against him related to Stephen Smith's death.
>
> 12. On or about June 17, 2022, Defendant Warner Bros. Discovery, Inc. began streaming and broadcasting a series, "Murdaugh Murders: Deadly Dynasty", throughout the entire country, including South Carolina, through its platform discovery+ and the Investigation Discovery television channel, which falsely implies and subtly accuses the Plaintiff of being the murderer of Stephen Smith. During a ten-minute segment of the "Murdaugh Murders: Deadly Dynasty" series, the Plaintiff is alluded to a number of times as the murderer of Stephen Smith.
>
> 13. These statements about the Plaintiff are defamatory in that when viewed as a whole, they falsely imply that Plaintiff committed a crime of moral turpitude. The statements have been published to hundreds of thousands, if not millions, of viewers who watched the show, including viewers in South Carolina, and the defamatory statements continue to be republished as of the filing of this action on a broad array of streaming platforms and channels owned by Defendant Warner Bros. Discovery, Inc. Defendant Warner Bros. Discovery, Inc. has hundreds of thousands of subscribers to its discovery+, Investigation Discovery, and other streaming and broadcasting services and channels within South Carolina, was aware of the acute regional interest in the series, and intended for South Carolina viewers to watch "Murdaugh Murders: Deadly Dynasty". Defendant Warner Bros.

2

Discovery, Inc. purposefully and specifically directed marketing and advertising efforts for the series to South Carolina citizens.

14. Defendant Blackfin, Inc. created and produced the series "Murdaugh Murders: Deadly Dynasty" and in doing so published the above-described defamatory statements concerning Plaintiff and profited from Defendant Warner Bros. Discovery, Inc.'s republishing of the statements. In creating and producing the series, Defendant Blackfin, Inc. engaged in persistent series-development, investigation, and filming activities within this State to create an artistic work that would have specific appeal to viewers within this State and would be consumed by viewers within this State.

15. Beginning on November 3, 2022, the Defendants Warner Bros. Discovery, Inc., and Warner Media Entertainment Pages, Inc. began distributing and streaming a three-part series to the public on the Murdaugh family entitled "Low Country: The Murdaugh Dynasty" through Defendant Warner Bros. Discovery, Inc.'s platform HBO Max (now entitled Max) throughout the entire country and specifically within this State. The series publishes statements that falsely suggest the Plaintiff, along with others, murdered Stephen Smith by striking him with a baseball bat. A sequence in the show accuses the Plaintiff of killing Stephen Smith because of his sexual orientation and further insinuates that the Plaintiff killed Stephen Smith in relation to a romantic relationship between Plaintiff and Smith. These statements are untrue in their entirety.

16. These statements are defamatory in that they falsely imply that Plaintiff committed murder. The false statements have been published to hundreds of thousands, if not millions, of viewers who watched the show, including viewers in South Carolina, and the defamatory statements continue to be republished as of the filing of this action across a broad array of streaming platforms and channels owned by Defendant Warner Bros. Discovery, Inc.

17. Defendant Campfire Studios Inc. created and produced the series "Low Country: The Murdaugh Dynasty" and in doing so published the above-described defamatory statements concerning Plaintiff and profited from Defendant Warner Bros. Discovery, Inc.'s republishing of the statements. In creating and producing the series, Campfire Studios Inc. engaged in persistent series-development, investigation, and filming activities within this State to create an artistic work that would have specific appeal to viewers within this State and would be consumed by viewers within this State.

18. Defendants' publications are unprivileged or exceed the scope of any privilege recognized by South Carolina and/or federal law. Defendants' publications are the product of their own investigations and interviews and are not a report of an official law enforcement proceeding. Defendants' publications and republications of the defamatory statements are unfair and biased in that Defendants deliberately chose to omit from the series information, including the information

described below, that would have detracted from the series' intended, sensational inference that Plaintiff was responsible for the death of Mr. Smith.

