IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| RICHARD ALEXANDER MURDAUGH, JR., | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: 9:24-cv-04914-RMG |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| BLACKFIN, INC., WARNER BROS. DISCOVERY, INC., WARNER MEDIA ENTERTAINMENT PAGES, INC., AND CAMPFIRE STUDIOS, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT BLACKFIN, INC.'S MOTION TO DISMISS

Defendant Blackfin, Inc. has moved the Court to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendant would have the Court believe that its series, "Murdaugh Murders: Deadly Dynasty", is a straightforward unembellished documentary memorializing the law enforcement investigation into Stephen Smith's death, and as such it only contains either protected Free Speech in the form of true statements of fact and statements of pure opinion and speculation, or reporting on the official law enforcement investigation into Mr. Smith's death that would be protected by the fair report privilege. A casual viewing of the series quickly demonstrates that it is anything but that.

Defendant's series is a heavily editorialized, dramatic production that relies on the results of Defendant's (1) own investigation, (2) carefully crafted thematic narratives, graphics, images, and music, and (3) cherry-picked interview excerpts of reporters, community members, law enforcement, commentators, and "researchers" to present to the audience a message that is

sensational, emotionally exploitative, and designed to entice viewers to continue watching the series to the end. The primary way in which Defendant has accomplished this objective in relation to Plaintiff is through ample editorialization, employed to convince the audience that Plaintiff is connected to the death of Mr. Smith as if it were a foregone conclusion. The problem for Defendant is that despite the fact that this implication is provably false, Defendant presents its findings in the series, and the inferences that can logically be drawn therefrom, as authoritative and the only plausible or available explanation for what happened to Mr. Smith.

While Defendant claims that it is merely presenting open-ended questions regarding the tragic death of Mr. Smith, when the series is watched from its beginning to the end of its second episode, it is readily apparent that Defendant from the get-go dangles the idea that a member of the Murdaugh family is connected to the death of a 19-year-old Hampton County resident, Mr. Smith, in front of the audience, then sets the hook once it has spun multiple narrative threads together that all lead to Plaintiff. Regardless of whether the interview excerpts and sound bites Defendant presents in the series are facially true, speculation, opinion, or otherwise protected if individually looked at in a vacuum, the defamatory implication that is created by the production as a whole is obviously intentional, provably false, and defamatory.

Defendant wants the Court to join it in ignoring the forest for the trees, but the Court should refuse to do so. Defendant has purposefully chosen to amplify and legitimize to a worldwide audience what previously existed only as isolated rumor and gossip, relying on "researchers" it knew were biased and compromised, solely for the purpose of driving its own profits. All the while, Defendant intentionally ignored every red flag indicating that the rumor was unfounded. In doing so, Defendant has destroyed the reputation and life of a private citizen. For the following

reasons, the Court, especially at this early juncture in the proceedings, should deny Defendant's Motion.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 14, 2024, Plaintiff Richard "Buster" Alexander Murdaugh, Jr. filed this defamation action in the Hampton County Court of Common Pleas. On April 1, 2025, after removal, he filed an Amended Complaint. The relevant allegations of the Amended Complaint are as follows:

> 11.     On July 8, 2015, Stephen Smith, whose car had given out of gas, was walking along a rural road in Hampton County, South Carolina. It was late at night. As he was walking along the road he was allegedly struck by a part of a vehicle and killed. News sources now report his death is being considered by a statewide grand jury, and the media has reported on individuals unrelated to Plaintiff allegedly being involved in his death. The Plaintiff, even though he has been falsely accused of harming Stephen Smith as described below, has not been notified by any law enforcement entities of any allegations against him related to Stephen Smith's death.

> 12.     On or about June 17, 2022, Defendant Warner Bros. Discovery, Inc. began streaming and broadcasting a series, "Murdaugh Murders: Deadly Dynasty", throughout the entire country, including South Carolina, through its platform discovery+ and the Investigation Discovery television channel, which falsely implies and subtly accuses the Plaintiff of being the murderer of Stephen Smith. During a ten-minute segment of the "Murdaugh Murders: Deadly Dynasty" series, the Plaintiff is alluded to a number of times as the murderer of Stephen Smith.

> 13.     These statements about the Plaintiff are defamatory in that when viewed as a whole, they falsely imply that Plaintiff committed a crime of moral turpitude. The statements have been published to hundreds of thousands, if not millions, of viewers who watched the show, including viewers in South Carolina, and the defamatory statements continue to be republished as of the filing of this action on a broad array of streaming platforms and channels owned by Defendant Warner Bros. Discovery, Inc. Defendant Warner Bros. Discovery, Inc. has hundreds of thousands of subscribers to its discovery+, Investigation Discovery, and other streaming and broadcasting services and channels within South Carolina, was aware of the acute regional interest in the series, and intended for South Carolina viewers to watch "Murdaugh Murders: Deadly Dynasty". Defendant Warner Bros. Discovery, Inc. purposefully and specifically directed marketing and advertising efforts for the series to South Carolina citizens.

14.     Defendant Blackfin, Inc. created and produced the series "Murdaugh Murders: Deadly Dynasty" and in doing so published the above-described defamatory statements concerning Plaintiff and profited from Defendant Warner Bros. Discovery, Inc.'s republishing of the statements. In creating and producing the series, Defendant Blackfin, Inc. engaged in persistent series-development, investigation, and filming activities within this State to create an artistic work that would have specific appeal to viewers within this State and would be consumed by viewers within this State.

***

18.     Defendants' publications are unprivileged or exceed the scope of any privilege recognized by South Carolina and/or federal law. Defendants' publications are the product of their own investigations and interviews and are not a report of an official law enforcement proceeding. Defendants' publications and republications of the defamatory statements are unfair and biased in that Defendants deliberately chose to omit from the series information, including the information described below, that would have detracted from the series' intended, sensational inference that Plaintiff was responsible for the death of Mr. Smith.

19.     The publications were made with reckless indifference to the truth and with knowledge of information that would have cast serious doubts on the intended defamatory meaning of the Defendants' publications. In publishing these statements Defendants purposefully ignored information demonstrating their falsity that was readily available to and within the Defendants' knowledge, including information indicating that individuals unrelated to Plaintiff were responsible for Mr. Smith's death. Accident investigation notes from the South Carolina Department of Public Safety's ("DPS") Multi-Disciplinary Accident Investigation Team ("MAIT") that were available to and reviewed by Defendants prior to publishing and republishing their series demonstrate that at least four individuals other than Plaintiff were rumored to be involved in the death of Mr. Smith or were potential suspects, that there was evidence indicating Mr. Smith's death was the result of a hit-and-run and not a homicide, and that the only sources of information tying Plaintiff to Mr. Smith were based on unfounded speculation, rumor, and hearsay. Defendants had no reliable or credible information indicating that Mr. Smith's death was the result of his sexual orientation or connected to Plaintiff.

***

21.     Episode 1 of Blackfin, Inc.'s and Warner Bros. Discovery, Inc.'s series "Murdaugh Murders: Deadly Dynasty" is entitled "Pandora's Box".

22.     The introductory sequence of the episode, which runs for approximately its first minute, introduces numerous themes through the juxtaposed statements of reporters, investigators, and community members which serve to drive the Defendants' narrative throughout the remainder of the series. Four of those themes of

particular relevance to Plaintiff's claims are as follows: (1) Plaintiff's family is an all-powerful legal dynasty in Hampton with improper influence on local law enforcement and the judicial system, (2) the Murdaugh family has a sinister, depraved, and menacing presence within the Hampton community, (3) the Murdaugh family has covered up and will continue to cover up crimes to preserve their family legacy, and (4) Mr. Smith's death is connected to Plaintiff and the Murdaugh family. This sequence is initiated by the title sequence of the show, which includes an on-screen graphic of "Murdaugh Murders: Deadly Dynasty".

23.     Samples of the juxtaposed, editorialized statements include "Who killed them? Why is this happening to these people?", "This was an incredibly powerful family", "The death of a 19-year-old man which for years had been unresolved, but has now been reopened . . .", "He was murdered. And somebody in Hampton County knows exactly who did it", "Everyone around this guy seems to die", "Your Honor, this is the tip of the iceberg", and "Pandora's Box is open. And the demons are loose." The juxtaposition of these statements intentionally vilifies the Murdaugh family and thematically sets the stage for Defendants to later encourage the audience to take a logical leap and conclude that Plaintiff killed Mr. Smith with a baseball bat as a result of a romantic relationship between the two.