19. The publications were made with reckless indifference to the truth and with knowledge of information that would have cast serious doubts on the intended defamatory meaning of the Defendants' publications. In publishing these statements Defendants purposefully ignored information demonstrating their falsity that was readily available to and within the Defendants' knowledge, including information indicating that individuals unrelated to Plaintiff were responsible for Mr. Smith's death. Accident investigation notes from the South Carolina Department of Public Safety's ("DPS") Multi-Disciplinary Accident Investigation Team ("MAIT") that were available to and reviewed by Defendants prior to publishing and republishing their series demonstrate that at least four individuals other than Plaintiff were rumored to be involved in the death of Mr. Smith or were potential suspects, that there was evidence indicating Mr. Smith's death was the result of a hit-and-run and not a homicide, and that the only sources of information tying Plaintiff to Mr. Smith were based on unfounded speculation, rumor, and hearsay. Defendants had no reliable or credible information indicating that Mr. Smith's death was the result of his sexual orientation or connected to Plaintiff.

### FOR A FIRST CAUSE OF ACTION AS TO DEFENDANTS BLACKFIN, INC. AND WARNER BROS. DISCOVERY, INC.
(Defamation by Implication)

\*\*\*

21. Episode 1 of Blackfin, Inc.'s and Warner Bros. Discovery, Inc.'s series "Murdaugh Murders: Deadly Dynasty" is entitled "Pandora's Box".

22. The introductory sequence of the episode, which runs for approximately its first minute, introduces numerous themes through the juxtaposed statements of reporters, investigators, and community members which serve to drive the Defendants' [Blackfin, Inc. and Warner Bros. Discovery, Inc.'s] narrative throughout the remainder of the series. Four of those themes of particular relevance to Plaintiff's claims are as follows: (1) Plaintiff's family is an all-powerful legal dynasty in Hampton with improper influence on local law enforcement and the judicial system, (2) the Murdaugh family has a sinister, depraved, and menacing presence within the Hampton community, (3) the Murdaugh family has covered up and will continue to cover up crimes to preserve their family legacy, and (4) Mr. Smith's death is connected to Plaintiff and the Murdaugh family. This sequence is initiated by the title sequence of the show, which includes an on-screen graphic of "Murdaugh Murders: Deadly Dynasty".

23. Samples of the juxtaposed, editorialized statements include "Who killed them? Why is this happening to these people?", "This was an incredibly powerful family", "The death of a 19-year-old man which for years had been unresolved, but

has now been reopened . . .", "He was murdered. And somebody in Hampton County knows exactly who did it", "Everyone around this guy seems to die", "Your Honor, this is the tip of the iceberg", and "Pandora's Box is open. And the demons are loose." The juxtaposition of these statements intentionally vilifies the Murdaugh family and thematically sets the stage for Defendants [Blackfin, Inc. and Warner Bros. Discovery, Inc.] to later encourage the audience to take a logical leap and conclude that Plaintiff killed Mr. Smith with a baseball bat as a result of a romantic relationship between the two.

24. Several sequences further on in the episode reinforce the theme that the members of the Murdaugh family hold "incredible power and influence", were guarded by "a great protector", and are never held accountable for their acts because they are covered up by the family and its influence. For example, one sequence approximately 13 minutes into the episode concludes that "There was a sense of invincibility, immunity and impunity around the Murdaugh family . . . . This is just probably going to be swept under the rug like everything else." "This family was seen as untouchable."

25. The episode also contains statements intended to falsely demonstrate that people in the Hampton community were afraid of the Murdaugh family and that there were sinister and depraved elements within the family's ranks. Statements by a reporter and community member imply that other community members were afraid of the Murdaugh family, that the family lacked empathy for others, and that one of the Murdaugh children, Plaintiff's deceased brother, would "kill little baby animals" and "could kill anyone".

26. Episode 2 of "Murdaugh Murders: Deadly Dynasty" is entitled "Something Wicked This Way Comes."

27. Episode 2 picks up where Episode 1 left off, and within the first fifteen minutes republishes a statement by a community member implying that it was known within the community ("We all knew this was gonna happen") that Mr. Smith's death was "dirty business" connected to the Murdaughs.

28. The episode then superimposes on-screen stock footage of virulent, anti-LGBTQ demonstrations while a reporter discusses how difficult it would have been for Mr. Smith to be openly gay in the South. This sequence foreshadows Defendants' [Blackfin, Inc. and Warner Bros. Discovery, Inc.'s] later implication that Mr. Smith's death was the result of his sexual orientation, as well as a false thread established by the series' narrative tying Mr. Smith romantically to Plaintiff.