24.     Several sequences further on in the episode reinforce the theme that the members of the Murdaugh family hold "incredible power and influence", were guarded by "a great protector", and are never held accountable for their acts because they are covered up by the family and its influence. For example, one sequence approximately 13 minutes into the episode concludes that "There was a sense of invincibility, immunity and impunity around the Murdaugh family . . . . This is just probably going to be swept under the rug like everything else." "This family was seen as untouchable."

25.     The episode also contains statements intended to falsely demonstrate that people in the Hampton community were afraid of the Murdaugh family and that there were sinister and depraved elements within the family's ranks. Statements by a reporter and community member imply that other community members were afraid of the Murdaugh family, that the family lacked empathy for others, and that one of the Murdaugh children, Plaintiff's deceased brother, would "kill little baby animals" and "could kill anyone".

26.     Episode 2 of "Murdaugh Murders: Deadly Dynasty" is entitled "Something Wicked This Way Comes."

27.     Episode 2 picks up where Episode 1 left off, and within the first fifteen minutes republishes a statement by a community member implying that it was known within the community ("We all knew this was gonna happen") that Mr. Smith's death was "dirty business" connected to the Murdaughs.

28.     The episode then superimposes on-screen stock footage of virulent, anti-LGBTQ demonstrations while a reporter discusses how difficult it would have been for Mr. Smith to be openly gay in the South. This sequence foreshadows Defendants' later implication that Mr. Smith's death was the result of his sexual orientation, as well as a false thread established by the series' narrative tying Mr. Smith romantically to Plaintiff.

29.     The next sequence stitches together interview statements that, when observed by an objective audience member who has watched the preceding parts of the series, could reasonably lead to the inference (1) that the initial investigation, which indicated that Mr. Smith's death may have been caused by a gun-shot wound, was covered up or deliberately bungled, (2) that there was no evidence or possibility his death was the result of a hit-and-run, and (3) that Mr. Smith may have been killed by a baseball bat. The sequence also indicates that a DPS investigator "knew something was not right" from the start.

30.     This sequence is followed by an on-screen graphic stating "Someone else is also thinking about Stephen's family." The series then states that Plaintiff's uncle, Randy Murdaugh, called the Smith family to see if they needed representation, and that this was "extraordinary." "Why would Randy Murdaugh call Stephen Smith's house, after he's found dead in the road and offer to represent the family?" The series purposefully omits information that would have been known and is known to the Defendants, including information that Randy Murdaugh was representing Mr. Smith's father, Joel Smith, in an ongoing, unrelated case at the time of Stephen Smith's death.

31.     The series publishes statements from a DPS investigator stating that he believed that he was being followed whenever he would travel into Hampton to investigate Mr. Smith's death by "law enforcement, some other agency, or – or some group . . . ." A reasonable inference from these statements, in light of the themes that have been presented to the observer thus far in the series and the investigator's previous interview excerpts, is that ill-intentioned forces have been assembled by the Murdaugh family to frustrate any outside law enforcement investigation into Plaintiff.

32.     All of the above-described sequences, excerpts, and statements from the series were intentionally calculated to prime the recipient for the next segment of the series, in which Defendants' editorialization of a number of excerpts from interviews conducted by law enforcement implies and subtly asserts that Plaintiff was responsible for the death of Mr. Smith, that there would be no conviction because his family would cover it up due to its powerful influence, that the Murdaugh family would do it to preserve its reputation and legacy, and that Plaintiff and Mr. Smith were in a romantic relationship preceding his death. During this sequence, the series depicts side-by-side images on the screen of Plaintiff and Mr. Smith, with the image of Plaintiff purposefully arranged such that it appears he is looking in Mr. Smith's direction and laughing, and concludes "But then, later on, it just kept coming up, Murdaughs,

Murdaughs, Murdaughs. And then everything was just, like, swept under the rug." All of the recorded statements are unfounded and are solely based on rumor.

33.     The Defendants' series is false and defamatory in that, when viewed in its entirety, it ultimately conveys the defamatory inference that Plaintiff killed Mr. Smith in connection with a romantic relationship, and that it was covered up by the Murdaugh family using its influence and connections, without any factual basis. The series interweaves statements supporting its thematic narratives with accounts from the law enforcement investigation into Mr. Smith's death in order to lend itself a sheen of authenticity while maximizing its sensational appeal to the audience by depicting Mr. Smith's death as being connected to Plaintiff and covered up by the Murdaugh family. The implication that Plaintiff killed Mr. Smith is provably false and defamatory.

34.     Defendants' deliberate editorial choices and narrative themes suggest that they intended, or at least endorsed, the inference that Plaintiff killed Mr. Smith. This inference is created by the juxtaposition of certain statements within the show, even if they are opinion and/or facially true, to create a defamatory implication, alongside certain omissions of information that would have tended to show that Plaintiff was not involved in the death of Mr. Smith.

\*\*\*

51.     All of the above-described statements, and the relevant portions of each series as a whole, are defamatory in that they falsely imply that Plaintiff was involved in the murder of Stephen Smith; as a result of the juxtaposition of specific statements made by Defendants and republished by Defendants, in conjunction with the Defendant's purposeful omissions of facts contrary to the false implications, the Plaintiff's reputation has been irreparably damaged, and he has suffered mental anguish. In the time since Defendants' publications were initially broadcast to the public, social media and online forums have become rife with posts republishing Defendants' assertions and demonstrating that Plaintiff's reputation has been lowered in the estimation of the community. The brunt of damage to Plaintiff's reputation has been suffered in South Carolina, where Plaintiff is known, domiciled, and resides. Plaintiff is entitled to actual damages and punitive damages because of the reckless and intentional conduct of the Defendants, in complete disregard of the truth, in creating and publishing statements falsely accusing him of being involved in the murder of Stephen Smith.

(ECF No. 86).

Defendant moves the Court to dismiss Mr. Murdaugh's Amended Complaint because it claims these factual allegations are not sufficient to plausibly state a cause of action for defamation under South Carolina law. In the alternative, Defendant asks the Court to look beyond the

pleadings and review the content of its series to determine if Mr. Murdaugh's defamation claim comports with First Amendment principles. In doing so, the Court should view Defendant's entire series, and specifically the defamatory implication it creates (that Mr. Murdaugh killed Mr. Smith), as the defamatory "statement" at issue in this action. Because the above-enumerated allegations are sufficient to provide a factual basis for each element of the common law defamation claim and inform Defendant of the time, place, medium, and recipient of the alleged defamatory inference, and because the First Amendment does not protect a false connotation of fact, especially if that statement is intentionally implied by a defendant, the Court should deny Defendant's Motion to Dismiss.

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) examines the legal sufficiency of the facts alleged on the face of the plaintiff's complaint and "does not resolve contests surrounding the facts, the merits of the claim, *or the applicability of defenses* . . . . Our inquiry then is limited to whether the allegations constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999) (emphasis added); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (quotation marks and citation omitted). Under Rule 12(b)(6), a motion to dismiss for failure to state a claim should not be granted unless it would be impossible for the plaintiff to prove any set of facts which would support his claim and entitle him to relief. *Brumbaugh v. First Fin. Ins. Co.*, Civil Action No. 2:13-2432, 2015 WL 12817166, at *1 (D.S.C. March 17, 2015).

To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007). Specific facts are not necessary so long as the allegations "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1955). A claim is facially plausible when the factual content allows the court to reasonably infer that the defendant is liable for the misconduct alleged. *Id.* However, "*the pleading standard Rule 8 announces does not require 'detailed factual allegations,*' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (emphasis added). When considering a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007).

## ARGUMENT

The elements of defamation under South Carolina law include: (1) a false and defamatory statement(s) concerning another; (2) an unprivileged publication to a third party; (3) fault on the part of the publisher; and (4) either actionability of the statement(s) irrespective of special harm or the existence of special harm caused by the publication. *Murray v. Holnam, Inc.*, 344 S.C. 129, 139, 542 S.E.2d 743, 748 (Ct. App. 2001). Defendant's arguments encompass the first three elements of Mr. Murdaugh's defamation by implication claim; therefore, the Court should look to Mr. Murdaugh's Amended Complaint to determine if it contains factual allegations, when taken as true, sufficient to allow the Court to reasonably infer that statements implying a false and defamatory meaning were made, that they plausibly were unprivileged publications to a third party,

and that they plausibly were made with at minimum common law malice. *See Addison v. S.C. Dep't of Corrs.*, C/A No. 8:11-2705-CMC-JDA, 2011 WL 5876915, at *2 (D.S.C. Nov. 22, 2011) (stating that in considering a Rule 12(b)(6) motion, the allegations are taken as true and the complaint viewed in the light most favorable to the plaintiff). The Court is permitted to look at materials properly before the Court, such as the contents of Defendant's series, in assessing whether to accept Mr. Murdaugh's allegations as true. *Mungo v. BP Oil, Inc.*, Civil Action No. 2:11-0482-CWH, 2012 WL 13005317, at *3 (D.S.C. Dec. 21, 2012). The Court may also review the claim to consider whether it is limited by the First Amendment. *Rollins Ranches, LLC v. Watson*, Case No. 0:18-cv-03278-SAL, 2021 WL 5355650, at *4 (D.S.C. Nov. 17, 2021).