29. The next sequence stitches together interview statements that, when observed by an objective audience member who has watched the preceding parts of the series, could reasonably lead to the inference (1) that the initial investigation, which indicated that Mr. Smith's death may have been caused by a gun-shot wound, was covered up or deliberately bungled, (2) that there was no evidence or possibility his death was the

5

result of a hit-and-run, and (3) that Mr. Smith may have been killed by a baseball bat. The sequence also indicates that a DPS investigator "knew something was not right" from the start.

30. This sequence is followed by an on-screen graphic stating "Someone else is also thinking about Stephen's family." The series then states that Plaintiff's uncle, Randy Murdaugh, called the Smith family to see if they needed representation, and that this was "extraordinary." "Why would Randy Murdaugh call Stephen Smith's house, after he's found dead in the road and offer to represent the family?" The series purposefully omits information that would have been known and is known to the Defendants [Blackfin, Inc. and Warner Bros. Discovery, Inc.], including information that Randy Murdaugh was representing Mr. Smith's father, Joel Smith, in an ongoing, unrelated case at the time of Stephen Smith's death.

31. The series publishes statements from a DPS investigator stating that he believed that he was being followed whenever he would travel into Hampton to investigate Mr. Smith's death by "law enforcement, some other agency, or – or some group . . . ." A reasonable inference from these statements, in light of the themes that have been presented to the observer thus far in the series and the investigator's previous interview excerpts, is that ill-intentioned forces have been assembled by the Murdaugh family to frustrate any outside law enforcement investigation into Plaintiff.

32. All of the above-described sequences, excerpts, and statements from the series were intentionally calculated to prime the recipient for the next segment of the series, in which Defendants' [Blackfin, Inc. and Warner Bros. Discovery, Inc.'s] editorialization of a number of excerpts from interviews conducted by law enforcement implies and subtly asserts that Plaintiff was responsible for the death of Mr. Smith, that there would be no conviction because his family would cover it up due to its powerful influence, that the Murdaugh family would do it to preserve its reputation and legacy, and that Plaintiff and Mr. Smith were in a romantic relationship preceding his death. During this sequence, the series depicts side-by-side images on the screen of Plaintiff and Mr. Smith, with the image of Plaintiff purposefully arranged such that it appears he is looking in Mr. Smith's direction and laughing, and concludes "But then, later on, it just kept coming up, Murdaughs, Murdaughs, Murdaughs. And then everything was just, like, swept under the rug." All of the recorded statements are unfounded and are solely based on rumor.

33. The Defendants' [Blackfin, Inc. and Warner Bros. Discovery, Inc.'s] series is false and defamatory in that, when viewed in its entirety, it ultimately conveys the defamatory inference that Plaintiff killed Mr. Smith in connection with a romantic relationship, and that it was covered up by the Murdaugh family using its influence and connections, without any factual basis. The series interweaves statements supporting its thematic narratives with accounts from the law enforcement investigation into Mr. Smith's death in order to lend itself a sheen of authenticity while maximizing its sensational appeal to the audience by depicting Mr. Smith's death as

being connected to Plaintiff and covered up by the Murdaugh family. The implication that Plaintiff killed Mr. Smith is provably false and defamatory.

34. Defendants' [Blackfin, Inc. and Warner Bros. Discovery, Inc.'s] deliberate editorial choices and narrative themes suggest that they intended, or at least endorsed, the inference that Plaintiff killed Mr. Smith. This inference is created by the juxtaposition of certain statements within the show, even if they are opinion and/or facially true, to create a defamatory implication, alongside certain omissions of information that would have tended to show that Plaintiff was not involved in the death of Mr. Smith.

### FOR A FIRST CAUSE OF ACTION AS TO DEFENDANTS WARNER MEDIA ENTERTAINMENT PAGES, INC. AND CAMPFIRE STUDIOS, INC.
(Defamation by Implication)

\*\*\*

36. Episode 1 of Warner Bros. Discovery, Inc., Warner Media Entertainment Pages, Inc., and Campfire Studios, Inc.'s series "Low Country: The Murdaugh Dynasty" is entitled "Kings of the Lowcountry".