I.    **Mr. Murdaugh's Amended Complaint contains sufficient factual matter to allege that Defendant defamed him by implication.**

Defendant argues that Mr. Murdaugh is required to identify in his Amended Complaint every single statement in "Murdaugh Murders: Deadly Dynasty" that when taken into consideration in the context of the series would contribute to an implication that he killed Mr. Smith. No decision of this Court or a South Carolina court has demanded such an exhaustive approach to pleading defamation by implication. Defendant fails to recognize that by asserting a cause of action for defamation by implication against Defendant, Mr. Murdaugh is not claiming that any specific statement made during Defendant's series is actionable or defamatory in itself.[1] Instead, Mr. Murdaugh alleges that when taken as a whole, the content of the entire series will be understood, beyond the literal meaning of any specific statement viewed in isolation, to imply an

---

[1] Defendant argues that Mr. Murdaugh has admitted that there are no facially defamatory or actionable statements within the series. This is not true. In explaining that a defamation by implication claim is not actionable because of any specific statements, Mr. Murdaugh has asserted that his claim may be viable even if there are no facially untrue statements. It does not follow *ipso facto* that Mr. Murdaugh is admitting that there are no facially defamatory or untrue statements published or republished by Defendant within the series. For example, the statement that "Buster did it" is facially defamatory, provably untrue, and actionable even if it is a republished rumor. (ECF No. 88-1, p. 15); *see infra* note 7.

actionable, defamatory meaning that Mr. Murdaugh murdered Mr. Smith. Therefore, it should be sufficient that the Amended Complaint has alleged the defamatory meaning implied by Defendant's publications for the purposes of a Rule 12(b)(6) motion, because under a defamation by implication theory the entire series when read as a whole represents its own individual act or statement of defamation. The Court can readily determine that the implication that someone murdered someone else is provably true or false.

This Court has noted that a plaintiff fails to state a claim for defamation if the complaint "does not state with specificity the time, place, medium, and listener of the alleged defamatory statements." *Doe v. Cannon*, No. 2:16-CV-00530-RMG, 2017 WL 591121, at *1 (D.S.C. Feb. 14, 2017) (citing *English Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc.*, No. 97-2397, 172 F.3d 862, 1999 WL 89125, at *3 (4th Cir. 1999) (table) ("in order to plead defamation, a plaintiff should allege specific defamatory comments including 'the time, place, content, speaker, and listener of the alleged defamatory matter'"));[2] *cf. McNeil v. S.C. Dep't of Corr.*, 404 S.C. 186, 195, 743 S.E.2d 843, 848 (Ct. App. 2013) (indicating that a plaintiff must plead every element of defamation with specificity, which could be satisfied by allegations concerning the defamatory meaning of the statement, how the statement was published by the defendant, and/or to whom the statement was made).

Mr. Murdaugh's Amended Complaint contains sufficient factual allegations to put Defendant on notice of the time, place, medium, content, meaning, and listener of the defamatory statement. Mr. Murdaugh's Amended Complaint alleges that on June 17, 2022, Defendant Warner Bros. Discovery, Inc. began streaming and broadcasting Blackfin's "Murdaugh Murders: Deadly

---

[2] To be clear, this not an accurate representation of substantive South Carolina law on defamation or Rule 8, SCRCP. The Court cited an unpublished Fourth Circuit decision, which in turn was citing a District Court for the District of Columbia decision applying District of Columbia law, for this proposition.

Dynasty" throughout the entire country through its streaming platform discovery+ and the Investigation Discovery channel. (ECF No. 86 ¶ 12). It also alleges that statements within segments of the series conveyed a defamatory inference that Mr. Murdaugh killed Mr. Smith, that this inference was published to third parties by streaming and broadcasting, and that the publications were made to hundreds of thousands, if not millions, of subscribers and viewers who watched the series on the Discovery streaming platforms and channels, including viewers in South Carolina. (ECF No. 86 ¶¶ 13, 21-34).

Mr. Murdaugh has alleged that Blackfin published the defamatory content as creator and producer of the series by engaging in series-development, investigation, and filming activities to create a work that would be consumed by South Carolina viewers. (ECF No. 86 ¶ 14). Mr. Murdaugh also has alleged that the series is defamatory in that it "falsely implies and subtly accuses the Plaintiff of being the murderer of Stephen Smith" and that during "a ten-minute segment of the 'Murdaugh Murders: Deadly Dynasty' series, the Plaintiff is alluded to a number of times as the murderer of Stephen Smith." (ECF No. 86 ¶ 12).

The Amended Complaint specifically identifies that the first introductory minute of the first episode introduces numerous themes driving the series' defamatory narrative, including excerpts from the episode. (ECF No. 86 ¶¶ 22-23). It also identifies several sequences further into the episode that reinforce these narratives, providing the runtime and specific language from some of the statements. (ECF No. 86 ¶¶ 24-25). It then goes on to identify numerous audio and video sequences beginning within the first 15 minutes of the series' second episode continuing and building upon these narratives by juxtaposing statements, culminating with a climactic segment of the episode in which Defendant relies upon its arrangement of cherry-picked excerpts from interviews to imply that Mr. Murdaugh killed Mr. Smith due to a previous romantic relationship

between the two, and that Mr. Murdaugh's family covered up the crime. (ECF No. 86 ¶¶ 27-32). The Amended Complaint describes these sequences in detail, including language, graphics, and video from the episode responsible for creating the defamatory inference. Thus, the Amended Complaint clearly identifies the time, place, medium, content of the series, speaker, and listener. Under South Carolina law and federal pleading standards, this should be sufficient under Rule 8 to have put Defendant on notice that Mr. Murdaugh was making a claim for defamation by implication and to have informed it of the basis of Mr. Murdaugh's claim.

Defendant argues that this is not enough to withstand its Motion to Dismiss, and that instead Mr. Murdaugh was required to identify each and every statement responsible for creating the defamatory implication in his Amended Complaint. Again, this argument misunderstands the defamation by implication theory. Mr. Murdaugh's defamation by implication claim is not actionable because of any specific statement within the series. Instead, it is actionable because there is a reasonable defamatory implication that can be gleaned from what otherwise could be truthful statements or opinions within the series, when those statements and opinions are viewed as a whole within the context of the series and its juxtaposition and omission of statements, opinions, and facts. *See Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380, 625 N.Y.S.2d 477, 481, 649 N.E.2d 825, 829-30 (1995) ("'Defamation by implication' is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements."); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13, 20, 110 S. Ct. 2695, 2702-03, 111 L. Ed. 2d 1 (1990) (recognizing that defamation can arise where a statement of opinion reasonably implies false and defamatory facts); 50 Am. Jur. 2d *Libel and Slander* § 161 ("A plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a

way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way.").

Not only does the Amended Complaint specifically identify numerous statements and segments of the series which as a whole create the numerous defamatory inferences regarding Mr. Murdaugh, and how those statements, images, and graphics are juxtaposed with one another, it also identifies information that was purposefully omitted by Defendant which would have detracted from the series' sensational defamatory inference. For example, the Amended Complaint alleges that there are reasonable, innocent explanations for why Mr. Murdaugh's uncle, Randy Murdaugh, would have been in contact with Mr. Smith's family following the incident, in addition to information that was available to Defendant that individuals other than Mr. Murdaugh were persons of interest in the investigation. (ECF No. 86 ¶¶ 19, 30). The Amended Complaint alleges that all of this information was known to Defendant and purposefully omitted because it would have detracted from the scandalous appeal of the series.

There is nothing "scattered" or "cryptic" about these allegations, and the Amended Complaint contains sufficient factual allegations to put Defendant on notice of the narrative themes, statements, graphics, and footage that Defendant has manipulated in its effort to "weave a tapestry of defamation." *See Tannerite Sports LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 251 (2d Cir. 2017); *Block v. Matesic*, Case No. 21-61032-CIV-ALTMAN/Hunt, 2023 WL 8527670, at *10 (S.D. Fla. Dec. 8, 2023). Mr. Murdaugh should not have to specifically allege in his Amended Complaint, line by line, every single statement made in the identified segments of the series that when viewed as a whole create the defamatory inference. *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000) (stating that a plaintiff may bring a defamation by implication claim based on "the entirety of a publication and not merely on individual

statements"); *Daniel v. Home Box Office, Inc.*, Civil Action No. ELH-23-233, 2023 WL 8478867, at \*18 (D. Md. Dec. 7, 2023) (stating that the "statement" in a defamation by implication case was the subject scene in its entirety, as opposed to any individual defamatory statements).