37. Episode 1 introduces numerous themes through the juxtaposed statements of reporters, local attorneys, and community members which serve to drive the Defendants' [Warner Bros. Discovery, Inc., Warner Media Entertainment Pages, Inc., and Campfire Studios, Inc.'s] narrative throughout the remainder of the series. Three of those themes of particular relevance to Plaintiff's claims are as follows: (1) Plaintiff's family is an all-powerful legal dynasty in Hampton with improper influence on local law enforcement and the judicial system, (2) the Murdaugh family has a sinister, depraved, and menacing presence within the Hampton community, and (3) the Murdaugh family has covered up and will continue to cover up crimes to preserve their family legacy. These themes intentionally build to the next episode in the series, in which it is insinuated that Plaintiff killed Mr. Smith and that the Murdaugh family has covered up the crime and interfered with its investigation.

38. Samples of the juxtaposed, editorialized statements include "If you didn't know the Murdaughs, you wasn't from Hampton. And whether you knew 'em or not, they knew you", "Where the Murdaughs go, death seems to follow", "There is no justice in Hampton County. Yeah, if it comes out of Hampton, it's not going nowhere", "People that could erase it like it never happened", and "Enough evil had been done by the family. It's gone too far this time". The juxtaposition of these statements intentionally vilifies the Murdaugh family and thematically sets the stage for Defendants [Warner Bros. Discovery, Inc., Warner Media Entertainment Pages, Inc., and Campfire Studios, Inc.] to later encourage the audience to take a

logical leap and conclude that Plaintiff killed Mr. Smith with a baseball bat as a result of a romantic relationship between the two.

39. Several sequences further on in the episode reinforce the theme that "Hampton is pretty much historically dominated by one family: the Murdaughs", that members of Plaintiff's family were "like the puppet master", and that Plaintiff's family was involved in law enforcement corruption and could use their connections to cover up crimes. For example, one sequence approximately 22 minutes into the episode concludes that "You didn't want to get on the Murdaughs' bad side. It would be beneficial to stay out of the Murdaughs' radar" and that "The Murdaughs were like the Mafia. You know you just don't mess with 'em."

40. The episode also contains statements intended to falsely demonstrate that people in the Hampton community were afraid of the Murdaugh family and that there were sinister and depraved elements within the family's ranks. Statements by a reporter and community member imply that other community members were afraid of the Murdaugh family, that the family did not believe the law applied to them, and that one of the Murdaugh family members, Plaintiff's great-grandfather, would "hurt you any way he could", could turn family opponents into "crab bait", and "could have somebody taken out in a minute."

41. Episode 2 of "Low Country: The Murdaugh Dynasty" is entitled "Something in the Road."

42. Episode 2 picks up where Episode 1 left off, stating that "What you got from a lot of people was, 'It's the Murdaughs. Nothing's going to happen.'", and within the next six minutes, it depicts a series of juxtaposed images of newspaper articles concerning the death of Mallory Beach, the murders of Plaintiff's mother and brother, and the death of Stephen Smith.

43. The episode then features interview excerpts discussing how difficult it would have been for Mr. Smith to be openly gay in the South, including statements implying that it is unsafe to be gay in Hampton County. This sequence foreshadows Defendants' [Warner Bros. Discovery, Inc., Warner Media Entertainment Pages, Inc., and Campfire Studios, Inc.'s] later implication that Mr. Smith's death was the result of his sexual orientation, as well a false thread established by the series' narrative tying Mr. Smith romantically to Plaintiff.

44. The next sequence stitches together interview statements that, when observed by an objective audience member who has watched the preceding parts of the series, could reasonably lead to the inference (1) that the initial investigation, which indicated that Mr. Smith's death may have been caused by a gun-shot wound, was covered up or deliberately bungled, (2) that there was no evidence or possibility his death was the result of a hit-and-run, (3) that Mr. Smith must have been murdered, and (4) that Mr. Smith's death was the result of some unknown, mysterious, premeditated conspiracy. The sequence also contains a DPS

8

investigator's assertion that "there were several red flags from the start in this investigation" and that they were "missing a whole lot of pieces that we should have not been missing."

45. The series asserts that Randy Murdaugh called Mr. Smith's father the morning after Mr. Smith's death and asked for Mr. Smith's electronic devices, passwords, and access to this social media accounts, and that Randy Murdaugh was seen on the site of the accident investigation while it was still ongoing. Additional statements imply that Randy Murdaugh knew about Mr. Smith's death and was on the scene before Mr. Smith's family was even notified. These statements are false and were purposefully inserted into the series to bolster the inference that Plaintiff killed Mr. Smith.