Mr. Murdaugh presumes that Defendant has watched its own series and is familiar with its contents. Defendant does not have to defend against any specific statement; Defendant must defend against the defamatory implication of the series when viewed as a whole. The allegations of the Amended Complaint are sufficient to demonstrate the plausibility of an objective viewer deriving the alleged defamatory inferences from the series. Mr. Murdaugh's Amended Complaint does not contain boilerplate allegations simply reiterating the elements of the defamation cause of action and instead includes factual detail directing Defendant's attention to exactly how Mr. Murdaugh is claiming it defamed him in its publications. On this point, Defendant's Motion to Dismiss should be denied, or Mr. Murdaugh should be granted leave to amend his Amended Complaint to insert the identified transcript segments prior to a dismissal with prejudice.

## II.     **Mr. Murdaugh's claim comports with the First Amendment.**

"The 'application of the state law of defamation' is limited . . . by the First Amendment to the Constitution of the United States." *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 293 (4th Cir. 2008) (quoting *Milkovich*, 497 U.S. at 20, 110 S. Ct. at 2702-03). These limitations apply for the dismissal of statements "that fail to contain a 'provably false factual connotation.'" *Snyder v. Phelps*, 580 F.3d 206, 219 (4th Cir. 2009) (quoting *Milkovich*, 497 U.S. at 20, 110 S. Ct. at 2702). When determining whether Defendant's series is reasonably susceptible of a defamatory implication, the Court must give its language a fair reading in the context of the series as a whole instead of parsing out and evaluating each statement in isolation. *Boone v. Sunbelt Newspapers, Inc.*, 347 S.C. 571, 582, 556 S.E.2d 732, 738 (Ct. App. 2001) ("[T]he intent and meaning of an

15

alleged defamatory statement must be gathered not only from the words singled out as libelous, but from the context; all of the parts of the publication must be considered in order to ascertain the true meaning . . . ."). Defendant argues that the "Murdaugh Murders: Deadly Dynasty" series merely presents opinions, speculation, rumor, and hearsay that cannot be reasonably interpreted as implying that Mr. Murdaugh killed Mr. Smith. However, Defendant fails to recognize that it presents its series, and the narratives concerning Mr. Murdaugh, as supported by false facts or undisclosed factual matter.

A.      **The context and tenor of the "Murdaugh Murders: Deadly Dynasty" series does not suggest that it is merely reflecting subjective and speculative opinions, rumor, and hearsay, and even if every statement contained within it was technically opinion or truth, the publication can still be actionable if when taken as a whole, it implies a defamatory meaning.**

Defendant asserts that the series only expresses subjective views, interpretations, theories, conjecture, and surmise concerning the investigation into Mr. Smith's death. This is not true. As will be discussed in more detail below, the series does not just convey musings on law enforcement's theories surrounding the investigations into Mr. Smiths' death, but instead includes independent commentary and narratives provided by members of the Hampton community, Mr. Smith's family, reporters, and paid "researchers".[3] The series contains numerous statements implying that the community "knew" an investigation into Mr. Smith's death tied to the Murdaugh family would happen, that it was "impossible" Mr. Smith's death was not a homicide, that

---

[3] One of these "researchers" is Gregg Roman. Mr. Roman was also a paid researcher for Parker's Kitchen, a co-defendant of the Murdaugh family in the Mallory Beach litigation. Parker's Kitchen has admitted to running a stealth campaign, using Mr. Roman's research and efforts, against the Murdaugh family, and Mr. Murdaugh in particular, in an effort to absolve itself of blame for the death of Mallory Beach. Will Folks, *'Murdaugh Murders' Saga: Vicki Ward Affidavit Blows Up Boat Crash Conspiracy Case*, FITSNews (Nov. 7, 2022) https://www.fitsnews.com/2022/11/07/murdaugh-murders-saga-vicki-ward-affidavit-blows-up-boat-crash-conspiracy-case/. Mr. Roman appeared in and helped produce the series. Vicki Ward, a producer of the subject series, was also named as a defendant in a lawsuit filed by the Beach family in connection with the alleged conspiratorial campaign, which targeted the Beach family as well as Mr. Murdaugh. *See Beach v. Parker*, 2021-CP-25-00392.

investigators "knew" that something was not right with the ongoing hit-and-run investigation and that Mr. Smith was in fact murdered, and that "Buster did it."[4] (*E.g.*, ECF No. 88-3, pp. 13, 20, 21, 28).

Defendant relies on *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180 (4th Cir. 1998), to argue that its series does not imply the existence of any fact and only expresses subjective views, interpretations, theories, conjecture, and opinion. The facts of *Biospherics* are completely distinguishable from the content of "Murdaugh Murders: Deadly Dynasty" and the nature of Mr. Murdaugh's claim. *Biospherics* is not a defamation by implication case. In *Biospherics*, the plaintiff, a publicly held company, brought a defamation claim against Forbes magazine as a result of a column that stated that the plaintiff's stock was overvalued. *Id.* at 182. The plaintiff specifically identified three statements within the column that it alleged were verifiably true or false, and as such were defamatory. *Id.* at 182, 184.

Here, the distinction between whether any individual statement contained within the series is factual or an opinion means little, because under Mr. Murdaugh's theory of liability, it does not matter if the individual statements are literally true or are speculative opinions, because even if they are Defendant's series can still be defamatory if as a whole it implies a defamatory meaning from those literally true statements and opinions that is provably untrue.[5] *See Chapin v. Knight-*

---

[4] Defendant argues that because the series relies on narrative themes that are composed of factual information to arrive at the conclusion that Mr. Murdaugh is connected to the death of Mr. Smith, the series sufficiently discloses a factual basis from which the audience could draw a conclusion and is therefore not defamatory. (ECF No. 88-1, pp. 26-27). The problem with Defendant's argument is that the identified thematic narratives are not in themselves factually true but instead are assertions of facts that "are either incorrect or incomplete", and Defendant's assessment of the facts in presenting the series' narratives is erroneous. *Milkovich*, 497 U.S. at 18-19, 110 S. Ct. at 2705; *see infra* Section II.B.

[5] Regardless of whether the statements at issue were couched as opinion, opinions may imply an assertion of objective fact. *Milkovich*, 497 U.S. at 18, 110 S. Ct. at 2705. "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Id.; see also Goodwin v. Kennedy*, 347 S.C. 30, 40-41, 552 S.E.2d 319, 325 (Ct. App. 2001) ("In *Milkovich*, the United States Supreme Court rejected the creation of an artificial dichotomy between opinion and fact, holding that the Constitution does

17

*Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) (stating that plaintiff may make a defamation by implication claim when the expressed facts are literally true); *Milkovich*, 497 U.S. at 13, 20, 110 S. Ct. at 2702, 2706 (recognizing that defamation can arise where a statement of opinion reasonably implies false and defamatory facts).

> The South Carolina rule goes further and holds that a demurrer to a complaint (and inferentially a motion for summary judgment) 'will only be sustained where the court can affirmatively say that the publication *is incapable of any reasonable construction which will render the words defamatory*.' Our courts hold that any words which raise a strong suspicion of the plaintiff's guilt in the minds of the hearers are sufficient upon which to base a cause of action for slander or libel. And even stronger, our courts hold that if the words are capable of the offensive meaning attributed to them, then an action for libel or slander lies.

*Adams v. Daily Tel. Printing Co.*, 292 S.C. 273, 279, 356 S.E.2d 118, 122 (Ct. App. 1986) (citation omitted) (emphasis added).

The question is not whether Defendant's published statements assert as a verifiable fact that Mr. Murdaugh killed Mr. Smith, the question is whether a reasonable observer could draw an inference from Defendant's series that Defendant is asserting between the lines that Mr. Murdaugh killed Mr. Smith.[6] Thus, Defendant cannot claim that the series' defamatory inference is opinion as an absolute constitutional defense. *See id.* at 19, 110 S. Ct. at 2706 (stating that publishers cannot avoid liability for defamatory statements simply by couching their implications within a subjective opinion). Instead, the proper analysis for the Court when deciding whether a discrete implication

---

not require a wholesale defamation exemption for anything that might be labeled 'opinion.'"). Therefore, the question for the Court is not whether any statements within the series are opinions but whether the statements could permit the listener to make a reasonable inference that Mr. Murdaugh engaged in specific conduct that is provably false.