46. All of the above-described sequences, excerpts, and statements from the series were intentionally calculated to prime the recipient for the next segment of the series, in which Defendants' [Warner Bros. Discovery, Inc., Warner Media Entertainment Pages, Inc., and Campfire Studios, Inc.'s] editorialization of a number of excerpts from interviews implies and subtly asserts that Plaintiff was responsible for the death of Mr. Smith, that there would be no conviction because his family would cover it up due to its powerful influence, that the Murdaugh family would do it to preserve its reputation and legacy, and that Plaintiff and Mr. Smith were in a romantic relationship preceding his death. All of the recorded statements are unfounded and are solely based on rumor.

47. Statements made by interviewees during this segment include: "The rumors that's going around Hampton that everybody keeps coming up to me and saying it was Murdaugh boys", "the Murdaughs knew of Stephen's death before, probably, some of even Stephen Smith's family members did", "I just heard that one of my classmates did it . . . . Buster Murdaugh", "Because when someone told me that it was Buster, and I was like they were saying, if it's him nothing was going to be done about it because of who he was", "I did hear names, or heard a name, and that name was – he goes by Buster Murdaugh", "One of the rumors that we heard was that Buster and a couple of other guys had been out, seen Stephen, and they got in some type of argument and that a 2x4 or a bat was used to strike Stephen in the head area and that's what caused his death", and that there is "a classic Murdaugh mentality of thinking he was completely above the law and that ignoring the problem would make it go away." The excerpts also imply that an autopsy confirmed that Mr. Smith was struck with a baseball bat, that Plaintiff fled the country after Mr. Smith's death, that witnesses "disappeared" or were paid by the Murdaugh family not to speak to investigators, and that Mr. Smith had become entangled with the Murdaugh family prior to his death. None of the implications that can be drawn from these statements have any connection to reality or a factual basis.

48. The segment concerning Plaintiff and Mr. Smith concludes with the following statements: "Them Murdaughs killed my son", "The Murdaughs killed

my son because he was gay", and "I can't [prove it], but I just know them Murdaugh boys killed my boy." "Being the underdogs in town, I guess, in their head, we're nothing, so who's gonna notice nothing being gone?"

49. The Defendants' [Warner Bros. Discovery, Inc., Warner Media Entertainment Pages, Inc., and Campfire Studios, Inc.'s] series is false and defamatory in that, when viewed in its entirety, it ultimately conveys the defamatory inference that Plaintiff killed Mr. Smith in connection with a romantic relationship, and that it was covered up by the Murdaugh family using its influence and connections, without any factual basis. The series interweaves statements supporting its thematic narratives with accounts from the law enforcement investigation into Mr. Smith's death in order to lend itself a sheen of authenticity while maximizing its sensational appeal to the audience by depicting Mr. Smith's death as being connected to Plaintiff and covered up by the Murdaugh family. The implication that Plaintiff killed Mr. Smith is provably false and defamatory.

50. Defendants' [Warner Bros. Discovery, Inc., Warner Media Entertainment Pages, Inc., and Campfire Studios, Inc.'s] deliberate editorial choices and narrative themes suggest that they intended, or at least endorsed, the inference that Plaintiff killed Mr. Smith. This inference is created by the juxtaposition of certain statements within the show, even if they are opinion and/or facially true, to create a defamatory implication, alongside certain omissions of information that would have tended to show that Plaintiff was not involved in the death of Mr. Smith.

51. All of the above-described statements, and the relevant portions of each series as a whole, are defamatory in that they falsely imply that Plaintiff was involved in the murder of Stephen Smith; as a result of the juxtaposition of specific statements made by Defendants and republished by Defendants, in conjunction with the Defendant's purposeful omissions of facts contrary to the false implications, the Plaintiff's reputation has been irreparably damaged, and he has suffered mental anguish. In the time since Defendants' publications were initially broadcast to the public, social media and online forums have become rife with posts republishing Defendants' assertions and demonstrating that Plaintiff's reputation has been lowered in the estimation of the community. The brunt of damage to Plaintiff's reputation has been suffered in South Carolina, where Plaintiff is known, domiciled, and resides. Plaintiff is entitled to actual damages and punitive damages because of the reckless and intentional conduct of the Defendants, in complete disregard of the truth, in creating and publishing statements falsely accusing him of being involved in the murder of Stephen Smith.

(ECF No. 86).