[6] Defendant argues that Mr. Murdaugh has "admitted" that a listener of the law enforcement interviews could conclude he was involved in Mr. Smith's death without reference to Defendant's series. (ECF No. 88-1, pp. 36-37, 41). Mr. Murdaugh has not admitted this, although he does note that a listener of Defendant's series, and the heavily editorialized manner in which its interview excerpts are arranged, could make such an inference, whereas if the MAIT report is reviewed alone in its entirety the only reasonable conclusion is that the interview excerpts are based solely on rumor, gossip, and hearsay. (ECF No. 51-2); *see also infra* Section III.A.

18

is constitutionally protected is to determine whether there is any evidence demonstrating that Defendant intended or endorsed the defamatory implication. *Chapin*, 993 F.2d at 1093.

The general tenor of the "Murdaugh Murders: Deadly Dynasty" series is that it is presenting authoritative commentary from those who appear to have first-hand knowledge or direct connections to the Hampton community, the Murdaugh family, and the incidents surrounding Alex Murdaugh and Mr. Smith's death, either by way of close ties to the Murdaugh family or through journalistic research or criminal investigation into the matters. There is no indefinite, loose, figurative, or vague language permeating the series which would negate the impression that Defendant is presenting fact, and in reality, the series is presented by Defendant with considerable gravitas. *See Milkovich*, 497 U.S. at 21, 110 S. Ct. at 2707 (stating that loose, figurative, or hyperbolic language can negate the impression that the writer was seriously intending to express fact).

Additionally, the series contains republications of gossip and hearsay directly accusing Mr. Murdaugh of killing Mr. Smith in explicit as opposed to vague terms.[7] (ECF No. 88-3, pp. 26-30). The entire context and tenor of "Murdaugh Murders: Deadly Dynasty" therefore do not suggest that the series merely reflects Defendant's and/or the interviewees' subjective and speculative suppositions or opinions and instead suggest that the impressions and inferences that can be reasonably be drawn by the audience from the series' depiction of the subject events are factual, truthful, and dead serious. *See Biospherics*, 151 F.3d at 186 (stating that imprecise, casual, "breezy" language is indicative of opinion speech). The series does not merely list a number of potential suspects while leaving it to the audience to decide on its own who killed Mr. Smith; every

---

[7] Under the Restatement, a republisher of a rumor can be liable for its publication just as if it originally published the rumor, even if it states that the statement is only rumor. Restatement (Second) of Torts § 578 cmt. c (Am. Law Inst. 1977); *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1195-96 (10th Cir. 2007).

element of Defendant's narrative themes point directly to the Murdaugh family in general and Mr. Murdaugh specifically. Other than a brief reference to Mr. Murdaugh's deceased brother, the series never identifies any of the other individuals who have been possibly connected or rumored to be connected to Mr. Smith's death. Regardless, whether it would be reasonable for a viewer to derive a defamatory inference from the series is ultimately a question for the jury and not a proper basis for granting a 12(b)(6) motion to dismiss under these facts.

Defendant points to the final comments of an investigator at the end of the segment concerning Mr. Smith, as well as on-screen graphics, as proof that no reasonable viewer could have been left with the impression that the series was purporting to convey factual implications concerning Mr. Smith's death. This includes statements that the South Carolina State Law Enforcement Division was pursuing multiple leads and had not identified any suspects, and that Mr. Murdaugh had not been named a suspect or person of interest. (ECF No. 88-3, p. 35). However, as will be explained in more detail below, when these statements are taken in context with the whole of the series' presentation on Mr. Smith and weighed against the tenor of the entire production, they play directly into and could be reasonably interpreted by the audience as further proof of Defendant's narrative that the Murdaugh family covered up a crime involving Mr. Murdaugh and Mr. Smith or at least influenced its investigation. As will be shown below, one of the themes of the entire "Murdaugh Murders: Deadly Dynasty" series is that you cannot trust the results of any inquiry into the Murdaugh family because of the family's supposed power and desire to cover up the truth. These themes are not presented as subjective theories, conjecture, or surmise, are provably false, are intentionally implied by Defendant as fact without any truthful explanation, are integral narrative-driving concepts behind "Murdaugh Murders: Deadly Dynasty", and therefore they are not afforded special protection by the First Amendment.

**B.     The defamation by implication claim alleged within the Amended Complaint does not exceed First Amendment limitations because the content of "Murdaugh Murders: Deadly Dynasty" can be reasonably interpreted by an objective viewer as implying that Mr. Murdaugh killed Mr. Smith, which is provably false, and Defendant's editorial choices demonstrate that Defendant intended or endorsed the defamatory implication.**

Defendant argues that First Amendment limitations apply because the statements within the series are literally true. However, this argument is irrelevant because the Fourth Circuit has recognized that a defamation by implication claim may be based on literally true statements without violating the First Amendment.

> Moreover, because the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference.

*Chapin*, 993 F.2d at 1092-93.[8] Defamation by implication has a longstanding history in defamation law and arises, not from the specific, literal statements made, but from what is implied when a defendant "(1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication . . . ." Dan B. Dobbs, *Prosser & Keeton on the Law of Torts* § 116 (Supp. 1988); *see also Toney v. WCCO Television, Midwest Cable and Satellite, Inc.*, 85 F.3d 383, 387 (8th Cir. 1996) ("[A] defendant does not avoid liability by simply establishing the truth of the individual statement(s); rather, the defendant must also defend the juxtaposition of two statements or the omission of certain facts."); *Turner*, 38 S.W.3d at 115 ("[T]he meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety

---

[8] Defendant contends that there is no South Carolina or Fourth Circuit law providing that a publication can be defamatory based upon the entire publication and not any specific defamatory statement. (ECF No. 88-1, p. 33). *Chapin* provides that a defendant may be liable for a defamation by implication claim even if "the expressed facts are literally true", i.e., nondefamatory, if the publication as a whole implies a defamatory meaning.

of a publication and not merely on individual statements. Many other courts have likewise recognized that while all the statements in a publication may be true when read in isolation, the publication may nevertheless convey a substantially false and defamatory impression by omitting material facts or suggestively juxtaposing true facts."). The content of "Murdaugh Murders: Deadly Dynasty", when viewed as a whole, reveals that its juxtapositions of statements, graphics, and music, alongside the omissions of certain evidence that would exonerate or reduce the intensity of suspicion cast onto Mr. Murdaugh, not only could reasonably lead a viewer to infer the defamatory meaning, but also serve as affirmative proof that Defendant made purposeful and deliberate choices to edit the series in such a manner as to suggest the inference.[9]

Episode 1 of "Murdaugh Murders: Deadly Dynasty" is entitled "Pandora's Box".[10] The introductory sequence of the episode, which runs for approximately its first minute, introduces numerous themes through the juxtaposed statements of reporters, investigators, and community members which serve to drive Defendant's narrative throughout the remainder of the series. (ECF No. 88-2, pp. 3-4). Four of those themes of particular relevance to Mr. Murdaugh's claims are as follows: (1) Mr. Murdaugh's family is an all-powerful legal dynasty in Hampton with improper influence on local law enforcement and the judicial system, (2) the Murdaugh family has an evil, sinister, depraved, and menacing presence within the Hampton community, (3) the Murdaugh family

---

[9] Defendant argues that the allegation in Mr. Murdaugh's Amended Complaint (ECF No. 86 ¶ 34) setting forth that Defendant intended or endorsed the defamatory innuendo is conclusory and does not include sufficient facts. (ECF No. 88-1, p. 35). Mr. Murdaugh's allegation references his prior allegations detailing Defendant's editorial choices in creating the series, which will be discussed further below. (ECF No. 86 ¶¶ 18-33). These choices serve as prima facie evidence that Defendant intended or endorsed the inference that Mr. Murdaugh was responsible for Mr. Smith's death. At this stage in the proceedings, Mr. Murdaugh cannot factually describe Defendant's editorial process or how its series creators and editors arrived at their decisions, and it would be unfair to expect him to include allegations with such a high level of factual detail prior to discovery.

[10] As noted by Defendant, when reviewing Plaintiff's claim to determine if it comports with the First Amendment, the Court may look to the series itself in assessing whether to take Plaintiff's allegations as true without converting Defendants' Motion to Dismiss into one for summary judgment.

has covered up and will continue to cover up crimes to preserve their family legacy, and (4) the Murdaugh family is somehow connected to the death of a 19-year-old male in Hampton County. This sequence is initiated by the title sequence of the show, which includes an on-screen graphic of "Murdaugh Murders: Deadly Dynasty".