The Warner Defendants move the Court to dismiss Plaintiff's Complaint because they claim these factual allegations are not sufficient to plausibly state a cause of action for defamation

specifically against them under South Carolina law because the allegations are primarily composed of impermissible "group pleadings" with regards to the elements of Plaintiff's defamation by implication claim, particularly with regards to the requirements of common law malice and endorsement of a defamatory implication. The Warner Defendants claim that Warner Media Entertainment Pages, Inc. is only referred to in four paragraphs of the Amended Complaint, and that Warner Bros. Discovery, Inc. is only referred to in nine paragraphs. This is not true.

As can be seen by a review of the allegations of Plaintiff's Amended Complaint included above, Warner Media Entertainment Pages, Inc., either individually or jointly with its co-Defendants, is directly referenced by the Amended Complaint eight times, with an entire Count of the Amended Complaint describing Warner Media Entertainment Pages, Inc.'s alleged conduct, either individually or jointly with Warner Bros. Discovery, Inc. and Campfire Studios, Inc. Warner Bros. Discovery, Inc. is directly referred to over 20 times within substantive allegations concerning Plaintiff's defamation claim, whether individually or jointly with the remaining Defendants, with two Counts describing its misconduct in detail. The allegations as to both Warner Defendants include allegations concerning common law malice and the Warner Defendants' intentional endorsement of the defamatory implication that has caused Plaintiff reputational harm.

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) examines the legal sufficiency of the facts alleged on the face of the plaintiff's complaint and "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses . . . . Our inquiry then is limited to whether the allegations constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"

*Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (quotation marks and citation omitted). Under Rule 12(b)(6), a motion to dismiss for failure to state a claim should not be granted unless it would be impossible for the plaintiff to prove any set of facts which would support his claim and entitle him to relief. *Brumbaugh v. First Fin. Ins. Co.*, Civil Action No. 2:13-2432, 2015 WL 12817166, at *1 (D.S.C. March 17, 2015).

To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007). Specific facts are not necessary so long as the allegations "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1955). A claim is facially plausible when the factual content allows the court to reasonably infer that the defendant is liable for the misconduct alleged. *Id.* However, *"the pleading standard Rule 8 announces does not require 'detailed factual allegations,'* but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (emphasis added). When considering a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007).

## **ARGUMENT**

The Warner Defendants argue that the Amended Complaint fails to include a single factual allegation demonstrating that either of them published the respective series with common law malice or endorsed the defamatory implications of the series. This argument is misleading.

Defendants are not actually arguing that Plaintiff has failed to do what he has clearly done: paragraphs 18, 19, 34, and 50 of the Amended Complaint specifically describe how, relying on particular facts, both Warner Defendants ignored information within their possession exonerating Mr. Murdaugh. The allegations, when taken into account with the allegations included under each Count of defamation, also factually describe additional omissions of information and how both Warner Defendants in conjunction with their production companies purposefully juxtaposed information within the respective series to create the defamatory implication that Mr. Murdaugh killed Mr. Smith. The allegations also describe how the Warner Defendants then distributed and published the defamatory content.

Instead, the Warner Defendants are arguing that these allegations are not sufficient because many of them are jointly alleged against the Warner Defendants, Blackfin, Inc., and/or Campfire Studios, Inc. as impermissible "group pleadings." The Warner Defendants argue that these allegations lump more than one of the named Defendants together without specifying their individual roles or mental states, violating the notice and plausibility requirements of Rule 8 by making it impossible to tell which Defendant did what with regard to the common law malice and intentional endorsement elements. However, there is no blanket rule under Rule 8 providing that a "group pleading" in and of itself is subject to dismissal. Mr. Murdaugh has alleged that each of the Warner Defendants was responsible for the publication of a defamatory series, including editorial choices in how the series were created.