The opening sequence juxtaposes statements such as "Who killed them? Why is this happening to these people?", "This was an incredibly powerful family", "The death of a 19-year-old man which for years had been unresolved, but has now been reopened . . .", "He was murdered. And somebody in Hampton County knows exactly who did it", "Everyone around this guy seems to die", "Your Honor, this is the tip of the iceberg", and "Pandora's Box is open. And the demons are loose." (ECF No. 88-2, pp. 3-4). The juxtaposition of these statements intentionally vilifies the Murdaugh family while never disclosing any facts supporting many of the assertions and thematically sets the stage for Defendant to later encourage the audience to take a logical leap and conclude that Mr. Murdaugh killed Mr. Smith with a baseball bat as a result of a romantic relationship between the two.

Several sequences further on in the episode reinforce the theme that the members of the Murdaugh family hold "incredible power and influence", were guarded by "a great protector", and are never held accountable for their acts because they are covered up by the family and its influence. (ECF No. 88-2, pp. 19-20, 22-24, 30, 40). For example, one sequence approximately 13 minutes into the episode concludes that "[t]here was a sense of invincibility, immunity and impunity around the Murdaugh family . . . . This is just probably going to be swept under the rug *like everything else*."[11] "This family was seen as untouchable." (ECF No. 88-2, p. 20). The first episode also contains statements intended to falsely demonstrate that people in the Hampton community were afraid of the Murdaugh family and that there were sinister and depraved elements within the family's ranks. (ECF

---

[11] This statement itself is facially defamatory in that it asserts the false fact that the Murdaugh family has "swept" its own misconduct and wrongdoing "under the rug" numerous times, "like everything else".

No. 88-2, p. 34). Statements by a researcher and community member imply that other community members were afraid of the Murdaugh family, that the family lacked empathy for others, and that one of the Murdaugh children, Mr. Murdaugh's deceased brother, would "kill little baby animals" and "could kill anyone".[12] (ECF No. 88-2, pp. 34, 35, 42).

Episode 2 of "Murdaugh Murders: Deadly Dynasty" is entitled "Something Wicked This Way Comes." Episode 2 picks up where Episode 1 left off, and within the first fifteen minutes republishes a statement by a community member implying that it was known within the Hampton community ("We all knew this was gonna happen") that Mr. Smith's death was "dirty business" connected to the Murdaugh family. (ECF No. 88-3, p. 13). Around the 14-minute mark, the episode then superimposes on-screen stock footage of virulent, anti-LGBTQ demonstrations while a reporter discusses how difficult it would have been for Mr. Smith to be openly gay in the South. (ECF No. 88-3, pp. 14-15). This sequence foreshadows Defendant's later implication that Mr. Smith's death was the result of his sexual orientation, as well the false thread that will be established by the series' narrative tying Mr. Smith romantically to Mr. Murdaugh solely through hearsay.

The next sequence stitches together interview statements that, when observed by an objective audience member who has watched the preceding parts of the series, could reasonably lead to inferences (1) that the initial investigation, which indicated that Mr. Smith's death may have been caused by a gun-shot wound, was covered up or deliberately bungled, (2) that there was no evidence or possibility his death was the result of a hit-and-run, and (3) that Mr. Smith was killed by a baseball bat.[13] (ECF No. 88-3, pp. 17-21). The sequence also indicates that a former DPS investigator, Michael Duncan, "knew something was not right" from the start.

---

[12] Again, a researcher who was on the payroll of a third-party actively trying to perpetuate a smear-campaign against the Murdaugh family.

[13] A second independent autopsy funded by Mr. Smith's family confirmed that Mr. Smith's death was the result of a hit-and-run after an object attached to a car, such as a side mirror or ladder, struck Mr. Smith in

This is immediately followed by ominous music and an on-screen graphic stating "Someone else is also thinking about Stephen's family." (ECF No. 88-3, p. 21). The series then states that Mr. Murdaugh's uncle, Randy Murdaugh, called the Smith family to see if they needed representation, and that this was "extraordinary." "Why would Randy Murdaugh call Stephen Smith's house, after he's found dead in the road and offer to represent the family?" (*Id.*). The series purposefully omits information that would have been known and is known to the Defendant demonstrating that there would have been a valid basis for such a call because Randy Murdaugh represented Mr. Smith's father in a worker's compensation claim, as well as information demonstrating that Randy Murdaugh did not initiate any call to begin with.[14]

A graphic then appears on the screen announcing, "Duncan suspects he is being surveilled." (ECF No. 88-3, p. 22). The series then publishes statements from DPS investigator Michael Duncan stating that he believed that he was being followed whenever he would travel into Hampton to investigate Mr. Smith's death by "law enforcement, some other agency, or – or some group . . . ." (*Id.*). At this point, the only logical inference from these statements, in light of the themes that have been presented to the audience thus far in the series and Mr. Duncan's previous interview excerpts, is that ill-intentioned forces have been assembled by the Murdaugh family to prevent or frustrate the investigation into Mr. Smith's death.

_____

the head as the vehicle was passing him at a high speed. The autopsy also concluded that Mr. Smith was walking in the middle of the road at the time of his death, and that the collision was not intentional. Audrey Conklin, *Buster Murdaugh's classmate Stephen Smith died in hit-and-run with large skull fracture: pathologist*, Fox News (Dec. 1, 2023 4:00 a.m.), https://www.foxnews.com/us/buster-murdaugh-classmate-stephen-smith-died-hit-run-large-skull-fracture-pathologist. It is undisputed that Mr. Smith was not killed by a gunshot wound. The SCDPS Incident Report and initial autopsy report (ECF No. 51-2 pp. 5, 7, 45-50, 101-02) indicate that Mr. Smith was killed by blunt force trauma, and debris collected from Mr. Smith's shirt, shorts, and shoes included metallic blue paint chips possibly consistent with automotive paint. The idea that Mr. Smith was shot originated with a Hampton County elected official. (*Id.* at 101).

[14] Angenette Levy, *Grand jury empaneled in death of Stephen Smith after Murdaugh case leads to renewed investigation: Attorney*, Law & Crime (June 16, 2023, 5:51 pm), https://lawandcrime.com/high-profile/grand-jury-empaneled-in-death-of-stephen-smith-after-murdaugh-case-leads-to-renewed-investigation-attorney/.

All of the above-described sequences, excerpts, and statements from the series prime the recipient for the next segment of the series, in which Defendant's creative editorialization of a number of excerpts from interviews conducted by law enforcement, in conjunction with the former statements, implies that Mr. Murdaugh was responsible for the death of Mr. Smith, that there would be no conviction because his family would cover it up due to its powerful influence, that the Murdaugh family would do it to preserve its reputation and legacy, and that Mr. Murdaugh and Mr. Smith were in a romantic relationship preceding his death. (ECF No. 88-3, pp. 25-33). During this sequence, the series depicts side-by-side images on the screen of Mr. Murdaugh and Mr. Smith, with the image of Mr. Murdaugh purposefully arranged such that it appears he is looking in Mr. Smith's direction and laughing. "But then, later on, it just kept coming up, Murdaughs, Murdaughs, Murdaughs. And then everything was just, like, swept under the rug." (ECF No. 88-3, p. 34). All of the recorded statements in this sequence are unfounded, solely based on rumor, or are completely false. The entirety of the above-described statements cannot be parsed out and analyzed individually in a vacuum to determine whether they are capable of conveying a defamatory inference, and instead, they must all be read together, within the context of the entire series, to ascertain the defamatory meaning of the series as a whole.[15]

The facts before this Court distinguish this action from the facts in *Chapin*. As noted above, the series contains numerous statements implying that the community "knew" an investigation into Mr. Smith's death tied to the Murdaugh family would happen, that it was "impossible" Mr. Smith's death was not a homicide, that investigators "knew" that something was not right with the ongoing investigation and that Mr. Smith was murdered, and that "Buster did it." (ECF No. 88-3, pp. 13,

---

[15] Although Defendant has argued that Mr. Murdaugh has claimed that an "unspecified" segment of the series defamed him (ECF No. 88-1, p. 20), the above-described video and audio citations should be sufficient for Defendant and the Court to identify the segments the series Mr. Murdaugh claims are defamatory.

20, 21, 28). Contrary to Defendant's argument, "Murdaugh Murders: Deadly Dynasty" very much speaks in certainties and suggests wrongdoing on the part of Mr. Murdaugh. It does not raise questions as to who may have been involved in the death of Mr. Smith, then decline to answer them. More importantly, Defendant's series *never* advances any of the available alternative answers that would in any way have been favorable to Mr. Murdaugh, and therefore it ultimately adopts only one answer as correct: the inference that Mr. Murdaugh killed Mr. Smith.