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative

level." *Id.* An allegation directed at multiple defendants can be adequate to plead personal involvement. *Rivera v. Lake Cnty.*, 974 F. Supp. 2d 1179, 1194 (2013). Where a plaintiff would not be able to attribute misconduct to specific actors without pretrial discovery, he is only required to allege with sufficient factual detail that each defendant caused or participated in the alleged tortious conduct, and it would be unreasonable for a court to expect more specific allegations prior to discovery. *Id.* at 1194-95; *see also Skeans ex rel. M.S. v. Lendlease (US) Pub. P'ships LLC*, Case No. 9:24-cv-03049-RMG, 2024 WL 4634971 at *6-7 (D.S.C. Oct. 30, 2024) (finding that a complaint can give fair notice of the claims under Rule 8 even if it relies on "group pleading"); *Blackstone Int'l, Ltd. v. E2 Ltd.*, C20-1686 TSZ, 2022 WL 16553034, at *5 n.8 (W.D. Wash. Oct. 31, 2022) (finding that group pleading was not improper); *Sanders v. JGWPT Holdings, Inc.*, No. 14 C 9188, 2016 WL 4009941 (N.D. Ill. July 26, 2016) ("Group pleading that refers to Defendants collectively is sufficient under Rule 8 when a plaintiff provides enough detail about the nature of the allegations to put each defendant on fair notice of the claims."); *Clapper v. Am. Realty Invs., Inc.*, 2015 WL 3504856, at *3-4 (N.D. Tex. June 3, 2015) ("[P]laintiffs are permitted under federal procedure to allege that more than one defendant (i.e., a group of named defendants) committed the same alleged act.").

A decision from another jurisdiction is directly on point with why the Warner Defendants' argument is completely off-base. In *Heller v. NBCUniversal, Inc.*, CV-15-09631-MWF-KS, 2016 WL 6573985 (C.D. Cal. March 30, 2016), a court in the Central District of California was presented with similar arguments concerning "group pleading" after the plaintiff, a major player in the music industry, brought numerous claims, including a defamation claim, against fifteen individual and corporate defendants, most of whom were alleged to be involved in the production of the film "Straight Outta Compton", which famously portrays the story of the plaintiff and rap

group N.W.A. *Id.* at *1-2. The plaintiff alleged that the film harmed his reputation by portraying him as morally corrupt and a criminal.

The defendants challenged the plaintiff's defamation claim on the ground of it being alleged as an improper "group pleading". *Id.* at *3. The defendants argued that the allegations lumped all of the defendants together without specifying their individual roles in the production of the film. The court did not agree that this violated Rule 8, explaining its reasoning as follows:

> Plaintiff alleges that each of the twelve Defendants "was responsible for the publication of the false, unprivileged statements in the Film." Defendants cannot reasonably contend that these allegations leave them in the dark as to the conduct at issue in this action. It is not necessary for Plaintiff to allege precisely how the Film was produced, and in what way each producer contributed to the defamatory statements, in order for Defendants to formulate appropriate defenses and conduct meaningful discovery. Any reasonable reader of the FAC would understand that Plaintiff accuses each Defendant of publishing false, defamatory statements against him. No more is required to provide notice under Rule 8.
>
> Nor is the Court persuaded that Plaintiff's group allegations are implausible. Defendants named in the first six claims for relief are alleged to have participated in "creating, writing, directing, producing, editing and/or distributing" the Film in their roles as "credited producers." While it is doubtful that all credited producers exercised control over the challenged aspects of the Film, the allegations of wrongful conduct are certainly plausible with respect to any given producer chosen at random. Contrary to Defendant's argument at the hearing, nothing in the FAC makes it implausible that Defendant Legendary Pictures, for example, contributed to the content of the Film. If a particular Defendant had nothing to do with allegedly defamatory statements, he or she or it may bring a prompt motion for summary judgment. Dismissal at this stage, however, is improper.
>
> That the Ninth Circuit has used a heightened pleading standard in cases implicating First Amendment rights does not detract from the Court's conclusion. As the Court indicated at the hearing, it is simply not possible for Plaintiff to be more specific about the role each Defendant played in producing the Film without discovery. Indeed, if the FAC's allegations were deemed insufficient any defamation claims against multiple producers of patently defamatory films would have little chance of surviving a motion to dismiss. A pleading burden generating such a result is neither wise nor imposed by current law. All that is necessary for this action to move to discovery is for it to be plausible that each Defendant engaged in wrongful conduct. That requirement is met here.

*Id.* at *3 (citations omitted).