Early on, the series establishes four narrative threads, through its juxtaposition and omission of statements, that all point to and support the false implication that Mr. Murdaugh killed Mr. Smith, then purposefully raises questions which are easily answered if the audience simply follows the threads that have been previously established by Defendant. However, these themes themselves are not supported by any facts that are complete or accurate (although the tenor and substance of Defendant's themes certainly implies that they are asserting facts and are supported by underlying facts, for example, that Mr. Smith was killed by a baseball bat extended from a moving vehicle), and in essence build unsubstantiated implications upon implications in arriving at the final implication that Mr. Murdaugh killed Mr. Smith. And Defendant cannot absolve itself of liability by displaying 15 seconds of simple disclaimers indicating that law enforcement has not formally identified any suspects or substantiated any allegations at the end of an 18-minute narrative that continually seeks to convince the audience that the Murdaugh family, and Mr. Murdaugh specifically, were involved in Mr. Smith's death. If anything, Defendant's disclaimers only reinforce the narrative built by Defendant throughout the series that if a member of the Murdaugh family commits a crime it will be "swept under the rug".

The basis of Mr. Murdaugh's defamation by implication claim lies in the juxtaposition of statements insinuating and asserting that Mr. Murdaugh had a romantic relationship with Mr.

Smith, with statements insinuating that the Murdaugh family attempted to cover up the alleged murder of Mr. Smith, with republished rumors that Mr. Murdaugh killed Mr. Smith, alongside the omission of information that individuals other than Mr. Murdaugh were more likely linked to the death of Mr. Smith. The Amended Complaint's allegations concerning these statements are sufficient to put Defendant on notice as to how an ordinary viewer could interpret its series as accusing Mr. Murdaugh of killing Mr. Smith. To the extent that the Court finds that Mr. Murdaugh has not sufficiently alleged in his Amended Complaint that the series can be reasonably understood to impart the false innuendo, Mr. Murdaugh reiterates his request to amend his Amended Complaint.

III.  **Mr. Murdaugh has sufficiently stated a South Carolina common law defamation claim.**

Next, Defendant essentially argues that Mr. Murdaugh has not pled a valid defamation claim under South Carolina law because there is no false defamatory implication, because he has not pled common law malice, and because the series is privileged. South Carolina law recognizes that defamation by implication, or defamation by innuendo, is a valid theory of liability. *See Leask v. Robertson*, 589 F. Supp. 3d 506, 525 (D.S.C. 2022) ("While *Chapin* may not be directly applicable, the court recognizes that South Carolina law similarly recognizes defamation by implication."). "Defamation may also be accomplished through inference, implication, innuendo or insinuation, as well as through direct reference." *Neloms v. Charleston Cnty. Sch. Dist.*, Case No. 2:18-cv-00316-DCN-MGB, 2019 WL 6092279, at *13 (D.S.C. June 19, 2019). Mr. Murdaugh has adequately pled all the elements of South Carolina's common law defamation cause of action to plausibly state a claim for relief.

A.  **Mr. Murdaugh has adequately pled a false and defamatory meaning that was conveyed by the "Murdaugh Murders: Deadly Dynasty" series.**

28

If there is a dispute regarding the truth of the defamatory statement, it is question for the jury to determine. *Weir v. Citicorp Nat'l Servs., Inc.*, 312 S.C. 511, 515, 435 S.E.2d 864, 867 (1993). Additionally, "[t]he publication of a statement is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Fleming v. Rose*, 350 S.C. 488, 494, 567 S.E.2d 857, 860 (2002). "It is the trial court's function to determine initially whether a statement is susceptible of having a defamatory meaning." *Lane v. Hilton Worldwide, Inc.*, Civil Action No. 6:11-2288-TMC-KFM, 2012 WL 1191648, at *3 (D.S.C. Feb. 28, 2012), *report and recommendation adopted*, 2012 WL 1192065 (D.S.C. Apr. 10, 2012) (internal quotation marks and citation omitted). "The Court will not hunt for a forced and strained construction to put on ordinary words, but will construe them fairly, according to their natural and reasonable import, in the plain and popular sense in which the average reader naturally understands them." *Timmons v. News & Press, Inc.*, 232 S.C. 639, 644, 103 S.E.2d 277, 280–81 (1958). "It is, therefore, proper to allege and prove *the meaning* claimed to have been intended and conveyed . . . ." *Id.* (citation omitted).

Additionally, a defamation by implication claim is not vulnerable to the substantial truth doctrine:

> These cases represent the converse of the substantial truth doctrine . . . . Just as the substantial truth doctrine precludes liability for a publication that correctly covey's a story's "gist" or "sting" although erring in the details, these cases permit liability for the publication that gets the details right but fails to put them in the proper context and thereby gets the story's "gist" wrong.

*Turner*, 38 S.W.3d at 115. Unfortunately, in this case, Defendant not only gets the story wrong, it also purposefully misrepresents the details in order to drive public interest, and consequently, its own profits.

As discussed above in Mr. Murdaugh's First Amendment analysis, the statements in "Murdaugh Murders: Deadly Dynasty" regarding the Murdaugh family, Mr. Murdaugh, and Mr. Smith, when read together, plausibly convey an inference that would tend to harm Mr. Murdaugh's reputation or lower it in the estimation of the community. Mr. Murdaugh has sufficiently pled that the statements indeed had such an effect, and Defendant cannot seriously contend that if "Murdaugh Murders: Deadly Dynasty" could be understood to reasonably imply that Mr. Murdaugh killed Mr. Smith that such a meaning would not cause harm to Mr. Murdaugh's reputation. The Amended Complaint alleges that the series implies that Mr. Murdaugh is the murderer of Mr. Smith. (*See generally* ECF No. 86). It also alleges that this defamatory meaning is false. (*Id.*). Even under a heightened plausibility pleading standard, this is sufficient to adequately allege that the series conveyed a false and defamatory meaning.

By omitting key facts and falsely juxtaposing others to create the appearance that there were no other persons of interest in Mr. Smith's case, that Mr. Murdaugh's family was surreptitiously trying to interfere with the investigation, that Mr. Murdaugh's family had covered up Mr. Smith's death and other crimes, and that Mr. Murdaugh was in a romantic relationship with Mr. Smith, the series' misleading account of the events surrounding Mr. Smith's death implicates Mr. Murdaugh in a manner that a substantially true and accurate account would not have done, rendering the series both false and defamatory. If the Court deems that more factual specificity is necessary to demonstrate how a false and defamatory meaning could be inferred from the series' statements, Mr. Murdaugh reiterates his request for the Court to permit him to Amend his Amended Complaint prior to a dismissal with prejudice.

**B.** **The Amended Complaint adequately alleges that the statements are unprivileged, and even if some of the statements would be within the fair report privilege, the Amended Complaint adequately alleges that the privilege would be overcome due to Defendant's reckless indifference to Mr.**

**Murdaugh's rights and the unfair and biased manner in which the statements are presented.**

To the contrary of Defendant's arguments, every statement within the "Murdaugh Murders: Deadly Dynasty" series relevant to Mr. Murdaugh's defamation by implication claim would not be protected by the fair report privilege. Numerous relevant statements within the series are not in any way concerned with the actual contents of the law enforcement investigation that followed the death of Mr. Smith. However, assuming that the fair report privilege does apply to all relevant statements within the series, Mr. Murdaugh has sufficiently alleged that the privilege would be overcome because Defendant's conduct was in reckless disregard of the truth, and that the scope of the privilege was exceeded because Defendant's "reporting" was unfair and biased in that Defendant deliberately chose to omit or downplay information known to Defendant that was not favorable to the prevailing themes of the series and its sensational "reporting". (ECF No. 86 ¶ 18).

Defendant asserts that the Court should apply New York law in this case because New York's fair report privilege is absolute, while South Carolina's fair report privilege is qualified. Defendant's reasoning is that the Court should apply New York law because it is where Defendant is incorporated and has its principal place of business. "A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits, including the state's choice-of-law rules." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 599-00 (4th Cir. 2004). Under traditional South Carolina choice of law principles, the substantive law governing a tort action is determined by the law of the place of the wrong, *lex loci delicti*. *Lister v. NationsBank of Delaware, N.A.*, 329 S.C. 133, 143, 494 S.E.2d 449, 456 (Ct. App. 1997). In other words, the substantive law is determined by the state in which the injury occurred. *Bannister v. Hertz Corp.*, 316 S.C. 513, 515, 450 S.E.2d 629, 630 (Ct. App. 1994).

31

There is no South Carolina case law examining in which state an injury occurs when an in-state plaintiff is harmed by a defamatory publication broadcast nationally by a foreign defendant. However, the prevailing view of other jurisdictions adhering to *lex loci delicti* appears to be that in multi-state defamation actions, the place of the wrong is where the plaintiff was domiciled at the time the defamatory statements were made.