15

Similarly, here, Mr. Murdaugh has alleged that the Warner Defendants distributed, streamed, and broadcast the defamatory series, that they published statements when taken as a whole implying that Mr. Murdaugh had killed Mr. Smith, that they directed marketing and advertising efforts for the series, that they published the statements with knowledge of information that would have cast serious doubts on the intended defamatory meaning of their publications, including publicly available information from law enforcement's investigation of the matter, that they jointly created the series and the series' narratives with their co-Defendants, that they intended for their viewers to infer from the productions that Mr. Murdaugh killed Mr. Smith, and that they in conjunction with their co-Defendants purposefully juxtaposed and arranged statements, graphics, interview excerpts, and visuals to create the defamatory implications in each series. (ECF No. 86 ¶¶ 12-51). Any "reasonable reader" of these allegations would understand that Mr. Murdaugh is alleging, with supporting factual detail, that the Warner Defendants acted with common law malice, i.e., a reckless indifference to the truth, and that they intended or endorsed the defamatory implication that Mr. Murdaugh killed Mr. Smith. Without the benefit of discovery, it is impossible for Mr. Murdaugh to allege in good faith further factual details specific to each Warner Defendant, nor should he be required to do so at this procedural juncture.

The District of South Carolina decisions the Warner Defendants cite to the contrary are unpersuasive, let alone binding. The Warner Defendants cite *Grant v. S.C. Dep't of Soc. Servs., CPS*, C/A: 2:18-1804-RMG-BM, 2019 WL 2093861 (D.S.C. Feb. 14, 2019), *Herdt v. Horry Cnty. Council*, Civil Action No.: 4:17-cv-00392-RBH, 2018 WL 827140 (D.S.C. Feb. 12, 2018), and *Evans v. York Cnty., Inc.*, C/A No.: 0:15-4954-JFA-SVH, 2016 WL 8193636 (D.S.C. Dec. 29, 2016) for the proposition that "group pleading" in itself is improper under Rule 8 and that a plaintiff must include specific facts detailing the specific acts taken by each defendant and how

each defendant was personally involved in the tortious conduct. However, all of the cited cases involved complaints filed by *pro se* plaintiffs alleging violations of their constitutional rights without identifying how the individual defendants performed any allegedly improper acts that violated those rights, amongst numerous other defects in pleading. Unlike here, under Rule 8 and § 1983, a plaintiff must plead specific facts showing that each individual government official defendant, and not the governmental entity as a unit, was personally involved in the alleged deprivation. *Smith v. Palmer*, C/A No. 6:22-cv-02385-RMG-KFM, 2022 WL 17750779, at *2 (D.S.C. Nov. 18, 2022).

The remaining case law cited by the Warner Defendants is equally unavailing and inapposite. *Faltas v. State Newspaper*, 928 F. Supp. 637 (D.S.C. 1996), which the Warner Defendants cite for the proposition that actual malice must be pled with specific facts pertaining to each defendant, concerned a motion for summary judgment, and not a 12(b)(6) motion to dismiss, and it only notes that a plaintiff must prove actual malice as to each defendant. *Faltas* never states that an allegation of common law malice cannot be pled jointly as to multiple defendants if the same facts plausibly demonstrate common law malice as to each of them. While *AdvanFort Co. v. Mar. Exec., LLC*, 2015 WL 4603090, at *7 (E.D. Va. July 28, 2015) analyzes a motion to dismiss, its language detailing that actual malice must be proved with respect to each defendant was composed within the context of defamation claims and agency, and details how actual malice cannot be imputed to a principal under agency theories unless there is an employer-employee relationship. Mr. Murdaugh is not making any such arguments here. Regardless, Mr. Murdaugh has included sufficient plausible allegations in his Amended Complaint indicating that each of the Warner Defendants disseminated the allegedly defamatory productions, that each of the Warner Defendants were in possession of information that would have put them on notice that

the defamatory implications of the series were false, and that the Warner Defendants' intentional juxtaposition and omission of facts within each series is indicative of an intentional endorsement of the defamatory implication.

## **CONCLUSION**

For the foregoing reasons, and those set forth by Plaintiff in his responses to Blackfin, Inc.'s and Campfire Studios, Inc.'s Motions to Dismiss, the Court should deny the Warner Defendants' Motion to Dismiss, or in the alternative, permit him to amend his Amended Complaint prior to a dismissal with prejudice in order to include more facts to put the Defendants on notice of how Mr. Murdaugh alleges that each acted with common law malice and endorsed the series' defamatory implications.

KENT LAW FIRM, LLC

/s/ Shaun C. Kent
Shaun C. Kent, Federal Bar #9326
Post Office Box 117
Manning, SC 29102
(803) 433-5368
shaun@shaunkentlaw.com

May 16, 2025
Manning, South Carolina