> Under *lex loci delicti*, the law of the place where the injury occurred, rather than the place where the act was committed, determines the substantive rights of the parties. The place of publication is the place of harm. Here, Defendants' statements were published (at least) in both New York and Georgia, but the place of Plaintiffs' reputation clearly is with the publications in Georgia.

*Adventure Outdoors, Inc. v. Bloomberg*, Civil Action No. 1:06-CV-2897-JOF, 2007 WL 9735875, at *3 (N.D. Ga. Dec. 18, 2007) (citations omitted). *See also Hatfill v. Foster*, 415 F. Supp. 2d 353, 364-65 (S.D.N.Y. 2006) (discussing application of *lex loci delicti* to choice of law questions for multi-state defamation and holding that place of greatest harm is where plaintiff is domiciled); *Nunes v. Cable News Network, Inc.*, 31 F.4th 135, 141 (2nd Cir. 2022) (holding that under Virginia law, the place of the wrong when a defamatory publication causes reputational harm in several states is the place where plaintiff was domiciled). Mr. Murdaugh is domiciled in South Carolina. Accordingly, the law of South Carolina applies to Defendant's assertion of the fair report privilege.

Under South Carolina law, the fair report privilege is a qualified privilege that protects reports of judicial and other governmental proceedings without incurring liability. *See Jones v. Garner*, 250 S.C. 479, 487, 158 S.E.2d 909, 913 (1968) ("Fair and impartial reports *in newspapers* of matters of public interest are qualifiedly privileged."). The scope of the privilege is limited to fair, impartial, and unbiased accounts of the particular proceeding or record. *West v. Morehead*, 396 S.C. 1, 8, 720 S.E.2d 495, 499 (Ct. App. 2011). Therefore, the fair report privilege "extends only to a report of the contents of the public record and any matter added to the report by the

publisher, which is defamatory of the person named in the public records, is not privileged." *Jones*, 250 S.C. at 487, 158 S.E.2d at 913. The privilege, if applicable, may be overcome if it is abused. *West*, 396 S.C. at 7, 720 S.E.2d at 499. A qualified privilege may be overcome when the plaintiff can show that the defendant acted with common law actual malice. *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, 334 S.C. 469, 484, 514 S.E.2d 126, 134 (1999). "To prove actual malice, the plaintiff must show . . . that the statements were published with such recklessness as to show a conscious disregard for plaintiffs rights." *Id.*

As stated, South Carolina's fair report privilege arguably does not protect Defendant. Defendant has not argued that it is a news organization. *See Tharp v. Media General, Inc.*, 987 F. Supp. 2d 673, 685 (D.S.C. 2013) (stating that the fair report privilege shields "news organizations"). Additionally, it is undisputed that the privilege would not protect any matter added to the contents of the MAIT investigation by Defendant, including its own editorialization of the file's contents as well as interviews with reporters, researchers, law enforcement, and Hampton residents, which is actually what comprises the entirety of the "Murdaugh Murders: Deadly Dynasty" series. *See id.* at 685-86 ("The Court agrees with Plaintiff and finds that the fair report privilege is inapplicable to the instant case in which the disputed publications publish information originally based upon their own investigation and interviews, rather than a government report or action."). In fact, the defamatory sequences of "Murdaugh Murders: Deadly Dynasty" never directly mention or allude to any of the contents of the MAIT case notes or incident report other than playing heavily edited excerpts from MAIT interviews.

Regardless of whether the privilege applies or does not, the question of whether or not the privilege has been abused cannot be properly considered by the Court on Defendant's Motion, which solely challenges the sufficiency of the allegations of Mr. Murdaugh's Amended Complaint

and has not been converted into a motion for summary judgment. "The fair [report] privilege may therefore be considered on a Rule 12(b)(6) motion only in the limited circumstance where a court is able to find that a winning claim of privilege is clearly evidenced on the face of the plaintiff's complaint." *Tharp v. Media General, Inc.*, Civil Action No. 4:11-cv-1819-TLW, 2011 WL 13142634, at *2 (D.S.C. Oct. 21, 2011) (citing *Eastern Shore Market's, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 185 (4th Cir. 2000)).

Mr. Murdaugh has sufficiently alleged that the series is not fair, impartial, and unbiased because Defendant has selectively omitted certain information from its reporting that was known to Defendant, including information that was known to Defendant indicating that other individuals may have been responsible for Mr. Smith's death, and because Defendant has purposefully juxtaposed factual and untruthful statements and assertions in such a manner as to suggest that Mr. Murdaugh is the only person who could have killed Mr. Smith. (ECF No. 86 ¶ 18). Mr. Murdaugh has also asserted this as a factual basis for his allegation that Defendant acted with common law malice, i.e., with reckless disregard for the truth.[16] (*Id.* at ¶ 19). Because Mr. Murdaugh has alleged facts legally sufficient to support that the privilege has been abused or exceeded, the Court should deny Defendant's Motion to Dismiss, or in the alternative, permit Mr. Murdaugh to amend his Amended Complaint to include more specific factual detail prior to a dismissal with prejudice.

**C.     The Amended Complaint adequately alleges that Defendant acted with common law malice.**

---

[16] An appendix submitted in support of Defendant's previously filed Motion to Dismiss contains the MAIT report, which lists numerous other individuals who were potential suspects or persons of interest in Mr. Smith's death that are never mentioned by Defendant in the series, including individuals whose involvement is supported by non-hearsay evidence, as well as evidence that the incident was a hit-and-run, and not a homicide. (ECF No. 51-2, pp. 29-30). This includes documentation that an individual other than Mr. Murdaugh allegedly confessed to striking and killing Mr. Smith with his vehicle on the night Mr. Smith was found, which was also never addressed by Defendant's series. (*Id.* at 29).

Defendant contends that the Amended Complaint does not include a single factual allegation relating to any specific Defendant's state of mind. As a private figure, Mr. Murdaugh will only be required to plead and prove common law malice in this case. *See Erickson v. Jones Street Publishers, LLC*, 368 S.C. 444, 466, 629 S.E.2d 653, 665 (2006). The Amended Complaint alleges that even after Defendant had information indicating that other individuals unrelated to Mr. Murdaugh were responsible for Mr. Smith's death, Defendant failed to include this information in its series and by omission created the inference that Mr. Murdaugh is the only person who could be responsible for Mr. Smith's death. (ECF No. 86 ¶¶ 18-19). The Amended Complaint alleges that Defendant purposefully omitted other information that would have offered reasonable explanations for certain questions raised by Defendant in its series, and that Defendant purposefully omitted this information because it would have detracted from the inference that Mr. Murdaugh killed Mr. Smith. (ECF No. 86 ¶ 30). The Amended Complaint alleges that Defendant's publications were therefore made with reckless indifference to the truth, i.e., Mr. Murdaugh's rights.[17,18] (*Id.* at ¶ 19). At this early stage in the proceedings, these allegations should be sufficient to plausibly allege common law malice under Rule 12(b)(6).[19] *See Potter v. FIA Card Servs., N.A.*, No. 2:12-CV-1722-RMG, 2012 WL 13005806, at *2 (D.S.C. Sep. 28, 2012) (denying motion to dismiss defamation claim where defendant had reason to know its statements were false).

---

[17] Defendant argues that this is an "improper group pleading" and that "by lumping together the states of mind of multiple organizations and with respect to all Defendants *en masse*, the Amended Complaint fails to provide sufficient notice of any facts demonstrating reckless indifference to the truth or knowledge of falsity of any of the individual defendants." (ECF No. 88-1, p. 38). Defendant fails to recognize that this allegation builds upon the prior individualized allegations of the Amended Complaint, which specifically set forth the editorial choices made by each separate individual Defendant demonstrating that each Defendant, for different specific factual reasons, chose to willfully ignore any facts that were unfavorable to the defamatory narratives they were creating in their own respective productions.

[18] Common law malice means the defendant acted recklessly or with conscious indifference of the plaintiff's rights. *Padgett v. Sun News*, 278 S.C. 26, 32, 292 S.E.2d 30, 34 (1982).

[19] Mr. Murdaugh further incorporates his arguments regarding "group pleading" from his response to Warner Bros. Discovery, Inc. and Warner Media Entertainment Pages, Inc.'s Motion to Dismiss.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss, or in the alternative, permit him to amend his Amended Complaint prior to a dismissal with prejudice.

KENT LAW FIRM, LLC

/s/ Shaun C. Kent
Shaun C. Kent, Federal Bar #9326
Post Office Box 117
Manning, SC  29102
(803) 433-5368
shaun@shaunkentlaw.com

May 16, 2025
Manning, South Carolina